## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | |
| Plaintiffs, | |
| v. | Case No. 25 Cv 12174 |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | Judge |
| Defendants. | |

## COMPLAINT FOR EMERGENCY, DECLARATORY, AND INJUNCTIVE RELIEF

### Introduction

1.      The American people, regardless of where they reside, should not live under the threat of occupation by the United States military, particularly not simply because their city or state leadership has fallen out of a president's favor. To guard against this, foundational principles of American law limit the president's authority to involve the military in domestic affairs. Those bedrock principles are in peril. Secretary Hegseth, on October 4th, invoked 10 U.S.C. § 12406 to federalize and bring under Department of Defense control up to 300 members of the Illinois National Guard, over the objection of the Governor of Illinois ("Federalization Order"), and, on October 5th, another up to 400 National Guard from the State of Texas to deploy into Chicago

("Texas Mobilization Order"). These advances in President Trump's long-declared "War" on Chicago and Illinois are unlawful and dangerous. The Court should enjoin the Federalization Order, Texas Mobilization Order, and any subsequent effort to achieve the same end with the National Guard of the United States or other U.S. military, immediately and permanently.

2. At the Pentagon on September 30, 2025, Trump pitched his plan to use American soldiers to punish his political enemies to hundreds of United States military leaders. He told them that they must prioritize "defending the homeland" against the "invasion from within" in American cities run by "radical-left Democrats," specifically including Chicago. He stated his intention to use our neighborhoods "as training grounds for our military."[1]

3. This is just the most recent in months of threats by Trump, Secretary of the Department of Defense Peter Hegseth, Secretary of the Department of Homeland Security Kristi Noem and others in the Trump administration—threats that are entirely unrelated to circumstances in Illinois or the needs of federal law enforcement.

4. In one example that received significant news coverage, on September 6, 2025, Trump posted on social media an image of the Chicago skyline in flames, stating "Chicago about to find out why it's called the Department of WAR," including a depiction of himself in the image of the fictitious warmonger character Lt. Col. Kilgore from the 1979 film *Apocalypse Now*, titling the post "Chipocalypse Now."

5. To the extent that Defendants have offered any basis at all to deploy the military to Illinois, it is based on a flimsy pretext: protests outside a two-story ICE processing facility in Broadview, a suburb of Chicago with less than 8,000 residents. But far from promoting public

---

[1] The transcript is available at https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-defense-leaders-quantico-september-30-2025/.

safety in the Chicago region, Defendants' provocative and arbitrary actions have threatened to undermine public safety by inciting a public outcry.

6.    Among other things, Trump and Noem have sent a surge of SWAT-tactic trained federal agents to Illinois to use unprecedented, brute force tactics for civil immigration enforcement; federal agents have repeatedly shot chemical munitions at groups that included media and legal observers outside the Broadview facility; and dozens of masked, armed federal agents have paraded through downtown Chicago in a show of force and control. The community's horror at these tactics and their significant consequences have resulted in entirely foreseeable protests. In response to those protests, local and state law enforcement agencies, including the Broadview Police Department, the Cook County Sheriff's Office, the Illinois State Police, and others, have been deployed to Broadview to maintain the peace. And ICE continues to operate the facility to process the hundreds of individuals it has detained in recent weeks. There is no legal or factual justification for Defendants' Federalization Order.

7.    Defendants' deployment of federalized troops to Illinois is patently unlawful. Plaintiffs ask this court to halt the illegal, dangerous, and unconstitutional federalization of members of the National Guard of the United States, including both the Illinois and Texas National Guard. Because this federalization is patently pretextual and baseless, Defendants cannot satisfy any of the three prerequisites for involuntarily federalizing any of the National Guard of the United States under 10 U.S.C. § 12406. Not only have the defendants acted outside the authority of 10 U.S.C. § 12406, but their conduct also violates the Posse Comitatus Act, the Administrative Procedure Act, and, of paramount concern, several provisions of the U.S. Constitution.

8.    The Trump administration's illegal actions already have subjected and are subjecting Illinois to serious and irreparable harm. The deployment of federalized National Guard,

including from another state, infringes on Illinois's sovereignty and right to self-governance. It will cause only more unrest, including harming social fabric and community relations and increasing the mistrust of police. It also creates economic harm, depressing business activities and tourism that not only hurt Illinoisians but also hurt Illinois's tax revenue. Illinois asks this Court to declare these actions unlawful and enjoin them, immediately as well as permanently.

9.     For these and other reasons discussed below, Defendants' actions should be declared unlawful and preliminarily and permanently enjoined.

### Jurisdiction and Venue

10.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this matter arises under the Constitution, laws, or treaties of the United States.

11.     This Court may provide the requested relief because there is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 702, 704-706, and the Court's equitable powers.

12.     Venue lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

### Parties

13.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief legal officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* 15 Ill. Comp. Stat. 205/4.

14.     Plaintiff City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

15.     Defendant Donald J. Trump is the President of the United States of America. He is the Commander-in-Chief of the United States' armed forces, including state National Guard units when under federal control. He is sued in his official capacity.

16.     The United States Department of Homeland Security (DHS) is a cabinet agency in the Executive Branch of the federal government. DHS's primary functions are preventing the entry of terrorists and their weapons into our country; securing borders, territorial waters, ports, terminals, waterways, and air; carrying out the immigration enforcement functions vested by the Immigration and Naturalization Act, as well as establishing national immigration enforcement policies and priorities; and administering customs laws. 6 U.S.C. § 202. U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) are each component agencies within DHS.

17.     Defendant Kristi Noem is the Secretary of DHS. As Secretary, Defendant Noem is responsible for all actions taken by the agency. She is sued in her official capacity.

18.     Defendant United States Department of Defense (DoD) is a cabinet agency in the Executive Branch of the federal government. DoD is responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control.[2]

19.     Defendant Peter Hegseth is the Secretary of Defense. As Secretary, defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

---

[2] On September 5, 2025, President Trump signed Executive Order 14347, entitled "Restoring the United States Department of War," purporting to assign "Department of War" as the secondary chosen name for the Department of Defense. However, this Complaint will refer to the agency by its statutory name, the Department of Defense, as only Congress is vested with the authority to change the name of cabinet-level executive agencies, and it made no change.

20.     Defendant United States Army (Army) is the primary land service branch of the United States military. The Army is a component of DOD, which is a cabinet agency in the Executive Branch of the federal government.

21.     Defendant Daniel P. Driscoll is the Secretary of the Army. He is the leader of the Army and is responsible for all actions taken by the Army. He is sued in his official capacity.

## Legal Background

### I.     The National Guard

22.     The modern National Guard originates from the longstanding tradition of organized local militias. During the Constitutional Convention, the founders recognized the importance of militias. But they disagreed about who should control them. Federalists advocated for centralized control by the federal government; anti-Federalists advocated for state authority.

23.     The debate was resolved by a compromise reflected in the Militia Clauses of the United States Constitution. These clauses provide Congress with the authority "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions" and "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." U.S. Const. art. I, § 8, cls. 15. But the clauses "reserve[e] to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." *Id*. art. I, § 8, cls. 16.

24.     States generally maintained control over local militias throughout the remainder of the eighteenth and nineteenth centuries. It was not until Congress enacted the Militia Act of 1903 that the federal government began to assert greater control over these militias, which the statute officially named the "National Guard." Pub. L. No. 57-33, § 3, 32 Stat. 775.

25.     Federal control over the National Guard increased during the twentieth century, culminating in the "Total Force Policy" announced by the Department of Defense in the 1970s. Under this policy, the National Guard was incorporated into the military reserve.  Later, in the 1990s, the National Guard further transitioned from a reserve force to an operational unit that could be quickly activated and readily utilized in any major conflict.

26.     In recent years, the National Guard has been deployed in a wide variety of missions, ranging from providing emergency assistance during natural disasters to serving abroad in military campaigns in Iraq and Afghanistan.

27.     Today, members of the National Guard may serve in one of three capacities: State Active Duty status, Title 10 status, and Title 32 status.

28.     First, members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. When natural disasters occur in Illinois, for example, Governor Pritzker frequently authorizes the Illinois National Guard to engage in relief efforts.

29.     Second, members of the National Guard may be "federalized" and serve in what is known as "Title 10" status. Under 10 U.S.C. § 12406, for example: "Whenever (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States; the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws."

30. Critically, the statute requires that an order for Title 10 deployment "shall be issued through the governor[.]" 10 U.S.C. § 12406. Therefore, Illinois National Guard members may serve in "Title 10" status only with the approval of the Governor. Once these National Guard members have been "federalized," they are, for all purposes relevant here, legally equivalent to members of the federal armed services. In that posture, National Guard members serve federal missions under federal command and control.

31. Third, members of the National Guard may serve in a hybrid status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." Although National Guard members serving in Title 32 status serve federal missions, they remain under the command and control of their home state's governor. *E.g.,* 32 U.S.C. § 328(a), (c); *see* 10 U.S.C. § 12401; *United States v. Hutchings*, 127 F.3d 1255, 1258 (10th Cir. 1997).

32. One crucial distinction between National Guard members deployed in Title 32 and those deployed in Title 10 status is that only members deployed in Title 10 status are "federalized" and functionally equivalent to members of the federal armed services. As members of the federal armed services, National Guard members deployed in Title 10 status are subject to the Posse Comitatus Act, which generally forbids military service members from participating in civilian law enforcement activities.

## II.    The Posse Comitatus Act

33. The United States has a deeply rooted "'traditional and strong resistance of Americans to any military intrusion into civilian affairs.'" *United States v. Dreyer*, 804 F.3d 1266,

8

1272 (9th Cir. 2015) (quoting *Laird v. Tatum*, 408 U.S. 1, 15 (1972)). This tradition is reflected in the Third Amendment to the United States Constitution, which prohibits quartering of soldiers and in other provisions ensuring civilian control of the military. *Id.*; U.S. Const. amend. III. The Illinois Constitution also explicitly provides that "The military shall be in strict subordination to the civil power." Ill. Const. Art. XII, § 2.

34.     This tradition is also reflected in the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, which prohibits use of the military to enforce civilian laws.

35.     Congress first codified this principle in 1878, enacting the precursor to the modern PCA to bring to an end to the use of federal troops to enforce the law in the former rebel states of the south once civil government had been re-established. *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988), *aff'd*, 924 F.2d 1086 (D.C. Cir. 1991).

