**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; CITY OF CHICAGO, an Illinois municipal corporation, | |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army | Case No. 25-12174    Judge |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.     Congress has determined when the President may call the National Guard into federal service. ............................................................................................................................ 3

    B.     President Trump has disparaged Chicago for years. ...................................................... 4

    C.     Since returning to office, President Trump has repeatedly targeted Chicago and Illinois with detrimental, and often unlawful, executive actions. ........................................................ 5

    D.     After troop deployments in Los Angeles and Washington, D.C., President Trump said Chicago would be next.................................................................................................................. 8

    E.     Since September 8, the Trump administration has targeted the Chicago area for increased immigration enforcement through "Operation Midway Blitz."................................. 12

    F.     The recent protests at ICE's detention facility in suburban Broadview do not warrant a troop deployment. ......................................................................................................................... 14

          1.    Prior to Operation Midway Blitz, ICE officials anticipated protests in Broadway, but those protests have not stopped the operation.......................................................... 15

          2.    Federal agents have escalated their response to small and peaceful protests in Broadview, predictably increasing protest activity. ................................................... 16

          3.    Despite provocative behavior by federal agents, the Broadview protests have not stopped federal agents from executing federal law. ................................................. 17

          4.    Multiple state and local law enforcement agencies, including the Illinois State Police, have formed a unified command in Broadview to manage public safety and protect First Amendment rights around ICE's facility. ............................................. 18

          5.    Despite clearly provocative action by administration officials—including DHS Secretary Noem—protests in Broadview remained lawful and mostly peaceful on October 3.................................................................................................................... 19

    G.     On October 4, President Trump ordered the federalization and deployment of "at least" 300 National Guard troops in Illinois over the Governor's objection. ..................................... 20

LEGAL STANDARD ....................................................................................................... 22

ARGUMENT ..................................................................................................................... 23

    I.     Plaintiffs have standing to challenge the federal administration's actions. .................. 23

    II.    Plaintiffs are likely to succeed on their claim that deploying National Guard troops in Illinois is *ultra vires* and exceeds the President's authority in 10 U.S.C. § 12406. ................. 25

        A.     The President has failed to properly invoke his limited authority in 10 U.S.C. § 12406. ................................................................................................................................................ 25

        B.     There is no basis for claiming the President is "unable" to "execute" federal law in Broadview or anywhere else in Illinois........................................................................................ 27

        C.     There is no "rebellion" or "danger of a rebellion" in Illinois. ...................................... 33

i

D.    The President cannot avoid or minimize judicial scrutiny of his use of Section 12406. ................................................................................................................. 35

    1.    The federalization and deployment of National Guard troops in Illinois over the Governor's objection is subject to judicial review. .................................................. 36

    2.    The Court owes the President and his administration no deference. ....................... 38

III.    Plaintiffs are likely to succeed on their claim that the deployment of federal troops in Illinois violates the Tenth Amendment. .................................................................... 41

IV.    Plaintiffs are likely to succeed on their claim that the Posse Comitatus Act prohibits the deployment of federal troops in Illinois. .................................................................... 44

V.    The State of Illinois will suffer irreparable harm—including profound sovereign injury—without an injunction. ............................................................................................. 47

VI.    The impending deployment of Texas National Guard troops in Illinois is unlawful for the same reasons—and more—and compounds the grave, irreparable injury to Illinois's sovereignty. ......................................................................................................................... 50

CONCLUSION .......................................................................................................................... 52

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982)...........................24

*Biden v. Nebraska*, 600 U.S. 477 (2023)...................................................................................24

*Bond v. United States*, 564 U.S. 211 (2011)...............................................................................43

*Boumediene v. Bush*, 553 U.S. 723 (2008) ...............................................................................40

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ..........................................................52

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ......................23

*Ex parte Milligan*, 71 U.S. 2 (1866) .........................................................................................35

*FBI v. Fikre*, 601 U.S. 234 (2024)............................................................................................23

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019) ..................................23

*Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466 (7th Cir. 2024)......................22, 23

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987)...........................................................................40

*J.A.V. v. Trump*, 781 F. Supp. 3d 535 (S.D. Tex. 2025)................................................................41

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) .........................................................................24

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) .........................................................................23

*Laird v. Tatum*, 408 U.S. 1  (1972).........................................................................................36

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)......................................49

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531  (7th Cir. 2021) .................................................47

*Martin v. Mott*, 25 U.S. 19 (1827)...........................................................................................36

*Maryland v. King,* 567 U.S. 1301 (2012)....................................................................................47

*National Federation of Independent Business v. Sebelius,* 567 U.S. 519 (2012) ..................42, 43

*Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025) ..............................................................25, 34

*Newsom v. Trump*, 786 F. Supp. 3d 1235 (N.D. Cal. 2025)......................................................9, 34

*Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619 ......................................10, 24, 25

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 49

*Ohio v. Envtl. Prot. Agency*, 603 U.S. 279 (2024) ...................................................... 48

*Oregon v. Trump*, No. 3:25-cv-1756-IM ............................................................. passim

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................................. 49

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .................... 23

*Shelby County v. Holder*, 570 U.S. 529 (2013) ........................................................... 52

*Sterling v. Constantin*, 287 U.S. 378 (1932) .............................................................. 39

*Swain v. Junior,* 958 F.3d 1081 (11th Cir. 2020) ......................................................... 48

*Trump v. J.G.G.*, 145 S. Ct. 1003 (2025) ................................................................... 40

*Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588 (7th Cir. 2017) ................................... 40

*United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) ...................................... 45

*United States v. Hutchings*, 127 F.3d 1255, (10th Cir. 1997) ....................................... 45

*United States v. Morrison*, 529 U.S. 598 (2000) .......................................................... 24

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, (N.D. Ill. 2019) ................................................................................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, (2008) ........................................... 49

*Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................. 35, 37, 38, 45

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ...................................... 23

**Statutes**

10 U.S.C. § 10106 ...................................................................................................... 45

10 U.S.C. § 12405 ...................................................................................................... 45

10 U.S.C. § 12406 ................................................................................................. passim

10 U.S.C. § 275 .......................................................................................................... 46

10 U.S.C. §§ 251-55 ................................................................................................... 45

18 U.S.C. § 1385 .................................................................................................... 44, 45

Ill. Pub. Act 100-463 (eff. Aug. 28, 2017) ................................................................... 6

Militia Act of 1795 ............................................................................................... 37

## Other Authorities

Executive Order 14159 ............................................................................................ 5

The Declaration of Independence ........................................................................... 36

## Regulations

Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21 .............................................................................................................. 45

## Constitutional Provisions

U.S. Const. amend. III ........................................................................................... 36

U.S. Const. amend. X ...................................................................................... 41, 42

U.S. Const. art. I, § 8, cl. 15 ............................................................................. 3, 41

U.S. Const. art. I, § 8, cl. 15–16 ........................................................................... 24

U.S. Const. art. I,, § 8, cl. 15–16 .......................................................................... 24

## INTRODUCTION

Since President Trump took office for the second time, his deployment of federal troops to the Chicago area has been a question of when, not if. The inevitability of this action—forecasted in countless posts and public statements—is confirmation of its illegality.

Nothing happening anywhere in Illinois justifies the President's extraordinary decision to deploy federalized National Guard troops over the objection of this state's Governor. Both the Constitution and Congress have carefully circumscribed the conditions under which the President can wield such an audacious power in our federalist system. None of those conditions exist in Illinois. There is no foreign invasion. There is no actual or imminent rebellion. And there is nowhere in Illinois where the President is unable to execute federal law.

Nonetheless, on October 4, 2025, President Trump ordered the federalization and deployment of "at least" 300 members of the Illinois National Guard in this state over the Governor's objection.[1] Effectuating the President's order, the Secretary of Defense, Pete Hegseth, directed a memorandum to the Adjutant General of the Illinois National Guard instructing him to activate these troops under 10 U.S.C. § 12406 ("October 4 Federalization Order").[2] The October 4 Federalization Order stated the troops were to "protect" federal property and personnel—specifically, "U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. government personnel" performing federal functions.[3] The October 4 Federalization Order referred to providing such protection "at locations where violent demonstrations against these

---

[1] Ex. 1, Declaration of Bria Scudder, (Scudder Decl.) at Exhibit 1-D (Oct. 4, 2025 Gen. Steven S. Nordhaus Memorandum for the Adjutant Gen., Ill. Nat'l Guard, re: "Request for Illinois National Guard Federal Protection Mission"); Ex. 2, Oct. 4, 2025 Sec'y of Def. Memorandum for the Adjutant Gen., Ill. Nat'l Guard Through: the Governor of Ill., re: "Calling Members of the Illinois National Guard into Federal Service" ("October 4 Federalization Order").
[2] Ex. 2, October 4 Federalization Order.
[3] *Id.*

1

functions are occurring or are likely to occur based on current threat assessments and planned operations."[4]

The October 4 Federalization Order followed small protests at a single temporary detention facility for U.S. Immigration and Customs Enforcement ("ICE") in Broadview, Illinois—a suburb of approximately 8,000 residents twelve miles from downtown Chicago.[5] For over 19 years, small groups have gathered on Fridays outside the ICE facility in Broadview, often to hold prayer vigils.[6] Since the launch of "Operation Midway Blitz," an aggressive immigration enforcement campaign targeting the Chicagoland area, the Broadview protests have grown, but only once have they had more than 200 participants.[7] At times, the number of federal agents protecting the property has exceeded the number of protestors. Although the protests in recent weeks have included acts of civil disobedience and a handful of arrests, the protests have never come close to stopping federal immigration enforcement in Illinois. Far from it: on October 3, the same day as the largest protest to date in Broadview, the President's administration announced that Operation Midway Blitz has yielded 1,000 immigration-related arrests in the Chicago area in less than a month.

The President is using the Broadview protests as a pretext. The impending federal troop deployment in Illinois is the latest episode in a broader campaign by the President's administration to target jurisdictions the President dislikes—because of their Democratic leadership, their so-called "sanctuary" policies preventing local police from becoming de facto federal immigration agents, or some other reason. Just days ago, the President made his intent undeniably clear when

---

[4] Ex. 2, October 4 Federalization Order.
[5] Ex. 4, Declaration of Chief Thomas Mills, Broadview Police Department ("Mills Decl.") ¶¶ 5, 16-58.
[6] Ex. 5, Declaration of Father Brendan Curran, OP ("Curran Decl.") ¶¶ 2-8; Ex. 4 (Mills Decl.) ¶ 9.
[7] Ex. 4 (Mills Decl.) ¶ 19.

he told U.S. military leaders that Chicago and other cities "should" be used as "training grounds for our military" amid a "war from within."[8]

The Court can and should stop the administration's lawlessness by enjoining implementation of the October 4 Federalization Order and the October 5 Texas Mobilization Order (collectively, the "Orders"). Any of three different claims warrant immediate injunctive relief. First, the Orders exceed the President's authority under the laws prescribed by Congress, including 10 U.S.C. § 12406. Second, the Orders violate the Tenth Amendment: by usurping the Governor's control over the Guard, by intruding on Illinois's general police power, and by attempting to coerce Illinois into abandoning a statewide policy the President dislikes. Third, the mission prescribed by the Orders cannot be done without defying the Posse Comitatus Act. This Court should immediately enter a temporary restraining order and preliminarily enjoin the President's unlawful troop deployment in Illinois.[9]

## FACTUAL BACKGROUND

### A. Congress has determined when the President may call the National Guard into federal service.

The Constitution gives Congress, not the President, the power "to provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress has exercised this authority in different federal statutes that create three active statuses for National Guard forces.[10]

---

[8] NBC Chicago Staff and The Associated Press, "Trump calls for using US cities like Chicago as a 'training ground' for military," NBC Chicago (Sept. 30, 2025), available at https://www.nbcchicago.com/news/local/trump-calls-for-using-us-cities-like-chicago-as-a-training-ground-for-military/3831694/.

[9] Yesterday evening, on October 5, the State of Illinois learned of an additional order purporting to federalize and mobilize up to 400 members of the Texas National Guard ("Texas Mobilization Order") under 10 U.S.C. § 12406 for deployment in Illinois, including, specifically, Chicago. *See* Ex. 3. As with the October 4 Federalization Order regarding the Illinois National Guard, the Texas Mobilization Order is unlawful and should be preliminary enjoined, as discussed *infra* § VI.

[10] Ex. 6, Declaration of Lt. Gen. Jeffrey S. Buchanan (Retired) (Buchanan Decl.), ¶¶ 11-14.

