EXHIBIT 14

## <u>DECLARATION OF MAJOR DONALD ORSENO</u>

I, Donald Orseno, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am over the age of eighteen and understand the obligations of an oath.

2.      I am the Major of Strategic Planning in the Office of the Director at the Illinois State Police (ISP). I have been employed by the ISP for 23 years across multiple divisions and offices. The Office of Strategic Planning is focused on the long-term vision of the ISP as well as allocating resources effectively to achieve specific goals in times of emergency. Strategic Planning is also responsible for the coordination of resources within the ISP's divisions during times of civil unrest or natural disasters.

3.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with ISP staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently based on information and belief to the matters set forth below.

## <u>The ISP: Protecting Public Safety and Promoting Justice in Illinois</u>

4.      The ISP is a public safety agency of nearly 3,000 employees, who are assigned to the Divisions of Criminal Investigation, Patrol, Forensic Services, Justice Services, Academy and Training, Statewide 911, and Internal Investigation, as well as bureaus under the Office of the Director. The ISP conducts statewide criminal investigations of violent crime, of drug, gun, and human trafficking, of public corruption, and of child exploitation; special operations including Special Weapons and Tactics (SWAT), air operations, federal task force officers, and Illinois's Statewide Terrorism and Intelligence Center (STIC); criminal interdiction and traffic patrol functions; Illinois' central repository for the National Instant Criminal Background Check System (NICS), Criminal Justice Information Services (CJIS), and the firearms background check system;

1

training of state police cadets and many local law enforcement recruits; telecommunications and implementation of Next Generation 911; and security for State of Illinois buildings, government officials, infrastructure, and employees.

5.      In recent years, working with federal, state, and local law enforcement and homeland security partners, the ISP has led the statewide law enforcement response to the COVID-19 pandemic, 2020 civil unrest, 2020 presidential election, and 2024 Democratic National Convention (DNC) security, as well as other protective security efforts.

6.      Every day, in pursuit of our mission of protecting the people of Illinois and promoting justice throughout all communities of the state, ISP officers conduct law enforcement activities such as searches and seizures, arrests, traffic stops and traffic control, security patrols, building security, and crowd control. Our officers have extensive experience with each of these actions and are trained in the constitutional implications of each. ISP officers are well-versed in the Fourth, Fifth, and Sixth Amendment rights of suspects, and are steadfast in protecting those fundamental rights as well as public safety.

7.      Like all law enforcement agencies, the ISP depends on the trust of the public to carry out its mission. We build that trust through constitutional, community policing, holding ourselves to the highest ethical standard. As members of the communities we serve, our officers have a strong incentive to maintain the public's trust. Our officers' deep knowledge of local communities and conditions in Illinois—and the Chicago area, specifically—enhances our effectiveness and is essential to carrying out our law enforcement mission.

**The ISP's Training Procedures**

8.      The ISP works to ensure that all of its officers are trained to safely and effectively carry out their duties in accordance with the law. Our training is founded on the core values and

2

tenets of the Peelian Principles[1] which are posted in every classroom at the ISP Academy, as well as the best practices of modern policing. Effective communication and de-escalation techniques are critical tools reinforced throughout the training to emphasize their importance in community engagement, solving crime and reducing violence.

9.      Each newly hired ISP officer must complete 27 weeks of Academy training (or 12 weeks if the officer has prior law enforcement service), followed by additional weeks or months of field training under the guidance of specially trained, experienced ISP officers. Academy training includes instruction in: civil disorder and crowd behavior; communication tactics; crime scene investigation; ethics; constitutional policing and procedural justice; identification procedures; laws and caselaw regarding search and seizure and arrest; relevant evidentiary standards and the legal requirements of reasonable, articulable suspicion and probable cause to conduct a Terry stop/frisk or arrest someone, respectively; rules of conduct; rules of evidence; vehicle stops and occupant control; and use of force and duty to intervene; among many other training topics.

10.     The ISP's training in civil disorder and crowd control includes 32 hours of classroom instruction as well as hands-on training and briefings. The ISP also has a Crowd Control Team (CCT) that is responsible for responding to and providing public safety during civil disorders and large gatherings. That CCT team receives specialized bi-annual training. SWAT personnel receive annual training on proper use and techniques for all less-lethal devices, which are deployed

---

[1] A summary of the 9 Peelian Principles are: (1) to prevent crime and disorder, (2) police powers are dependent on public approval, (3) securing the willing cooperation of the public, (4) public cooperation reduces need for force, (5) impartial service to law, protect and preserve life, (6) only use force where necessary and to a minimum, (7) police are the public and the public are the police, (8) strict adherence to police-executive functions, and (9) prevention is better than response.

3

during crowd control in case they are required under the ISP's use of force policy, discussed in further detail below. All ISP officers learn applicable law including First Amendment protections, crowd and demonstrator behavior and techniques, and tactics for containing crowds, isolating disorderly protestors, and dispersing unlawful assemblies, while minimizing the use of force.

11.    ISP Academy training also provides real-world, interactive use-of-force scenarios in the areas of critical incident training, tactical judgment, and de-escalation training.

12.    The ISP provides extensive training in Control and Arrest Tactics (CAT) which focuses again on de-escalation, only utilizing that degree of force necessary to effect the arrest.

13.    The ISP's traffic control training includes classroom and practical exercise training in the areas of traffic law enforcement, traffic safety, traffic stops, and traffic incident management.

14.    The ISP also provides ample ongoing training on the above topics for current officers, including annual mandatory and in-service training. Officers who are expected to respond to large demonstrations also receive specialized training to prepare them for that work. For example, in preparation for the 2024 DNC in Chicago, when significant protest activity was expected, the ISP provided in-person training to all ISP officers on First Amendment rights, and the difference between protected and criminal conduct. The ISP CCT received additional training on crowd control and demonstrator techniques and tactics and responding to new demonstrator methodologies.

15.    The ISP trains all of its officers throughout their careers to protect people, property, and the peaceful exercise of Illinoisans' First Amendment rights.

## The ISP's Extensive Experience with Civil Unrest and Crowd Control

16.    Illinois, and Chicago in particular, have a long history of protest activity, including mass demonstrations. Thus, ISP officers are often called to put their training into practice in

responding to large protests.  This is a long-term, historical mission of the ISP that has been called upon throughout numerous points in state history, and continues through today. In 2024, ISP's Troop 3 prepared for and devoted resources to more than 60 protest events in and around the Chicagoland area.

17.     The ISP and local law enforcement partners have repeatedly demonstrated their effectiveness in managing recent episodes of protest activity. For example, dozens of protests of varying sizes during the 2020 George Floyd civil unrest, anticipatory measures taken during the peak of the Gaza and Palestinian-related protests, protest activity at the 2024 DNC, the 2025 No Kings protests, and annual recurring protests or crowd control events such as Mexican Independence Day caravans are routinely managed appropriately by the ISP and its partners.

18.     In addition to the training described above, the ISP's advance preparations for this work typically includes creating a senior leadership team and a command post; developing a communications plan; determining staffing; participating in the Federal Emergency Management Agency's (FEMA) tabletop exercises on agency coordination and response to large-scale critical events; behind the scenes observations of other National Special Security Events such as the 2024 Republican National Convention and the Summit of the Americas; participating in a Chicago Police Department training on mass arrests; and assisting with training the Illinois National Guard on tactics more fully described below.

