IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

STATE OF ILLINOIS, a sovereign State;
and the CITY OF CHICAGO, an
Illinois municipal corporation,

        Plaintiffs,

v.

DONALD TRUMP, et al.; in his official
capacity as President of the
United States, et al.,

Case No. 25-cv-12174

Hon. April M. Perry

**PROPOSED BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
BY *AMICUS CURIAE* COOK COUNTY, ILLINOIS**

**I.    Interest of Amicus Curiae**

Cook County is the most populous county in Illinois and the second largest in the United States. Spanning urban, suburban, and rural areas, it is home to more than 5 million diverse residents including Chicago, the economic and cultural hub of the Midwest. Cook County government is entrusted with the health, safety, and welfare of its residents and visitors and is dedicated to maintaining a community where the people of the County can live and work freely and peacefully.

The Cook County Board President and the elected officials of Cook County,[1] including the State's Attorney, the Sheriff, the County Board and the Office of the Chief Judge operate the Cook County consolidated court system - one of the largest in the world.[2] The Cook County court system ensures community safety as well as the protection of the rights of the accused. More than 61,000[3]

---

[1] Cook County government also administers John H. Stroger and Provident Hospitals, health centers and CountyCare, the largest Medicaid managed care plan in the region , as well as the Cook County Department of Public Health.
[2] https://www.cookcountycourtil.gov/about/organization-court (last accessed October 7, 2025).
[3] Cook County Dashboard: Cases Filed in Court, available at https://cook-dashboard.loyolaccj.org/court-filings-bond/cases-filed-in-court (last accessed October 7, 2025).

1

prosecutions were commenced in Cook County in 2024. Central to the success of any such prosecution is community cooperation and trust. Militarized forces roaming the streets and policing courthouses erodes that trust. It endangers the operations of the system thereby causing irreparable harm to the safety of the citizens of Chicago, Cook County, and Illinois.

## II. Argument

### a. State and Local Governments Are Granted Sovereign Authority to Govern Local Affairs and Ensure Public Safety.

By design, state and local governments operate closer to the people they serve, allowing them to tailor their activities to their communities' needs. Federalism is not merely an administrative arrangement; it is a structural protection of liberty. As the Supreme Court has explained, "[t]he Framers concluded that allocation of powers between the National Government and the States enhances freedom, first by protecting the integrity of the governments themselves, and second by protecting the people, from whom all governmental powers are derived." *Bond v. U.S.*, 564 U.S. 211, 221 (2011). The Tenth Amendment reinforces that division, reserving to the States any powers not delegated to Congress, except certain sovereign functions explicitly prohibited or implicitly restricted. Art. I, § 10; *Murphy v. NCAA*, 584 U.S. 453, 468 (2018); *U.S. v. Illinois, et al.*, 2025 U.S. Dist. LEXIS 142735, *21-22 (N.D. Ill. 2025).

"Thus both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.'" *Id.* Notably, the powers delegated to the federal government "are few and defined" whereas "[t]he powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (quoting The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961)). When the federal government acts outside its enumerated powers,

2

it does not merely exceed its authority—it undermines the sovereignty of state and local governments and the constitutional balance that safeguards individual liberty. *See Bond*, 564 U.S. at 222 ("By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power.").

      b. *A National Guard Presence Threatens to Undermine Improvements in Public Safety and the Communities' Relationship with the Criminal Justice System.*

One such power reserved to the States is the general police power to ensure public safety and maintain order within their borders. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (the reservation of police powers to the States is "one of the few principles that has been consistent since [the constitution] was adopted"). In holding that power, it is in the province of state and local governments—not the federal military—to facilitate constitutionally sound policing and execute day-to-day law enforcement. *See id.* ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime…"). The federal government's invocation of crime prevention as a justification for military deployment thus intrudes into an area of authority historically and constitutionally reserved to the States. And this invocation is wholly unnecessary. In the past year alone, the court system has responded to violent crime occurring in Cook County by ensuring that individuals charged with violent crimes, serious gun offenses, and crimes on public transportation are detained pretrial when they pose a flight risk or danger to the community in compliance with Illinois' Pretrial Fairness Act.[4]

As federal enforcement efforts have increased in the Chicagoland area, the public has grown anxious and uncertain about future actions of the federal government.[5] A militarized

---

[4] Exhibit 1, Declaration of Guy Lisuzzo.
[5] Julie Bosman, *Neighbors Warn Neighbors as Fear of ICE Ripples Across Chicago,* NEW YORK TIMES,

3

presence will intrude on state and local sovereignty, increase fear among the public, and irreparably damage the relationship between justice partners and the community.

