# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*, | Case No.: 1:25-cv-12174 |
| Plaintiffs, | The Hon. April Perry |
| v. | |
| DONALD J. TRUMP, *et al.*, | **BRIEF OF THE STATES OF IOWA, MONTANA, OKLAHOMA, SOUTH CAROLINA AND 14 ADDITIONAL STATES AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

**TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* .................................................................................................. 3

ARGUMENT ................................................................................................................................. 3

    I.    Violent Rioters in Chicago Are Harming Federal Officers and Property and Impacting the Federal Government's Ability to Carry Out Federal Laws. ............ 3

    II.    President Trump Certainly Has a "Colorable Basis" For Federalizing the National Guard to Protect Federal Agents and Property from Violent Rioters in Chicago. . 6

    III.    The Harms Incurred If Violent and Destructive Protests and Riots Are Allowed to Continue in Chicago are Borne by All States. ....................................................... 7

CONCLUSION ............................................................................................................................. 10

2

## TABLE OF AUTHORITIES

Cases

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................................. 8, 9
*Blackie's House of Beef, Inc. v. Castillo*,
  659 F.2d. 1211 (D.C. Cir. 1981) ............................................................................ 10
*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ................................................................................. 8
*Newsom v. Trump*,
  141 F.4th 1032 (9th Cir. 2025) ............................................................................ 6, 7
*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................................ 8

Statutes

10 U.S.C. § 12406(3) ................................................................................................... 6

## INTEREST OF *AMICI CURIAE*

For the past four years, illegal open-border immigration policies flooded the country with illegal aliens, including criminals convicted of crimes in their home country, violent international gang members, and suspected ISIS terrorists. Much of that was done in violation of federal immigration law through the assertion of executive enforcement prerogatives. Now, President Trump is executing Congress's dictates and enforcing federal immigration law—which includes valiant efforts by federal law enforcement to identify and deport alien criminals. Against that backdrop of law enforcement, activists began to gather in cities across the United States, including Chicago. But rather than protest peacefully, some of those protests became violent, threatening federal officers, harming federal property, and certainly impeding enforcement of federal law. President Trump's deployment of a small number of National Guard members to defend against this lawlessness is responsible, constitutional, and authorized by statute.

*Amici Curiae* are Iowa, Montana, Oklahoma, South Carolina and 14 additional States who submit this brief in support of Defendants. Prohibiting the deployment of the National Guard to ensure ICE agents can fulfil their duties safely and effectively comes at an immense cost to the States. The undersigned States recognize the important roles and balance played in the National Guard system by both the states and federal government. But Plaintiffs fail to respect that balance here.

## ARGUMENT

**I.    Violent Rioters in Chicago Are Harming Federal Officers and Property and Impacting the Federal Government's Ability to Carry Out Federal Laws.**

Recently, violence against federal immigration officials has increased. "The men and women of ICE put their lives on the line to protect and defend the lives of American citizens," ICE

3

Assistant Secretary Tricia McLaughlin recently said in a statement. Audrey Conklin, *California sheriff says Newsom 'encouraged' LA riots as ICE arrests violent illegal aliens*, Fox News (Jun. 10, 2025), https://tinyurl.com/y942z342. McLaughlin also noted that "politicians . . . are contributing to the surge in assaults of our ICE officers through their repeated vilification and demonization of ICE," referencing comparisons made "to the modern-day Nazi gestapo" and to "glorifying rioters." *Id.* Indeed, there are real-world consequences to Chicago's poor treatment of federal immigration officials and inaction to address violence against them.