36.     The current version of the PCA makes it a felony to use the military "as a posse comitatus or otherwise to execute the laws," unless such use is "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

37.     Reinforcing the PCA is the Congressional directive of 10 U.S.C. § 275, commanding the Secretary of Defense to "prescribe such regulations as may be necessary" to ensure that any military support of civilian law enforcement activity "does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity" unless specifically authorized by law. *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619, at *29 (N.D. Cal. Sept. 2, 2025) (enjoining National Guard actions executing the law because they would violate the PCA, "including but not limited to engaging in arrests, apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants").

38. National Guard members who have been called into federal service under 10 U.S.C. § 12406 are subject to both the PCA and the regulations promulgated under 10 U.S.C § 275. *See* 10 U.S.C. 12405 ("Members of the National Guard called into Federal service are, from the time when they are required to respond to the call, subject to the laws and regulations governing the Army or the Air Force . . ."); Department of Defense Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies ("DODI 3025.21") (applicable to federalized National Guard members) and Enclosure 3 (prohibiting military participation in e.g., arrests, apprehension, stop and frisk, crowd control).

39. 10 U.S.C. § 12406 does not contain any express authorization from Congress for the National Guard to engage in domestic law enforcement, including civil immigration enforcement.

40. The National Guard troops, when federalized, are legally the same as U.S. military, and operate under the Department of Defense rules. Department of Defense guidance provides instructions regarding the civilian law enforcement tasks, including direct assistance, that are not allowed to be carried out by the U.S. military (including National Guard members federalized under Title 10). DODI 3025.21.

41. Those Department of Defense instructions cover a broad swath of law enforcement tasks and make clear that the directive of October 4 cannot lawfully be carried out by federalized national guard troops. In particular, the Federalization Order and preceding memoranda and statements identify policing protesters and crowd control functions that are squarely within the Department of Defense's own definition of prohibited civilian law enforcement by a U.S. military member. DODI 3025.21, encl. 3, ¶ 1.c.(1).

42.     Similarly, the Immigration and Nationality Act (INA), which prescribes who may execute immigration warrants and conduct immigration searches, arrests, and interrogation, makes no provision for any member of the military or the National Guard to participate in these activities. *See* 8 U.S.C. §§ 1357(a), (g); 8 C.F.R. §§ 287.5(a), (c)–(e). Nor do members of the military or National Guard receive the training required by the INA to qualify them to carry out these activities. 8 C.F.R. §§ 287.5(c)(1)–(4),  (c)(5)(ii), (d), (e)(1), (e)(3), (e)(4).

**Factual Allegations**

## I.     Defendants Have a Long History of Animus towards Chicago and Illinois

43.     President Trump has long directed threatening and derogatory statements towards the State of Illinois, the City of Chicago, and its leaders.

44.     The supposed current emergency is belied by the fact that Trump's Chicago troop deployment threats began more than ten years ago. In a social media post from 2013 Trump writes "we need our troops on the streets of Chicago, not in Syria."

45.     As President, Trump would go on to characterize Chicago in October 2019 as "the worst sanctuary city in America" that "protects criminals at a level few could even imagine," and further claiming that "Afghanistan is a safe place by comparison."

46.     In the spring and summer of 2020, when the killing of George Floyd by Minneapolis police sparked nationwide protests and civil disturbances, President Trump derided "the radical-left wing mobs that you see all over in some of the cities," specifically citing Chicago and "so many different places that are run by Liberal Democrats."

47.     Three years ago, in 2022, Trump was between his presidential terms.  In two separate speeches that summer, Trump shared his plans for Chicago, stating in July 2022 that the "next president needs to send the National Guard to the most dangerous neighborhoods in

11

Chicago." He reiterated that point at the August 2022 CPAC speech, saying that the problem was "these cities that were run by Democrats going so bad so fast."

48.     While running for his current term as President, Trump continued to demonize cities where Democrats had been elected as leaders. On August 20, 2024, he said that "cities…almost all are run by democrats…you can't walk across the street to get a loaf of bread. You get shot, you get mugged, you get raped, you get whatever it may be . . . ."

49.     Since retaking office on January 20, 2025, Trump issued several executive orders intended to deter states and localities from implementing or keeping "sanctuary" policies or laws—laws that preclude components of state or local governments from participating in federal *civil* immigration enforcement in various ways.

50.     Those "sanctuary"-targeting Executive Orders, each issued earlier in 2025, were: Executive Order 14159, Protecting the American People Against Invasion; Executive Order 14218, Ending Taxpayer Subsidization of Open Borders; and Executive Order 14287, Protecting American Communities from Criminal Aliens.  All focus on defunding state and local "sanctuary jurisdictions," including by claiming that "sanctuary" jurisdictions "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," and by accusing them of undertaking a "lawless insurrection." Executive Order 14287 ¶ 4.

51.     From the Trump administration's comments before and after these Executive Orders, it was clear that they were meant to target, among others, the State of Illinois and City of Chicago, which have laws making clear their non-participation in federal *civil* immigration enforcement.

52.     In 2017, Illinois passed the TRUST Act, 5 ILCS 805/15, which sets a "[p]rohibition on enforcing federal civil immigration laws." It was signed into law by Bruce

Rauner, then-Governor of Illinois, a Republican. Ill. Pub. Act 100-463 (eff. Aug. 28, 2017). In 2021, Illinois enacted amendments to the TRUST Act, known as the Way Forward Act, that expanded the limits on participation by state and local law enforcement in federal civil immigration enforcement. Ill. Pub. Act 102-234 (eff. Aug. 2, 2021).

53. The City of Chicago Welcoming City Ordinance also generally prohibits local Chicago law enforcement and other government participation in federal *civil* immigration enforcement activities. Chicago Mun. Code § 2-173.

54. In 2022, the Seventh Circuit held that the TRUST Act, as amended by the Way Forward Act, was "a permissible exercise of the State's broad authority over its political subdivisions within our system of dual sovereignty." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 585 (7th Cir. 2022).

55. Soon after the "sanctuary jurisdiction" EO of Trump's second term, the Trump administration filed suit against the State of Illinois, City of Chicago, Cook County, and others, seeking to invalidate their immigration-related laws. The United States alleged that the laws created national security and public safety threats posed by noncitizens and violated the U.S. Constitution. *United States v. Illinois*, No. 25 CV 1285 (N.D. Ill.) (filed Feb. 6, 2025) As explained below, a federal district court in Chicago dismissed that lawsuit in July 2025. *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688, at *27 (N.D. Ill. July 25, 2025).

56. In addition to issuing EOs ordering defunding of "sanctuary" jurisdictions, and suing the Plaintiffs and others, Trump made public statements threatening them, including on April 10, 2025, falsely claiming they protect criminals and calling them "Death Traps":



57.     On April 18, 2025, Stephen Miller, White House Deputy Chief of Staff for Policy and the Homeland Security Advisor leveled the accusation that "Sanctuary cities shield criminal illegal aliens from removal." Although not a lawyer, he opined that "these cities are engaged in systemic criminal violations and that they are engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of America." Miller specifically cited Chicago, along with Los Angeles and Boston, saying the cities were "waging war against the very idea of nationhood."

58.     In accordance with the president's effort to defund sanctuary cities, the Trump administration, acting through various federal agencies, has sought to assert a sweeping entitlement to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Illinois and other states to agree to cooperate with federal immigration enforcement activities as a condition for receiving billions of dollars in federal funding.

59.     For example, beginning in March 2025, the U.S. Department of Homeland Security and its sub-agencies, including Federal Emergency Management Agency ("FEMA"), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless Illinois and other states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

14

60.     Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Illinois law allows, Illinois, with other states, brought suit to challenge those coercive conditions. *State of Illinois v. Federal Emergency Management Agency*, 25-cv-00206 (D.R.I.) (filed May 13, 2025). In September 2025, the court granted summary judgment to the states, holding among other things that those conditions violated the Constitution and were tantamount to "economic dragooning." *Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277, at *14 (D.R.I. Sept. 24, 2025).

61.     Illinois and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dept. of Transportation*, 25-cv-00208 (D.R.I.) (filed May 13, 2025) and the U.S. Department of Justice, *New Jersey v. U.S. Dept. of Justice*, 25-cv-00404 (D.R.I.) (filed August 18, 2025).

62.     The funding for Illinois jeopardized by these coercive actions by the Trump administration totals over $2 billion. Those funds are critical to the state's service to its residents and used by Illinois to maintain state and local roads and bridges, protect against and respond to natural disasters, and provide emergency shelter to crime victims and conduct sexual assault forensic exams, among other things.

63.     In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary jurisdictions" around the country. It accused them of "shamefully obstructing" the Trump administration's deportation plans and "shielding dangerous criminal aliens." Fox News Channel 32 Chicago accurately characterized the list as an escalation of "efforts to penalize states and cities that limit cooperation with federal immigration authorities."

15

64.     However, days later, based on widespread news reporting as early as June 1st, that first sanctuary jurisdiction list was gone.  As reported, very soon after publishing the list, the Trump administration faced objections from Republican stronghold jurisdictions that found themselves on the list.  The Department of Homeland Security quickly and quietly removed the list from the website where it had been posted.

65.     Then on July 25, 2025, the federal district judge presiding over the United States' lawsuit regarding Illinois's, Chicago's and Cook County's immigration-related laws and policies dismissed the case.  *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688, *27 (N.D. Ill. July 25, 2025). In concluding that there was no claim for the United States to pursue, the court held that "the Sanctuary Policies reflect [Illinois's, Chicago's and Cook County's] decision to not participate in enforcing civil immigration law—a decision protected by the Tenth Amendment and not preempted by the INA. Finding that these same Policy provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment. It would allow the federal government to commandeer States under the guise of intergovernmental immunity— the exact type of direct regulation of states barred by the Tenth Amendment." *Id.*

66.     Less than two weeks later, the Trump administration posted a new version of its sanctuary jurisdiction target list.  That August 5, 2025, publication shortened the list from about 500 to just 35 jurisdictions.  The new sanctuary "jurisdiction" list targeted twelve states (including Illinois, California, and Oregon), the District of Columbia, eighteen cities (including Chicago), and four counties (including Cook County).