First, the National Guard could be activated by the state in which the National Guard unit is based—commonly referred to as "State Active Duty."[11] Second, the National Guard could be activated pursuant to Title 32 of the United States Code.[12] In "Title 32 status," a state's governor makes a request for the federal government to bring troops into active duty for a particular mission, and the governor remains in command of the National Guard troops performing the mission while the federal government bears the costs.[13] Third, the National Guard can be activated pursuant to Title 10 of the United States Code—the type of activation being contested here.[14]

In "Title 10 status," the National Guard is considered "federalized" and acts as part of the federal military, subject to the command of the President in his capacity as Commander-in-Chief.[15] Federalized National Guard troops serving under Title 10 may not engage in domestic law enforcement activities, subject to specific exceptions.[16] Through this lawsuit, the Plaintiffs challenge the President's decision to federalize the Illinois National Guard over the Governor of Illinois's objection.

### B. President Trump has disparaged Chicago for years.

The federalization and deployment of the National Guard in the Chicago area is the direct result of President Trump's longstanding and well-documented animus toward Illinois and Chicago. The day before he was first elected President, on November 7, 2016, then-candidate Trump tweeted about Chicago claiming: "The crime is unbelievable. You can't walk to the store and get a loaf of bread. Often, you get shot."[17] As President, Trump would go on to characterize Chicago in October 2019 as "the worst sanctuary city in America" that "protects criminals at a

---

[11] *Id*. ¶ 12
[12] *Id*. ¶ 13.
[13] *Id*..
[14] Ex. 6 (Buchanan Decl.) ¶ 14.
[15] *Id*. ¶ 14.
[16] *Id*. ¶ 15.
[17] Ex. 9, Declaration of Sherief Gaber ("Gaber Decl."), ¶ 20.

4

level few could imagine," and further claiming that "Afghanistan is a safe place by comparison."[18] In the summer of 2020, when the killing of George Floyd by Minneapolis police sparked nationwide protests and civil disturbances, President Trump derided "the radical-left wing mobs that you see all over in some of the cities," specifically citing Chicago and "so many different places that are run by Liberal Democrats."[19]

Trump's targeting of Chicago continued after he left office and as he prepared to seek the presidency again. In a July 2022 speech, Trump asserted that "the next president needs to send the National Guard" to Chicago.[20] A month later, he decried "cities that were run by Democrats going so bad, so fast."[21] Trump repeated this theme in his 2024 campaign, claiming again that in "cities" that are "run by Democrats . . . you can't walk across the street to get a loaf of bread. You get shot. You get mugged. You get raped. You get whatever it may be."[22]

### C. Since returning to office, President Trump has repeatedly targeted Chicago and Illinois with detrimental, and often unlawful, executive actions.

Immediately upon taking office again, President Trump translated his hostile rhetoric toward Illinois, Chicago, and other disfavored jurisdictions into executive action. The day of his second inauguration, January 20, 2025, President Trump signed Executive Order 14159, titled "Protecting the American People Against Invasion."[23] The order targeted "sanctuary jurisdictions" that allegedly "seek to interfere with the lawful exercise of Federal law enforcement operations."[24] In the order, President Trump directed the U.S. Attorney General and the Secretary of Homeland Security to take action "to the maximum extent possible under law" to "ensure that so-called

---

[18] *Id.* ¶ 25.
[19] *Id.* ¶ 29.
[20] *Id.* ¶ 33.
[21] Ex. 9 (Gaber Decl.) ¶ 34.
[22] *Id.* ¶ 35.
[23] Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025).
[24] *Id.*, Sec. 17.

'sanctuary' jurisdictions . . . do not receive access to Federal funds," and to "undertake any other lawful actions, civil or criminal," based on "any such jurisdiction's practices that interfere with the enforcement of Federal law."[25]

Shortly thereafter, on February 6, 2025, Attorney General Bondi, in one of her first official acts, filed a lawsuit against the State of Illinois, its Governor, JB Pritzker, the City of Chicago, and its Mayor, Brandon Johnson.[26] The lawsuit sought to invalidate so-called "sanctuary" policies in this state and its largest city, which generally restrict state and local police from assisting with federal civil immigration enforcement.[27] Illinois's so-called "sanctuary" law, the TRUST Act, first took effect in 2017, when it was signed by then-Governor Rauner, a Republican.[28] The Trump administration's challenge to the TRUST Act was dismissed by Judge Lindsay Jenkins of this Court in August, though the deadline for the federal government to appeal the dismissal has not yet expired.[29]

In addition to targeting Chicago and Illinois with litigation, the President's lieutenants have also sought to carry out his directive to strip them of federal funds appropriated by Congress. Following the President's directive to withhold federal funds from "sanctuary" jurisdictions, the U.S. Department of Homeland Security ("DHS") has attempted to force states and localities to accept conditions on federal grant funding requiring them to assist with federal immigration enforcement or lose those funds.[30] Illinois, together with several other states, challenged these immigration-related grant conditions as unlawful, obtaining a final judgment and injunction against DHS and its sub-agencies on September 24, 2025.[31] Undeterred, DHS tried another tack:

---

[25] *Id.*
[26] *United States v. Illinois*, No. 25 CV 1285 (N.D. Ill.) (filed Feb. 6, 2025).
[27] *United States v. Illinois*, No. 25 CV 1285, 2025 WL 2098688, at *2 (N.D. Ill. July 25, 2025).
[28] Ill. Pub. Act 100-463 (eff. Aug. 28, 2017).
[29] *United States v. Illinois*, 2025 WL 2098688, at *27.
[30] *See Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2716277 (D.R.I. Sept. 24, 2025).
[31] *Id.*

arbitrarily slashing discretionary grant funding earmarked for so-called "sanctuary" states and redirecting those funds to more favored states.[32] But that approach has also been rebuffed, at least initially, with a temporary restraining order entered on September 30, 2025.[33]

Meanwhile, Chicago, Cook County, and Illinois have all been designated "sanctuary" jurisdictions in a list first published by DHS on May 29, 2025.[34] DHS described the listed jurisdictions, initially totaling around 500 American communities, as "shamefully obstructing" the federal administration's deportation efforts and "shielding dangerous criminal aliens."[35] But by June 1, 2025, DHS unpublished the initial list following objections from several of the included jurisdictions, some of which were led by Republicans.[36] Later, on August 5, 2025, the DOJ published an updated "sanctuary" jurisdiction list with 35 entries—nearly all of which are states and municipalities led by Democrats.[37] Chicago, Cook County, and Illinois are all included.[38] In announcing the updated "sanctuary" jurisdiction list, Attorney General Bondi stated that DOJ would "continue bringing litigation against sanctuary jurisdictions and work closely with [DHS] to eradicate these harmful policies around the country."[39]

The republished "sanctuary" jurisdiction list prompted further actions by DHS and DOJ. On August 8, Secretary Noem traveled to a Chicago suburb to denounce "elected leaders in this State of Illinois" who she claimed "are ignoring the law" and being "obstructionists when it comes

---

[32] *See Illinois v. Noem*, No. 25-cv-495 (D.R.I.) (filed Sept 29, 2025).
[33] *Id.*, Dkt. 14.
[34] Compl. ¶ 63
[35] *Id.*
[36] Compl. ¶ 64.
[37] U.S. Dep't of Justice, "Justice Department Publishes List of Sanctuary Jurisdictions," Press Release (Aug. 5, 2025) ("DOJ Sanctuary List"), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.
[38] *Id.*
[39] *Id.*

to getting dangerous criminals off of their streets."[40]  Secretary Noem specifically named Illinois's

Governor Pritzker and Chicago's Mayor Johnson as examples, saying "they'd rather be a sanctuary

state" than protect American citizens from dangerous criminals.[41] Not to be outdone, on August

13, 2025, Attorney General Bondi sent threatening letters to Governor Pritzker and Mayor Johnson

blaming their "sanctuary jurisdiction policies" for allegedly "obstruct[ing] federal immigration

enforcement, giving aliens cover to perpetrate crimes in our communities and evade the

immigration consequences that federal law requires."[42] The purported purpose of the August 13

letters was to provide notice to the recipient jurisdictions of "their unlawful sanctuary status and

potential violations of federal law."[43]

### D.  After troop deployments in Los Angeles and Washington, D.C., President Trump said Chicago would be next.

Amid these threats by his cabinet officials, on August 22, 2025, President Trump returned

to a proposal he had floated almost exactly three years prior, in July 2022: sending National Guard

troops to Chicago.[44] The proposal had become far more concrete by late August 2025. By that

point, President Trump had already deployed federalized National Guard troops in two cities, Los

Angeles and Washington, D.C., that, like Chicago, have Democratic leaders and so-called

"sanctuary" status.[45]

---

[40] Christian Piekos and Sarah Schulte, "DHS Secretary Kristi Noem accuses Illinois leaders of being 'obstructionist' in Chicago area visit," ABC7 (Aug. 8, 2025), available at https://abc7chicago.com/post/dhs-secretary-kristi-noem-chicago-friday-speak-immigration/17470258/.

[41] Matt Masterson, "Homeland Security Head Noem Criticizes Pritzker, Johnson in Illinois Visit While Local Officials Brand Her a 'Liar'", WTTW (Aug. 8, 2025), available at https://news.wttw.com/2025/08/08/homeland-security-head-noem-criticizes-pritzker-johnson-illinois-visit-while-local.

[42] Ex. 7, August 13, 2025 Letter from Att'y Gen. Bondi to Governor Pritzker; Ex. 8, August 13, 2025 Letter from Att'y Gen. Bondi to Mayor Johnson.

[43] Id.

[44] Ex. 9 (Gaber Decl.) ¶ 33 (July 26, 2022 speech), ¶ 43 (August 22, 2025 remarks).

[45] See U.S. Dep't of Justice, "Justice Department Publishes List of Sanctuary Jurisdictions," Press Release (Aug. 5, 2025), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

On the evening of June 6, 2025, a protest against the Trump administration's immigration policies outside the federal courthouse in Los Angeles resulted in property damage, a burned vehicle, and injuries to some federal officers on the scene. *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1243 (N.D. Cal. 2025). The following morning, June 7, 2025, President Trump issued a memorandum to Secretary of Defense Hegseth, Attorney General Bondi, and Secretary Noem, in which he claimed:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws . . . To the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States.[46]

The June 7 Presidential Memorandum further declared that "[i]n light of these incidents and credible threats of continued violence," the President was "call[ing] into Federal service members and units of the National Guard" in order to "temporarily protect ICE" and other federal government personnel and facilities.[47] The President cited 10 U.S.C. § 12406 as the authority for his order federalizing the National Guard, though he did not name a specific state's National Guard or identify the location of the deployment.[48]

Subsequent to the June 7 Presidential Memorandum, President Trump's administration deployed both California National Guard troops—who had been federalized over the objection of California's Governor, a Democrat—and active-duty U.S. Marines to Los Angeles. *Newsom v. Trump*, 786 F. Supp. 3d at 1245. California and its Governor immediately sued to stop the deployment and initially obtained a temporary restraining order in federal district court, though a

---

[46] Ex. 10, June 7, 2025 Presidential Memorandum.
[47] *Id.*
[48] *Id.*

9

Ninth Circuit panel vacated it. *See Newsom v. Trump*¸ 141 F.4th 1032 (9th Cir. 2025). In addition to being deployed around federal buildings in Los Angeles, California National Guard troops also performed additional missions assisting federal law enforcement in the broader Los Angeles metropolitan area—and sometimes far beyond. *See Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025). A federal district court later ruled that several of those missions and actions violated limitations in a century-and-a-half-old federal law, the Posse Comitatus Act, on domestic use of the military for civilian law enforcement. *Id.* That ruling is currently on appeal in the Ninth Circuit.

In the wake of the Ninth Circuit's ruling, President Trump deployed National Guard troops in Washington, D.C., another so-called "sanctuary" city with a Democratic mayor.[49] Through an August 11, 2025 order, President Trump mobilized National Guard troops purportedly "to address the epidemic of crime in our Nation's capital"—though crime in Washington had been declining according to his own administration.[50] Because of Washington's unique status as a federal jurisdiction, rather than a state, the authority invoked differed from the troop deployment in California in June.[51] The President also authorized the use of National Guard members from states outside of Washington, D.C., which multiple Republican Governors promptly agreed to provide.[52]

---

[49] U.S. Dep't of Justice, "Justice Department Publishes List of Sanctuary Jurisdictions," Press Release (Aug. 5, 2025), available at: https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.
[50] August 11, 2025 Presidential Memorandum, https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/; U.S. Atty's Office, D.C., "U.S. Attorney Ed Martin Jr. Highlights Successful Local Prosecutions During First 100 Days," Press Release (Apr. 29, 2025), available at: https://www.justice.gov/usao-dc/pr/us-attorney-ed-martin-jr-highlights-successful-local-prosecutions-during-first-100-days (25% drop in violent crime year-to-date).
[51] August 11, 2025 Presidential Memorandum, https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/.
[52] Joseph Ax, "More Republican governors send National Guard to Washington, backing Trump," Reuters (Aug. 19, 2025), available at https://www.reuters.com/world/us/more-republican-governors-send-national-guard-washington-backing-trump-2025-08-19/.