19.      In addition to the CCT team, which is trained for such events, other specialized units are often called upon to help manage large demonstrations where police intervention is needed. For example, STIC provides real-time intelligence information regarding critical incidents; the ISP's Air Operations Bureau provides aircraft and highly trained flight crews to monitor large-scale protests and events and provide intelligence to officers on the ground; the

Intelligence Support Unit (ISU) utilizes drone detection along with drones to assist with safety and intelligence; SWAT personnel are trained in crowd control and deployed with less-lethal devices; and Telecommunications Services Bureau (TSB) telecommunicators are trained in and handle emergency communications for critical events.

20.     Finally, ISP officers provide security and traffic control on Illinois highways to prevent vehicular and pedestrian incursions.

21.     The ISP, along with other law enforcement agencies in Illinois, participates in a multi-agency command (the Law Enforcement Joint Operations Command, or LEJOC) specifically for managing large-scale civil disturbances, mass casualty events, and natural disasters. The LEJOC is composed of senior-level officials from state and federal agencies, along with designated policymakers; the ISP serves as the primary agency for law enforcement coordination. When the Illinois National Guard is activated by the Governor under the Illinois Emergency Operations Plan, the ISP assists with coordination for placement of Illinois National Guard personnel. The ISP also has also used the Illinois National Guard, when activated by the Governor, for large winter weather and natural disaster responses.

22.     The ISP also participates in the Illinois Law Enforcement Alarm System (ILEAS), which, among other programs, provides a mutual aid program that enables local law enforcement agencies to request assistance from other members in the event of a crisis beyond the ability of a single agency to control. This system has proven effective in addressing large-scale protest activity such as the 2020 U.S. presidential inauguration and Gaza and Palestinian-related protests, and in addressing the recent smaller-scale protests in Broadview, Illinois, discussed in greater detail below.

23.     For years, the ISP and its partners in local law enforcement have successfully managed civil unrest in Illinois—and specifically in the Chicago area—effectively and constitutionally without the intervention of the National Guard or other military forces. We expect to continue doing so in the future, and we are actively monitoring and continually preparing for future episodes of civil unrest in Chicago, its suburbs, and elsewhere in the state. For example, we are monitoring for threats to federal law enforcement at the Immigration and Customs Enforcement (ICE) processing facility in Broadview and are prepared to act preventively and protectively on any intelligence we receive.

24.     During the narrow circumstances in which the National Guard has been called to assist with responding to civil unrest in Illinois, their role has been limited. Unlike the ISP and local Illinois law enforcement officers, National Guard members are not required to receive law enforcement training mandated by Illinois or federal law.

25.     When the National Guard was activated during the protests following the death of George Floyd, it fell to ISP officers to provide National Guard members with rudimentary security training, including some basic crowd control techniques. That training was extremely limited in scope, given the short time available and the limited experience of National Guard members who did not have law enforcement or military police experience.

26.     Additionally, during this period, the ISP expended considerable resources to make sure every National Guard unit deployed had at least one ISP Trooper with them.  This was important because the National Guard did not possess the proper communication devices to contact the Chicago Police Department, and swift communication is an essential tool in law enforcement.

27.     Historically, deployments of the National Guard for civil disturbances have required the ISP to expend significant resources.

## The ISP's Use of Force Policy

28.     Proper crowd control and civilian policing, including during First Amendment protected activity, requires adherence to proper, lawful use of force protocols.

29.     All officers are trained in the ISP's use of force policy (OPS-046, Use of Force and Intermediate Weapons). A true and correct copy of this public policy is attached to this declaration as Exhibit A, and an excerpt appears below. The use of force policy has been prepared with the understanding that it allows for maintaining safety while still respecting the Constitutional rights of individuals involved.

30.     As shown in the diagram excerpted below, the ISP's use of force policy prescribes a proportional, stepped approach matched to the subject's level of resistance. For passive resistance, defined as resistance "where a subject does not attempt to defeat an officer's attempt to touch or control but will not voluntarily comply with verbal and physical attempts of control," the policy does not permit the use of any type of weapons, nor hard empty-hand control, meaning "strikes or take-downs."

31.     Under the ISP's use of force policy, oleoresin capsicum spray (pepper spray), smoke agents, and other irritant agents are permitted only in response to active physical resistance to an officer's attempt to gain or maintain control of the subject.

### USE OF FORCE MODEL DIAGRAM



| | | | | | |
|---|---|---|---|---|---|
| | | | | | **DEADLY FORCE, FIREARMS** |
| | | | | **HARD EMPTY-HAND CONTROL, OLEORESIN CAPSICUM SPRAY, INTERMEDIATE WEAPON STRIKE, CEW, K-9 APPREHENSION** | |
| | | | **SOFT EMPTY-HAND, PRESSURE SENSITIVE AREAS, JOINT MANIPULATION** | | |
| | **OFFICER PRESENCE, TACTICAL COMMUNICATION** | | | | |
| COOPERATIVE SUBJECT | VERBALLY UNCOOPERATIVE | PASSIVE RESISTANCE | ACTIVE RESISTANCE | PHYSICALLY COMBATIVE, LESS THAN GREAT BODILY HARM / DEADLY FORCE | PHYSICALLY COMBATIVE, GREAT BODILY HARM / DEADLY FORCE |

32.     With respect to chemical agents like tear gas, ISP's use of force policy provides specific restrictions on, and procedure for, their use:

> A peace officer, or any other person acting under the color of law, shall not use chemical agents or irritants for crowd control, including OC spray and tear gas, prior to issuing an order to disperse in a sufficient manner to allow for the order to be heard and repeated if necessary, followed by sufficient time and space to allow compliance with the order unless providing such time and space would unduly place an officer and another person at risk of death or great bodily harm.

Ex. A, ¶ V.F.3.

33.     The policy provides other restrictions and procedures for the use of each of the other categories of weapon as well.  *See generally* Ex. A.

34.     It further provides that "a peace officer, or any other person acting under the color of law, shall not use force as punishment or retaliation."  Ex. ¶ V.B.

## Partnering with Federal Law Enforcement

35.     As stated above, the ISP also routinely and effectively collaborates with and assists federal law enforcement, including the Federal Bureau of Investigation (FBI); the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); Homeland Security Investigations (HSI); the Drug Enforcement Administration (DEA); United States Marshals Service (USMS); the United States Postal Inspection Service (USPIS); the United States Secret Service (USSS); and other federal law enforcement agencies.

36.     As an example, the ISP is responsible for deconfliction between law enforcement agencies in the Chicago area. For instance, deconfliction prevents two agencies—say, the Chicago Police Department and the DEA—from trying to carry out a search warrant at the same address at the same time. The ISP utilizes these deconfliction pathways to prevent interference in federal enforcement activities. The ISP does not interfere in the enforcement of federal law and, as a matter of policy, takes appropriate steps to ensure federal law enforcement can conduct their operations.

37.     In another example, the ISP participates in two "fusion centers" that facilitate information- and intelligence-sharing among law enforcement and public safety agencies: the ISP's own statewide fusion center, STIC, which includes analysts from the Chicago Police Department, the Cook County Sheriff's Office, the FBI, DEA, and DHS including HSI, among other agencies; and the Crime Prevention and Information Center (CPIC), which is staffed by full-time personnel from the ISP, the Chicago Police Department, the FBI, and DHS. Among other services, these fusion centers monitor criminal activity in real time to assist in investigations, communicate with field personnel to enable proactive measures, and inform agencies of specific incidents pertinent to their missions.