> *i. Operation of the Cook County Criminal Justice System*

The powers traditionally reserved to the States include the prosecution of purely local crimes. *Bond*, 572 U.S. at 856. The Illinois Constitution provides for the election of a State's Attorney for each county, Art. VI, § 19, and the Counties Code vests the State's Attorney with the power to commence and prosecute all actions, civil or criminal, in which the people of the State or county may be concerned. 55 ILCS 5/3-9005(a)(1). Significant strides have been made to sustainably reduce gun violence and increase community safety, particularly in communities most impacted by gun violence in our region. Cook County's outstanding success is attributable to consistent and meaningful collaboration with city, state, and local law enforcement, community partnerships, and leaders at the State of Illinois, City of Chicago, and Cook County, including the Government Alliance for Safe Communities (GASC).[6]

Chicago and Cook County have demonstrated that when working in partnership, they are fully capable of maintaining public safety and have demonstrated continued progress in reducing crime without federal intervention over the last 10 months.[7] In April, Chicago recorded the fewest monthly homicides in a decade.[8] According to Chicago Police Department statistics, shooting incidents from January 1, 2025 through June 1, 2025 dropped 34% compared to the same period

---

(October 6, 2025), Neighbors Warn Neighbors as Fear of ICE Ripples Across Chicago - The New York Times

[6] Home Page | Government Alliance for Safe Communities; Board of Commissioners of Cook County - File #: 24-5299 and Board of Commissioners of Cook County - File #: 25-4003

[7] Chicago Sees Historic Drop in Violent Crime During First Half of 2025, PBS NewsHour, Chicago sees historic drop in violent crime during first half of 2025 | PBS News (last accessed October 7, 2025).
[8] Matt Masterson, *Chicago's Homicide Total in April Was its Lowest of Any Month in a Decade*, WTTW News, May 5, 2025, Chicago's Homicide Total in April Was Its Lowest of Any Month in a Decade | Chicago News | WTTW

4

in 2024, and homicides declined by 27%.[9] Robberies and carjackings have also decreased. *Id*. In fact, data shows that among American cities with populations of 100,000 or more, Chicago ranks 80th overall for violent crime per capita.[10]

The introduction of militarized law enforcement agents near and around the courthouses threatens these critical improvements in public safety. Further, the deployment of the National Guard will interfere with the City and County's ability to maintain public safety, by further eroding trust in the criminal justice system.

### i. Erosion of Trust in the Justice System

An increased military presence threatens to undermine that system by deterring residents from engaging with local law enforcement and the courts. Attorneys and judges have already noted a chilling effect from prior federal enforcement activity, such as when ICE agents arrested individuals at criminal courthouses, causing both criminal defendants and victims to fear appearing in court.[11]

Assistant State's Attorneys ("ASAs") have experienced previously cooperative victims and witnesses grow unwilling to appear for trial because of ICE patrols outside of courthouses.[12]. In one instance, the wife of a murder victim refused to attend trial because she feared being arrested.[13] Parents of minor victims of sexual assault have refused to bring their children to the State's Attorney's offices located in the courthouse because of ICE presence outside.[14] The State's

---

[9] Chicago Police Dep't, CompState Public Report, Week 22 (2025), 1_PDFsam_CompStat-Public-2025-Week-22.pdf (last accessed October 6, 2025).
[10] Sara Tenebaum, Is Chicago crime out of control, as Trump claims? The data says no, https://www.cbsnews.com/chicago/news/chicago-crime-data-trump-national-guard/#:~:text=It's%20not%20even%20in%20the,for%20violent%20crime%20per%20capita (last accessed October 6, 2025).
[11] *Lawyers, Judges, See a Chilling Effect from Immigrants' Arrests at Criminal Courthouses*, NPR, (August 8, 2025), https://www.npr.org/transcripts/nx-s1-5467685 (last accessed October 7, 2025).
[12] Exhibit 2, Dec. of Jose Villarrael, ¶ 24.
[13] *Id*. at ¶ 11.
[14] *Id*. at ¶¶ 13-14.