In September 2025, violence toward ICE agents in Chicago began to escalate after ICE began "Operation Midway Blitz"—an initiative to "target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor [JB] Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets." Chris Nesi, *Chicago police ordered to ignore Border Patrol agents' plea for help while surrounded by angry mob of protesters*, N.Y. Post (Oct. 5, 2025, at 6:51 pm), http://bit.ly/4q0x76U. The Broadview Processing Center in Chicago "continues to face violence and unlawful activity by rioters." Natasha Korecki & Daniella Silva, *Illinois officials issue orders and file lawsuits as protesters clash with immigration agents*, NBC News (Oct. 6, 2025, at 1:34 pm), https://bit.ly/3KF4igs.

More than one hundred people have surrounded the Center and "assaulted law enforcement, threw tear gas cans, slashed tires of cars, blocked the entrance of the building, and trespassed on private property." *Violent Rioters Assault Law Enforcement at ICE Broadview Processing Center, Police under JB Pritzker's Sanctuary Jurisdiction Refuse to Answer Calls to Help Stop Assaults*, DHS (Sept. 19, 2025), https://bit.ly/3IP2Rvi. So far, these riots have resulted in federal agents having to arrest at least 13 people. Christine Fernando & John O'Connor, *Noem*

*visits Chicago area ICE facility as agents arrest 13, raid city neighborhoods*, AP (Oct. 3, 2025, at 5:26 pm), https://bit.ly/4q53mSM.

But the threat ICE agents face in Chicago is not limited to the Broadview Center. ICE agents, who were on patrol about 15 miles from the Broadview facility, "were attacked and rammed by vehicles and boxed in by 10 cars." Nesi, *supra*. ICE agents "attempted to flee their trapped vehicle," but a woman, carrying a semi-automatic weapon, "attempted to run the officers down." *Id.* Astonishingly, local police, who were initially prepared to help ICE, were told to "stand down by the chief of patrol." *Id.*

Despite the continued violence occurring at the ICE facility and toward ICE in general, Chicago Mayor Brandon Johnson has continuously decried any federal help and has gone so far as to sign an executive order declaring "'ICE-free zones' throughout the city to limit the areas where federal authorities can operate." Connor Greene & Brian Bennett, *'Push Back Against Tyranny': Chicago and Illinois Fight Trump's Intensifying Crackdown*, Time (Oct. 6, 2025, at 4:26 pm), https://bit.ly/4nIPZ98. He has done so in a purported effort to "check" the administration, "build[] a broader civic shield that limits the reach of harmful enforcement practices" and "reaffirms Chicago's role as a welcoming city." Will Hager, *Chicago establishes ICE-free zones: Here's what we know*, FOX 32 (Oct. 6, 2025, at 10:17 am), https://bit.ly/4nyCvwy. Illinois Governor JB Pritzker has similarly demanded federal officers "stay the hell out of Chicago," Molly Parks, *Pritzker vows to boot Noem's ICE 'thugs' from Chicago*, Washington Examiner (Oct. 6, 2025, at 5:44 pm), https://bit.ly/46Yyf2n, and called the President's attempt to protect ICE by deploying the National Guard an "unconstitutional invasion." Greene & Bennett, *supra*.

Even before the current conflict, Illinois has enforced some of "the nation's strictest sanctuary laws, widely barring cooperation between local police and federal immigration agents, including for detention." Sophia Tareen, *Chicago area center in Trump's immigration crackdown sparks complaints of inhumane conditions*, AP (Sept. 25, 2025, at 4:04 pm), https://bit.ly/439Fp2x. "The state effectively banned immigration detention in 2021, when it ended local cooperation agreements between the federal government and county jails. Illinois barred private detention in 2019 following failed attempts to build a new detention facility and there are no federal immigration detention centers in the state." *Id.*

Given the prevalence of violence aimed at federal law enforcement, in Chicago and around the country, it is unsurprising that the President deployed National Guard resources to protect them from obstructions in their attempts to follow the law.