67.     Although DOJ stated its intention in pressuring "sanctuary jurisdictions" was to "compel compliance with federal law," in reality the administration's efforts sought to impermissibly force sovereign states like Illinois to disavow their own laws and subjugate

themselves to the political whim of the Trump administration. The August 5 publication specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."

68.     Days later, on August 8, 2025, Noem on behalf of DHS appeared at a press conference in a suburb near Chicago and continued the pressure on Plaintiffs to change their laws.

69.     Specifically, defendant Noem stated that she was in Illinois because "elected leaders in this State of Illinois are ignoring the law" and being "obstructionists when it comes to getting dangerous criminal off of their streets." She specifically named Governor Pritzker and Mayor Johnson as examples of who she was claiming "worked so hard to protect these dangerous criminals," saying "they'd rather be a sanctuary state and continue to put those individuals above American citizens."

70.     On August 13, 2025, defendants' coercive conduct regarding state law continued. That day, Attorney General Bondi sent letters to 32 of the 35 jurisdictions on the August 5 list, including Governor Pritzker for Illinois, and Mayor Johnson for Chicago. The letters contended that "sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."

71.     Bondi's August 13 letters further stated that, to ensure full cooperation in federal immigration enforcement efforts, "the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law." The letters did not include any specifics regarding any particular law(s), nor did they reflect any

recognition of prior court rulings holding the state laws valid. The letter demanded a response by August 19, 2025.

72.     This letter from Attorney General Bondi followed Trump's deployment of troops to Los Angeles in June and Washington D.C. in early August, both jurisdictions on the Trump administration's "sanctuary jurisdictions" list.

73.     On August 19, Governor Pritzker's office replied in a letter that reiterated the state's adherence to its own laws, including the TRUST Act, and reminded the U.S. Attorney General that federal courts had rejected the Trump administration's legal challenges to those laws.[3]

74.     Three days later, on August 22, 2025, during an Oval Office appearance to announce the 2026 FIFA World Cup draw, Trump stated that Chicago would be the next target for a military deployment as part of a federal crime crackdown. Trump stated at that event: "Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."

75.     On August 25, Trump referenced again plans for a federal military deployment in Chicago, stating "We go in, we will solve Chicago within one week, maybe less. But within one week, we will have no crime in Chicago, just like we have no crime in D.C." He also made a social media post criticizing Chicago and Mayor Johnson and stating the desire to bring the national guard D.C. playbook to Chicago:

---

[3]     Letter from A. Spillane to P. Bondi (Aug. 19, 2025), *available at* https://www.politico.com/f/?id=00000198-cc6b-da96-abff-de6f2c310000.



76.     On August 29, 2025, on behalf of the Trump administration, Stephen Miller stated that "the highest degree of national security and public safety concern are in sanctuary cities," such that the President would be "prioritizing enforcement in these sanctuary jurisdictions as a matter of public safety and national security."

77.     When asked specifically about the administration's plans for Chicago, Miller said that "this administration is committed to the eradication of organized street violence . . . as one of our top public safety objectives" and referenced "homegrown" threats as well as "foreign criminal cartels."  Miller then made the outrageous and outlandish accusation that, "the Democrat party as an institution at every level—its judges, its lawyers, its community activists, and its politicians— exist to serve these criminal thugs."

78.     That same day, August 30th, Trump posted on Truth Social unsupported crime statistics about Chicago and threatened that Governor Pritzker with federal forces, stating: "Six people were killed, and 24 people were shot, in Chicago last weekend, and JB Pritzker, the weak

and pathetic Governor of Illinois, just said that he doesn't need help in preventing CRIME. He is

CRAZY!!! He better straighten it out, FAST, or we're coming! MAGA. President DJT[.]"

79.     Less than an hour later, Trump posted on Truth Social that "nothing can stop what

is coming:"



80.     On September 1st, Trump again claimed that Chicago and Illinois, along with Los

Angeles, New York and Baltimore, should "work with" the Trump administration like in D.C.,

where the National Guard were deployed over the Mayor's objection, and then Plaintiffs could be

"A CRIME FREE ZONE."

81.     The next day, September 2nd, in the Oval Office, Trump made clear that he planned

to deploy National Guard troops to Chicago.   Trump was asked, "Have you decided you're

definitely going to send National Guard troops to Chicago?"

82.     In response, Trump criticized Governor Pritzker on crime, saying that, in "three

weeks, he's lost almost 20 people, killed," and calling Chicago "a hellhole" worse than

"Afghanistan."  When pressed with the follow up question, "Have you made your mind up on

Chicago though?," Trump answered, "We're going in. I didn't say when, we're going in."

83.     Trump's social media posts on September 2nd continued his pronouncements, including a Truth Social post that falsely stated that "CHICAGO IS THE MURDER CAPITAL OF THE WORLD!"



84.     Another post by Trump that same day also falsely called Chicago the "worst and most dangerous city in the World, by far."  The post stated that Governor "Pritzker needs help badly," and claimed Trump would "solve the crime problem fast, just like I did in DC."

85.     The next day, September 3rd, Trump repeated his Oval Office promise that "We're going into Chicago!" in a fundraising email to his supporters:





86.     On September 6, 2025, the President shared on social media an image of himself dressed as a military officer from the film *Apocalypse Now*, rebranded as, "Philocaly's Now." The post riffed on a line from the film in which a character celebrated using napalm on a Vietnamese village, writing "I love the smell of deportations in the morning..." Referring to the announcement by Trump and defendant Hegseth a day earlier that they would rebrand the Department of Defense

as the "Department of War," the post also threatened that "Chicago about to find out why it's called the Department of WAR."



87.     Two days later, on September 8, defendant DHS announced, "Operation Midway Blitz," and stated that ICE "will target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets."

88.     The Trump administration then sent Chicagoland the same federal immigration enforcement teams that had perpetrated workplace and other public raids in Los Angeles earlier in 2025.  Those raids caused injuries and unconstitutional detentions, along with mass panic and protest.

89. The federal law enforcement teams sent to Chicago were led by same DHS leadership from those Los Angeles, Customs and Border Protection Commander of Operations Gregory Bovino. Many were from Custom and Border Protection's Office of Field Operations' Special Response Team (SRT), a specialized tactical unit analogous to SWAT.

90. Although DHS claimed the "blitz" was to nab "the worst of the worst criminal illegal aliens in Chicago," in reality the focus of the agents was warrantless *civil* immigration arrests, not criminal arrests using criminal warrants. Although conducting arrests for civil offenses, many agents were filmed using violent arrest tactics.

91. Nearly immediately, the brute force tactics had foreseeably harmful consequences. For example, on the morning of September 12, 2025, in Franklin Park, Illinois, two of these DHS agents shot and killed a longtime area resident and father, following an attempted warrantless vehicle stop. The victim had just dropped off his toddler at daycare. DHS immediately put out a statement putting the blame on the victim, which quickly was contradicted by witness videos.

92. Citizens already had expressed concern about ICE agent tactics, but the killing of an unarmed man, along with a perceived cover-up and lack of accountability, increased community ire.

93. The Chicago area federal immigration operation involves the use of the ICE Processing Center on Beach Street in Broadview, Illinois, a suburb of Chicago. The modest, two-story ICE facility is used to process immigrants who are subject to detention or removal under U.S. immigration laws. The facility is not designed for holding detainees overnight, but reports that detainees are being held there improperly drew community attention.

94. Small demonstrations began taking place outside the ICE facility months ago, particularly a twice-weekly religious gathering and prayer vigil.

24

95.    Following the September "blitz" and particularly the killing of the local father, protests outside Broadview became larger and more regular.  Even so, the protests have been small, most often with fewer than 100 people, including significant attendance by clergy, media, and local elected officials.  On September 12, in the morning, between 80 and 100 protestors assembled outside the ICE facility in Broadview.  Initially, the crowd was singing and chanting. Some of them had small musical instruments. The crowd that morning included several older individuals and individuals using wheelchairs and canes. Broadview Police officers were also on the scene.

96.    At around 10:00 a.m. that morning, 20-30 federal agents parked their vehicles in the parking lot on the opposite side of the street from the facility and began to walk across the street toward the ICE facility.  The agents were dressed in camouflage tactical gear and had masks covering their faces. According to the Broadview Police Chief in a sworn declaration, "September 12 was the first day that I recall seeing federal agents on scene dressed in that manner. It was a very noticeable shift in my mind."

97.    As agents approached, masked and dressed in tactical gear, the tone of the crowd of protestors changed. The crowd grew louder and began to press closer to the building. Broadview Police officers positioned themselves on the public way, between the 1930 Beach Street building and the crowd, attempting to keep the crowd on the public way and off of the DHS property. When the masked, camouflaged federal agents went into the building, the crowd calmed down, and Broadview Police officers relocated to the outer perimeter of the crowd.

98.    Also, that day, federal agents with long guns appeared on the roof of the facility. Throughout that day, the crowd of protestors loudly chanted, and some individuals stood in the driveway to the building as ICE vehicles attempted to enter and exit the premises, transporting detainees. ICE assembled their own Special Weapons and Tactics (SWAT) team or Special

Reaction Team (SRT) to respond to the protestors. ICE agents intermittently grabbed people, physically moving them out of the driveway leading into the parking lot of the ICE facility. DHS at some point began to use tear gas and pepper spray against the crowd.

99. That scene has recurred outside the ICE processing facility in Broadview, with DHS agents consistently appearing armed, in tactical gear and masked, including several on the rooftop, regularly deploying chemical munitions at protestors, along with other abusive tactics.

100. According to the sworn statement of the Broadview police chief who witnessed this conduct daily, the "use of chemical agents by federal agents at the ICE facility in Broadview has often been arbitrary and indiscriminate. At times it is used when the crowd is as small as ten people. The deployment of chemical agents is dangerous to the health of both demonstrators and first responders on the scene. In addition, when ICE agents deploy chemical agents, it causes the crowd of protesters to disperse, sometimes running into the road, which is dangerous both for them and for motorists. Broadview police officers have had to attempt to position themselves in a way that directs the crowd to disperse in a safe manner. Over the course of my career in law enforcement, the way in which federal agents have indiscriminately used chemical agents in Broadview is unlike anything I have seen before."