Amid these ongoing troop deployments in California and Washington, in late August and early September, President Trump repeatedly announced his plan to send federal troops to Chicago:

- Speaking to reporters on August 22 from the Oval Office, President Trump remarked that "the National Guard has done such an incredible job working with the police," and "I think Chicago will be our next and then we'll help with, uh, New York."[53]

- On August 25, President Trump again referenced plans for a Chicago troop deployment, stating: "We go in, we will solve Chicago within one week, maybe less. But within one week, we will have no crime in Chicago just like we have no crime in D.C."[54]

- On August 30, after Governor Pritzker voiced opposition to a potential Chicago troop deployment, President Trump posted on social media that the Governor "better straighten it out, FAST, or we're coming!"[55]

- On September 2, President Trump called Chicago "a hellhole" and worse than Afghanistan; when asked whether he had made up his mind "on Chicago," the President answered simply: "We're going in – I didn't say when, we're going in."[56]

- On September 3, President Trump sent a fundraising email to his supporters with the subject "We're going to Chicago!" The email began: "**WE'RE GOING INTO CHICAGO**. I'm not saying when, but we're going in!" Claiming he had "turned our Great Capital into a Safe Zone," President Trump declared: "**NOW I WANT TO LIBERATE CHICAGO!**" After decrying that "The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime," the President assured his supporters: "<u>WE'RE GOING TO DO IT ANYWAY</u>."[57]

This weeks-long torrent of declarations about Chicago reached a temporary crescendo on Saturday, September 6, when President Trump posted this image on social media:

---

[53] Ex. 9 (Gaber Decl.) ¶ 43.
[54] *Id*. ¶ 44.
[55] *Id*. ¶ 52.
[56] *Id*. ¶ 57.
[57] Ex. 9 (Gaber Decl.) ¶ 60.



In its imagery, language, and font, the post evoked a character from the 1979 Vietnam War film, *Apocalypse Now*, who led a helicopter attack on a Vietnamese village, massacring several civilians.[58]

### E. Since September 8, the Trump administration has targeted the Chicago area for increased immigration enforcement through "Operation Midway Blitz."

Two days after the President's "Chipocalpyse Now" post, the President's administration announced the launch of Operation Midway Blitz on September 8.[59] The announced purpose of the operation was to target "the criminal illegal aliens who flocked to Chicago and Illinois because they know Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets."[60] Within eleven days of announcing the start of Operation Midway Blitz, a DHS spokesperson claimed on September 19 that the operation had resulted in "almost

---

[58] *Id.* ¶ 61.
[59] Ex. 11, DHS, "ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois," Press Release (Sept. 8, 2025) ("DHS Sept. 8 Press Release").
[60] *Id.*

550 arrests," and declared that DHS "will not be deterred by sanctuary politicians or violent rioters."[61]

This initial wave of arrests also quickly brought tragedy. On September 12—day five of Operation Midway Blitz—in suburban Franklin Park, Illinois, an ICE officer shot and killed Silverio Villegas-Gonzalez, a 38-year-old father of two as he was driving home from dropping his three-year-old son off at daycare.[62] Although neither of the involved ICE officers had body-worn cameras, videos of the incident and its aftermath from other sources contradicted various aspects of a hastily issued DHS press release describing the shooting officer as "seriously injured" by a "criminal illegal alien."[63]

In addition to the high-profile fatal shooting on September 12, DHS leadership and officials engaged in prominent and provocative displays of force throughout Chicago and its suburbs in the rollout of Operation Midway Blitz. On September 16—four days after a shooting by an agent under her command—Secretary Noem came to the Chicago area to ride along with federal immigration agents executing early-morning raids and other actions.[64] In particular, Secretary Noem accompanied Greg Bovino, the U.S. Customs and Border Protection ("CBP") agent who led the immigration enforcement operations in Los Angeles that coincided with the National Guard deployment there.[65] Agent Bovino has also led conspicuous patrols with large groups of CBP

---

[61] CBS News Chicago, "Nearly 550 arrested during Chicago area immigration crackdown so far, official says," (Sept. 19, 2025), available at: https://www.cbsnews.com/chicago/news/400-ice-arrests-chicago-operation-midway-blitz/.
[62] Kim Bellware, "Videos of fatal ICE shooting in Chicago raise questions about DHS account," Washington Post (Sept. 28, 2025), available at: https://www.washingtonpost.com/immigration/2025/09/28/ice-officers-chicago-shooting-dhs-video/.
[63] Id.
[64] Commander Op At Large CA Gregory K. Bovino, @CMDROpAtLargeCA, 12:26 p.m., Sept. 18, 2025 post on X.com, available at: https://x.com/CMDROpAtLargeCA/status/1968730847168643176; Secretary Kristi Noem, @Sec_Noem, 8:53 a.m., Sept. 18, 2025 post on X.com, available at: https://x.com/Sec_Noem/status/1968674758838391049.
[65] Camilo Montoya-Galvez, "Border official who oversaw Los Angeles immigration raids arrives in Chicago as Trump widens crackdown," CBS News (September 10, 2025), available at: https://www.cbsnews.com/news/immigration-chicago-gregory-bovino-border-official-trump/.

agents through downtown Chicago—both on foot and on the Chicago River. For example, on September 25, several CBP boats sailed through a downtown stretch of the Chicago River with Agent Bovino visibly perched on the bow.[66] A similar boat patrol took place on September 28, accompanied by foot patrols on dry ground.[67] Specifically, on a warm, sunny Sunday afternoon, Agent Bovino led dozens of fatigue-clad, masked, and, in some cases, heavily armed CBP agents on foot through the Chicago Loop and other nearby neighborhoods.[68]

Since then, detentions and arrests have continued. In a large-scale operation on October 1, federal agents stormed an apartment building in Chicago's South Shore neighborhood, detaining several dozen residents, including multiple children who are U.S. citizens.[69] On October 3, 2025, DHS issued a press release—coinciding with Secretary Noem's visit that day to an ICE temporary detention center in Broadview, Illinois—touting 1,000 arrests in Operation Midway Blitz.[70]

**F. The recent protests at ICE's detention facility in suburban Broadview do not warrant a troop deployment.**

Since at least May 2025, small groups of protestors have gathered outside an ICE temporary detention facility in Broadview, a suburb of Chicago approximately twelve miles west

---

[66] Mack Liederman, "Armed Border Agents' Cruise On Chicago River Slammed As 'Photo Op' By Alderman," Block Club Chicago (Sept. 26, 2025), available at https://blockclubchicago.org/2025/09/26/armed-border-agents-cruise-on-chicago-river-slammed-as-photo-opp-by-alderman/.

[67] Chip Mitchell, et al., "Feds march into Downtown Chicago; top border agent says people are arrested based partly on 'how they look'," WBEZ Chicago (Sept. 29, 2025), available at: https://www.wbez.org/immigration/2025/09/29/feds-march-into-downtown-chicago-top-border-agent-says-people-are-arrested-based-on-how-they-look.

[68] James Neveau, JC Navarrete and Matt Stefanski, "Armed Border Patrol agents patrol downtown Chicago, drawing mayoral criticism," NBC Chicago (Sept. 29, 2025), available at: https://www.nbcchicago.com/news/local/chicago-politics/armed-border-patrol-agents-patrol-downtown-chicago-drawing-mayoral-criticism/3830594/; Adriana Perez, "In show of force, dozens of armed federal immigration agents patrol downtown Chicago," Chicago Tribune (Sept. 28, 2025), available at: https://www.chicagotribune.com/2025/09/28/immigration-agents-patrol-downtown/.

[69] Cindy Hernandez, "Massive immigration raid on Chicago apartment building leaves residents reeling: 'I feel defeated,'" WBEZ Chicago (Oct. 1, 2025), available at: https://www.wbez.org/immigration/2025/10/01/massive-immigration-raid-on-chicago-apartment-building-leaves-residents-reeling-i-feel-defeated.

[70] Ex. 12, DHS, "Secretary Noem travels to Chicago as Operation Midway Blitz Reaches More than 1,000 Illegal Aliens Arrested," Press Release (Oct. 3, 2025).

of the Loop.[71] ICE's facility in Broadview serves as a processing and temporary detention center for individuals detained by ICE and other DHS agencies in the Chicagoland area for civil immigration enforcement.[72] The crowd of protestors has typically been fewer than fifty people.[73] Since the initiation of Operation Midway Blitz on September 8, the size of some of the protests in Broadview has increased, but even at its largest, the size of the crowd only once exceeded 200 people (and then it was about 250 people)—including elected officials, their staff, legal observers, and members of the media who have been present for some of the protests.[74] The protests have tended to occur Fridays, though small groups have also assembled on Sunday mornings to pray outside the facility.[75]

### 1. Prior to Operation Midway Blitz, ICE officials anticipated protests in Broadway, but those protests have not stopped the operation.

On September 2, 2025—as President Trump was repeatedly threatening a troop deployment in Chicago—ICE's Chicago Field Director Russell Hott and Assistant Field Director Jimmy Bahena met with Broadview's Chief of Police, Thomas Mills.[76] In that meeting, Director Hott informed Chief Mills and his staff that, beginning the next day, a large number of federal agents, including approximately 250 to 300 CBP agents, would begin arriving in Illinois to assist with a ramped-up immigration enforcement campaign in the Chicagoland area.[77] Director Hott stated their goal was to make large numbers of immigration-related arrests and stated that the ICE facility in Broadview would be the primary processing location for the operation.[78] Director Hott

---

[71] Ex. 4 (Mills Decl.) ¶¶ 5-6, 9.
[72] *Id*. ¶ 6.
[73] *Id*. ¶ 18.
[74] *Id*. ¶ 18-19.
[75] Ex. 4 (Mills Decl.) ¶ 9.
[76] *Id*.
[77] *Id*.
[78] *Id*.

stated that the facility would operate continuously, seven days per week for approximately 45 continuous days.[79]

Director Hott also informed Chief Mills that ICE officials expected numerous protests, including potential property damage and assaults against law enforcement personnel, similar to what had occurred in Los Angeles earlier in the year.[80] ICE officials also expected there to be impacts on traffic and businesses in the immediate vicinity of ICE's detention center, located at 1930 Beach Street in Broadview.[81]

In early- to mid-September, some protestors began to stand or sit down in the driveway that ICE vehicles use to access the detention facility in Broadview.[82] When this has happened, ICE and other federal agents have at times physically removed the individuals from the driveway, allowing ICE vehicles to ultimately be able to enter and exit the facility as needed.[83] Chief Mills is not aware of any occasion on which an ICE vehicle was actually prevented from entering or exiting the ICE facility at 1930 Beach Street due to activity by protestors.[84] When protestors have engaged in this form of civil disobedience, federal agents have responded, including by physically removing the individuals from the driveway, allowing ICE vehicles to ultimately proceed.[85]

### 2. Federal agents have escalated their response to small and peaceful protests in Broadview, predictably increasing protest activity.

While the crowd of protesters at the Broadview facility has typically been fewer than fifty people, some of the protests grew to up to 200, and on one occasion 250, people. This includes elected officials, their staff, legal observers, and members of the media who have been present for

---

[79] Ex. 4 (Mills Decl.) ¶ 10.
[80] Id. ¶ 11.
[81] Id. ¶¶ 6, 9, 11.
[82] Id. ¶ 17.
[83] Ex. 4 (Mills Decl.) ¶ 17.
[84] Id. ¶ 44.
[85] Id. ¶ 17.

some of the protests. The increase in protest activity in Broadview has been the predictable response to unreasonable aggressive and provocative actions by ICE and CBP.

For example, during Operation Midway Blitz, in Broadview or in and around Chicagoland, ICE or CBP agents have, among other things:

- dressed in camouflage tactical gear and with masks covering their faces;[86]
- shot and killed Silverio Villegas-Gonzalez in Franklin Park, another western Chicago suburb;[87]
- intermittently grabbed protestors, physically moving them; and[88]
- deployed tear gas and pepper spray at the protestors in Broadview.[89]

Broadview Police Chief Mills characterized the use of chemical agents by federal officials at the ICE facility in Broadview as often arbitrary, indiscriminate, and unlike anything he has seen before in his 35-year career in law enforcement, including 32 years spent as an officer and high-ranking member of the Chicago Police Department ("CPD").[90]

### 3. Despite provocative behavior by federal agents, the Broadview protests have not stopped federal agents from executing federal law.