38.     The ISP also regularly responds to ad hoc requests for assistance from federal law enforcement agencies. For example, the ISP routinely receives requests from DHS, USSS, and the Capitol Police to assist with dignitary escorts, and those requests are vetted through the chain of command and assigned accordingly. Additionally, the ISP receives requests to assist with arrests, investigations, and traffic stops of suspects and persons of interest on interstate contraband-related crimes; those requests are vetted, and assistance is provided.

39.     In the last few years, the ISP has not been asked to provide law enforcement resources to protect federal facilities, although the ISP stands ready to assist if law enforcement circumstances warrant it.

## The ISP: The Trust Act and Federal Immigration Enforcement

40.     Pursuant to Illinois law, the ISP does not participate, support, or assist with Immigration and Customs Enforcement's (ICE) civil enforcement removal operations but neither does the ISP hinder them in any way – they are free to carry out their operations in our jurisdiction just as other federal law enforcement agencies can and do.

41.     The ISP does cooperate with HSI on criminal investigations and with other divisions of DHS. ISP officers assigned to the statewide Illinois Trafficking Enforcement Group work with HSI on arrests and victim rescue for human trafficking; and STIC works with a full-time DHS intelligence officer, who is assigned at the fusion center, described above. For example, the ISP also provided dignitary escorts in August of 2025 for Secretary of Homeland Security Kristi Noem.

42.     The ISP also routinely shares information and intelligence regarding threats to federal officer safety or other aspects of federal law enforcement operations with all components of DHS, where appropriate. If federal officers were in danger, the ISP would respond to protect them, just as we would for any other law enforcement officers.

43.     ISP officers stand ready, able, and willing to assist our federal law enforcement partners where appropriate. If federal law enforcement agencies find themselves unable to protect federal personnel or property, they may reach out to the ISP for aid, as they have before.

**<u>The ISP's Involvement Responding to Recent Protest Activity in Broadview</u>**

44.     The ISP recently has been involved in monitoring and providing support in connection with public safety needs raised by local law enforcement in Broadview, Illinois, a small village about 12 miles west of Chicago, where there is an ICE detainee processing center. A true and accurate diagram of the area surrounding the facility appears below. As shown in the diagram, the facility is bordered by railroad tracks to the west, a private business to the north, Beach Street to the east, and another private business to the south. It has two entrance/exits, which are labeled on the diagram: the Beach Street exit to the north and the Harvard Street exit to the south.

11



45. Small-scale protest activity began outside the ICE facility in Broadview this summer, and is continuing through the date of this declaration.

46. The ISP has been in daily communication with the Broadview Police Department (BPD) about this activity. Through those direct channels, and through the ILEAS system discussed above, the ISP has responded to BPD's requests for assistance regarding the protest activity, including providing surveillance equipment, intelligence from STIC, gas masks and training on their use, and vehicles and personnel for traffic control.

47. For example, at BPD's request, ISP officers briefly closed an Interstate 290 on-ramp adjacent to the ICE facility during one protest event. To our knowledge, every one of the

12

BPD's requests for assistance with the recent protests has been fulfilled, whether by the ISP or by another Illinois law enforcement agency.

48.     ISP received three requests from DHS's Homeland Security Investigations (HSI) to provide assistance and responded to each of them. One concerned an arrested protester in possession of a firearm; ISP clarified that the protester had a valid Firearm Owner Identification card and Concealed Carry Permit. The second involved traffic management for a potential protest, and the third was a request for video of the Broadview facility site.

## Protest Activity in Broadview on October 3rd, 2025, and the ISP's Response

49.     On October 2nd, 2025, at the request of the BPD, the Cook County Sheriff's Office (CCSO) and the ISP, with assistance from the Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency (IEMA), the ISP established a temporary Unified Command to coordinate public safety measures in Broadview. The Unified Command set up designated areas where people could safely exercise their rights in order to support public safety and ensure vehicular traffic could safely access the roads in the area.

50.     On October 3rd, 2025, Kristi Noem, the United States Secretary of Homeland Security, visited the ICE facility.

51.     When Secretary Noem's motorcade exited the facility, it went through the Harvard entrance.

52.     There were two routes to exit the ICE facility; one of which was through the Harvard Street entrance and the other through the Beach Street entrance.

53.     At that time, there was a route at the Beach Street entrance that did not have protesters at the entrance.

54. At the same time the motorcade exited the facility, the Harvard Street entrance was congested with protesters.

55. At approximately 9:10 a.m., as the motorcade prepared to approach the intersection of Harvard Street and 25th Avenue where protesters were gathered, federal agents consulted with ISP personnel. The federal agents advised they would give the crowd in the northeast area of the intersection a warning to clear the block before taking action. Federal agents stated their intent to bring the Secretary down Harvard Street to 25th Avenue, turning north to enter a building in the area. Secretary Noem's motorcade to passed directly through a protest of approximately several hundred people where ISP personnel were already engaged. An alternate entry point at the rear of the building—approximately 300 yards from the protest activity—was available.

56. At that time, ISP was actively engaged in crowd management, with officers holding a line to prevent protesters from entering the roadway. ISP offered to push the crowd back further as an alternative to the use of "gas," but federal agents indicated they intended to make arrests. Federal agents then warned the crowd to move; immediately thereafter, the federal agents advanced independently, and effected arrests. As they advanced, ISP officers were in the process of donning gas masks as a precaution in case federal agents deployed chemical irritants. Therefore, ISP was not in a position to move the crowd in a manner consistent with ISP crowd management procedures (an organized line of officers with warnings and a methodical, slow approach). Concurrently, ISP was mobilizing 19 additional officers to implement a systematic crowd movement strategy.

57. At approximately 9:22 a.m., federal agents advised that the large crowd on the southwest corner of Harvard Street and 25th Avenue would need to be relocated further back to allow the motorcade to proceed. The crowd was moved approximately 20–30 feet from the

roadway using ISP officers as well as federal agents to prepare for the arrival of the Secretary. Federal agents asked ISP personnel if "gas" would be useful; ISP personnel advised the situation was under control and did not request its use. Once the roadway was clear, the Secretary's motorcade advanced through the area. No pepper balls, gas, or other chemical or irritant agents were deployed, either by federal agents or by state and local law enforcement. After the Secretary's motorcade departed, the number of protesters near the facility began to decrease.

58.     Overall, the Unified Command accomplished its mission of maintaining public safety and protecting protesters' First Amendment rights on October 3rd.

59.     Over the course of the day and evening, the ISP made four arrests, and the BPD made one arrest, all of which were for charges related to disobeying or resisting law enforcement; in two instances, battery or aggravated battery charges were also involved. According to the information available to the Unified Command, federal law enforcement arrested or detained 12 people.

60.     Over the course of the day and evening, protesters objected to the ISP's presence outside the ICE facility. Officers heard comments such as, "Quit your job," "You are helping ICE and helping kidnap people," "You fascist pigs," "You are complicit," "You are violating the TRUST Act," and "Who are you protecting?"

## National Guard or Other Military Deployment into the Chicago Area

61.     Due to public statements by federal leaders and information provided by the ISP's federal law enforcement partners indicating that immigration enforcement operations in the Chicagoland area could be accompanied by a National Guard deployment, the ISP has devoted significant staff time to preparing for the possibility of such a military deployment.