5

Attorney's Office now faces multiple domestic violence prosecutions in which the victims hesitate to cooperate with ASAs because they fear aggressive immigration enforcement.[15] There are documented instances of victims and witnesses cooperating with prosecutors to bring matters involving violent crime to trial only to recant or become uncooperative in the days since the increased federal presence in Chicago.[16] Such actions may force courts to postpone hearings, compel prosecutors to drop prosecutions when witnesses refuse to appear,[17] and in some circumstances release a previously detained defendant because of this lack of participation by the victim or witness.

The Cook County Public Defender has observed similar and additional impediments. An increased military presence threatens to erode the very system of justice it purports to protect by deterring residents from engaging with local law enforcement and the courts. Cook County Public Defender Sharone Mitchell Jr. reports that the presence of federal agents in and around courthouses has already deterred clients from appearing in court out of fear of detention.[18] In the past month alone, ICE agents have entered courthouses in at least four Cook County court facilities—the Daley Center, the Leighton Criminal Court Building, the Domestic Violence Courthouse, and the branch courts at 111th Street—and detained individuals attempting to attend their court hearings.[19]

In one such instance, a victim seeking to appear in her domestic violence court case was stopped by ICE agents, missed her hearing, and saw her case dismissed. *Id*. Federal agents have also repeatedly refused to provide their names or agency affiliations, and refused to show valid warrants or identification.[20] The resulting confusion has emboldened impersonators and vigilantes

---

[15] *Id.* at ¶ ¶17-21.
[16] *Id.* at ¶ 23.
[17] *Id.* at ¶ 25
[18] Exhibit 3, Declaration of Sharone Mitchell, Jr.
[19] *Id.* at ¶ 5.
[20] *Id.* at ¶ 6.

to exploit the federal government's lack of transparency for their own ends, causing further harm.[21] The Cook County Public Defender's office, which represents thousands of residents required by law to appear in these courts, has warned that an escalating federal presence puts its clients in an impossible position: comply with court orders only by exposing themselves to detention, or risk violating those orders to preserve their safety.[22] "As a result, what is sometimes touted as a public safety measure may, in the end, place the public in much greater peril."[23]

Increased military presence also has an indirect effect on the judicial system, by redirecting law enforcement resources away from the judicial process. As the *Oregon* court recognized, "state and local law enforcement will need to expend additional resources to quell increased civil unrest that is likely to result from the Guard's mobilization." 2025 U.S. Dist. LEXIS 197039, at *42. Redirecting law enforcement resources in such a manner will have a significant effect on the ability of local courts and prosecutors to address local crime – since law enforcement officers are often the primary (if not only) witnesses in a criminal prosecution, redirection of law enforcement resources to address the disturbances that will inevitably result from an unlawful federal troop deployment could literally result in the dismissal of meritorious criminal charges. *See*, *e.g.*, *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 127 (2d Cir. 1997) (noting that criminal charges were dismissed when law enforcement witness "failed to appear to testify"). Redirecting law enforcement resources also distracts from focusing on the investigation of violent crime and could result in increased serious criminal conduct and decreases in the prosecutions of violent offenders.

    ii.    *Irreparable Harm*

A preliminary injunction should be granted in order to preserve the status quo and avoid

---

[21] *Id.* at ¶ 10.
[22] *Id.* at ¶¶ 10–11.
[23] ICE Arrests Threaten to Chill Access to Justice, https://www.illinoiscourts.gov/News/855/ICE-Arrests-Threaten-to-Chill-Access-to-Justice/news-detail/ (last accessed October 7, 2025).

irreparable harm to Plaintiffs City of Chicago and State of Illinois. *Ind. Civ. Liberties Union v. O'Bannon,* 259 F.3d 766, 770 (7th Cir. 2001); *CF Entertainment, Inc. v. Nielsen Co. (US), LLC*, 2020 U.S. Dist. LEXIS 121402, *18 (N.D. Ill. July 10, 2020) (the purpose of a preliminary injunction is to preserve the positions of the parties until the merit can be resolved); *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (a party seeking a preliminary injunction must first demonstrate (1) some likelihood of success on the merits; (2) that it will suffer irreparable harm in the absence of a preliminary injunction; (3) the injunction is in the public interest; and (4) the balancing of equities tips in its favor.) The federal government's deployment of National Guard troops into the area is a clear departure from the status quo and will cause the City and County further irreparable harm in the administration of the criminal justice system.