**II.     President Trump Certainly Has a "Colorable Basis" For Federalizing the National Guard to Protect Federal Agents and Property from Violent Rioters in Chicago.**

Section 12406(3) provides that "[w]henever . . . the President is unable with the regular forces to execute the laws of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to … execute those laws." 10 U.S.C. § 12406(3). In *Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025), the Ninth Circuit held that the President indeed had "a colorable basis for invoking" § 12406(3) to federalize the National Guard in Los Angeles. The Court used "a highly deferential standard of review" to determine if there was a "colorable assessment of the facts and law within a 'range of honest judgment'" to warrant such a decision. *Id.* at 1051–52.

In determining that the President's actions were authorized, the Court referenced that the defendants had presented evidence "of protesters' interference with the ability of federal officers

6

to execute the laws," noting violence against federal officers, including throwing objects, ramming gates, and vandalizing property. *Id.* at 1052. The Court also noted that defendants' declarations there showed how "those activities significantly impeded the ability of federal officers to execute the laws." *Id.*

This Court should employ this same analysis, under which, there is no doubt that the President's decision to send national guard members to Chicago reflects a similar "colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051. There has been a continuous and growing threat outside of the ICE building in Chicago. Hundreds of protesters have gathered, assaulted ICE agents, and actively worked to block agents from accessing the building. *See* DHS *supra*, https://bit.ly/3IP2Rvi. And the President's order to send approximately 300 National Guard members, contrasted with the thousands deployed in California in *Newsom*, shows that there is a measured response here. That is not to say that the President cannot federalized more members, but this response certainly shows that it was a reasoned decision based on the facts as known at the time. The President's response here was certainly "within a 'range of honest judgment.'"

**III.    The Harms Incurred If Violent and Destructive Protests and Riots Are Allowed to Continue in Chicago are Borne by All States.**

The President's decision to federalize the national guard to protect federal officers and property in Chicago has effects beyond the borders of Illinois; states and cities across the U.S. are benefited by this decision.

States are already impacted with the immense costs of illegal immigration. States have been required to bear numerous financial costs because of illegal immigration including cost related to incarceration and supervisions of criminal illegal aliens, the cost of criminal recidivism,

7

and public education and healthcare costs. *See United States v. Texas*, 599 U.S. 670, 716-17 (2023) (Alito, J., dissenting). These expenses have collectively cost the states billions. *See California v. United States*, 104 F.3d 1086, 1090 (9th Cir. 1997). These costs are particularly acute, where the Supreme Court has left the States without recourse to address immigration-related harms outside of federal enforcement. *See Arizona v. United States*, 567 U.S. 387 (2012) (holding that a state generally may not enact a law that addresses the subject of immigration because Congress has "occupied the field."); *Texas*, 599 U.S. at 674 (holding a state is precluded from suing to ensure that the federal government is enforcing immigration laws). As the United State Supreme Court has stated, "[t]he problems posed to the State[s] by illegal immigration must not be underestimated." *Arizona*, 567 U.S. at 389. If federal resources needed to enforce federal immigration law are diverted from Illinois, other states will continue to bear the costs of illegal immigration.

 States are at risk of even more costs if violent protests are implicitly endorsed in Illinois. Antifa-aligned groups seek to undermine the federal government as it works to redress this significant problem by causing damage to federal property, harming federal agents, and in some cases, damaging the city in which the riot is located—causing significant damage to the state and its citizens. For example, the costs of the anti-ICE riots in Los Angeles are estimated to have cost taxpayers $30 million. Chris Nesi*, House Judiciary Committee opens probe into taxpayer-funded group's potential ties to LA anti-ICE riots*, N.Y. Post (June 24, 2025, at 12:34 pm), https://bit.ly/4gWJCMM.