101. The Mayor of Broadview sent DHS a letter on September 26, demanding they cease and desist that conduct. She decried the "relentless deployment of tear gas, pepper spray, mace, and rubber bullets" by DHS agents against protesters. She wrote that ICE's response to protesters exercising their First Amendment rights outside the Broadview facility is "endangering nearby village residents" and harming Broadview's police and firefighters. "In effect, you are making war on my community," she wrote. "And it has to stop."

102.    The same day, ICE Acting Director Todd Lyons wrote back to the Mayor of Broadview.  Lyons threatened Mayor Thompson and suggested that ICE's behavior was retaliatory for Broadview's compliance with Illinois' TRUST Act, stating: "[f]ailure to help provide relief [to ICE agents from protest activities] makes you a party to the obstruction of justice . . . The only siege in Broadview is the one being waged against the United States government. You can either continue to be part of the problem or choose to be part of the solution by directing your police to enforce local ordinances and working with us to remove violent offenders."

103.    According to a sworn statement by the Broadview Police Chief, the next morning, Saturday, September 27, Bovino and several CBP agents came to the Broadview Police station. They told the Broadview Police that the DHS agents would bring a "shitshow" to Broadview that weekend, including that they would be increasing deployment of chemical arms, such as tear gas and pepper spray.

104.    As it had promised, DHS continued to employ those tactics outside Broadview, including indiscriminately using those weapons on peaceful protesters, members of the media, and legal observers.  Late on Sunday morning, September 28, 2025, a CBS News Chicago reporter stated that she was alone, driving her truck to the facility, when a masked federal agent shot a pepper ball at her from about 50 feet inside the fence. There were no protests or protesters on scene at the time.  The attack caused the chemical agent to fill the inside of her truck, leaving white residue on her windshield and causing her face to feel "on fire for at least the last 10 minutes or so," as well as causing her to vomit.

105.    The Broadview Police Department now has an open criminal investigation into the chemical munitions attack by an as-yet-unidentified ICE or CBP agent at the Broadview facility.

106.    As this DHS show of force in Broadview was escalating, CBP appeared in tactical gear with large weapons in hand around the City of Chicago. On September 25, 2025, Greg Bovino, head of the CBP operations in Chicago, led a small fleet of "Border Patrol" boats downtown on the Chicago River, with officers armed with semi-automatic rifles. Photographs in the local news showed the boats passing the upscale Riverwalk, in the area of the Trump Tower:



107.    The CBP boats were seen again on the Chicago River in the following days, seemingly doing nothing more than eponymous showboating.

108.    However, the day after the Border Protection's first unimpeded river fleet cruise, DHS executed a memo expressing an urgent need for support in Illinois from the "Department of War." Specifically, on September 26, DHS requested from DoD 100 troops to protect ICE facilities in Illinois with "immediate and sustained assistance" because of a fictional "coordinated assault by violent groups . . . actively aligned with designated domestic terror organizations . . . ." DoD's National Guard Bureau informally made this request to Illinois for its National Guard troops on September 27, which Illinois refused the following day.

109.    Two days after this request, on Sunday, September 28, around 100 DHS agents, dressed in militaristic tactical gear and carrying semi-automatic rifles, patrolled the Chicago

28

business district near Millenium Park and Michigan Avenue. They positioned themselves in large groups on major pedestrian thoroughfares in tourist and commercial areas.



110.    Following that provocative display of heavily armed DHS resources and, because of their conduct against protestors, including use of chemical munitions, Illinois State Police ("ISP") became involved in coordinating public safety measures at the Broadview facility.

111.    At the request of Broadview Police Department ("BPD"), on October 2, 2025, the ISP, the Cook County Sheriff's Office, the Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency, engaged to form a joint operation outside the Broadview ICE facility. This included putting barricades in place around a street near the facility to establish designated free speech protest areas off of the public road and a few blocks from the ICE facility. It also included staffing the location with ISP troopers.

112.    On October 3rd, 2025, Kristi Noem, the United States Secretary of Homeland Security, orchestrated a visit to the Broadview facility designed to provoke those who could hear or see the visit. Throughout this visit, rather than avoiding the protesters, Secretary Noem and her entourage, including Bovino, entered areas congested with protesters, even when there were alternative routes that would have avoided those areas.

29

113.    Defendant Noem was videotaped speaking to assembled DHS agents about protestors outside of the ICE facility in which she stated: "Today, when we leave here we're going to go hard. We're going to hammer these guys that are advocating for violence against the American people . . . we're going to go out there and we're going to make sure that there's consequences for the way that they're behaving and that we're going to prosecute them" Noem's comments about protestors "advocating for violence against the American people" are unsupported by public reports, and appear to conflate the First Amendment-protected speech of protestors with political violence.

114.    Noem then introduced Bovino, who began his speech saying, "It's roll up time here, state instrument is a hard power, you're going to be put into full effect." Although at that time demonstrators were confined to a free speech area blocks from the ICE facility, and managed by ISP and local police, Bovino called demonstrators an "unsafe crowd." He further stated, "we're going to roll them all the way out of here, and when they resist what happens? They get arrested. So it's now going to be a free arrest zone . . . I'm giving them one warning . . . They're getting it here as soon as we leave."

115.    Subsequently, Secretary Noem's motorcade, in a large armored, tactical vehicle known as a BearCat, exited the facility through an entrance congested with protesters, rather than the alternative, which was not. She then proceeded to an area with protesters on all sides and exited the vehicle.  Because she affirmatively went to the protest area, the U.S. Secret Service was required to extend the protective perimeter, resulting in federal agents engaging with protesters and prompting ISP involvement. There was no legitimate purpose under federal law for this conduct by defendant Noem.

116.    At the protests that day outside Broadview, ISP and local police made a total of five arrests.  Upon information and belief, federal agents also made arrests.  Despite the provocative actions of Noem and DHS, the actions of protestors were managed with a routine law enforcement response.

117.    During this period, the Trump administration's decrying of Illinois and its leadership continued.  A September 26, 2025, White House press release, titled "Democrats' Unhinged Crusade Against ICE Fuels Bloodshed" listed dozens of federal, state and local political figures who had made statements critical of ICE's activities, including many Illinois elected officials: Governor Pritzker, Chicago Mayor Brandon Johnston, Rep. Robin Kelly, Rep. Delia Ramirez, and Rep. Nikki Budzinski.

118.    The release falsely called these officials' protected First Amendment speech part of "a wave of Radical Left terror" and a "battle cry for violence."  This allegation of "terror" to describe Democratic elected officials exercising their free speech rights seemed intended to connect with Trump's September 22nd Executive Order, Designating ANTIFA as a Domestic Terrorist Organization.

119.    On September 26, the White House issued National Security Presidential Memorandum 7, which similarly characterized political opposition to ICE and criticisms of fascism and authoritarianism as violent incitement and terroristic activity.

120.    A few days later, on September 30 at the Pentagon, Trump and Hegseth addressed a gathering of about 800 top military leaders.  Trump took the opportunity again to attack Chicago, stating: "You know, the Democrats run most of the cities that are in bad shape. We have many cities in great shape too, by the way. I want you to know that. But it seems that the ones that are run by the radical left Democrats, what they've done to San Francisco, Chicago, New York, Los

Angeles, they're very unsafe places and we're going to straighten them out one by one." He went on to say, "And this is going to be a major part for some of the people in this room. That's a war too. It's a war from within."

121. Trump then stated that he had informed defendant Hegseth, "we should use some of these dangerous cities as training grounds for our military National Guard, but military, because we're going into Chicago very soon." Defendant Hegseth has now taken formal action to do so.

## II.     The Trump Administration's Unlawful Deployment of National Guard

122. The first formal step of the deployment at issue in this complaint occurred on that same day, September 26, 2025, with a memo from DHS to DoD ("September 26 DHS memo" or "DHS memo").

123. Presumably referring to the ICE facility in Broadview, the DHS memo asked DoD for 100 troops to protect ICE "facilities" in Illinois with "immediate and sustained assistance" because of a purported but fictional "coordinated assault by violent groups . . . actively aligned with designated domestic terror organizations . . . ."

124. The DHS memo was sent by email directly to a member of the Illinois National Guard (ILNG) on September 29, 2025. The DHS memo specifically requests troops for the task of "mission security in complex urban environments[,]" stating that the troops "would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures."

125. No next step occurred with respect to Illinois for another week, as the Trump administration appeared to focus on ordering the federalization of Oregon's National Guard, as described further below.

126.    Then, the morning of October 4th, the Adjutant General of the Illinois National Guard, General Rodney C. Boyd, received by email a formal memorandum from the National Guard Bureau of the U.S. Department of Defense ("October 4, 2025 National Guard Bureau Memo" or "National Guard Bureau Memo"). The National Guard Bureau Memo and email at 10:23 a.m. that morning, bore the subject, "Request for Illinois National Guard Federal Protection Mission." It stated: "I am writing to inform you that the President has directed the mobilization of at least 300 members of the Illinois National Guard (ILNG) to protect federal personnel, functions, and property in Illinois." It provided no further information about the specifics of the intended deployment, nor any order or memorandum from the President.

127.    The National Guard Bureau memo further explicitly stated that if the "request" for 300 troops was not acceded to within two hours, defendant Hegseth would federalize and deploy under Title 10 status as many Illinois National Guard troops as he chose. Specifically, it stated: "Due to the circumstances and immediate nature of this requirement, if ILNG forces are not mobilized under Title 32 in the next 2 hours, the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code." The National Guard Bureau memo offered thanks for support in an "emergent situation," without providing any legal citation or factual support.

128.    The National Guard Bureau memo further stated: "If your Governor agrees to a Title 32 mobilization of the ILNG, we will work with the Department of Homeland Security and other federal officials to coordinate mission details with you. To be clear, we believe time is of the essence and failure to mobilize sufficient forces quickly to address the situation may risk lives and property damage. I respectfully request that you inform me immediately if your Governor is unable or unwilling to mobilize the ILNG under Title 32 to perform the necessary protective functions."

33

Governor Pritzker's office received no direct request or memorandum from any of the defendants regarding a Title 32 National Guard mobilization request at any time.

129.    General Boyd responded to the National Guard Bureau memo in the early afternoon by email, stating: "The Governor will not call National Guard troops into Title 32 status. There is no public safety need or other emergency requiring the National Guard and, therefore, the Governor objects to the federalization of the National Guard."