Around 7:00 a.m. on Saturday, September 27, three Chevrolet Tahoe SUVs appeared in the Broadview Police Department's parking lot without invitation.[91] Federal agents, including Agent Bovino of the CBP, emerged from the vehicles with a message for the Broadview police: prepare for "a shitshow."[92] Specifically, federal agents, including Agent Bovino, told the Broadview police to expect increased use of chemical munitions and increased ICE activity in Broadview.[93]

---

[86] *Id*. ¶ 21.
[87] Kim Bellware, "Videos of fatal ICE shooting in Chicago raise questions about DHS account," Washington Post (Sept. 28, 2025), available at: https://www.washingtonpost.com/immigration/2025/09/28/ice-officers-chicago-shooting-dhs-video/.
[88] Ex. 4 (Mills Decl.) ¶ 23.
[89] *Id*. ¶ 24.
[90] *Id*. ¶¶ 4, 31
[91] *Id*. ¶ 38.
[92] *Id*.
[93] *Id*.

That afternoon and evening, September 27, Agent Bovino and his colleagues followed through on their warning. Groups of federal agents repeatedly chased people on foot through the streets of Broadview in ongoing vehicle traffic.[94] Around dusk, Agent Bovino and a large team of fatigue-clad, tactically equipped, and masked federal agents escorted multiple federal vehicles out of the ICE detention facility.[95] And, again, federal agents fired pepper balls, rubber bullets, and teargas cannisters at protestors.[96] Over the course of the protests on September 26 and 27 in Broadview, DHS reported making a total of eleven arrests of protestors, though only five of the individuals arrested have been criminally charged.[97]

### 4. Multiple state and local law enforcement agencies, including the Illinois State Police, have formed a unified command in Broadview to manage public safety and protect First Amendment rights around ICE's facility.

Following the protests in Broadview on September 26 and 27, at the request of the Broadview Police Department, the Illinois State Police ("ISP") joined with multiple state and local law enforcement agencies—the Broadview Police Department, the Cook County Sheriff's Office, the Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency ("IEMA")—to establish a unified command "to coordinate public safety measures in Broadview" around ICE's temporary detention facility.[98]

An October 2 press release announcing the establishment of the unified command described its purpose and mission as follows:[99]

---

[94] "Agents chase after protesters, smoke and pepper bullets deployed outside Broadview ICE facility" ABC 7 Chicago (Sept. 26, 2025), available at https://www.youtube.com/watch?v=Byews1aX7XI.

[95] "Protest continues outside ICE facility in Broadview," CBS News (Sept. 27, 2025), available at https://www.cbsnews.com/chicago/video/protest-continues-outside-ice-facility-in-broadview/; *see also* Ex. 13, Declaration of Gil Kerlikowske ("Kerlikowse Decl."), ¶¶ 46-51; Ex 15, Declaration of Commander Jacqueline Cepeda (Cepeda Decl.) at ¶ 8.

[96] Ex. 4 (Mills Decl.) ¶¶ 35-36, 40.

[97] Sabrina Franza, "Arrested Broadview ICE protestors appear in court; 2 held, 3 released," CBS News Chicago (Sept. 29, 2025), available at: https://www.cbsnews.com/chicago/news/broadview-ice-facility-protesters-arrest-court/.

[98] Ex. 4 (Mills Decl.) ¶¶ 46-47.

[99] *Id*. ¶ 48.

> The Unified Command is setting up designated areas where people can safely exercise their rights, which will support the safety of the public, and ensure vehicular traffic can safely access the roads in the area. The goal of the Unified Command is to protect the health and safety of all individuals, including nearby Broadview residents and businesses, and enable the peaceful expression of First Amendment rights. The agencies involved in this operation will neither assist nor obstruct enforcement of federal immigration statutes in compliance with state and federal law.
>
> Uniformed officers will be on site to help direct people to the designated areas. In addition to protecting the safety and rights of people peacefully expressing their views, these measures will also ensure that third parties that need access to the facility – including attorneys and legal representatives, people bringing medicine to detainees, and representatives from foreign consulates – will maintain clear points of access to the facility.

The October 2 press release also informed the public of where both the designated protest areas and restricted areas in the vicinity of the ICE facility in Broadview. The unified command remains in place at the facility in Broadview as of the filing of this brief.

### 5. Despite clearly provocative action by administration officials—including DHS Secretary Noem—protests in Broadview remained lawful and mostly peaceful on October 3.

On October 3, the unified command instituted by state and local law enforcement successfully secured the protest and allowed protestors to voice their views, despite the challenges created by provocative actions taken by federal officials, including Secretary Noem.[100]

On the morning of October 3, Secretary Noem appeared on the roof of the ICE facility in Broadview.[101] Secretary Noem's presence was not welcome by state and local officials, including Broadview Chief of Police Thomas Mills, because it made their job harder.[102] When Secretary Noem departed from the ICE facility, her SUV was accompanied by a large armored tactical

---

[100] *Id.* ¶ 57.
[101] Asal Rezaei, et al., "Pritzker: Noem should 'no longer be able to step foot' in Illinois without accountability as she visits Broadview facility," CBS News Chicago (Oct. 3, 2025), available at: https://www.cbsnews.com/chicago/news/pritzker-noem-illinois-accountability-friday-visit-reports/.
[102] Ex. 4 (Mills Decl.) ¶ 54.

vehicle and several heavily armed federal agents.[103] Secretary Noem's vehicle proceeded to a location a few blocks away where ICE vehicles were parked.[104] In the parking lot, Secretary Noem got out of her vehicle within twenty-five feet of nearby protestors and for the apparent purpose of attempting to provoke them.[105]

Despite Secretary Noem's antics, the apparently 100 state and local police officers securing the Broadview protest that day kept her safe while also allowing protestors to voice their views.[106] In the times where protestors attempted to move through the line being maintained by state and local police around designated protest areas, those officers made a few temporary detentions and a total of five arrests throughout the day on October 3.[107] Because of the professionalism of the state and local law enforcement assisting the unified command in Broadview, protestors in Broadview were able to exercise their First Amendment rights without being subjected to the reckless use of chemical agents.[108]

### G. On October 4, President Trump ordered the federalization and deployment of "at least" 300 National Guard troops in Illinois over the Governor's objection.

Within hours of the largely peaceful protest in Broadview on October 3, at 10:23 a.m. on Saturday, October 4, the Adjutant General of the Illinois National Guard received via email a memorandum from U.S. Air Force General Steven S. Nordhaus, the Chief of the National Guard Bureau in Washington, D.C.[109] Although titled "Request for Illinois National Guard Federal Protection Mission," General Nordhaus's memorandum was in fact an ultimatum.[110]

---

[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] Ex. 4 (Mills Decl.) ¶ 57.
[107] *Id.* ¶ 55.
[108] *Id.* ¶ 57.
[109] Ex. 1 (Scudder Decl.) at Exhibit 1-C (Oct. 4, 2025, 10:23 a.m. S. Nordhaus email to R. Boyd re: "Request for Assistance of ILNG in T32").
[110] *Id.* at Exhibit 1-D.

Noting that "the President has directed the mobilization of at least 300 members of the Illinois National Guard (ILNG) to protect federal personnel, functions, and property in Illinois," General Nordhaus continued:

> [T]he Secretary of War has been authorized to first provide additional federal funding for 300 members of the ILNG under Title 32 United States Code, Section 502(f), and request that they perform this mission in a non-federalized status under your command and control.[111]

Confirming that the request was essentially performative, General Nordhaus instructed that "if ILNG forces are not mobilized under Title 32 in the next 2 hours, the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code."[112] Approximately two hours later, Governor Pritzker notified the public of the federal government's ultimatum and reported his reply in a press statement: "I will not call up our National Guard to further Trump's acts of aggression against our people."[113]

Later that day on October 4, Secretary Hegseth issued the October 4 Federalization Order calling forth "at least 300 National Guard personnel into Federal service" pursuant to 10 U.S.C. § 12406, "to protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations. This memorandum further implements the President's direction…."[114]

---

[111] *Id.* ¶ 1.
[112] *Id.* ¶ 2.
[113] Office of the Governor, JB Pritzker, "Governor Pritzker Statement on the Illinois National Guard," Press Release (Oct. 4, 2025), available at: https://gov-pritzker-newsroom.prezly.com/governor-pritzker-statement-on-the-illinois-national-guard.
[114] Ex. 2, October 4 Federalization Order.

President Trump had already made clear the true objective earlier in the week, however. Building on comments he had been making for some time, on September 30 the President addressed hundreds of U.S. military leaders summoned in person from their posts around the world.  During those remarks he described his mission—to use military troops in cities run by so-called "radical left Democrats," including Chicago, to "straighten them out":

> You know, the Democrats run most of the cities that are in bad shape . . . [T]he ones that are run by the radical left Democrats, what they've done to San Francisco, Chicago, New York, Los Angeles, they're very unsafe places and we're going to straighten them out one by one. And this is going to be a major part for some of the people in this room. That's a war too. It's a war from within. Controlling the physical territory of our border is essential to national security.
>
> * * *
>
> I want to salute every service member who has helped us carry out this critical mission. It's really a very important mission. And I told Pete [Hegseth], we should use some of these dangerous cities as training grounds for our military[,] National Guard, but military, because we're going into Chicago very soon.[115]

At bottom, this motion and this lawsuit ask the Court to do a simple thing in assessing the lawfulness of the challenged troop deployment in Illinois: take the President at his word.

## LEGAL STANDARD

To be entitled to a preliminary injunction or a temporary restraining order, a plaintiff must "demonstrate[e] a likelihood of success on the merits and a likelihood of irreparable harm in the absence of preliminary relief." *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466, 471 (7th Cir. 2024) (cleaned up); *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) ("The standards for granting a temporary restraining order and preliminary injunction are the same."). If the plaintiff succeeds in making this showing, plaintiff must also "convince [the court] that the balance of equitable interests tips in favor of

---

[115] Ex. 9 (Gaber Decl.) ¶ 66.

injunctive relief." *Indiana Right to Life*, 112 F.4th at 471. This inquiry requires a court to "consider both the 'the public interest' as well as the 'competing harms' that would flow to the parties from a grant or denial of the requested injunction." *Id*. (*quoting Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)). When the government is a party to the lawsuit injunction, the public interest and the harm to the party merge. *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025).

The Seventh Circuit employs a "sliding scale" approach to this balancing: "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up).

## ARGUMENT

### I. Plaintiffs have standing to challenge the federal administration's actions.

This Court has the power and the duty to review whether the deployment of federalized National Guard troops in Illinois—over the objection of the Governor—is a valid exercise of the President's constitutional and statutory authority. *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (federal courts have a "virtually unflagging obligation" to consider cases within their jurisdiction) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 817 (1976)); *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) ("In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid.") (cleaned up).

As a threshold matter, the State of Illinois has standing because of the sovereign injury inflicted on it by the President's unlawful deployment of National Guard troops in Illinois. Standing is necessary to "satisfy Article III's case-or-controversy requirement," and the presence of one plaintiff with standing in a multi-plaintiff case is sufficient to meet this requirement. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Standing exists when a plaintiff has "suffered an injury in fact—a concrete and imminent harm to a legally

protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). The asserted injury must be "legally and judicially cognizable." *United States v. Texas*, 599 U.S. 670, 676 (2023).

Like any sovereign state, Illinois has "an interest in securing observance of the terms under which it participates in the in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607–08 (1982); *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619, at *13 (N.D. Cal. Sept. 2, 2025) (same). "States also have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). States retain the authority to regulate and command their militias—now organized as the National Guard—except when these units have been lawfully called forth into federal service in accordance with conditions set by Congress. U.S. Const. art. I, § 8, cl. 15–16. The Constitution also generally reserves the "police power" for the States, not the federal government. *United States v. Morrison*, 529 U.S. 598, 618 (2000). Protecting public health and safety are among the more "conspicuous examples of the traditional application of the police power." *Berman v. Parker*, 348 U.S. 25, 32 (1954). And there is "no better example of the police power" than deterring and punishing criminal misconduct. *Morrison*, 529 U.S. at 618; *accord Cohens v. Virginia*, 6 Wheat. 264, 426, 428, (1821) (Marshall, C.J.) (stating that it is "clear . . . that congress cannot punish felonies generally").

The President's troop deployment in Illinois inflicts injury on the state in at least three ways. First, the President has unlawfully usurped Illinois's control over its own Illinois National Guard units, depriving Illinois of its constitutionally protected prerogative to supervise its state militia. U.S. Const. art. I, § 8, cl. 15–16. Second, the non-consensual deployment of federalized National Guard troops in Illinois, purportedly to address protests and crowd control, intrudes on

Illinois's sovereign police power. *See Morrison*, 600 U.S. at 489. Third, the deployment of the National Guard inflicts economic harm on the State of Illinois and the city of Chicago. These injuries are also judicially cognizable and capable of redress through the judicial process, as an injunction against the deployment order would stop the ongoing sovereign injury to Illinois. *See Newsom v. Trump*, 141 F.4th 1032, 1045–64 (9th Cir. 2025) (challenge to president's order federalizing the California National Guard under 10 U.S.C. § 12406(3) was justiciable); *Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619, at *13 (N.D. Cal. Sept. 2, 2025) (claim that president violated the Posse Comitatus Act, 18 U.S.C. § 1385, was cognizable and redressable); *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF 56 (Oct. 4, 2025 Op. and Ord.). Because of the ongoing injury inflicted on Illinois and Chicago by the unlawful deployment National Guard troops, and further injuries that are certain to result, the State of Illinois and City of Chicago have standing to bring this suit.