62. For example, senior command staff at the ISP have attended daily meetings to discuss contingency plans for responding to any National Guard or military force deployment, as well as frequent briefings with other state leaders and law enforcement agencies, including the Governor's office, the adjutant general of the Illinois National Guard, and the Illinois Emergency Management Agency. Command staff and others at the ISP have spent substantial time making practical preparations for the possible deployment and ensuing civil unrest, including surveying personnel for their availability to address protest activity, preparing specialized crowd control units, planning for reassignment of personnel, testing communications systems and equipment, and training ISP personnel on how to recognize different military uniforms and insignia. Finally, command staff and others at the ISP have spent time responding to numerous media inquiries about a potential military deployment.

63. As stated above, the ISP and its local law enforcement partners are experienced and highly capable of handling protest activity, even large and unruly protests, without assistance from military troops.

64. In addition, in the event we need additional assistance from the National Guard, there is a well-established process for assessing that need and then making the appropriate requests. The ISP has no information or intelligence that Illinois has that need at the present time.

## Conclusion

65. Based on its extensive experience, long-term collaboration with local and federal law enforcement, and best-practices training for responding effectively and professionally to both First Amendment-protected protests and civil unrest, the ISP is uniquely qualified and positioned to partner with local law enforcement to successfully handle such events.

66.     With the deployment of the National Guard or other military forces into peaceful protests and/or civil unrests, there are inherent, significant logistical and operational challenges for the ISP and local law enforcement.

67.     Nonetheless, if the National Guard or other military force is deployed to the Chicago area, the ISP will attempt to professionally communicate and coordinate with such deployment to protect public safety, the exercise of constitutional rights, and law enforcement as well as military personnel.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of October, 2025, in Cook County, Illinois.

*Donald Orseno*
Donald Orseno
Major of Strategic Planning
Office of the Director
Illinois State Police

17

# EXHIBIT A

# ILLINOIS STATE POLICE DIRECTIVE
## OPS-046, USE OF FORCE AND INTERMEDIATE WEAPONS

| RESCINDS: | REVISED: |
|---|---|
| OPS-046, 2022-182, revised 06-17-2022. | 07-24-2023     **2023-163** |
| **RELATED DOCUMENTS:**<br>ENF-019, OPS-002, OPS-003, OPS-004, OPS-034, OPS-047, OPS-048, OPS-052, OPS-054, OPS-084, ORD-001, PER-012, PER-029, ROC-002, Control and Arrest Tactics Manual | **RELATED CALEA STANDARDS (6th Edition):**<br>1.1.2, 1.2.2, 4.1.1, 4.1.2, 4.1.3, 4.1.4, 4.1.5, 4.1.6, 4.1.7, 4.2.1, 4.2.2, 4.2.3, 4.2.4, 4.2.5, 4.3.1, 4.3.2, 4.3.3, 4.3.4, 26.1.1, 26.2.1, 26.2.5, 26.3.1, 26.3.7, 33.4.1, 33.5.1, 33.6.1, 33.6.2, 40.1.1, 40.2.1, 40.2.2, 41.2.1, 41.2.2, 41.2.3, 41.3.8, 46.1.4, 46.1.10, 46.1.12, 61.1.2, 70.1.7, 70.2.1, 83.2.2 |

### PREAMBLE

The primary mission of the Illinois State Police (ISP) is to promote public safety through education and enforcement. In the course of enforcement activity encounters, it may be necessary to control and apprehend offenders using varying degrees of force in order to effect an arrest, prevent escape, or to protect the officer or others from injury or death. An officer is authorized to use reasonable force to gain compliance and need not retreat from their enforcement duties in the face of threatened or actual resistance by an offender. Due to the often dynamic and stressful nature of these types of encounters, the standard of review for any application of force is whether it was objectively reasonable under the totality of the circumstances from the perspective of a reasonable officer in the same circumstances. To achieve this mission, ISP officers will be trained in appropriate tactics and techniques to successfully gain offender compliance while protecting the rights of the offender as well as the general public.

I.  POLICY

The Illinois State Police (ISP):

I.A.    Will provide Cadet, In-service, and remedial instruction in the appropriate use and application of force through the ISP Academy that includes, but is not limited to, tactical communication, decision making under stress, Control and Arrest Tactics (CAT), appropriate use of intermediate weapons, firearms, etc.

I.B.    Will ensure that all officers complete Quarterly In-service Training provided through the Academy to ensure ongoing proficiency and that training participation is documented.

I.C.    Will ensure that when force is used in an encounter, proper medical aid is rendered for any party who appears to be injured in the encounter in a reasonably timely manner and when it is safe to do so, and that the outcomes are documented.

I.D.    Will comply with all reporting requirements imposed by state and federal statute.

I.E.    Acknowledges that this policy does not preclude the use of any technique(s) to protect an officer or another under the threat of great bodily harm and/or death.

II. AUTHORITY

II.A.   U.S. Constitution, IV Amendment

II.B.   720 ILCS 5/7 et seq., especially
720 ILCS 5/7-1, "Use of force in defense of person"
720 ILCS 5/7-5, "Peace officer's use of force in making arrest"
720 ILCS 5/7-5.5, "Prohibited use of force by a peace officer"
720 ILCS 5/7-8, "Force likely to cause death or great bodily harm"
720 ILCS 5/7-9, "Use of force to prevent escape"
720 ILCS 5/7-15, "Duty to Render Aid"
720 ILCS 5/7-16, "Duty to Intervene"

II.C.   Tennessee v. Garner, 471 U.S. 1 (1985)

II.D.   Graham v. Connor, 490 U.S. 386 (1989)

III.   DEFINITIONS

III.A.   Apprehension (K-9) – a suspect surrenders, changes behavior, or is otherwise brought into custody as the result of a canine deployment, either due to the canine being used as trained, or due to the suspect surrendering after realizing the canine may be used.

III.B.   Apprehension with Contact (K-9) – a suspect brought into custody as the result of canine contact (also referred to as a bite).

III.C.   Authorized Weapons – ISP authorized firearms are identified and addressed in ORD-001, "Firearms," and authorized intermediate weapons are defined in this directive below and addressed in section V., "Procedures," of this directive.

III.D.   Canine (K-9) Team – police canine team includes the officer canine handler and specially trained canine.

III.E.   Chokehold – applying any direct pressure to the throat, windpipe, or airway of another, with the intent to reduce or prevent the intake of air (720 ILCS 5/7-5.5) or prevent the ingestion of evidence. Chokehold does not include any contact with the neck that is intended to stabilize or restrain the head, but not reduce the intake of air.

III.F.   Conducted Energy Weapon (CEW) – an instrument used by an officer to aid in establishing control of a subject by means of conducted energy and by use of neuromuscular incapacitation and/or pain compliance by probe deployment and/or direct contact (also known as a Taser).

III.G.   Control and Arrest Tactics (CAT) – Academy-instructed skills in verbal control, handcuffing, soft, empty-hand control, Oleoresin Capsicum (OC) spray, hard empty hand control, escalation and de-escalation of force decisions, tactical communication, and the use of intermediate weapons.

III.H.   Deadly Force – force likely to cause death or great bodily harm, including, but not limited to, the discharge of a firearm into an occupied vehicle or in the direction of any person.