When, as here, the federal government acts in a manner that "exceeds the National Government's enumerated powers," the Supreme Court has explained, it "undermine[s] the sovereign interests of States." *Bond v. United States*, 564 U.S. 211, 225 (2011). Such "invasions of state sovereignty," standing alone, constitute irreparable harm because they defy easy quantification in monetary terms. *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, No. 25-1235, 2025 U.S. App. LEXIS 19475, at *10 (6th Cir. Aug. 1, 2025) (per curiam) (collecting authority); *accord Oregon v. Trump*, No. 3:25-cv-1756-IM, 2025 U.S. Dist. LEXIS 197039, at *42 (D. Or. Oct. 4, 2025) (federal government's "encroachment on Oregon's police power leaves an indelible mark on Oregon's sovereignty under the Constitution, which cannot be remedied by a legal remedy, such as an award of damages").

> 1. *Militarized Police Forces Create the Impression of Instability Thereby Causing Irreparable Harm to Orderly Administration of the Criminal Justice System*

When the federal government assumes a role traditionally reserved to the States, it blurs the constitutional lines that define who is responsible for public safety. Reflecting this fact,

8

following a recent federal enforcement at a South Side apartment building, one resident noted that he had received no answers from *Chicago* police, who neither conducted nor participated in the raid in question.[24]

This erosion of clarity is precisely what the Constitution's division of powers is meant to protect. As the Supreme Court has recognized, federal overreach can leave local officials "in the position of taking the blame for [the] burdensomeness and [] defects" of federal action, even when they should not bear responsibility for it. *Printz v. United States*, 521 U.S. 898, 930 (1997). When federal failures are mistaken as local ones, accountability blurs and public confidence in local government suffers. *See New York v. United States*, 505 U.S. 144, 169 (1992) ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation."). By the same token, federal overreach can shake public confidence in local authorities.

The increased federal presence may complicate local law enforcement's ability to protect the County. On October 4, 2025, in Chicago's Brighton Park neighborhood, federal agents called police for assistance with crowd control for protesters who had gathered after Border Patrol officers shot a woman. The federal agents used tear gas in an effort to disperse crowds, also injuring at least 27 local police officers on scene.[25] Following the incident, rumors spread that Chicago police "stood down," and the Chicago Police Department was forced to address misinformation about the incident and reassure the public that the department would be present to

---

[24] Cindy Hernandez, *Massive Immigration Raid on Chicago Apartment Building Leaves Residents Reeling: 'I Feel Defeated,'* WBEZ CHICAGO (October 1, 2025), Massive immigration raid on Chicago apartment building leaves residents reeling: 'I feel defeated' - WBEZ Chicago

[25] Madison Savedra, *27 Police Officers Among Those Injured by Tear Gas During Weekend Protest, Chicago's Top Cop Says,* BLOCK CLUB CHICAGO, (October 6, 2025), https://blockclubchicago.org/2025/10/06/27-police-officers-among-those-injured-by-tear-gas-during-weekend-protest-chicagos-top-cop-says/

9

police crime and assist fellow law enforcement within the bounds of the city's policies.[26] This kind of incident hurts the public's confidence in law enforcement in general and adds to public confusion and mistrust

During the recent rise of federal law enforcement activity, incidents have been reported that call into question whether justice is being administered in line with constitutional principles. The deployment of the National Guard to facilitate this enforcement will exacerbate concerns over constitutional policing. For example, a family of four was recently detained by federal agents in Millenium Park with the mother telling reporters they were targeted because of their appearance, raising fears of racial profiling.[27] Residents report being detained and searched absent any circumstances that would support reasonable suspicion.[28] *See U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (an individual can be briefly detained and questioned upon reasonable suspicion that they are illegally in the United States). According to Gregory Bovino, commander-at-large of the U.S. Border Patrol, appearance is one of the "articulable facts" that agents use to detain individuals.[29] These activities intrude on local sovereign authority to exercise police powers, and undermine the work undertaken by local officials to build trust and cooperation between law enforcement and the community.

---

[26] Sarah Schulte, *CPD Superintendent Larry Snelling Defends Department's Actions at Immigration Protests*, ABC 7 CHICAGO, CPD Superintendent Larry Snelling defends department's actions at immigration protests (last accessed October 7, 2025).