Indeed, many reports suggest that much of the violence and destruction caused by these riots can be traced to a few organizations funding the riots, *see id.,* or individuals moving between the States encouraging this type of behavior, *see Wiley, et al., supra*.[1]

The pervasiveness of these coordinated attacks cannot be underestimated. They have resulted in the President declaring Antifa a domestic terrorist organization due to its explicit "calls for the overthrow of the United States Government, law enforcement authorities, and our system of law." Designating Antifa as a Domestic Terrorist Organization, 90 Fed Reg. 46317, 46317 (Sept. 22, 2025). To accomplish its goals, Antifa organizes and executes a campaign to "obstruct enforcement of Federal laws through armed standoffs with law enforcement, organized riots, violent assaults on Immigration and Customs Enforcement [ICE] and other law enforcement officers, and routine doxing of and other threats against political figures and activists." *Id.*

Accordingly, aggression toward ICE is not a problem unique to Illinois. ICE faces significant threats nationwide. Take for example the tragic shooting at a Dallas ICE field office in September 2025, where a sniper opened fire and killed three people. "This vile attack was motivated by hatred for ICE[.]" *DHS Issues Statement on Targeted Attack on Dallas ICE Facility*, DHS (Sept. 24, 2025), https://bit.ly/46Y6pTM. The shell casings that were found contained "anti-ICE messages on them," and handwritten notes by the shooter indicating he "hoped his actions

---

[1] Indeed, this type of interstate movement has occurred before. Take for example the riots that occurred in 2020. Destruction due to rioting occurred in at least 20 States, Jennifer A. Kingson, *Exclusive: $1 billion-plus riot damage is most expensive in insurance history and rioters*, AXIOS (Sept. 16, 2020), https://bit.ly/4q0xRcc, and some rioters moved between jurisdictions. After rioting occurred in Minnesota in 2020, arrest records showed that out of 18 people arrested in St. Paul, 6 were not from Minnesota, and out of 109 people arrested in Minneapolis, 16 were not from another state. Trevor Hughes, *Protests in Minneapolis turned violent: Officials first blamed outsiders, but that's not what arrests show*, USA Today (updated June 4, 2020, at 3:39 pm), https://bit.ly/3IZuZvw.

9

would give ICE agents real terror of being gunned down[.]" *Id.*; Holly Yan & Priscilla Alvarez, *A 2nd detainee — a father of 4 — dies after a gunman opened fire at an ICE office in Dallas*, CNN (Sept. 30, 2025), https://bit.ly/4o8pCJq.

Because this type of aggression toward ICE—targeting a specific facility and preventing agents from being able to safely fulfill their duties—has already necessitated the need for National Guard federalization in three States, it is imperative that the unrest be squelched quickly to deter similar rioting in the other states.

Accordingly, the President's action of federalizing the National Guard furthers the public interest because it allows ICE agents to continue to perform their statutory duties of identifying, apprehending, and removing illegal aliens, which is the only way to protect the States from the harms caused by illegal immigration. *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) ("[T]he public interest in enforcement of the immigration laws is significant." (collecting cases)). And it protects states from the costs incurred by violent protests and riots. Further, allowing the federal government to quash this type of behavior at its outset sets a precedent discouraging similar behavior in other States.

## CONCLUSION

The Court should deny Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction.

BRENNA BIRD

Attorney General of Iowa

*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
1305 E. Walnut Street

10

Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

## ADDITIONAL ATTORNEYS GENERAL IN SUPPORT

Austin Knudsen
Attorney General of Montana

Gentner Drummond
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina

Steve Marshall
Attorney General of Alabama

Tim Griffin
Attorney General of Arkansas

James Uthmeier
Attorney General of Florida

Chris Carr
Attorney General of Georgia

Raúl R. Labrador
Attorney General of Idaho

Theodore E. Rokita
Attorney General of Indiana

Kris Kobach
Attorney General of Kansas

Liz Murrill
Attorney General of Louisiana

Lynn Fitch
Attorney General of Mississippi

Catherine Hanaway
Attorney General of Missouri

Michael T. Hilgers
Attorney General of Nebraska

Marty Jackley
Attorney General of South Dakota

Ken Paxton
Attorney General of Texas

John B. McCuskey
Attorney General of West Virginia