130.    The evening of October 4, General Boyd received a memorandum from defendant Hegseth, purporting to call Illinois National Guard into federal service pursuant to 10 U.S.C. § 12406 (the "Federalization Oder"). The Federalization Order, purporting to overrule the objection of the Governor of Illinois to bring Illinois's National Guard into the service of the Trump administration, had only two paragraphs, as shown below.



**SECRETARY OF WAR**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

OCT - 4 2025

MEMORANDUM FOR THE ADJUTANT GENERAL, ILLINOIS NATIONAL GUARD
THROUGH: THE GOVERNOR OF ILLINOIS

SUBJECT: Calling Members of the Illinois National Guard into Federal Service

On October 4, 2025, the President of the United States called forth at least 300 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations.

This memorandum further implements the President's direction. Up to 300 members of the Illinois National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

131.    The memo's only language indicating its basis for invoking Section 12406 was its purpose to "protect [ICE], Federal Protective Service, and other U.S. Government personnel who are performing federal functions, including the enforcement of Federal law, and to protect Federal

property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." It provided no information about either the "threat assessments" or "planned operations" referenced in the memorandum, or the basis for the assertion that violent demonstrations would be "likely" based on either. Its only citation to authority of any kind is its reference to unspecified "President's direction."

132.     The Federalization Order from defendant Hegseth neither cited nor attached any order from the President invoking Section 12406, as required by law.

133.     On October 5, General Boyd of the Illinois National Guard learned of and received another memorandum, purporting to invoke Section 12406 to federalize national guard troops from the State of Texas into Illinois and Oregon ("the Texas Mobilization Order").  The Texas Mobilization Order was an undated memorandum from defendant Hegseth that, similar to that issued the prior weekend in Oregon, referenced the June 7 Presidential memorandum that had been used as support for the federalization of California's National Guard months prior.

134.     The Texas Mobilization Order stated that, on October 4, 2025, "the President had determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations throughout the United States."  It purported to authorize, pursuant to 10 U.S.C. § 12406, up to 400 Texas National Guard troops for an initial period of 60 days, subject to extension, "to perform federal protection missions where needed, including in the cities of Chicago and Portland."

135.     Despite referencing an October 4, 2025 Presidential determination as the basis for its action, the Texas Mobilization Order provided no order from the President for the extraordinary

action. The State of Illinois learned from a credible source that the physical deployment of the Texas National Guard troops to Illinois was planned for the following day, October 6th.

## III. The Trump Administration's Wave of Domestic Troop Deployments

136. Defendants' unlawful deployment of the Illinois National Guard, over the objection of the state, is similar to the unlawful course of conduct they have taken against other disfavored states and cities. Prior to the Federalization Order and Texas mobilization order regarding deployment in Illinois, defendants federalized National Guard troops in California, Washington, D.C., and Oregon over the objection of each of their leaders. No circumstances in any of these jurisdictions warranted federalization of troops under Section 12406, but each has "sanctuary" laws, Democratic leadership, and has been the subject of Trump's taunts about "crime." Each of them, including Chicago and Illinois, is being targeted for this harmful and coercive conduct by defendants.

137. In his first troop deployment in Los Angeles, Trump's federalization of the California National Guard on June 7, 2025, followed by only one day the beginning of aggressive immigration enforcement activity in the vicinity. The immigration enforcement tactics inspired community outrage and protest response. President Trump's June 7 authorizing memorandum to defendants Hegseth, Noem, and Bondi cited 10 U.S.C. § 12406 as legal authority for federalizing the California National Guard and claimed, as his factual basis, violence, disorder, and damage to federal property, as follows:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property.

36

138.    California challenged that deployment in court.  On September 2, 2025, the federal court in California found that the Trump administration had "instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act."  *Newsom v. Trump*, 3:25-cv-04870-CRB, 2025 WL 2501619, at *43 (N.D. Cal. Sept. 2, 2025), *appeal docketed*, No. 25-5553 (9th Cir. Sept. 3, 2025).  That decision is now stayed while on appeal.

139.    With California National Guard two months into their Los Angeles area deployment, on August 11, the Trump administration's focus turned to Washington, D.C.  At a press conference at the White House that day, President Trump announced the planned deployment of the D.C. National Guard into the district to "to rescue our nation's Capitol from crime, bloodshed, bedlam and squalor and worse."  He called it "liberation day in DC," and said, "we're gonna take our Capitol back."

140.    At the same briefing, defendant Hegseth announced that day that National Guard troops would be deployed in D.C. to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles.  The Trump administration deployed National Guard troops from D.C. and seven other states into that city.

141.    On September 4, 2025, the District of Columbia sued the Trump Administration for violating various statutes as well as the U.S. Constitution. D.C. alleged that, among other harms, the "encroachment of National Guard troops in the District has also already caused harm to public safety in the District." Compl. at. ¶¶ 129-30, *District of Columbia v. Trump*, No. 25 C 3005 (D. D.C. Sept. 4, 2025).

142.    On September 28, 2025, the Trump administration announced the federalization of the Oregon National Guard over the Oregon Governor's objection. With a two-paragraph cover memo, only one paragraph of which even regarded Oregon, the "Secretary of War" sent a "MEMORANDUM FOR THE ADJUTANT GENERAL, OREGON NATIONAL GUARD THROUGH: THE GOVERNOR OF OREGON" with the "SUBJECT: Calling Members of the Oregon National Guard into Federal Service[.]"

143.    The first paragraph of the September 28 memorandum to Oregon's Adjutant General referenced the June 7 memo that had been used for federalizing the California National Guard, and it attached that June 7 memo.

144.    In remarkable similarity to the October 4 memorandum received by Illinois, the September 28 Oregon memorandum stated only directives without any specific basis for the federalization of the Oregon National Guard, as follows:

> This memorandum further implements the President's direction. 200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

145.    Oregon promptly filed suit to prevent this unlawful conduct.  On October 4, 2025, a federal district court granted Oregon's motion for a temporary restraining order and held that plaintiffs in that case were "likely to succeed on their claim that the President's federalization of the Oregon National Guard exceeded his statutory authority under 10 U.S.C. § 12406 was *ultra vires*", and also exceeded the President's "constitutional authority and violated the Tenth Amendment." *Oregon v. Trump*, No. 3:25-cv-1756-IM, at 16 (D. Or. Oct. 4, 2025).

38

146.    The Oregon court recognized that, "This case involves the intersection of three of the most fundamental principles in our constitutional democracy. The first concerns the relationship between the federal government and the states. The second concerns the relationship between the United States armed forces and domestic law enforcement. The third concerns the proper role of the judicial branch in ensuring that the executive branch complies with the laws and limitations imposed by the legislative branch. Whether we choose to follow what the Constitution mandates with respect to these three relationships goes to the heart of what it means to live under the rule of law in the United States." *Id.* at 2.

147.    On these questions, the court concluded that: "this country has a longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs . . . . This historical tradition boils down to a simple proposition: this is a nation of Constitutional law, not martial law. Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation." *Id.* at 30.

148.    However, even as that court entered its temporary restraining order against the defendants on October 4, 2025, the Trump administration ordered the redeployment of hundreds of the federalized California National guard troops from California to Oregon, without the consent of the Governor of Oregon.  The Texas mobilization order also seeks to send Texas National Guard to Oregon, in addition to Illinois.  This appears to be a clear end-run effort around the Oregon district court's temporary restraining order preventing defendants from federalizing the Oregon National Guard for deployment in Oregon.

149.    Oregon filed an emergency motion to enjoin those efforts.  At an October 5 emergency hearing before the court, the district judge enjoined both new deployment orders, in

which defendant Hegseth, on behalf of the Trump administration, had sought to deploy other states' National Guard to Oregon.

150.    As defendants have made clear, the Trump administration's troop deployment plan in Illinois is simply a continuation of the administration's militaristic vision of troops deployed across the country. That deployment in Illinois follows a pattern of involuntary National Guard deployment in four other jurisdictions is further evidence that defendants' actions are not based on the facts on the ground in Illinois or the needs of federal law enforcement here and are, accordingly, unlawful.

## IV.    No Factual or Legal Predicate Exists for Deploying the Military in Illinois

151.    When Trump was articulating his plans to send troops to Chicago on August 22nd, Governor Pritzker responded the next day that, "There is no emergency that warrants the President of the United States federalizing the Illinois National Guard" or sending in federal agents.

152.    There is no insurrection in Illinois.

153.    There is no rebellion in Illinois.

154.    The federal government is able to enforce federal law in Illinois.

155.    The manufactured nature of the crisis is clear. Trump first announced his plans to send National Guard troops to Chicago from the Oval Office on August 22, 2025.  His rationale then, as at many points, was his view of Chicago and Illinois as crime ridden.  At that event, he asserted that his national guard deployment in Washington D.C. had reduced crime and he wanted to send troops in Chicago for the same reason.

156.    Trump stated: "National Guard has done such an incredible job working with the police and we haven't had to bring in the -- the regular military which we're willing to do if we have to. And after we do this, we'll go to another location and we'll make it safe also. We're going

40

to make our country very safe. We're going to make our cities very, very safe. Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."

157. Therefore, this decision was made long before recent events, and Trump's true plan is impermissibly to use federalized national guard as a crime-fighting force.

158. As recently as yesterday, Trump again made clear that his purpose in sending troops to Chicago is to fight crime. On October 5, 2025, President Trump addressed reporters in front of Marine One, spoke about crime in Chicago, and said of the city, "they need help." He then claimed that he had "solved the crime" in Washington D.C., where he previously had sent troops, and said "we're going to do that in Chicago."

159. Additionally, as explained above, any assertion that the facts in Illinois require this extraordinary step is also belied by the fact that defendants have used the same playbook of involuntary deployment of the National Guard in four other jurisdictions in just the last few months.

160. In fact, DHS's first formal memo seeking the deployment of National Guard troops in Illinois, dated September 26, 2025, claimed an urgent need because of "lawless riots." That assertion was plainly untrue, as evidenced by the fact that no further steps to deploy the National Guard occurred for more than a week, until the morning of October 4, 2025.

161. Now, the Federalization Order claims that DHS needs 300 military members to protect ICE's "federal facilities" in Illinois, and the Secretary of Defense offers Illinois National Guard members for that task. What facilities, for what purpose, and under what authority none of the memos say.