## II. Plaintiffs are likely to succeed on their claim that deploying National Guard troops in Illinois is *ultra vires* and exceeds the President's authority in 10 U.S.C. § 12406.

Defendants claim 10 U.S.C. § 12406 gives the President authority to federalize members of the National Guard and deploy them in this state over the objection of the Governor. They are wrong. None of the perquisites for federalization and deployment under Section 12406 exist and, in fact, the President has failed to even identify a purported justification. The deployment order is facially deficient, exceeds the President's authority, is *ultra vires*, and must be enjoined.

### A. The President has failed to properly invoke his limited authority in 10 U.S.C. § 12406.

Section 12406 authorizes the President to "call into Federal service members and units of the National Guard of any State" in three specific circumstances: (i) "whenever" the United States is "invaded or in danger of invasion by a foreign nation," (ii) "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," or (iii) "the President is

unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406. Section 12406 further requires the President to issue "[o]rders for these purposes . . . through the governors of the States." *Id.*

The President has issued no such order satisfying these requirements. To start, there is no order from the President himself, let alone one that is issued "through the governor[]" of Illinois. Instead, the October 4 Federalization Order comes from Secretary Hegseth, who asserts that "[o]n October 4, 2025, the President of the United States called forth at least 300 National Guard personnel into Federal service pursuant to section 12406."[116] But Secretary Hegseth's memorandum attaches no such order from the President, nor has Governor Pritzker received such an order.[117] Accordingly, Section 12406 has not been properly invoked.

Furthermore, Secretary Hegseth's October 4 Federalization Order and the Texas Mobilization Order are also insufficient for the additional reason that they fail to identify which of the three statutory predicates applies here: they make no claim of an invasion, rebellion, or inability to execute federal law.[118] Instead, Secretary Hegseth claims only that the National Guard will "protect" federal personnel and property, "including the enforcement of Federal law."[119] These stated justifications are insufficient under the plain text of Section 12406, which identifies three specific and limited circumstances under which Section 12406 may be invoked.

Finally, Plaintiffs are aware of no document—issued by the President or anyone else—that provides any specific basis for the deployment of the National Guard to Illinois, let alone one that satisfies the statutory requirements. On the contrary, the only document issued by the President

---

[116] Ex. 2, October 4 Federalization Order.
[117] As explained *infra,* while the Texas Mobilization Order cites the June 7 Presidential Memorandum, that Memorandum was issued nearly four months ago and does not relate to any current facts in Illinois or the current needs of federal law enforcement in Illinois. The June 7 Presidential Memorandum, therefore, is not a presidential order that can support the mobilization of the National Guard in the Texas Mobilization Order.
[118] Ex. 2, October 4 Federalization Order.
[119] Ex. 2, October 4 Federalization Order and Ex. 3, Texas Mobilization Order.

that could plausibly be related to this deployment and that has been made available to Plaintiffs is the June 7 Presidential Memorandum order issued in the wake of protests in California.[120] But that memorandum is not the stated basis for the Illinois deployment; instead, Secretary Hegseth's memorandum relies on an unseen directive issued by the President on October 4, 2025.[121] Furthermore, the June 7 Presidential Memorandum makes no actual finding that any of the three statutory prerequisites have been satisfied in any specific state, and is thus insufficient as a standalone directive.[122]

All told, Illinois has not received any justification from the President as to why he invoked Section 12406 on October 4, 2025, and in the Texas Mobilization Order, and certainly not one that satisfies statutory and constitutional guaranties. The failure to provide such an explanation at the time of the deployment is unlawful and constitutes an independent basis for preliminary injunctive relief. Furthermore, to the extent Defendants attempt to provide a document purporting to provide such justifications—regardless of its provenance—that document should be afforded no deference. Instead, to the extent defendants are entitled to any deference, *see infra,* Defendants must stand on the justifications offered to Illinois when they invoked Section 12406—an extraordinary exercise of authority over a sovereign state—in the documents that were provided at the time of deployment.

> **B.  There is no basis for claiming the President is "unable" to "execute" federal law in Broadview or anywhere else in Illinois.**

Notwithstanding the lack of any contemporaneous justification, the President may view the primary source of his authority for the Illinois troop deployment as the third prong of Section 12406, given the aforementioned documents referencing the enforcement of federal law. But given

---

[120] Ex. 10, June 7 Presidential Memorandum.
[121] Ex. 2, October 4 Federalization Order.
[122] Ex. 10, June 7 Presidential Memorandum.

the lack of any appropriate justification in the relevant documents, it is unclear *which* federal laws he is currently unable to execute. Nor is it evident from present circumstances. On the contrary, the President remains able to execute federal law: this court remains open, federal criminal prosecutions remain ongoing, and, as explained, *supra*, enforcement of immigration law has *increased* in recent weeks in Illinois.[123]

Indeed, the federal government's own data, statements, and actions undermine any claim that it is "unable" to "execute" federal law in Illinois—whether in Broadview, Chicago, or anywhere else in this state. 10 U.S.C. § 12406(3).

According to DHS data, as of the end of July, ICE had made at least 1,441 arrests and 4,900 detentions in Illinois in 2025.[124] Compared to the same time period for 2024, ICE arrests and detentions in 2025 in Illinois are up 59% and 185%, respectively.[125] Arrests by ICE and assisting federal agencies have also increased significantly since the September 8 announcement of Operation Midway Blitz targeting the Chicago area. Within eleven days of announcing the start of Operation Midway Blitz,[126] a DHS spokesperson claimed on September 19 that the operation had resulted in "almost 550 arrests," and declared that DHS "will not be deterred by sanctuary

---

[123] *See, for example*, U.S. Attorney's Office, Northern District of Illinois, "Five Individuals Charged in Federal Court in Chicago with Assaulting or Resisting Federal Agents Engaged in Immigration Enforcement Operations," Press Release (Sept. 29, 2025), available at: https://www.justice.gov/usao-ndil/pr/five-individuals-charged-federal-court-chicago-assaulting-or-resisting-federal-agents; U.S. Attorney's Office, Northern District of Illinois, "Three Chicago-Area Men Indicted in Federal Court for Allegedly Scheming to Open Credit Cards in the Name of Deceased Individuals," Press Release (Sept. 29, 2025), available at: https://www.justice.gov/usao-ndil/pr/three-chicago-area-men-indicted-federal-court-allegedly-scheming-open-credit-cards; U.S. Attorney's Office, Northern District of Illinois, "Federal Indictment Charges Chicago Police Officer with Conspiring to 'Straw Purchase' Firearms on Behalf of Acquaintance," Press Release (Sept. 24, 2025), available at: https://www.justice.gov/usao-ndil/pr/federal-indictment-charges-chicago-police-officer-conspiring-straw-purchase-firearms; U.S. Attorney's Office, Northern District of Illinois, "Federal Judge Sentences Man to More than Seven Years in Prison for Robbing U.S. Postal Service Carrier in Chicago," Press Release (Sept. 23, 2025), available at: https://www.justice.gov/usao-ndil/pr/federal-judge-sentences-man-more-seven-years-prison-robbing-us-postal-service-0.
[124] Lauren FitzPatrick, "How many immigrants as ICE arrested and detained so far this year? Here's what we know," WBEZ (Sept. 12, 2025), available at: https://www.wbez.org/immigration/2025/09/12/immigration-customs-enforcement-ice-arrests-detentions-data-deportation-project-trac; *see also* Data Deportation Protect, "Immigration and Customs Enforcement," https://deportationdata.org/data/ice.html (sorted by "Apprehension State").
[125] *See* FitzPatrick, *supra* note 124 124.
[126] Ex. 11, DHS September 8 Press Release.

politicians or violent rioters."[127] On October 3—when the largest protest to date occurred in Broadview—DHS boasted that during Operation Midway Blitz, it had "arrested more than 1,000 illegal aliens."[128]

As part of the operation, federal agents have also engaged in conspicuous patrols in Chicago and the surrounding suburbs, including deploying boats from CBP on the Chicago River on September 25 and 28, and conducting a large-scale foot patrol with over 40 CBP agents in downtown Chicago on September 28.[129] In the course of the CBP's September 28 patrol through downtown Chicago, agents made multiple spontaneous arrests and chased several individuals on foot through major downtown streets.[130]

Despite all the ostentatious federal law enforcement activity occurring in the Chicago area, the President may attempt to argue that his invocation of Section 12406(3) arises from small protests outside a single ICE temporary detention facility in Broadview.[131] The ICE facility in Broadview has drawn small groups of protestors for months, during which time the operation of the facility has continued unabated.[132] Amid these protests, as of September 12, 2025, ICE had

---

[127] "Nearly 550 arrested during Chicago area immigration crackdown so far, official says," CBS News, Sept. 19, 2025, available at: https://www.cbsnews.com/chicago/news/400-ice-arrests-chicago-operation-midway-blitz/.
[128] Ex. 12, DHS October 3 Press Release.
[129] Mohammad Samra, et al., "Border Patrol spotted with guns on Chicago River in Trump's latest deportation push," Chicago Sun-Times (Sept. 26, 2025), available at: https://chicago.suntimes.com/immigration/2025/09/25/border-patrol-chicago-river-immigration-enforcement-greg-bovino-deportation; Michelle Gallardo, "Federal immigration agents, Border Patrol boat seen in downtown Chicago," ABC7 (Sept. 28, 2025), available at: https://abc7chicago.com/post/ice-chicago-today-federal-immigration-agents-border-patrol-boat-seen-downtown-live/17899424/; Adriana Perez, "In show of force, dozens of armed federal immigration agents patrol downtown Chicago," Chicago Tribune (Sept. 28, 2025), available at: https://www.chicagotribune.com/2025/09/28/immigration-agents-patrol-downtown/.
[130] Chip Mitchell, "Feds march into downtown Chicago; top border agent says people are arrested based on 'how they look'," Chicago Sun-Times (Sept. 28, 2025), available at: https://chicago.suntimes.com/immigration/2025/09/28/ice-agents-spotted-downtown-on-michigan-avenue-along-chicago-river.
[131] Ex. 4 (Mills Decl.) ¶ 16.
[132] Id. ¶ 44.

29

detained 3,182 more people at its Broadview facility or in downtown Chicago this year than in 2024—a 185% increase.[133]

In recent weeks, small groups of protestors have at times engaged in civil disobedience by attempting to block the coming and going of vehicles into and out of the parking lot of the ICE Broadview facility.[134] Nonetheless, federal agents have consistently succeeded in creating a path for these vehicles, and ICE detainees have continued to be brought in and out of the facility.[135] At no point has the size of any one of the protests outside the ICE Broadview facility been more than a couple hundred people.[136]

The hyperbolic characterization of the small-scale protests in Broadview by DHS confirms that these protests are being used as a pretext for an unlawful, long-planned troop deployment—and not because DHS is in fact "unable" to "execute" federal law in Illinois.[137] DHS initiated the first definitive step toward a federalized National Guard deployment in its September 26 memorandum to DOD, requesting a troop deployment "in the State of Illinois," without referencing Broadview at all.[138] As confirmation that the September 26 DHS-to-DOD memorandum is untethered to facts on the ground in Illinois, the document is a verbatim copy of another DHS memorandum, also dated September 26, requesting a troop deployment in Oregon that differs in only two ways: substituting "Illinois" for "Oregon" and changing the number of

---

[133] *See* FitzPatrick, *supra* note 124; *see also* https://deportationdata.org/data/ice.html (sorted by "Apprehension State").

[134] Ex. 4 (Mills Decl.) ¶ 17.

[135] *Id*. ¶ 44

[136] Ashlyn Wright, et al., "U.S. Border Patrol takes over security of Broadview ICE facility, protests continue over the weekend," WGN (Sept. 27, 2025), available at: https://wgntv.com/news/operation-midway-blitz/protesters-rally-outside-broadview-ice-facility-against-operation-midway-blitz/ (noting that "[a]bout 100 demonstrators" gathered outside the Broadview ICE facility" on Saturday, September 28); Ex. 4 (Mills Decl.) ¶ 19; *see also* Ex. 13, Declaration of Gil Kerlikowske ("Kerlikowske Decl."), ¶¶ 44-45.