III.I.   Deadly Weapon – a deadly weapon is defined as a firearm, knife, vehicle, or anything else that in the manner of its use, or intended use, is capable of causing death or great bodily harm.

III.J.   Display of a Weapon – the act of showing a weapon (CEW, firearm, etc.) to an individual(s) in a manner designed or intended to change behavior.

III.K.   Encounter – an encounter is a physical or verbal event. A physical encounter is one in which an officer uses force to achieve compliance. A verbal encounter is one in which an officer uses verbal de-escalation tactics to prevent a physical encounter. A physical encounter is a use of force incident. Officer presence, a verbal encounter, or the use of handcuffs on a compliant subject are not a use of force incident.

III.L.   Excessive Force – force that is greater than was reasonably necessary given the totality of the circumstances from the perspective of a reasonable officer in the same circumstances.

III.M.   Impact Munitions – blunt-impact projectiles deployed from a less-lethal firearm. Impact munitions may contain a chemical agent or marking substance to enhance the effectiveness of the round or aid in the identification of suspects.

III.N.   Impact Weapon – an impact weapon is a form of intermediate weapon that is used to gain compliance by transferring kinetic energy or pressure to the subject (pain and disruption compliance) or to leverage the subject into a position of control.

III.O.   Intermediate Weapon – an instrument or weapon that, by its design or use, bridges the gap between deadly force and unarmed control techniques. Examples include OC spray, baton, CEW, less-lethal munitions, or any other improvised device used to gain offender control and compliance in accordance with this directive.

III.P.   Less-Lethal Launcher – also known as a less-lethal delivery device, a device used specifically for the deployment of impact munitions.

III.Q.   Levels of Subject Behavior/Resistance – behaviors/actions displayed by a subject requiring the officer to increase or decrease the amount of force required to subdue or apprehend the subject. Specific behaviors are defined in section IV.B. below.

III.R.   Non-Deadly Force – force not likely to cause death or great bodily harm.

III.S.   Officer – any Sworn employee of the ISP, as well as inspectors under the authority of ISP task forces and Metropolitan Enforcement Group (MEG) units.

III.T.   Officer's Response to the Subject's Behavior – officer actions in response to a subject's displayed behavior. Specific response options are defined in section IV.C. below.

III.U.   Restraint Device – a device used to temporarily restrict a subject's movement.

III.V.   Subject – any person that is potentially subject to enforcement action by an officer during the course of his/her duties.

III.W.   Tactical Communication – the use of persuasive verbal techniques to de-escalate non-compliant behaviors, deflect a subject's abusive behavior, identify verbal danger cues to impending violence, encourage voluntary compliance, and enhance overall situation safety.

III.X.   Use of Force Incident – An action, other than officer presence or a verbal encounter, which constitutes a use of force in the "Use of Force Model," to achieve compliance in a subject.

III.Y.   Use of Force Incident Review Committee – As defined in ISP Directive OPS-054, "Officer Survival Training."

III.Z.   Working Knife – any knife with a blade 5 inch or less in length that is used primarily as a tool for job related functions and not as a weapon.

IV.   **USE OF FORCE MODEL**

The decision by a sworn officer to use force is dictated by each situation. This decision is based on the totality of the circumstances known or reasonably believed by the officer at the time such force is used. In order to assist officers in understanding the appropriate application of force given the circumstances of the encounter, the ISP has adopted a Use of Force Model. The diagram depicted below shall serve as a general visual guideline to the reasonable application of force, including the escalation and de-escalation of force used in response to the offender's behavior.

IV.A.   General Concepts

IV.A.1.   Officers will take into consideration the subject's level of compliance, continue to reassess both the offender's resistance and the officer's response throughout the encounter, and justify the response given the subject's level of resistance.

IV.A.2.   Officers may utilize reasonable force to overcome an offender's resistance.

IV.A.3.   Officers may rely on information obtained from other officers in determining response options; but the decision to use force in a given situation is an individual decision, which must be justified by the officer.

IV.A.4.   When feasible, officers will utilize tactical communication, positioning, and a warning that force will be utilized if the subject fails to comply.

IV.A.5.   Officers are not required to utilize any lower level of force before resorting to an appropriate, higher-level response based on the totality of the circumstances.

IV.A.6.   Officers may utilize an appropriate response based on the reasonable perception of the subject's threat and are not required to wait for an attack or injury to occur.

IV.A.7.    When the use of force by an officer causes injury to another, the officer will evaluate the subject's physical condition, render first aid, and request emergency medical assistance as soon as practical and safe to do so.

IV.A.8.    The ISP prohibits the use of warning shots.

IV.A.9.    The ISP Academy will ensure that all CAT and Firearms Instructors are properly trained, and that all programs are reviewed at least annually and updated, as necessary.

IV.A.10.    The ISP Academy will update the ISP Control and Arrest Tactics (CAT) Manual at least annually and provide updates to information as necessary.

IV.A.11.    Only Academy authorized Instructors may conduct Cadet, Recruit, and In-service CAT instruction.

IV.A.12.    Officers are not required to unreasonably endanger themselves to comply with this directive, and this directive shall not preclude the use of any techniques to protect an officer or another under the threat of great bodily harm and/or death.

**NOTE:** Active shooter incidents necessitate immediate law enforcement intervention to stop the active shooter. These situations are inherently dangerous where priority of life is civilians before officers.

## USE OF FORCE MODEL DIAGRAM

| COOPERATIVE SUBJECT | VERBALLY UNCOOPERATIVE | PASSIVE RESISTANCE | ACTIVE RESISTANCE | PHYSICALLY COMBATIVE, LESS THAN GREAT BODILY HARM / DEADLY FORCE | PHYSICALLY COMBATIVE, GREAT BODILY HARM / DEADLY FORCE |
|---|---|---|---|---|---|

OFFICER PRESENCE, TACTICAL COMMUNICATION

SOFT EMPTY-HAND, PRESSURE SENSITIVE AREAS, JOINT MANIPULATION

HARD EMPTY-HAND CONTROL, OLEORESIN CAPSICUM SPRAY, INTERMEDIATE WEAPON STRIKE, CEW, K-9 APPREHENSION

DEADLY FORCE, FIREARMS

**SUBJECT BEHAVIOR/RESISTANCE**

IV.B.    Levels of Subject Behavior/Resistance:

IV.B.1.    Cooperative Subject – A subject contacted by an officer who acknowledges direction or lawful orders given and offers no verbal, passive, active, or physically combative resistance.

IV.B.2.    Verbally Uncooperative – Non-compliant verbal responses by a subject to an officer's requests and/or commands.

IV.B.3.    Passive Resistance – Any resistance where a subject does not attempt to defeat an officer's attempt to touch or control but will not voluntarily comply with verbal and physical attempts of control.

IV.B.4.    Active Resistance – Any action by a subject that attempts to prevent an officer from gaining and/or maintaining control of the subject, but the subject is not attacking the officer.

IV.B.5.    Physically Combative, Less Than Great Bodily Harm/Deadly Force – Implied or actual physical actions by a subject against an officer that would lead to less than great bodily harm or deadly force. THIS SUBJECT IS AN ACTIVE ASSAILANT.

IV.B.6.    Physically Combative, Great Bodily Harm/Deadly Force – Implied or actual physical actions by a subject against an officer that would lead to great bodily harm or deadly force. THIS SUBJECT IS AN ACTIVE ASSAILANT.