[27] Laura Rodriguez Presa, *Mother, Children Detained by ICE at Millennium Park Sunday Held at O'Hare with Other Families: 'We Never Imagined,'* CHICAGO TRIBUNE, (September 30, 2025), https://www.chicagotribune.com/2025/09/29/ice-immigrant-families-ohare/

[28] Cindy Hernandez, *Massive Immigration Raid on Chicago Apartment Building Leaves Residents Reeling: 'I Feel Defeated,'* WBEZ CHICAGO (October 1, 2025), Massive immigration raid on Chicago apartment building leaves residents reeling: 'I feel defeated' - WBEZ Chicago

[29] Chip Mitchell, *Transcript: Gregory Bovino Says Arrestees in Downtown Chicago Chosen Based Partly on 'How They Look,'* WBEZ CHICAGO, (September 30, 2025),
 https://www.wbez.org/immigration/2025/09/30/transcript-audio-gregory-bovino-immigrant-arrests-downtown-chicago-chosen-how-they-look

*2. Militarized Police Forces Create the Impression of Instability Thereby Also Causing Irreparable Economic Harm.*

That said, the unlawful deployment of the National Guard into Chicago will also cause the City and County an irreparable monetary injury, by impacting their tourism, business, and ability to draw top talent.[30] This is because such an extraordinary step as the deployment of armed troops to address crime would necessarily create the false impression that Chicago and therefore Cook County is experiencing an equally extraordinary, unprecedented public safety crisis, contrary to facts on the ground.[31] That would affect tourism, conventions, and hospitality, all of which are key components of the City and County's economy, and all of which are strongly dependent on confidence in public safety. Chicago welcomed an estimated 55.3 million visitors in 2024, generating $20.6 billion in economic impact.[32] By suggesting instability where none exists, a federal military deployment would undermine years of work to build the City and County's reputation as a safe, vibrant destination for business and travel. Indeed, this effect has already been observed in the District of Columbia, where the deployment of the National Guard had a significant negative effect on tourism.[33]

These negative effects are unsurprising. Rather than cultivating a relationship of trust between the public and police, for whom they are charged with protecting and serving, the presence of armed military suggests that law enforcement "are soldiers at war against citizens."[34] This

---

[30] Bryan Mena, *Trump's Federal Takeover is Disrupting Washington, DC's Ailing Economy*, CNN, (August 21, 2025), https://www.cnn.com/2025/08/21/business/washington-dc-economy-trump-takeover .
[31] *See supra, FN Nos. 4-6.*
[32] Chicago Breaks Summer Tourism Record with More than 3.5 Million Hotel Bookings, (October 1,2025), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/october/summer-tourism-records.html (last accessed October 6, 2025).
[33] Marshall Cohen, et al., *DC crime falls, but tourism takes a hit too as Trump's federal surge reaches one-month mark*, available at DC crime falls, but tourism takes a hit too as Trump's federal surge reaches one-month mark | CNN Politics (last visited Oct. 7, 2025).
[34] Senta Scarborough, Militarizing Police Does Not Reduce Crime, New Emory Data Analysis Finds, Emory News Ctr. (Dec. 7, 2020), Militarizing police does not reduce crime, new Emory data analysis finds.

would affect residents as well as visitors, making even Chicagoans and Cook County residents feel less safe in their own neighborhoods. *See Laird v. Tatum*, 408 U.S. 1, 16 (1972) (noting a "strong resistance of Americans to any military intrusion into civilian affairs"). The economic injuries to the County and City economy resulting from the government's actions will be substantial; because the federal government's enjoys sovereign immunity to actions for damages, those grievous economic injuries will be irreparable as well. *See*, *e.g.*, *Odebrecht Constr. v. Sec'y, Fla. DOT*, 715 F.3d 1268, 1289 (11th Cir. 2012) ("In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable.")

## CONCLUSION

For the reasons set forth above, amicus Cook County respectfully urges the Court to grant Plaintiffs' motion for a preliminary injunction.

Dated: October 7, 2025

EILEEN O'NEILL BURKE
*Cook County State's Attorney*
*Counsel for Amicus Curiae Cook County*

PRATHIMA YEDDANAPUDI
Chief; Advice, Business & Complex Litigation Division
LYLE K. HENRETTY
Chief; Special Litigation Division
JONATHON BYRER
MEGAN HONINGFORD
SILVIA MERCADO MASTERS
EDWARD M. BRENER
JESSICA L. WASSERMAN
Assistant State's Attorneys

By: *s/ Jessica M. Scheller*
JESSICA M. SCHELLER
Assistant State's Attorney
Deputy Chief, Civil Actions Bureau
500 W. Richard J. Daley Center Place
Chicago, IL 60602
(312) 603-6934
Jessica.Scheller@cookcountysao.org