41

162.    ICE has no detention facilities in Illinois, according to its own website. It has exactly one "processing" center, in Broadview. Otherwise, its only "facilities" in the state of Illinois are three office locations.

163.    DHS's claim that the request for military intervention is made because of "lawless riots" or its claim that the request is to "protect federal facilities" suggest that it could be relying on the existence of protests outside the single ICE processing facility in Broadview.  However, far from lawless riots, the Broadview protests have been small, primarily peaceful, and unfortunately escalated by DHS's own conduct, seemingly for the goal of using them as a pretext for the Chicago troop deployment that was announced by Trump long ago.

164.    Although Illinois State Police regularly partners with federal law enforcement on criminal matters, the only requests made to ISP from DHS relating to the Broadview facility were from DHS's Homeland Security Investigations (HSI), and ISP responded to each of them. One concerned an arrested protester in possession of a firearm; ISP clarified that the protester had a valid Firearm Owner Identification card and Concealed Carry Permit. The second involved traffic management for a potential protest, and the third was a request for ISP's video of the area surrounding the ICE facility. When ISP ultimately joined the joint unified command, it was not because of any need for support or help from DHS, but instead to support Broadview Police.

165.    Therefore, the limited protest activity also has not prevented the Trump administration from enforcing federal laws.

166.    Defendant DHS has loudly touted its immigration enforcement success in Operation "Midway Blitz".  In an October 3rd press release regarding the operation's success, DHS wrote that ICE and CBP "have arrested more than 1,000 illegal aliens." Even before the "blitz," ICE's Illinois law enforcement activity in 2025 was up by a significant factor, and

immigration detentions had more than doubled, according to September 12, 2025 WBEZ reporting based on collected data for January through July of 2024 and 2025.

167.    News reports about DHS's activities in the area also make clear they are able to enforce federal law.

168.    On September 16, 2025, defendant Noem came in person to suburban Illinois to oversee a DHS raid on a home that included helicopters and many federal agents breaking down the door of a U.S. citizen's home in Elgin, Illinois, without presentation of a warrant. According to a local report, the "entire street was blocked off by armed ICE agents wearing fatigues and using military vehicles[,]" and "helicopters, bright lights and smoke bombs were used in the raid."

169.    According to reporting by WBEZ and other news outlets, during the raid overseen by Noem, DHS detained several occupants of the home, including two U.S. citizens. Tricia McLaughlin, DHS Assistant Secretary, posted on social media that day to tout several arrests ICE had made that morning "so far" in the Chicago area.

170.    On September 19, 2025, DHS's official social media account on X, @DHSgov, reposted a local news video showing an ICE agent outside the ICE facility Broadview violently throwing to the ground a Congressional candidate who had been there to protest the detention conditions.  The posted stated: "You will not stop @ICEgov and DHS law enforcement from enforcing our immigration laws[.]"

171.    On September 25, 2025, CBP was seen using four boats with armed agents positioned on them traveling up and down the Chicago River in the Loop. CBP Chief Michael W. Banks posted several photos of this event, including several posed to highlight boats against the Trump Tower's marquee, with the caption "Where streets end, our Marine Unit begins. On the

Chicago River, CBP leadership stays vigilant. Our ability to patrol on the water extends the reach of enforcement."

172.    The next day, September 26th—the same day as DHS's memo expressing a purported need for 100 National Guard troops —DHS continued to make clear that demonstrations and protests have not had any impact on their ability to carry out their mission. That day, DHS issued a press release titled, "DHS Is Fighting Back Against Antifa Violence," with the subheading "Antifa-aligned domestic terrorists have nowhere to hide: DHS is upholding the rule of law."

173.    The September 26 press release focused on DHS's success in its mission and then set out a series of reports of arrests made and charges filed against those it considered as seeking to get in DHS's way, including in Broadview, Illinois.  The release made clear that: "Antifa and their friends haven't stopped us. They're not even slowing us down."

174.    On September 27, 2025, after Bovino and DHS agents had visited the Broadview Police Department in the morning, as described above, Bovino and other DHS agents in tactical gear were seen marching freely through the streets adjoining the Broadview ICE facility, entering and exiting the fencing that they erected surrounding the facility. At times when individual demonstrators temporarily obstructed traffic in the right-of-way, DHS appeared able to clear vehicle passage.

175.    At some point late in the night of September 27, DHS officials outside the ICE facility in Broadview formed a line and marched north on one of two available streets DHS could use to exit the building, Beach Street, pushing the crowd up the street and forcing them to relocate to Lexington Avenue. That evening, those agents also deployed chemical munitions, including tear gas, pepper spray, and pepper bullets at the protesters.

176.    Based upon what DHS agents told the Broadview Police Chief the next morning, as relayed in his sworn declaration, on the night of September 27, DHS agents detained eleven protesters.   According to a September 29 press release from the U.S. Attorney's Office for the Northern District of Illinois, five protesters were charged with federal offenses. Federal law continued, and continues, to be enforced in Illinois.

177.    In addition, dozens of DHS agents dressed in tactical gear and carrying semi-automatic rifles walked the streets of downtown Chicago on September 28. Their presence on the streets was a demonstration of force. And that confident show of force in downtown Chicago makes clear that the statutory basis for Title 10 has not been met.

178.    On September 29, CBP Commander-at-Large Bovino, the head of the "blitz," led more than 300 agents in raiding a large apartment building on the south side of Chicago. As part of the operation, agents rappelled down to the building from Blackhawk helicopters among other military style tactics.   While it is not clear whether any part of that conduct was within any lawful federal authority, defendants were not impeded in executing this large-scale planned operation.

179.    Following the operation that night, in a video recorded interview at the site of the apartment raid, Bovino stridently directed a message at Governor Pritzker, "Don't worry, Governor Pritzker, we've got it covered from here.  This is just the beginning… We're gonna roll on and on. We're gonna turn and burn, Governor.  We're going from this one to the next to the next to the next."

180.    Also, that same day, the Trump administration asserted that it can and would enforce federal law and, where it perceives the need, it would assign additional federal law enforcement, components of DOJ, to assist DHS. On September 29, Attorney General Bondi issued a memo titled, ENDING POLITICAL VIOLENCE AGAINST ICE. It decried a new era of

political violence and cited incidents such as the Dallas shooting at an ICE facility, as well as the non-ICE-related killing of Charlie Kirk. The memo included misleading descriptions of the protests outside Broadview in the days just before, over the weekend of September 26-28.

181.    Leaving aside the disputed predicate of the memo, the document makes clear that DOJ is fully capable of enforcing federal law.  It states, in part: "The Department of Justice will stand strong when federal law enforcement officers are attacked or threatened for doing their sworn duty on behalf of the United States government. I am directing the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Marshals Service, the Drug Enforcement Administration, and the Federal Bureau of Investigation to immediately direct all necessary officers and agents to defend ICE facilities and personnel whenever and wherever they come under attack, including in Portland and Chicago."

182.    Upon information and belief, DOJ already had assigned agents from these components to provide support to DHS and has been continuing to do so since issuing the September 29 Bondi memo. Plaintiffs are not aware of any other federal agencies providing support similar to what DOJ offered in the Bondi memo, although most, if not every, other federal agency also has sworn officers and agents as well and could do the same.

## V.    The Federalized National Guard Deployment Harms Illinois

### A.    The State's Sovereign Interests are Injured

183.    Illinois's sovereignty is harmed by this unlawful incursion by the infringement of its sovereign interest in managing law enforcement within its own borders, including the authority to manage protests and unrest.

184.    The police powers reserved to the State of Illinois includes the authority to regulate its internal law enforcement activities. *United States v. Morrison*, 529 U.S. 598, 618 (2000). Likewise, those powers include the work of policing its own populace.

185.    Defendants' efforts to overtake the state's authority in this regard functionally supersedes Illinois's authority to regulate and oversee its own local and state law enforcement.   It reflects an unconstitutional attempt to infringe on Illinois's power.

186.    The Federalization Order and the implementing agency actions also injure Illinois's abilities to give full effect to its own laws protecting residents' health, safety, and rights, harming its sovereign interests and intruding on an area traditionally left to the States.

187.    Defendants' purported use of National Guard troops to control protests or guard property amounts to a usurpation of the role of domestic law enforcement. The state has neither requested nor consented to federal intervention to take over that law enforcement role, which is being carried out by local enforcement under their lawful authority. The impending use of federalized troops to engage in domestic law enforcement, without the State's consent, threatens an irreparable injury to Illinois's sovereign interest in managing its own law enforcement activities.

188.    Defendants' conduct also will directly and concretely interfere with current and planned law enforcement activities of state and local authorities.  State and local law enforcement agencies, including variously the Broadview Police Department, the Cook County Sheriff's Office, the Chicago Police Department, and the Illinois State Police, along with other municipal police forces who provide support to these departments and each other when necessary through mutual aid agreements, have in place their own plans and protocols for maintaining safety and order in Illinois communities.   They are trained and resourced to execute those plans, including in coordination with each other, and do so regularly.

189.    The unlawful deployment of federalized National Guard troops to usurp that law enforcement role will directly interfere with the ability of state and local law enforcement to deal with any given situation. The presence of military units purporting to exercise law enforcement

authority creates confusion among the public and threatens to undermine the work of local law enforcement in maintaining order and combating local crime. This is especially concerning as numerous state and local law enforcement and community initiatives in the past years have been implemented, leading to a significant reduction in crime in the State and City of Chicago.

190.    Further, military troops are not law enforcement. They are not trained in law enforcement in the professional manner that Plaintiffs' own law enforcement are trained for the role of constitutional policing, including property protection and crowd control during protest activity, along with other domestic law enforcement responsibilities. As explained above, the needless presence of federalized troops will lead directly to escalated tensions and increased protest activity, interfering with state and local law enforcement's ability to maintain order. It will require diversion of state and local law enforcement and state and local resources.

191.    Recent deployment of troops elsewhere in the country have provoked protests and escalated tensions. Those military incursions included operations that were directly calculated as shows of force, intended to demonstrate federal presence and strength in otherwise peaceful locations. *See Newsom,* 2025 WL 2501619 at *7 (describing federal troops stationed in Humvees and tactical vehicles outside MacArthur Park in Los Angeles). As in those instances, Defendants' deployment of troops in Illinois communities will provoke and escalate protests and unrest and will require the State to divert its law enforcement personnel and resources to deal with unrest that the federal military presence has created.