[137] *See* Ex. 14, Declaration of Major Donald Orseno ("Orseno Decl."), ¶ 45; *see also* Ex. 13 (Kerlikowske Decl.), ¶¶ 43-45

[138] Ex. 9 (Gaber Decl.) Ex. 9-C, DHS, Andrew J. Whitaker Memorandum to Col. Anthony Fuscellaro, "Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security," (Sept. 26, 2025) (September 26 DHS Memo).

troops requested.[139] A federal district court has already concluded that the attempted federalization of the Oregon National Guard originating from the a substantively identical DHS request is "untethered to facts." *Oregon*, No. 3:25-cv-07156, ECF 56, at 23. So too with the ongoing attempt to federalize the National Guard in Illinois.

The actions of federal officials since the September 26 DHS-to-DOD memorandum belie the notion that the protests in Broadview exceed law enforcement's capacity to address them. *See* 10 U.S.C. § 12406 (referring to inability to execute federal law with the "regular forces"). When confronted with a protest of approximately 100 people on the evening of September 27 outside the Broadview ICE facility, federal agents dispersed the protestors and arrested eleven people, including a journalist, in the process.[140] Far from being overwhelmed by this protest, a DHS spokesperson bragged on social media about the number of arrests its agents made in response.[141] And although DHS declared all 200 people at the protest to be "rioters," only eleven people had been arrested by federal agents, and, as of September 29, only five had been criminally charged by federal prosecutors.[142]

If the September 27 protest in Broadview had truly threatened to render the federal government incapable of executing federal law, then presumably the federal officials in charge of the ICE facility in Broadview would have focused their energy, attention, and resources on

---

[139] *Id.*

[140] Ashlyn Wright, et al., "U.S. Border Patrol takes over security of Broadview ICE facility, protests continue over the weekend," WGN (Sept. 27, 2025), available at: https://wgntv.com/news/operation-midway-blitz/protesters-rally-outside-broadview-ice-facility-against-operation-midway-blitz/ (noting that "[a]bout 100 demonstrators" gathered outside the Broadview ICE facility" on Saturday, September 27); Cindy Hernandez, et al., "Broadview officials say ICE agents warned that mayor's comments would bring consequences," Chicago Sun-Times (Sept. 27, 2025), available at: https://chicago.suntimes.com/news/2025/09/27/ice-broadview-action-mayor-katrina-thompson-immigration; @DHSgov, 8:50 a.m., Sept. 28, 2025 post on X.com, available at: https://x.com/DHSgov/status/1972297960319832252.

[141] @DHSgov, 8:50 a.m., Sept. 28, 2025 post on X.com, available at: https://x.com/DHSgov/status/1972297960319832252.

[142] ABC7 Chicago Digital Team, "Neurodivergent man among 5 protesters charged after clash at Broadview ICE facility, supporters say," ABC7 (Sept. 29, 2025), available at: https://abc7chicago.com/post/ice-chicago-today-protesters-expected-return-broadview-facility-weekend-clashes/17902425/.

securing it the following day, September 28. Instead, CBP sent dozens of armed, fatigue-clad Border Patrol agents led by Agent Bovino through downtown Chicago—twelve miles removed from the ICE facility in Broadview.[143] These actions are impossible to square with any good-faith argument from the federal government that it is unable to execute federal law in Broadview or anywhere else in Illinois.

Likewise, the protests in Broadview on October 3 remained largely peaceful and under the control of the over 100 state and local police who were deployed there.[144] Federal vehicles loaded with federal agents and officials came and went throughout the day notwithstanding the protest.[145] Through their professionalism and training,[146] state and local police both kept the peace and protected vigorous exercise of the First Amendment—all without resorting to teargas or pepper balls.[147] Even Secretary Noem felt comfortable making a conspicuous, unannounced appearance at the ICE facility in Broadview, on October 3, getting out of her vehicle within twenty-five feet of protestors, and stopping by the Broadview Town Hall.[148] That is not the conduct of agency leadership that requires military deployment to execute federal laws.

Finally, this Court should reject any attempt by the President to interpret the phrase "unable . . . to execute the laws of the United States" to require anything less than what the plain text requires. A contrary reading, if accepted, would contradict basic statutory interpretation principles and effect a startlingly broad executive power-grab that Congress did not intend. Indeed, the Supreme Court has repeatedly counseled that a word or phrase in a statute "is given more precise

---

[143] Adriana Perez, "In show of force, dozens of armed federal immigration agents patrol downtown Chicago," Chicago Tribune (Sept. 28, 2025), available at: https://www.chicagotribune.com/2025/09/28/immigration-agents-patrol-downtown/.
[144] Ex. 4 (Mills Decl.) ¶¶ 49-58.
[145] Id. ¶¶ 53-54.
[146] Ex. 14 (Orseno Decl.) ¶¶ 8-15.
[147] Ex. 4 (Mills Decl.) ¶ 57.
[148] Id. ¶ 54.

content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). And here, the phrase "unable . . . to execute the laws of the United States" immediately follows two of the most extreme exigencies the United States (or any nation) could face: an invasion by a hostile foreign nation or a domestic rebellion. 10 U.S.C. §§ 12406(1)-(2). Such exigencies are thankfully rare. *E.g., Martin v. Mott*, 25 U.S. 19, 30 (1827) (such rare and extraordinary events constitute "sudden emergencies" implicating "great occasions of state, and under circumstances which may be vital to the existence of the Union"). Reading the third predicate in Section 12406 in light of the first two, the phrase "unable . . . to execute the laws" necessarily describes a scenario comparable in magnitude to an invasion or rebellion. Protests, civil disobedience, or sporadic unlawful acts by a handful of individuals within an otherwise peaceful crowd do not come remotely close to that threshold.

Simply put, nothing that has occurred at or around the ICE facility in Broadview has rendered the federal government "unable" to "execute the laws of the United States" with the "regular forces" under any remotely colorable definition of those statutory terms. *See* 10 U.S.C. §12406. At most, the Broadview protests are a convenient pretext—not a good-faith reason—to carry out the President's long-established, preexisting plan to deploy federal troops in the Chicago area. The Court should invalidate the unlawful invocation of Section 12406(3) effectuated through Secretary Hegseth's October 4 Federalization Order and the Texas Mobilization Order.

### C. There is no "rebellion" or "danger of a rebellion" in Illinois.

There is no "rebellion" or "danger of a rebellion against the authority of the United States" anywhere in Illinois. 10 U.S.C. § 12406(2). Any claim by the Trump administration to the contrary would be farcical if the consequences were not so dire.

President Trump has been recklessly conjuring the specter of rebellion since at least his June 7 Presidential Memorandum responding to protests in Los Angeles, where he asserted: "To

33

the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."[149] Under this telling, the President would have spotted at least three incipient rebellions brewing across the country in the last four months—in Los Angeles, Portland, and now suburban Broadview. The two district courts to have ruled on his "rebellion" talk have swatted it away. *Oregon v. Trump*, No. 3:25-cv-1756-IM, ECF 56, at 25-26 (Oct. 4, 2025 Op. and Ord.); *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1253-55 (N.D. Cal. 2025) (*Newsom I*), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025) (*Newsom II*). Even the Ninth Circuit panel declined to consider the President's "rebellion" declaration. *Newsom II*, 141 F.4th at 1051.

This Court can and should become the third to summarily reject any assertion that a "rebellion" exists such that the Illinois National Guard may be federalized and deployed here. As the district court in Oregon stated in the last few days, a "rebellion" under Section 12406(2) must be "violent," "armed," "organized," "open and avowed," and aimed at "the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue." *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 25 (quoting *Newsom I*, 786 F. Supp. 3d at 1253). There is no activity in Illinois that comes close to this definition.

Far from seeking to overthrow the entire federal government, the Broadview protests are clearly focused on a specific issue: the President's immigration crackdown. That is why the protests are occurring in Broadview—a previously low-key, low-profile suburb of Chicago. The fact that Broadview is even a topic of discussion is evidence that the protests there are specific to the President's immigration agenda. *See Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 25. That the Broadview protests are focused on the President's immigration policies, not toppling the federal

---

[149] Ex. 10, June 7 Presidential Memorandum.

34

government, is further confirmed by the fact that they have coincided with ramped-up immigration enforcement through Operation Midway Blitz.

Far from being "violent" and "armed," the Broadview protests have largely been peaceful.[150] The size of the Broadview protests have also never exceeded a few hundred people—indicating a degree of organization that pales in comparison to other recent protests in the Chicago area.[151] The ISP considers the Broadview protests small-scale.[152] By contrast, Chicago has seen much larger-scale protests, including the 2020 presidential inauguration and the Gaza and Palestinian-related protests.[153] Given their comparative focus, scale, and character, the protests in Broadview are hardly sufficient to add to the very short list of bona fide "rebellions" throughout the history of this country.

### D. The President cannot avoid or minimize judicial scrutiny of his use of Section 12406.

The President and his administration have taken the audacious position in litigating the recent California National Guard deployment that a President's decision to invoke Section 12406 is categorically immune from judicial review. Both the district court and the Ninth Circuit rejected this extreme position, and this Court should also. *See Newsom II*, 141 F.4th at 1050-51. Just a few days ago, the district court in Oregon similarly rejected it. *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 17 & n.2. Even in the face of the U.S. Civil War and foreign conflict, federal courts have not shied from judicial review of and checks upon presidential overreach in the domestic use of military authority. *See Ex parte Milligan*, 71 U.S. 2 (1866) (granting habeas relief despite presidential suspension of habeas corpus during the U.S. Civil War); *Youngstown Sheet & Tube*

---

[150] Ex. 4 (Mills Decl.) ¶¶ 9, 20-23, 49.
[151] *Id.* ¶¶ 19, 49.
[152] Ex. 14 (Orseno Decl.) ¶ 45; *see also* Ex. 13 (Kerlikowske Decl.), ¶¶ 44-45
[153] Ex. 14 (Orseno Decl.) ¶ 22.

*Co. v. Sawyer*, 343 U.S. 579 (1952) (invalidating presidential seizure of steel mills during the Korean War). Court intervention is even more justified here—where a sovereign state challenges a peacetime domestic deployment with no remotely comparable exigency.

### 1. The federalization and deployment of National Guard troops in Illinois over the Governor's objection is subject to judicial review.

The President's claim to unreviewable authority over domestic troop deployments disregards the founding of this nation and its subsequent history and tradition. One of the grievances against King George III in the Declaration of Independence was that he had "affected to render the Military independent and superior to the Civil power." The Declaration of Independence para. 14 (U.S. 1776). Likewise, Britain's king had "kept among us, in times of peace, Standing Armies without the Consent of our legislatures," and had "Quarter[ed] large bodies of troops among us"—an objection later translated into the Third Amendment's prohibition on non-consensual quartering of troops in civilian homes. *Id.* paras. 13, 16; U.S. CONST. amend. III. Our founding charters thus affirm the "traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972). Consistent with that tradition, "when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury." *Laird*, 408 U.S at 15-16; *accord Newsom II*, 141 F.4th at 1050-51.

In other recent cases, the current federal administration has asserted that its attempt to shield its unlawful militarism from judicial scrutiny stems from a 198-year-old Supreme Court case, *Martin v. Mott*, 25 U.S. 19 (1827), decided in a readily distinguishable context. In *Martin*, the Supreme Court reviewed the seizure of property from a New York militiaman as a fine for his failure to report for duty during the War of 1812. *Id.* at 21-22. The militiaman challenged the property seizure by claiming that the President's order calling forth the militia was invalid. *Id.* at

36

23-24. President Madison issued the challenged order under the Militia Act of 1795, in which Congress specified that "whenever the United States shall be invaded, or in imminent danger of invasion from any foreign nation or Indian tribe," the President could "call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion[.]" *Id.* at 29 (quoting Militia Act of 1795). Rejecting the militiaman's contention that President Madison's calling forth of the militia did not comport with the statute, *Martin* observed that "the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30.

*Martin* does not insulate the President's domestic deployment of American troops from judicial review in this case. To begin with, *Martin* dealt with an anticipated invasion by a foreign nation—one that not only came to pass but that yielded occupation of the nation's capital and the burning of the President's residence. *See, e.g.*, Alfred W. Blumrosen, Steven M. Blumrosen, *Restoring the Congressional Duty to Declare War*, 63 RUTGERS L. REV. 407, 453 (2011). The non-reviewability of executive authority exercised in that scenario is not transferable to the current context. This case involves a peacetime deployment purportedly to respond to a few hundred protestors objecting to ramped-up immigration enforcement outside a single temporary detention facility in a single, small, suburban municipality. That is hardly comparable to a war-time mobilization order issued on the brink of an invasion by a hostile foreign nation.

Even apart from the radically different factual context, subsequent Supreme Court precedent affirms that judicial review is available and appropriate even when a President purports to exercise military authority within the United States. Decided 125 years after *Martin*, *Youngstown*, 343 U.S. 579 (1952) exemplifies the role federal courts must play in checking

unlawful presidential action even amid an ongoing foreign war. When President Truman seized steel mills in which strikes threatened the nation's steel supply during the Korean War, the Supreme Court did not shirk from reviewing that order: "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Finding no such authority for the President's seizure order, the Court declared it invalid. *Id.* at 589. Writing separately in his now-canonical concurrence, Justice Jackson articulated the controlling legal principle that animates this lawsuit: "Congress has forbidden [the President] to use the army for the purpose of executing general laws except when *expressly* authorized by the Constitution or by Act of Congress." *Id.* at 644-45 (Jackson, J., concurring) (emphasis supplied).