IV.C.    Officer's Response to the Subject's Behavior

IV.C.1.    Officer Presence – A professional demeanor and bearing that projects authority.

IV.C.2.    Tactical Communication and Positioning – Utilizing the concepts of tactical communication and positioning to de-escalate the situation and encourage compliance.

IV.C.3.    Handcuffing – Handcuffing is a temporary detention function and will be accomplished in accordance with ISP Directive ENF-014, "Prisoner Transportation, Handling, Searching, and Jailing."

IV.C.4.    Pain Compliance – The use of empty hand control techniques or intermediate weapons to cause pain, discomfort, or muscle disruption in an effort to generate compliance.

IV.C.5.    Empty Hand Techniques

IV.C.5.a.    Soft, Empty-Hand – The use of pressure sensitive areas or joint manipulation to generate compliance.
IV.C.5.b.    Hard, Empty-Hand – The use of strikes or take-downs, designed to stop aggressive or combative behavior.

IV.C.6.    Intermediate Weapon – An instrument or weapon that, by its design or use, bridges the gap between deadly force and unarmed control techniques. Examples include OC spray, baton, CEW, less-lethal munitions, or any other improvised device used to gain offender control and compliance in accordance with this directive.

IV.C.7.    Deadly Force – Force likely to cause death or great bodily harm, including the discharge of a firearm into an occupied vehicle or in the direction of any person.

IV.D.    Reasonableness Factors

When assessing the encounter and the available response options, officers should take into consideration the following factors, which include, but are not limited to:

IV.D.1.    The severity of the underlying crime.

IV.D.2.    The subject's ability and opportunity to inflict great bodily harm or death to the officer, or another, in the immediate or near future.

IV.D.3.    The probability that great bodily harm or death to the officer, or another, will occur if the subject is not arrested without delay.

IV.D.4.    The subject's efforts to resist or escape.

IV.D.5.    The effectiveness of the approved techniques used.

IV.D.6.    Officer/subject factors – factors include, but are not limited to relative:

IV.D.6.a.    Age
IV.D.6.b.    Size
IV.D.6.c.    Strength

                IV.D.6.d.   Offender's perceived skill level or training (including military or other specialized fighting training)

                IV.D.6.e.   Injuries sustained or level of exhaustion/fatigue

                IV.D.6.f.   The number of officers available vs. subjects

                IV.D.6.g.   Prior knowledge of subject's propensity for violence

IV.D.7.     The perceived effects of alcohol, drugs, and mental state/condition of subject regarding pain and overall compliance.

IV.D.8.     The relative environmental conditions (e.g., unstable ground, road hazards, etc.).

IV.D.9.     The availability of other options.

## V.   PROCEDURES

This section describes the weapons authorized for use by the ISP and the authorized application of use of force options, including the use of intermediate weapons and techniques. For additional or specific information on the utilization of firearms, see ISP Directive ORD-001, "Firearms." For additional or specific information regarding techniques, see the ISP CAT Manual.

V.A.     Deadly Force

     Officers may only utilize deadly force:

     V.A.1.     When the officer reasonably believes, based on the totality of circumstances, that such force is necessary to prevent imminent death or great bodily harm to himself or another; or

     V.A.2.     When the officer reasonably believes, based on the totality of circumstances, both that:

          V.A.2.a.   Such force is necessary to prevent the arrest from being defeated by resistance or escape, and the officer reasonably believes that the person to be arrested is likely to cause great bodily harm to another; **and**

          V.A.2.b.   The person to be arrested committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

V.B.     Duty to Intervene

     A peace officer, or any other person acting under the color of law, shall not use force as punishment or retaliation. Officers have a duty to intervene to stop another officer from engaging in unauthorized or excessive force.

V.C.     Prohibited Weapons

     V.C.1.     Officers may only carry authorized weapons.

     V.C.2.     Officers are prohibited from carrying on their person, or in a Department vehicle, any unauthorized firearms (see ISP Directive ORD-001, "Firearms") or knives, or any other instruments that are designed to be used as defensive or offensive weapons, except those being transported as evidence for storage, or with their Commander's prior approval for training or other authorized purposes.

     V.C.3.     Examples of prohibited weapons include, but are not limited to, black-jacks, saps, unauthorized CEW, etc.

     V.C.4.     Authorized weapons used by specialty teams are governed by written directives of those specialty teams including weapon specification, training, proficiency and certification, and procedures for use.

**OPS-046, Use of Force**                                                                      **Page 7 of 12**

V.D.    Restraint Devices

    V.D.1.    Restraint devices will be used in accordance with ISP Directive ENF-014, "Prisoner Transportation, Handling, Searching, and Jailing."

    V.D.2.    When used in accordance with Academy training, restraint devices are not a use of force instrument. When used to gain pain compliance, restraint devices may be considered a use of force instrument.

    V.D.3.    Only restraint devices approved by the Officer Survival Section will be carried or used.

V.E.    Empty-Hand Control Techniques

    V.E.1.    When tactical communication techniques prove ineffective, pressure sensitive areas and joint manipulations, as defined and trained by the ISP Academy, may be used to gain compliance of a verbally uncooperative subject.

    V.E.2.    To overcome an actively resisting subject, or stop aggressive behavior, officers may use hard, empty-hand control techniques as defined and trained by the Academy.

    V.E.3.    The use of chokeholds is prohibited.

V.F.    Irritant Agents

    V.F.1.    Oleoresin Capsicum (OC)

        V.F.1.a.    The Department will issue an authorized OC spray canister and holster for the duty belt to all officers.
        V.F.1.b.    Officers may use OC spray to overcome active resistance and above.
        V.F.1.c.    Officers will follow Academy training guidelines regarding periodic testing and replacement of their OC canisters.
        V.F.1.d.    Officers will follow Academy training guidelines regarding deployment, decontamination, and medical assistance guidelines, and will document the same in the appropriate Field and Use of Force Reports.
        V.F.1.e.    The officer may carry only OC, only the baton, or both OC and the baton.

    V.F.2.    (CN)/(CS)/Smoke Agents

        V.F.2.a.    May be used only when authorized by the Incident Commander (IC) in appropriate circumstances (e.g., crowd control, barricaded subject, etc.), and may be deployed only by trained and certified officers according to Academy training guidelines. The Special Weapons and Tactics (SWAT) Commander may authorize other CN/CS/smoke device training and deployment methods for officers assigned to SWAT.
        V.F.2.b.    Upon the use of CN/CS agents, decontamination of the violator and any other effected persons will ensue as soon as it is safe for the officer involved.
        V.F.2.c.    Units maintaining a stock of CN/CS/smoke agents (e.g., Troop range officers, crowd control units, SWAT, etc.) will conduct a semi-annual safety inspection of inventory on hand and report usage and inventory amounts to their respective commands.

    V.F.3.    Use of Chemical Agents for Crowd Control

        A peace officer, or any other person acting under the color of law, shall not use chemical agents or irritants for crowd control, including OC spray and tear gas, prior to issuing an order to disperse in a sufficient manner to allow for the order to be heard and repeated if necessary, followed by sufficient time and space to allow compliance with the order unless providing such time and space would unduly place an officer and another person at risk of death or great bodily harm.

**OPS-046, Use of Force**                                           **Page 8 of 12**

V.G.     Impact Weapons

    V.G.1.     Batons

        V.G.1.a.     Officers will only carry an approved baton.