192.    In addition to the sovereign injury to Illinois, Plaintiffs are harmed in multiple other ways by defendants' unlawful conduct.

48

**B.      The Diversion of National Guard Personnel, Rendering them Unable to Engage in Other Critical Work, Harms the State of Illinois.**

193.    Defendants' unlawful federalization and deployment of the Illinois National Guard will concretely harm the State's interests by rendering those members unable to engage in other critical work.

194.    Illinois National Guard (ILNG) members are trained to carry out important missions, where necessary, and at great cost, both to themselves personally and to the state.  Most ILNG members are part time reservists who have civilian jobs.  They commit a minimum of one weekend per month and two additional weeks per year, primarily for training and maintaining unit readiness.

195.    Except for when it has been lawfully called into federal service, ILNG answers to its Commander-in-Chief, the Governor of Illinois.  The Governor calls members of the ILNG into active duty to serve the needs of Illinois in numerous ways, including to assist with emergent and unpredictable situations the State could face at any moment.  The Governor, in consultation with other state government officials and local law enforcement, is in the best position to determine the needs of the State and how the Guard could be deployed to meet those needs.

196.    The Illinois National Guard's resources are limited.  While the ILNG has about 12,775 total members, only some of those are presently available for assignment over the next six months. Others are unavailable because, among other reasons, they are already deployed in federal services overseas or at military bases in the United States; engaged in the ILNG's essential administrative functions; or in basic training.  Unlawfully federalizing even a portion of these Guard members impairs the State's capacity to respond to emergencies.

197.    Since September 11, 2001, ILNG members have faced an increased operations tempo that has included longer training periods in more advanced specialties. For example, ILNG

49

members recently completed an annual training on how to respond to cyberattacks. They specifically perform work to protect Illinois's elections infrastructure from cyberattacks and other intrusions.

198.    They also recently performed training on response to chemical and biological weapons attacks, as well as on responding to man-made and natural disasters, including site search, rescue, mass decontamination, medical triage, and fatality recovery.

199.    In its role as a state entity, ILNG also has been called into state active duty to respond to disasters including several instances of severe flooding in the state, as well as severe winter weather. And it has provided significant planning and support for large-scale events, like the Democratic National Convention in 2024, which hosted 50,000 people.

200.    With a federal deployment of ILNG members, the State does not have the benefit of all of its ILNG members, including if needed by the State for emergency response efforts. Given the ILNG's limited resources, and the inherent uncertainty about what needs might arise, needlessly calling hundreds of the ILNG's members into federal service for a months-long period places Illinois in jeopardy.

## C.    The Federal Deployment Will Harm Plaintiffs' Ability to Provide Important Services to the Community

201.    The deployment of federalized national guard troops into Illinois will cause great and immediate harm. This harm will occur to Plaintiffs regardless of whether the deployment is of Illinois National Guard or another military.

202.    In addition to the above harms, a deployment will hinder the provision of needed social services and health care and redirect valuable resources away from their proper use on behalf of the City of Chicago and the State.

203.    Among other harms and impacts on resources, the City of Chicago's Office of Emergency Management & Communications will have to divert important resources away from needed services and planning as a result of any troop deployment in the greater Chicago area.

204.    The Chicago Police Department ("CPD") has likewise incurred substantial costs protecting public safety at large events that generated protest activity, as a military deployment would. For example, Chicago hosted the Democratic National Convention in 2024. In connection with that event, CPD spent $30 million on operations, overtime compensation, and other expenses. These costs can increase when responding to unplanned protests. For instance, in 2020, CPD spent about $90 million responding to often-unplanned protests and civil unrest following George Floyd's murder.

205.    Based on these facts, it is reasonably likely that the deployment of the National Guard would impose costs on CPD and other City departments while diverting those departments' resources away from their usual responsibilities.

**D.    Defendants' Actions Will Also Harm the State of Illinois and the City of Chicago by Suppressing Business Activity.**

206.    Defendants' conduct threatens the economic well-being of the people of Illinois. In recent months, unlawful federal deployments and militarized raids in California and the District of Columbia have directly and rapidly chilled economic activity. The deployment of troops in California stifled economic activity in the Los Angeles area. Restaurants, festivals, and farmers' markets shut down, as individuals were afraid to leave their homes due to militarized raids. As the *Newsom* court observed, federal immigration-enforcement actions and the deployment of the National Guard has "sent economic shockwaves through southern California." 2025 WL 2501619, at *14. A study employing U.S. Census Bureau data found that federal immigration actions had "profoundly negative consequences for California's economy," comparable only to the Great

51

Recession and Covid-19 pandemic. *Newsom v. Trump*, Case No. 25-4870, Dkt. 183, Ex. 14 at 7 (N.D. Cal. Sept. 2, 2025). The number of people reporting to work in California's private sector decreased by 3.1% in June 2025 and by 4.9% in July 2025, even though those numbers increased elsewhere. *Id*. at 1, 4. The study explained: "As a result of [federal] enforcement actions, many noncitizens avoided work, school, and other public spaces, leading to declines in consumption, business, work and employment." *Id*. at 2. A Los Angeles Chamber of Commerce official confirmed that the National Guard deployment harmed "small businesses throughout the region," explaining that businesses saw "a sharp decrease in customers," "increased staffing shortages," and incurred "additional costs" for "security" and other expenses. *Id.*, Dkt. 183-3 ¶¶ 5-9. Attendance at public events in Los Angeles also suffered. For example, the director of an LGBTQ+ organization that holds an annual event in a predominantly Latino neighborhood stated that 2,000 fewer people attended the post-deployment event this year compared to prior years. *Id.*, Dkt. 183-6 ¶¶ 4, 13-14.

207.     Similarly, according to reporting in the Washington Post, the deployment of National Guard troops in the District of Columbia depressed key industries, including tourism, restaurants, and hospitality services. Within a week after the deployment of federal troops in D.C., foot traffic in the District dropped 7 percent on average, with restaurant reservations showing an even steeper drop.

208.     Defendants' military incursion into Illinois threatens similar immediate harms by depressing business activities, travel, and tourism in Illinois communities. Chicago taxes various sales and services. E.g., Mun. Code of Chi. §§ 3-24-030 (hotel tax), 3-30-030 (restaurant tax); 3-40-010 (sales tax). Thus, when businesses in Chicago experience declining sales, Chicago receives less tax revenue.

209.     Defendants' conduct also threatens financial harm to the government of Illinois in multiple ways.  The military incursion's chilling effect on economic activity will directly decrease tax revenue collected by the State and by the City of Chicago. In the District of Columbia, troop deployment has resulted in a reduction of work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government.

210.     Deployment of troops in Illinois communities threatens similar harm to both City of Chicago and State of Illinois tax revenues.

**First Claim for Relief**
***Ultra Vires* Action – Violation of 10 U.S.C. § 12406**
**Against All Defendants**

211.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

212.     Under 10 U.S.C. § 12406, only the President is permitted to federalize a state's National Guard, and they are only permitted to do so when (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States.  The order issued by the President pursuant to this provision must specify the basis for this invocation, including, for subsection (3), what laws the President is unable to execute.  None of that was done here.  Moreover, no factual circumstances satisfying any of those predicates are present in Illinois. Defendants' actions to the contrary—including in the Federalization Order and the Texas Mobilization Order—are patently pretextual and lack any good faith basis.

213.     Defendants have not identified any "invasion by a foreign nation."

214.     Nor is there any "rebellion or danger of a rebellion."  The assertion that National Guard troops are needed to protect federal facilities is both untrue and legally insufficient.  Neither the June 7, 2025 Presidential memorandum, nor the federalization or Texas mobilization order identified any particular location or event as a basis for federalizing state military.  However, to the extent that protests in Broadview, Illinois, are the Defendants' excuse for this deployment in Illinois, they are insufficient.

215.     The protests in Broadview are contained to a small area a few blocks from an ICE facility, are being successfully managed, and do not in any way constitute a rebellion or danger of a rebellion.  Likewise, no other facts warrant a finding of rebellion in the State of Illinois.

216.     Nor have Defendants cited even a single instance in which they were "unable . . . to execute the laws of the United States" as would be required under Section 12406. For example, they have not identified an inability to detain or deport those who are unlawfully present in the United States due to protests in Broadview.

217.     In addition, the Federalization Order and the Texas Mobilization Order contravene Section 12406 by failing to identify the federal laws that the President purports to be unable to execute and by failing to specify a corresponding scope of authority to execute "those laws."

218.     By ignoring these prerequisites for an invocation of 10 U.S.C. § 12406, and relying on pretextual, baseless, and bad-faith invocation of Section 12406, Defendants are acting *ultra vires*.

**Second Claim for Relief**
*Ultra Vires* **Action — Violation of the Posse Comitatus Act and 10 U.S.C. § 275**
**Against All Defendants**

219.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

220.   The Posse Comitatus Act forbids the armed forces from engaging in law enforcement "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

221.   Consistent with the limitations imposed by the PCA, the Title 10 statutory scheme itself expressly limits the scope of activities that can be performed by the military. For instance, 10 U.S.C. § 275 provides that "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation un such activity by such member is otherwise authorized by law."

222.   Neither the Constitution nor any Act of Congress permits Defendants to use the armed forces, including the National Guard, for routine law enforcement, such as protest management or the suppression of violent crime or property damage.

223.   The Court need look no further than Defendants' own statements on social media and to United States military leaders to conclude that this troop deployment is being made for purposes that are plainly incompatible with the Posse Comitatus Act and 10 U.S.C. § 275.

224.   By ignoring the PCA and 10 U.S.C. § 275, Defendants are acting *ultra vires*.

**Third Claim for Relief**
**Tenth Amendment of the U.S. Constitution**
**Against All Defendants**

225.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

226.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

227.    Defendants' federalization of members of the Illinois National Guard usurps the Governor of Illinois's role as Commander-in-Chief of the National Guard in Illinois, which he could and would use if necessary, and violates the State's sovereign role over local law enforcement, pursuant to its police powers.

228.    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the States. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878).

229.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)).