In letter and in spirit, the orders deploying federal troops to Illinois are an attempt to "use the army for the purposes of executing general laws," including both criminal and immigration laws. *Id.* As in *Youngstown*, this Court may review whether these orders arise from authority conferred on the President by the Constitution or Congress. Because the challenged orders are based on no such authority, this Court may invalidate them.

### 2. The Court owes the President and his administration no deference.

Having failed to evade judicial review entirely in California and Oregon, the President and his administration are certain to press for a highly deferential standard of review in this Court. As explained above, the deployment orders contain *no* rationale and should, for that reason alone, be accorded no deference.

While the orders contain no rationale from the President, the President's own words do offer explanation. To the extent a reason could be attributed to the President, his announced plan to send the military to Chicago to "straighten them out" ought to be considered by this Court as

38

the (coercive and unlawful) rationale for this deployment.[154] Even if the other reasons articulated by the President over the past several months—that Chicago is a purported hotbed of crime, that the state is controlled by "radical left Democrats," or that local "sanctuary" laws are disfavored are considered, they are each, individually or collectively, further evidence that no explanation given by the President satisfies Section 12406.

Even if the President were now allowed to offer a post-deployment order rationalization to be considered by this Court, the deployment orders at issue here fail under any standard, including even a highly deferential one.

To be sure, the Ninth Circuit's preliminary view was that "*Martin* and its progeny" require federal courts to "give a great level of deference to the President's determination that a predicate condition exists" under Section 12406. *Newsom II*, 141 F.4th at 1048. But the Ninth Circuit also conceded that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 287 U.S. 378, 399 (1932)). The President, who has not spoken in any official document related to the October 4 Federalization Order or the Texas Mobilization Order, cannot clear even this modest hurdle here. The President has been threatening to deploy federal troops in the Chicago area for years without regard to the facts on the ground and with a mix of justifications ranging from "crime" to Illinois's so-called "sanctuary" policies. The recent protests outside the ICE facility in Broadview are a transparent pretext for carrying out this long-desired, lawless show of unnecessary force. In other words, the President's decision to federalize and deploy National Guard troops in Illinois was "made in bad faith" and is therefore invalid. *Id.* at 1050.

---

[154] Ex. 9 (Gaber Decl.) ¶ 66.

39

In all events, this Court should reject as unpersuasive the Ninth Circuit's overly deferential standard of review under Section 12406—a standard that is, of course, "not binding authority in this circuit." *Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 604 (7th Cir. 2017). For starters, the Ninth Circuit's interpretation of Section 12406 lacks any support in the text or history of Section 12406 itself. Quite the contrary: before 1903, when Congress enacted what is now Section 12406, the Militia Act had authorized the President to federalize the militia "whenever . . . it shall become ***impracticable, in the judgment of the President*** . . . to enforce . . . the laws of the United States." 12 Stat. 281, 281 (1861) (emphasis added). But in 1903, Congress made two important changes: it (1) substituted "unable" for "impracticable" and (2) omitted any reference to the President's judgment. The Ninth Circuit essentially chose to read this deferential language back into Section 12406. But that outcome is entirely at odds with one of the most "compelling" "principles of statutory construction": "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987).

Even if *Martin* implied the need for extreme judicial deference to the President's determinations regardless of Section 12406's text and history (it doesn't), the Ninth Circuit erred in overlooking subsequent Supreme Court precedent engaging in far less obsequious judicial review. At least since *Youngstown*, 343 U.S. 579, the Supreme Court has recognized the critical importance of unflinching judicial checks on presidential power—even in wartime, and even when the President acts in the realm of foreign affairs. *E.g.*, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025); *Boumediene v. Bush*, 553 U.S. 723, 797-798 (2008); *United States v. Nixon*, 418 U.S. 683, 692-697 (1974); *see Baker v. Carr*, 369 U.S. 186, 213 (1962) (*Martin* stands for the limited proposition that courts will "refus[e] to review the political departments' determination of when

or whether a war has ended"); *Newsom v. Trump*, No. 25-cv-04870-CRB, 2025 WL 2501619, at *20 n.18 (N.D. Cal. Sept. 2, 2025) (*Youngstown* "undermined the exact precedent that the Ninth Circuit relied on in affording the President significant discretion under § 12406"). This year alone, courts have rejected an expansive reading of *Martin* that would preclude or circumscribe judicial review of actions taken by the President under other statutes. *E.g.*, *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 547-54 (S.D. Tex. 2025) (Alien Enemies Act). If this Court must choose, it should follow this persuasive line of authority and reject the Ninth Circuit's ill-advised deference.

### III. Plaintiffs are likely to succeed on their claim that the deployment of federal troops in Illinois violates the Tenth Amendment.

The President's deployment of National Guard troops to Illinois over the Governor's objection is unlawful for an additional reason: it violates the Tenth Amendment. U.S. Const. amend. X; *accord Oregon*, No. 3:25-cv-07156, ECF 56, at 26-27. The federalization and deployment of the National Guard violates Illinois's retained sovereignty under the Tenth Amendment in three ways: (1) by unlawfully usurping Illinois's control over its National Guard forces; (2) by punishing and coercing Illinois for enacting a state law the President dislikes; and (3) by intruding on Illinois's general police power to protect the public's health, safety, and welfare through, among other things, routine law enforcement.

The October 4 Federalization Order places Illinois National Guard members under federal command and control, usurping the Governor's authority to command them and depriving the State of Illinois of their services.[155] Through the Militia Clauses in the Constitution, the Framers carefully apportioned responsibility over the "militia"—now embodied in the National Guard— between the federal government and the states. U.S. Const. art. I, § 8, cl. 15-16. The Tenth Amendment "reserved to the States" those "powers not delegated to the United States by the

---

[155] *See* Ex. 6 (Buchanan Decl.) ¶ 14; Ex. 21, Declaration of Matthew K. Swearingen ("Swearingen Decl."), ¶ 12.

Constitution, nor prohibited by it to the States." U.S. Const. amend. X. Because of this reservation of state power, Illinois, like its sister states, "has a Tenth Amendment power to control its National Guard to the extent it is not cabined by the Militia Clause." *Oregon*, No. 3:25-cv-07156, ECF 56, at 27. By "federalizing state National Guardsmen for federal service when no statutory or constitutional authority permitted their federalization," the President and his administration have "interfered with the constitutional balance of power between the federal and state governments." *Id.* The Tenth Amendment requires this Court to reset that balance by invalidating the October 4 Federalization Order.

The October 4 Federalization Order and the Texas Mobilization Orders are also an attempt to impermissibly coerce Illinois into rescinding a sovereign choice the President does not like. Even using recognized instruments of federal power—like Congress's Spending Clause authority or, in this case, the Militia Clauses—can violate the Tenth Amendment when the effect is like "a gun to the head." *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 581 (2012) ("*NFIB*"). As confirmed by the President's own words and his relentless campaign of targeted, hostile executive actions, the President wants Illinois to abandon a specific state law he does not like: the TRUST Act, Illinois's so-called "sanctuary" law.

The President's resort to the "calling forth" power in the Militia Clauses is at least the third different federal power he has weaponized against Illinois in his campaign to dragoon Illinois into federal immigration enforcement. First, his administration sued under the Supremacy Clause to try to invalidate the TRUST Act head-on. *See generally Illinois*, 2025 WL 2098688. When that failed, the President turned to leveraging federal grant dollars—authorized by Congress through the Spending Clause—to force Illinois into either foregoing those funds or abandoning its statewide policy. Although that campaign is likewise failing, multiple battles on that front remain ongoing.

42

*See Illinois v. FEMA*, No. 25-206, ECF 71 (D. R.I. Sept. 24, 2025 Mem. and Ord.); *Illinois v. Noem*, No. 1:25-cv-00495, ECF 14 (D. R.I. Sept. 30, 2025 TRO). Now, with the October 4 Federalization Order and the Texas Mobilization Order, the President has reached for yet another federal tool to attempt to coerce Illinois into compliance with the President's preferred policy position.

At each of these steps, the President's campaign against Illinois's so-called "sanctuary" law has been coercive. That coercion has far surpassed the threshold for a Tenth Amendment violation. Both on its own, and as a particularly volatile escalation of a wide-ranging campaign of intimidation, the federalization orders inflict a degree of coercion that the Tenth Amendment does not allow. *See NFIB*, 567 U.S. at 581; *accord Murphy* ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct order to the governments of the States.").

The police power is foremost among the powers "reserved for the States" by the Tenth Amendment. The Framers ensured that that the powers which "'in the ordinary course of affairs, concern the lives, liberties, and properties of the people'" are "held by governments more local and more accountable than a distant federal bureaucracy." *NFIB*, 567 U.S. at 536 (quoting The Federalist No. 45, at 293 (J. Madison). The police power encompasses "the facets of governing that touch on citizens' daily lives," and it is "controlled by 50 different States instead of one national sovereign." *Id.* at 536. The dispersion and localization of the police power through our federalist system operates "as a check on the power of the Federal Government" in the interest of "protect[ing] the liberty of the individual from arbitrary power." *Id.* (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)).

A month into Operation Midway Blitz, the people living in the Chicago region find themselves at the whim of a federal administration brandishing the instruments of its power. Now,

the President has added federal troops to the mix, ordering them on an ill-defined, open-ended mission to accompany undefined "federal personnel" or protect undefined "federal property."[156] California's recent experience demonstrates that protecting federal "personnel" and "property" can bring National Guard troops to any number of places and communities. *See generally Newsom v. Trump*, No. 25-CV-04870-CRB, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025), *appeal pending*, No 25-5553 (9th Cir. 2025). When federal troops arrive, each of these Illinois communities will cede some portion of "local control" over "citizens' daily lives" to a "distant"—and openly hostile— "federal bureaucracy." By all but guaranteeing these intrusions throughout communities in the Chicagoland area, the October 4 Federalization Order and the Texas Mobilization Order violate the Tenth Amendment and must be enjoined from taking effect.

## IV. Plaintiffs are likely to succeed on their claim that the Posse Comitatus Act prohibits the deployment of federal troops in Illinois.

In addition to exceeding the President's authority under Section 12406 and violating the Tenth Amendment, the mobilization of National Guard in Illinois violates the Posse Comitatus Act. 18 U.S.C. § 1385. Since 1878, the Posse Comitatus Act has prohibited the U.S. military from engaging in civilian law enforcement unless expressly authorized by Congress. And yet, the very reason for the federal troop deployment in Illinois is to engage in civilian law enforcement activities like protest response and crowd control. This Court can and should enjoin the October 4 Federalization Order and the Texas Mobilization Order because they conflict with the Posse Comitatus Act and, as such, exceed the authority vested in the President and his administration. At a minimum, this Court should enjoin any federalized National Guard or other U.S. military service members deployed in Illinois from engaging in civilian law enforcement activities in violation of the Posse Comitatus Act.

---

[156] Ex. 2, October 4 Federalization Order.

"Congress has forbidden [the President] to use the army for the purpose [of] executing general laws except when *expressly* authorized by the Constitution or Act of Congress." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 644-45 (Jackson, J., concurring). The Posse Comitatus Act is the longstanding codification of this principle. It does so by imposing criminal liability on members of the military who "execute the laws of the United States" except when "expressly authorized by the Constitution or an Act of Congress." 18 U.S.C. § 1385. Military members subject to the Posse Comitatus Act may not act as a "posse comitatus," or those "upon whom a sheriff could call for assistance in preventing any type of civil disorder." *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015). National Guard members in Title 10 status—as the Illinois National Guard members deployed under the October 4 Federalization Order or Texas Mobilization Order will be—are subject to the Posse Comitatus Act. 10 U.S.C. § 12405 (National Guard members "called into Federal Service" are "subject to the laws and regulations governing the Army or the Air Force"); 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army."); *See also United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir. 1997); *United States v. Benish*, 5 F.3d 20, 25-26 (3d Cir. 1993). The limited exceptions Congress has created for the Posse Comitatus Act include statutes like the Insurrection Act, 10 U.S.C. §§ 251-55, but neither the Insurrection Act nor any other exception has been invoked here (nor could they be). The statutory authority the President has invoked, 10 U.S.C. § 12406, is not one of those exceptions.

Federal law and the Department of Defense's own regulations confirm the wide range of activities that the federal troops deployed in Illinois must not perform because of the Posse Comitatus Act. *See* Ex. 16, Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21, Enclosure 3 ¶ 1.c (Feb. 27, 2023) (Incorporating Change 1, Eff.