        V.G.1.b.     The Department will provide each officer with an approved 21-inch or 26-inch expandable tactical baton and appropriate duty belt scabbard. Officers are authorized to attach a leverage cap or flashlight accessory to their tactical baton, as long as it is of the same brand as the authorized baton.

        V.G.1.c.     Officers will be issued a 36-inch hard wood straight baton. Officers may also carry a 26-inch wood baton.

        V.G.1.d.     Officers may use the baton, or other improvised impact weapon, in conjunction with empty-hand control techniques, to apply steady, non-impact pressure to pressure-sensitive areas in order to gain compliance. However, non-impact pressure with an impact weapon should generally not be used to apply targeted pressure to locations in the head, neck, spine, groin, and throat area unless deadly force is appropriate.

        V.G.1.e.     An officer may use impact weapons to defend himself/herself or another against an actively resistive or combative subject, or to establish control in situations where the use of a firearm may not be justified or necessary, and he/she reasonably believes the use of weaponless techniques will be ineffective or will risk the safety of the officer or another.

        V.G.1.f.     Officers may use the baton to target impact strikes to large muscle groups. If targeting large muscle groups is ineffective, boney areas and joints may be targeted. Officers may only target the head, neck, spine, throat, or groin when deadly force is authorized.

        V.G.1.g.     The officer may carry only OC, only the baton, or both OC and the baton.

    V.G.2.     Improvised Impact Instruments

        An officer's primary impact weapon is the baton. If it becomes necessary to use a flashlight or other object as an improvised impact weapon, officers will use it in the same manner as a baton.

    V.G.3.     Impact Munition/Less-Lethal Launcher

        V.G.3.a.     Allows an officer to deliver kinetic impact force from a distance in situations where it is not possible or safe to use another impact weapon. Impact munitions are used in the same circumstance as a baton strike; however, due to their specialized nature, impact munitions may be deployed only by properly trained officers.

        V.G.3.b.     Officers shall not discharge kinetic impact projectiles and all other non- or less-lethal projectiles in a manner that targets the head, neck, groin, anterior pelvis, or back.

        V.G.3.c.     Officers shall not discharge firearms or kinetic impact projectiles indiscriminately into a crowd.

V.H.     Conducted Energy Weapon (CEW)

    V.H.1.     The Department shall issue an authorized CEW only to officers who complete an initial Academy approved training program and continue to maintain proficiency through periodic In-service training based on the following:

        V.H.1.a.     The Department shall issue a CEW to all officers in the Division of Patrol (DOP) of the rank of Master Sergeant and below. Officers in the DOP higher than the rank of Master Sergeant will be given the option to be issued a CEW.

        V.H.1.b.     The Department shall issue a CEW to officers in the Division of Criminal Investigation (DCI) as authorized by the Deputy Director of DCI of the rank Master Sergeant and below. This issuance will be limited to work units such as SWAT, Public Safety Enforcement Group (PSEG), MEG/Task Forces, or other specialized units.

V.H.1.c.     Officers may only carry and use a department-authorized CEW and department-inventoried cartridges.

V.H.1.d.     Officers transferring from the DOP or applicable work unit into the DCI to non-CEW authorized work units will turn in their CEW to their work unit before their transfer. Should the work unit be unable to re-issue the CEW, it will be turned into the Officer Survival Section (OSS) at the ISP Academy. CEWs will remain with officers upon transferring from a work unit that is authorized to carry to another work unit that is authorized to carry.

V.H.1.e.     The Officer Survival Section (OSS) will maintain a list of originally issued CEWs, along with any physical returns made to the OSS, upon transfer or separation from the Department. Any transfers of the CEW made within the work units will be the sole responsibility of the assigned officer and the inventory custodian of each work location. This list will at minimum contain the following information:

     V.H.1.e.1)     Officer's name
     V.H.1.e.2)     Officer's ID
     V.H.1.e.3)     Officer's work location
     V.H.1.e.4)     Date of issuance
     V.H.1.e.5)     Make/model of CEW
     V.H.1.e.6)     Serial number of CEW
     V.H.1.e.7)     ISP inventory tag number

V.H.2.     The CEW is considered a supplementary weapon to the duty pistol and is not considered a deadly force option.

V.H.3.     Officers may use a CEW under the same circumstances in which the use of an impact weapon strike would be justified, usually at the active resistance level or above, based on the officer's training.

V.H.4.     Officers will carry the issued CEW in an approved and issued holster on their duty belt while in uniform in a patrol function, or properly secured in close proximity if in a plain clothes or specialty assignment. Officers will carry the issued CEW in an approved holster on their duty belt on the opposite side of their issued firearm.

V.H.5.     Officers shall, unless exigent circumstances exist, place the CEW batteries in the docking stations located at their work unit every 30 days.

V.H.6.     While off duty, the CEW will not be carried and will be stored in the trunk or locked glove compartment of the assigned department vehicle or in the officer's residence.

V.H.7.     Officers shall not improperly display or allow unauthorized persons to use the issued CEW.

V.H.8.     For officers that are issued a CEW, the officer is not required to carry the CEW when processing prisoners or in other special circumstances, with supervisor approval, where the CEW could compromise an operation or mission.

V.H.9.     At the beginning of their shift, an officer will:

     V.H.9.a.     Inspect their issued CEW for damage, excessive wear, or debris accumulation.

     V.H.9.b.     Ensure that they have at least four Department-issued cartridges accessible and inspect the expiration dates on the cartridges: two standoff cartridges and two close quarters cartridges.

     V.H.9.c.     Ensure that, if equipped, the attached camera is operational.

     V.H.9.d.     If equipped, place the CEW in functionality test mode and conduct a "functionality test" for a full five seconds, check for proper battery strength, and ensure no default icons appear on the CEW display screen.

     V.H.9.e.     Otherwise maintain their CEW in accordance with the manufacturer's instructions and Academy training guidelines.

     V.H.9.f.     If equipped, the CEW will be loaded with a Close Quarters (CQ) cartridge in bay one and a Standoff (SO) cartridge in bay two.

V.H.10.    When appropriate, the officer may display the CEW and activate a warning arc or use the laser dot to warn a non-compliant subject to encourage compliance.

V.H.11.    The CEW will NOT BE DEPLOYED if the subject has been exposed to flammable liquids or discharge would occur in a flammable or explosive environment.

V.H.12.    Absent exigent circumstances, the CEW will not be discharged:

    V.H.12.a.    If the subject could fall from a significant height or into a body of water.
    V.H.12.b.    Against an obviously pregnant female, small child, or elderly person.
    V.H.12.c.    To intentionally target a sensitive area, including the head, neck and throat, chest, groin, anterior pelvis, or visibly injured area.
    V.H.12.d.    Against any subjects who are restrained by handcuffs, unless the subjects pose an immediate physical threat to the officer, themselves, or another.