230.    The Federalization Order's deployment of federalized military forces to protect federal personal and property from "violent demonstrations" that "are occurring or are likely to occur"  represents the exact type of intrusion on State power that is at the heart of the Tenth Amendment, especially where, as here, there is no evidence that local law enforcement was incapable of asserting control and ensuring public safety. State officials in conjunction with local officials, such as the Broadview Police Department and the Cook County Sheriff's Department, are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

231.    In addition to infringing upon the States' police powers, Defendants' actions in calling up and deploying members of the Illinois National Guard are designed to coerce Illinois into abandoning its own statutory prerogatives and instead adopt President Trump's policy priorities.

232.    "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

233.    Similarly, the federal government "may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. U.S.,* 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*., 452 U.S. 264, 288 (1981)). Such impermissible pressure can occur "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own."  *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 578.

234.     Defendants' actions forced such an impermissible "choice": use state and local law enforcement resources to carry out the federal government's civil immigration priorities or accept occupation by federal troops.  Then, in advance of the Federalization Order, Defendants posed an additional coercive "choice":  either deploy the National Guard under state control or be subject to federalization via 10 U.S.C. § 12406.

235.     Additionally, Defendants' actions place Illinois National Guard members under federal command and control, usurping the Governor's authority to command them and depriving the State of Illinois of their services.  These actions thus violate the Tenth Amendment because the President lacks constitutional authority to call forth the militia in a manner that exceeds the authority delegated to him by Congress. Indeed, Congress is granted the authority to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress has exercised that authority through 10 U.S.C. § 12406 which, as explained, does not authorize Defendants' decision to federalize the Illinois National Guard.  By acting in a manner that "exceeds the National Government's enumerated powers," Defendants have "undermine[d] the sovereign interests of States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

236.     Finally, to the extent Defendants' actions are deemed to fall within the scope of 10 U.S.C. § 12406, then such use of Section 12406 constitutes an as-applied violation of the Tenth Amendment insofar as it restricts the State's ability to exercise its reserved police power over its citizens, including through an impermissible coercive choice.

**Fourth Claim for Relief**
**Violation of Equal Sovereignty Under the U.S. Constitution**
**Against All Defendants**

237.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

238.    "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among States." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 U.S. 529, 544 (2013) (citation omitted).  The Supreme Court has long recognized that our nation "was and is a nation of States, equal in power, dignity, and authority," and that this "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith,* 221 U.S. 559, 567, 580 (1911).

239.    This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty,* 570 U.S. at 544 (citation omitted).

240.    Defendants have trampled these principles by selecting certain politically disfavored jurisdictions – including Chicago and Illinois – for an involuntary deployment of military troops under federal control. "And despite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [three] states" and the District of Columbia.  *Id.* at 544.

241.    Such an "extraordinary departure from the traditional course of relations between the States and the Federal Government" can only be justified by dire and "unique circumstances," and must be limited to "areas where immediate action" is truly necessary. *Id.* at 546.

242.    Defendants have treated the States differently, subjecting only some States to involuntary National Guard deployment without satisfying that high bar.  On the contrary,

59

defendants have failed to provide even a reasonable explanation for the differential treatment. Instead, Defendants have treated certain States differently based solely on whether the administration approves of the State and local policies within those States. Illinois, Oregon, California, and the District of Columbia, all states and cities disfavored by Defendants, have been the subject of involuntary federalization of National Guard troops. Defendants have not deployed state National Guards in any other state without their consent. Such disparate treatment without any basis violates the principle of equal sovereignty. Defendants' selection of Illinois for National Guard federalization and deployment is, at best, arbitrary and, at worst, a politically motivated retaliation for Plaintiffs' adoption of policies that the President disfavors, and it harms the state of Illinois.

**Fifth Claim for Relief**
**Violation of the Administrative Procedure Act § 706(2)(A) - Arbitrary and Capricious**
**Against Agency Defendants**

243.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

244.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or that is "contrary to constitutional right [or] power," 5 U.S.C. § 706(2)(A)-(B).

245.    Defendants United States Department of Homeland Security, United States Department of Defense, United States Army are each an "agency" under the APA, 5 U.S.C. § 551(1).

246.    The DOD and Secretary Hegseth's Federalization Order, federalizing up to 300 members of the Illinois National Guard at the request of DHS and Secretary Noem, and the Texas Mobilization Order, federalizing up to 400 members of the Texas National Guard to deploy to

Illinois and Oregon, each constitute final agency action because each represents the "consummation" of the agency's decision-making process and an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

247.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). This "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

248.    Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

249.    Defendants DHS, DOD, and Army have provided no reasoned basis or explanation for these final agency actions.  On the contrary, for the reasons described herein, the implementation by DHS, DOD, and Army of the Federalization Order, and/or the Texas Mobilization Order is arbitrary and capricious because, as discussed above, each relies on false statements and is pretextual.

250. Finally, the Federalization Order and the Texas Mobilization Order are further arbitrary and capricious because each is in excess of constitutional and statutory authority, including the limitations in 10 U.S.C. § 12406 and the Posse Comitatus Act.

**Sixth Claim for Relief**
**Violation of the Administrative Procedure Act 5 U.S.C. § 706(2)(A)-(C) - Action in Excess of Statutory and Regulatory Authority, Not in Accordance with Law, and Contrary to Law**
**Against Agency Defendants**

251. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

252. Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

253. Defendants United States Department of Homeland Security, United States Department of Defense, and the United States Army are each an "agency" under the APA, 5 U.S.C. § 551(1).

254. Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392. Rather, it "remains the responsibility of the court to decide whether the law means what the

agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (Scalia, J., concurring in judgment)).

255.    The DOD and Secretary Hegseth's Federalization Order, federalizing up to 300 members of the Illinois National Guard at the request of DHS and Secretary Noem, and the Texas Mobilization Order constitute final agency action because each represents the "consummation" of the agency's decision-making process and because it represents action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

256.    For the reasons discussed above, the Federalization Order is contrary to and exceeds authority in numerous laws and regulations, including 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 275.

257.    The DOD and Secretary Hegseth's Texas Mobilization Order, federalizing up to 400 members of the Texas National Guard at the request of DHS and Secretary Noem also constitutes final agency action because it represents the "consummation" of the agency's decision-making process and because it represents action "from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (citation and quotation marks omitted).

258.    For the reasons discussed above, the Texas Mobilization Order is contrary to and exceeds authority in numerous laws and regulations, including 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 275.

259.    And, for the reasons described herein, the implementation by defendants Department of Defense, Department of Homeland Security, and the U.S. Army of the Federalization Order and the Texas Mobilization Order is contrary to and in excess of authority

and limitations in 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 275, as well as their implementing regulations.

**Seventh Claim for Relief**
**Violation of the U.S. Constitution Separation of Powers**
**Against All Defendants**

260.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

261.    The Constitution's separation of powers doctrine and the Take Care Clause all place limitations on the exercise of executive authority.

262.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024).

263.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

264.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

265.    Defendants have violated the Separation of Powers doctrine by asserting authority over Illinois's state Militia that the Constitution and federal law expressly assign to Illinois.

266.    Additionally, defendants have violated the Separation of Powers doctrine by disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement.

267.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), aff'd, 343 U.S. 579 (1952).

**Eighth Claim for Relief**
**Violation of the U.S. Constitution Militia Clauses**
**Against All Defendants**

268.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

269.    The Militia Clauses expressly provide that "Congress shall have Power … To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions…." U.S. Const. art. I, § 8, cl. 15.  They further provide that Congress has authority "To provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of Officers, and the Authority of training the Militia according to the discipline prescribed by Congress…" U.S. Const. art. I, § 8, cl. 16.

270.    Defendants have violated each of the Milita Clauses by asserting authority over Illinois's state Militia that the Constitution and federal law expressly assigns to Illinois Additionally, Defendants have violated each of the Militia Clauses by disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement.

271.     This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown*, 103 F. Supp. at 576.

### Ninth Claim for Relief
### Violation of the U.S. Constitution Take Care Clause
### Against All Defendants

272.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

273.     The Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them.") (internal quotation marks and citation omitted).

274.     The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

275.     Defendants have violated the Take Care Clause doctrine by asserting authority over Illinois's state Militia that the Constitution and federal law expressly assigns to Illinois. Additionally, Defendants have violated the Take Care Clause doctrine by and disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement.

276.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown*, 103 F. Supp. at 576.

### Prayer for Relief

Wherefore, Plaintiffs request that the Court enter judgment against Defendants and award the following relief:

A.  Declare that Defendants' federalization and deployment of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois, including under 10 U.S.C. § 12406, is unconstitutional and/or unlawful because it: (a) is *ultra vires*; (b) violates the APA; and (c) is contrary to the Constitution of the United States;

B.  Hold unlawful and enjoin Defendants' federalization and deployment of the National Guard of the United States, any state National Guard, or deployment of the U.S. military, pursuant to the Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois over the objection of the Governor of Illinois;

C.  Permanently and preliminarily enjoin defendant Hegseth and the Department of Defense from federalizing or otherwise deploying forces in implementation of the Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois over the objection of the Governor of Illinois;

D.  Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military in Illinois over the objection of the Governor of Illinois;

E.  Award the Plaintiffs their costs and reasonable attorneys' fees; and

F.  Award such additional relief as the interests of justice may require.

Dated this 6th Day of October, 2025

KWAME RAOUL
*Attorney General of Illinois*

by:

 /s/  Sarah J. North
CARA HENDRICKSON
Executive Deputy Attorney General
CHRISTOPHER WELLS
Division Chief, Public Interest Division
SARAH J. NORTH
Deputy Division Chief, Public Interest
Division
SARAH HUNGER
Deputy Solicitor General
KATHARINE ROLLER
Complex Litigation Counsel
GRETCHEN HELFRICH
Deputy Chief, Special Litigation Bureau
KATHERINE PANNELLA
Senior Assistant Attorney General
SHERIEF GABER
MICHAEL TRESNOWSKI
Assistant Attorneys General
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Christopher.Wells@ilag.gov
Sarah.North@ilag.gov
Katharine.Roller@ilag.gov
Gretchen.Helfrich@ilag.gov
Katherine.Pannella@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

By: /s/ Stephen J. Kane
Stephen J. Kane
Chelsey B. Metcalf
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
stephen.kane@cityofchicago.org
chelsey.metcalf@cityofchicago.org

*Counsel for the City of Chicago*