45

Feb. 8, 2019) (regulations implementing Posse Comitatus Act). Congress has conferred on the

Secretary of Defense the power to enact regulations to ensure that no member of the U.S. military

engages in "direct participation . . . in a search, seizure, arrest, or other similar activity unless

participation in such activity by such member is otherwise authorized by law." 10 U.S.C. § 275.

The Secretary of Defense has enacted those regulations through, *inter alia*, Department of Defense

Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies ("DODI 3025.21").

In addition to reiterating the statutory prohibitions on searches, seizures, and arrests, DODI

3025.21 further prohibits members of the U.S. military from a wide range of specific "forms of

direct civilian law enforcement assistance," including:

> A search or seizure . . . An arrest; apprehension; stop and frisk; engaging in
> interviews, interrogations, canvassing, or questioning of potential witnesses or
> suspects; or similar activity . . . Using force or physical violence, brandishing a
> weapon, discharging or using a weapon [except in self-defense or defense of others]
> . . . Evidence collection; security functions; crowd and traffic control; and
> operating, manning, or staffing checkpoints . . . Surveillance or pursuit of
> individuals, vehicles, items, transactions, or physical locations, or acting as
> undercover agents, informants, investigators, or interrogators.

Ex. 16, DODI 3025.21, Enclosure 3 ¶ 1.c (Feb. 27, 2023) (Incorporating Change 1, Eff. Feb. 8,

2019). In other words, federal law prohibits the National Guard troops deployed in Illinois from

engaging in the vast majority of what civilian law enforcement does daily—no stops or arrests, no

investigations or surveillance, no security functions, no crowd or traffic control.

Given the long list of prohibited actions specified in DOD's own regulations, there is

simply no way federalized National Guard troops can perform their assigned mission without

violating the Posse Comitatus Act. DOD's own implementing regulations for the Posse Comitatus

Act specify that federal troops may not "staff[] checkpoints, perform "security functions," pursue

"individuals" or "vehicles," or engage in "crowd and traffic control[.]" Ex. 16, DODI 3025.21,

Enclosure 3 ¶ 1.c (Feb. 27, 2023) (Incorporating Change 1, Eff. Feb. 8, 2019). Given the facial

contradiction between these limitations and the assigned mission, the federalization orders run headlong into the Posse Comitatus Act. For this additional reason, they must be enjoined.

## V. The State of Illinois will suffer irreparable harm—including profound sovereign injury—without an injunction.

There can be no serious dispute that the remaining equitable factors justify an injunction against the President's unlawful deployment orders.

At a minimum, the State of Illinois will suffer irreparable harm in the absence of an injunction. Harm is irreparable if legal remedies are "seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). The President's unlawful deployment of military force in Chicago harms Plaintiffs in multiple ways that can never be redressed through remedies at law. In the absence of injunctive relief, the State of Illinois is already enduring a substantial sovereign injury from the uncalled-for deployment of federal troops, a usurpation of the police power the Constitution expressly grants the States. A sovereign injury "is itself sufficient to establish irreparable harm." *City of Evanston v. Sessions*, No. 18 C 4853, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018). The sovereign injury to Illinois is more than sufficient, standing alone, to support injunctive relief.

But there is more. The "ongoing and concrete harm[s]" to Illinois and Chicago's "law enforcement and public safety interests" are irreparable. *See Maryland v. King,* 567 U.S. 1301, 1303 (2012). Those harms include the diversion of Illinois National Guard members from their state responsibilities, impairing the State of Illinois's ability to call upon the Guard to protect itself and its citizens to respond to a natural disaster or other emergency. Those harms also include the increased unrest the military deployment threatens to provoke, requiring increased expenditure and diversion of resources by state and local law enforcement agencies to maintain order.[157] *Cf. Swain*

---

[157] *See* Ex. 14 (Orseno Decl.) ¶¶ 66.

*v. Junior,* 958 F.3d 1081, 1090 (11th Cir. 2020) (finding irreparable harm because government officials "will lose the discretion … to allocate scarce resources among different county operations necessary to fight the pandemic"); *see also Abbott v. Perez,* 585 U.S. 579, 602 n.17 (2018) (the "inability [of the State] to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

Third, deploying military troops to Chicago threatens irreparable economic and financial harms to Illinois, Chicago, and our residents. The experience of Los Angeles and Washington, D.C. under federalized military occupation demonstrates that such an occupation wreaks havoc on local economies, particularly the restaurant and tourism sectors.[158] Those harms would likely be visited on the Chicagoland area as well, if federalized troops are deployed here.[159] That harm to local businesses would, in turn, shrink Illinois's and Chicago's tax revenues, which depend in significant part on industries that would suffer from a decrease in tourism, such as entertainment, rental cars, retail, and hotels.[160] Those financial harms are potentially devastating: in an average month, the State of Illinois takes in $313,103,426 from sales, car rental, hotel, and cannabis taxes alone, and the City of Chicago collected more than half a billion dollars in entertainment, hotel, and sales taxes alone in 2024, which made up nearly one fourth of local tax revenue for Chicago's operating fund.[161] And they are irreparable, because the United States has sovereign immunity. *Ohio v. Envtl. Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that non-recoverable costs traced to federal action are sufficient to show irreparable harm).

---

[158] Ex. 17, Declaration of Jack Lavin ("Lavin Decl.") ¶¶ 6, 8; Ex. 18, Declaration of Sam Toia ("Toia Decl.") ¶¶ 6-7.
[159] Ex. 17 (Lavin Decl.) ¶¶ 7, 9-10; Ex. 18 (Toia Decl.) ¶¶ 8-10.
[160] Ex. 19, Declaration of Rosalind Harmon ("Harmon Decl.") ¶¶ 8, 12; Ex. 20, Declaration of Marvin Salao ("Salao Decl.") ¶¶ 13, 15, 17, 19.
[161] Ex. 19 (Harmon Decl.) ¶¶ 8-9; Ex. 20 (Salao Decl.) ¶¶ 14, 16, 18-19.

Plaintiffs need not wait before obtaining injunctive relief. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) ("[T]he alleged harm need not be occurring or be certain to occur before a court may grant relief.") Rather, plaintiffs need only show a "presently existing actual threat." *Id*. Here, the Defendants' plan to deploy military troops is clear, as evidenced by the October 4 Federalization Order and the Texas Mobilization Order.

Finally, injunctive relief is appropriate where (1) the balance of the equities tips in the applicants' favor and (2) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These "factors merge" when the government is the party to be enjoined. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The balance of the equities tips sharply in Plaintiffs' favor. Plaintiffs seek to protect their sovereignty, retain control over local policing, and prevent completely unnecessary disruption to one of the world's leading local economies. They have filed this suit to protect the basic structure of American federalism from this administration's unprecedented intrusion. On the other hand, the federal government faces no harm from an injunction. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding that "[t]here is generally no public interest in the perpetuation of unlawful agency action," but rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operation" (internal quotation marks omitted)). The federal government has enforced federal law in Illinois for decades without the support of active-duty military forces. It may continue to enforce such laws even with Plaintiffs' requested injunction in place. This Court can and should enjoin the unlawful deployment orders issued by President Trump's administration.

49

**VI.    The impending deployment of Texas National Guard troops in Illinois is unlawful for the same reasons—and more—and compounds the grave, irreparable injury to Illinois's sovereignty.**

After approximately 5:00 p.m. on the evening of Sunday, October 5, members of Governor Pritzker's administration received information through informal channels that approximately 200 members of the Texas National Guard will be deployed in Illinois beginning October 6. A few hours later, Governor Pritzker's administration received a copy of an undated memorandum from Secretary Hegseth directed to the Adjutant General of the Texas National Guard regarding "Calling Members of the Texas Guard into Federal Service," (the "Texas Mobilization Order") in which Secretary Hegseth asserts:[162]

> On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to [10 U.S.C. § 12406] to protect [ICE] and other [federal] personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations. On October 4, 2025, the President determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations through the United States.

The undated Texas Mobilization Order further indicates that "up to 400 members of the Texas National Guard" would be mobilized purportedly under 10 U.S.C. § 12406 "to perform federal protection missions were needed, including in the cities of Portland and Chicago."[163] Because of the grave intrusion on Illinois's sovereignty posed by this development, Plaintiffs are compelled to seek immediate relief against this additional unlawful action now.

Defendants' plan to deploy federalized troops to Illinois under 10 U.S.C. § 12406— regardless of where they are from—fails to meet the requirements of that statute. In other words, for all the reasons that the October 4 Federalization Order regarding the Illinois National Guard is

---

[162] Ex. 3, Texas Mobilization Order.
[163] *Id.*

unlawful, the Texas Mobilization Order is likewise unlawful and *ultra vires*. The Section 12406 perquisites do not exist, and the Governor Pritzker has not formally received an order of any kind regarding the Texas National Guard, so any such order has not been issued "through" him. *Id.*

The Texas Mobilization Order is even more "untethered to the facts" on the ground in Illinois. *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 23. By invoking the June 7 Presidential Memorandum—issued after protests in California—the Texas Mobilization Order confirms that the plan to send federal troops to Illinois predates any recent events in Illinois. Events that occur after a decision has already been made cannot form the factual predicate for that decision.

Although the Texas Mobilization Order also refers to "violent incidents" considered by President Trump on October 4, there is no indication where these events took place or when. The federal government has already failed in arguing that "violence in a different state" can justify invocation of Section 12406, *Oregon*, No. 3:25-cv-1756-IM, ECF 56 at 21, and for good reason: allowing such an unbounded universe would undermine the high threshold Congress set for invoking Section 12406. *Id.* at 22. Because "violence *elsewhere* cannot support troop deployments *here*," the geographically unspecified "violent incidents" in the Texas Mobilization Order provide no support for sending troops from Texas to Illinois. *Id*.

In addition to being factually unsupported, the Texas Mobilization Order gets the law wrong. The President's purported October 4 "determ[ination]" was that "violent incidents" and "a credible threat of continued violence" are "impeding the execution of the laws of the United States" in Illinois, Oregon, and unspecified "other locations" in the United States.[164] But Section 12406(3) refers to the President being "unable" to execute federal law. *See* 10 U.S.C. § 12406(3). The word

---

[164] Ex. 3, Texas Mobilization Order.

"impeding" appears nowhere in Section 12406. The Texas Mobilization Order is thus *ultra vires* on its face because it relies on a triggering condition that Congress has not adopted.

Deploying Texas National Guard members to Illinois is also a violation of the Tenth Amendment. The unauthorized federal deployment of troops one from state into another state is a particularly jarring afront to the non-consenting state's sovereign "integrity"—territorial and otherwise—and "dignity." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)). And as noted, the federalization and deployment of Illinois National Guard troops is already, by itself, an unduly coercive attempt to force Illinois to abandon its sovereign choice not to assist with federal civil immigration enforcement. Sending in troops from another state that has made the opposite choice—the choice favored by the President— makes the coercion all the more transparent and egregious. *See City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) (upholding Texas statute regarding local immigration enforcement).

Finally, as explained above, the Texas Mobilization Order is also inconsistent with the Posse Comitatus Act, because the mission specified cannot be reconciled with the limitations imposed by that statute and DOD's own implementing regulations. The Texas Mobilization Order suffers from the same defects as the October 4 Federalization Order regarding the Illinois National Guard. The Court should enjoin them both.

## CONCLUSION

For the foregoing reasons, the Court should grant the State of Illinois and City of Chicago's motion and enter a temporary restraining order and preliminary injunction against implementation of the October 4 Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military over the objection of the Governor of Illinois.

Dated: October 6, 2025

Respectfully submitted,

**MARY B. RICHARDSON-LOWRY**
*Corporation Counsel of the City of Chicago*

**KWAME RAOUL**
*Attorney General of Illinois*


By: /s/ Stephen J. Kane

By: */s/* Christopher G. Wells

STEPHEN J. KANE
CHELSEY B. METCALF
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
stephen.kane@cityofchicago.org
chelsey.metcalf@cityofchicago.org

*Counsel for the City of Chicago*

CARA HENDRICKSON
Executive Deputy Attorney General
CHRISTOPHER WELLS
Division Chief, Public Interest Division
SARAH J. NORTH
Deputy Division Chief, Public Interest Division
SARAH HUNGER
Deputy Solicitor General
KATHARINE ROLLER
Complex Litigation Counsel, Public Interest
Division
GRETCHEN HELFRICH
Deputy Chief, Special Litigation Bureau
KATHERINE PANNELLA
Senior Assistant Attorney General, Civil Rights
Bureau
SHERIEF GABER
MICHAEL TRESNOWSKI
Assistant Attorneys General, Special Litigation
Bureau
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Christopher.Wells@ilag.gov
Sarah.North@ilag.gov
Katharine.Roller@ilag.gov
Gretchen.Helfrich@ilag.gov
Katherine.Pannella@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*