V.H.13.    If the CEW is deployed on a subject, the officer will:

    V.H.13.a.    Attempt to warn other officers of the impending discharge by saying, "Taser."
    V.H.13.b.    Attempt to assemble two or more additional officers if time allows.
    V.H.13.c.    After each cycle, re-assess the situation before delivering an additional cycle. The deployment of the CEW shall not exceed three five-second cycles unless justification can be articulated.
    V.H.13.d.    Provide medical aid, when it is safe to do so, including monitoring the subject and removing the probes, in accordance with Academy training guidelines.
    V.H.13.e.    Notify the Shift Commander or supervisor of the discharge, as well as any responding units.
    V.H.13.f.    When safe to do so, collect any discharged cartridges, probes, and a sample Anti-Felon Identification (AFID) tag (if the cartridge is so equipped) as evidence. The cartridge serial number will be documented in the event log, if so equipped.
    V.H.13.g.    When possible, document the probe impact sites and any other injuries on the subject with photos or video recordings. (Do not photograph genitals, buttocks and anus, or breasts for injuries.)
    V.H.13.h.    Within 72 hours, have the discharge log, pulse graph, and the video data (if CEW is equipped with a camera) extracted by a supervisor or their designee.
    V.H.13.i.    Properly document the use of force with a Field Report, and address at a minimum:

        V.H.13.i.1)    Why the CEW was discharged
        V.H.13.i.2)    Circumstances surrounding the discharge
        V.H.13.i.3)    The results and effects of the discharge
        V.H.13.i.4)    Medical aid rendered
        V.H.13.i.5)    Documentation of the CEW and cartridge serial numbers, if so equipped
        V.H.13.i.6)    Documentation of Shift Commander notification
        V.H.13.i.7)    Documentation that the discharge log and video (if CEW is equipped with a camera) was downloaded within 72 hours
        V.H.13.i.8)    Documentation of the collection of evidence as identified in section V.G.12.f. of this directive
        V.H.13.i.9)    Not simultaneously hold a CEW and any firearm. if the situation requires a transition to a firearm
        V.H.13.i.10)    Request replacement cartridges through the Officer Survival Section of the Academy where any un-issued cartridges will be maintained
        V.H.13.i.11)    Refer to the ISP CAT Manual for additional CEW information

V.I.    Canine Team

    V.I.1.    The use of a specially trained canine constitutes non-deadly force.  Generally, a canine may be deployed against an active resister or above, unless the handler can articulate special circumstances based on their training and experience.

V.I.2.    Whenever feasible, the handler will issue appropriate warnings to the subject before deployment of the canine.

V.I.3.    The use of a specially trained canine as part of a canine team will be governed by guidelines set forth in the ISP canine training curriculum, the Canine Unit SOP, and ISP Directive OPS-034, "Canine."

V.I.4.    Authorized SWAT canines are governed by V.I.3. of this directive, and written SWAT Directives, including canine selection, training, proficiency and certification, and procedures for use.

V.J.    Notifications, Documentation, and Review

This section describes the general notification and reporting requirements whenever an officer is involved in an encounter resulting in a use of force incident. Any additional or specific documentation requirements are identified in the respective sections. For additional information, see ISP Directive OPS-002, "Weapons Discharge/Deadly Force Investigations."

V.J.1.    Notification

V.J.1.a.    An officer, whether on or off-duty, who utilizes deadly force, will immediately notify the Shift Commander in the ISP Troop of occurrence by the fastest means available, and render as much information as possible.

V.J.1.b.    The Shift Commander will immediately notify his/her Troop Commander and the Springfield Communications Center with all known information.

V.J.1.c.    The Shift Commander will ensure all other appropriate notifications are made in accordance with ISP Directive OPS-002, "Weapons Discharge/Deadly Force Investigations."

V.J.1.d.    In the event an officer is required to intervene as described in V.B. of this directive, the officer will complete and submit a supplementary report utilizing the code, "Use of Force Intervention" in the report type field and checking yes in the use of force field. The Field Report will be approved and submitted within three calendar-days to the Troop Commander, who will follow the appropriate use of force review and documentation procedures. The supplemental report will contain, at a minimum, the date, time, location, involved subjects, and the circumstances describing the event and interventions applied.

V.J.1.e.    In the event an officer is required to intervene as described in V.B. of this directive in an incident involving a law enforcement officer from another agency, the respective Troop Commander shall notify the involved agency, and document the notification in a supplementary report to the file.

V.J.2.    Documentation

V.J.2.a.    All incidents involving the use of force, regardless of the amount of force used, including all weapon displays, will be documented by the primary officer utilizing a Field Report via appropriate ISP report software and will be coded as an "Encounter."

V.J.2.b.    For any officers who engage in a use of force, a supervisor will complete an ISP Use of Force Incident Review Form, ISP 1-256, all copies of which will be attached to the Field Report.

V.J.2.c.    The display of a firearm or CEW with the intent to change behavior and gain compliance will require the completion of a Use of Force Incident Review Form. Merely having the firearm or CEW available but not used to gain compliance (e.g., drawn, but not readily visible or in a low ready position for officer safety) will not require the completion of a Use of Force Incident Review Form.

V.J.2.d.    The deployment of a canine resulting in an apprehension, with or without contact, will require the completion of a Use of Force Incident Review Form, a Field Report via appropriate ISP software, and in the K-9 Activity Tracking System (KATS) reporting software, including the completion of the "person" and "force" tabs.

**OPS-046, Use of Force**                                                    **Page 12 of 12**

V.J.2.e.   If an officer serves in a supporting role to the primary responding officer, the supporting officer(s) will complete a narrative of the events on a supplemental report via appropriate ISP report software.

V.J.3.   Review

V.J.3.a.   The supervisor will have a CAT and/or a CEW instructor review each use-of-force incident and any accompanying addenda and video medium before approving the reports. The supervisor will then forward the reports and accompanying addenda and media through the chain-of-command to the appropriate division's Assistant Deputy Director to be reviewed through the Use of Force Incident Review Committee as outlined in ISP Directive OPS-054, "Officer Survival Training." The reports, accompanying addenda, and video medium shall be received by the Use of Force Incident Review Committee within 30 calendar-days of the incident. The Committee will ensure that any related firearm discharge reports are forwarded to the Firearms Training Unit for their review pursuant to the requirement in ISP Directive ORD-001, "Firearms," section IV.A.

V.J.3.b.   The supervisor will have a CAT instructor and the appropriate DOP Regional Canine Coordinator review each use-of-force incident involving a canine apprehension with or without contact and any accompanying addenda (including KATS reports) and video medium before approving the reports. The supervisor will then forward the reports and accompanying addenda and media through the chain-of-command to the appropriate division's Assistant Deputy Director to be reviewed through the Use of Force Incident Review Committee as outlined in ISP Directive OPS-054, "Officer Survival Training." The reports, accompanying addenda, and video medium shall be received by the Use of Force Incident Review Committee within 30 calendar-days of the incident.

V.J.3.c.   If the Use of Force under review involves federal reporting criteria, defined as: Death of an individual, serious bodily harm to an individual, or the discharge of a firearm at or in the direction of an individual, the Officer Survival Section will report the incident to the I-UCR Program via the Illinois NIBRS Repository (INR).

V.J.3.d.   If the Division of Internal Investigation (DII) adopts an investigation concerning a use-of-force incident, all reports and any related addenda, (e.g., video/audio medium, supplemental reports, etc.) may become exhibits of investigatory interest for use in the investigation. The Use of Force Incident Review Committee will not proceed with their incident review until such internal investigation is closed, unless otherwise approved by the DII Deputy Director. If the DII retains the case, they will coordinate required FBI Law Enforcement Enterprise Portal (LEEP) reporting with the Officer Survival Unit.

**NOTE:** This directive is a statement of Departmental policy and not a statement of law. Nonconformance with this policy should serve as a basis for administrative sanctions only.

**-End of Directive-**