# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

STATE OF ILLINOIS and the CITY OF CHICAGO,

<em>Plaintiffs</em>,

v.

DONALD J. TRUMP, *et al.*, in their official capacities,

<em>Defendants</em>.

Case No. 1:25-cv-12174

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................................1

BACKGROUND .............................................................................................................................6

I.      Legal Background ...............................................................................................................6

      A.      The National Guard System ....................................................................................6

      B.      The Posse Comitatus Act ........................................................................................7

II.     Factual Background ...........................................................................................................8

THE COURT'S QUESTIONS .......................................................................................................15

LEGAL STANDARD ....................................................................................................................15

ARGUMENT .................................................................................................................................16

I.      Plaintiffs Are Unlikely to Succeed on the Merits............................................................16

      A.      The President Reasonably Determined that Section 12406's Conditions Are
              Satisfied and that Decision Is Conclusive. ...........................................................16

            1.      The President's Decision to Invoke Section 12406 Is Conclusive and
                    Not Subject to Judicial Review. ...............................................................17

            2.      At A Minimum, This Court Should Apply a Highly Deferential
                    Standard of Review. ..................................................................................19

            3.      Plaintiffs' Procedural Challenge Is Unlikely to Succeed Because the
                    President Has Met the Procedural Requirement of Section 12406. ...............20

            4.      The President Properly Invoked Section 12406. ................................................22

                    i.      The President properly determined that the condition of
                          Section 12406(3) exists. ...............................................................22

                    ii.      The condition of 10 U.S.C. § 12406(2) likewise exists.........................25

      B.      Defendants' Actions Are Consistent with the Tenth Amendment..............................27

      C.      Plaintiffs' PCA Claim Fails....................................................................................30

II.     Plaintiffs Have No Right to Judicial Relief Regarding Their Challenge the
      Federalization and Deployment of Texas National Guard Members to Illinois .....................37

A.     Plaintiffs Cannot Demonstrate Article III Standing for Their Challenge Concerning the Texas National Guard................................................................37

B.     Plaintiffs' Challenge Is Not Within the Zone of Interest of Section 12406, and Thus They Cannot Sue for Any Alleged Injury........................................40

III.    Plaintiffs Have Not Shown Irreparable Harm..................................................42

IV.    The Remaining Factors Counsel Against Injunctive Relief..............................45

V.    Any Injunctive Relief Should Be Narrowly Tailored and Permit Lawful Agency Activity.............................................................................................................47

VI.    This Court Should Proceed to Address Plaintiffs' Preliminary Injunction Motion and Not Entertain the TRO Motion.....................................................47

VII.   Any Injunctive Relief Should Be Stayed Pending Appeal and Must Include a Bond.............48

CONCLUSION....................................................................................................................49

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
   585 U.S. 579 (2018)................................................................................................................43

*Air Courier Conference of America v. American Postal Workers Union,*
   498 U.S. 517 (1991)...............................................................................................................40

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982)...............................................................................................40, 43, 44

*American School of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902).................................................................................................................32

*American Society of Cataract & Refractive Surgery v. Thompson,*
   279 F.3d 447 (7th Cir. 2002).................................................................................................20

*Armstrong v. Exceptional Child Center, Inc.,*
   575 U.S. 320 (2015)...............................................................................................................32

*Baker v. Carr,*
   369 U.S. 186 (1962)...............................................................................................................18

*Black Lives Matter D.C. v. Trump,*
   544 F. Supp. 3d 15 (D.D.C. 2021)........................................................................................31

*Bryan v. United States,*
   524 U.S. 184 (1998)...............................................................................................................36

*Califano v. Yamasaki,*
   442 U.S. 682 (1979)...............................................................................................................47

*Cunningham v. Neagle,*
   135 U.S. 1 (1890)...................................................................................................................35

*Dalton v. Specter,*
   511 U.S. 462 (1994)...............................................................................................................18

*Department of Commerce v. New York,*
   588 U.S. 752 (2019)...............................................................................................................44

*Diamond Alternative Energy, LLC v. Environmental Protection Agency,*
   145 S. Ct. 2121 (2025)...........................................................................................................37

*East Bay Sanctuary Covenant v. Trump,*
 932 F.3d 742 (9th Cir. 2018) ..................................................................................48

*Federal Express Corporation v. United States Department of Commerce,*
 39 F.4th 756 (D.C. Cir. 2022) ................................................................................20

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992) ...............................................................................................47

*GEFT Outdoors, LLC v. City of Westfield,*
 922 F.3d 357 (7th Cir. 2019) ................................................................................16

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local Number 70 of Alameda County,*
 415 U.S. 423 (1974) ...............................................................................................47

*Haaland v. Brackeen,*
 599 U.S. 255 (2023) ...............................................................................................40

*Hayes v. Hawes,*
 921 F.2d 100 (7th Cir. 1990) ................................................................................34

*Hollingsworth v. Perry,*
 570 U.S. 693 (2013) ...............................................................................................38

*Illinois Republican Party v. Pritzker,*
 973 F.3d 760 (7th Cir. 2020) ................................................................................16

*Immigration & Naturalizaton Service v. Cardoza-Fonseca,*
 480 U.S. 421 (1987) .........................................................................................19, 20

*In re Debs,*
 158 U.S. 564 (1895) ...............................................................................................35

*Index Newspapers LLC v. United States Marshals Service,*
 977 F.3d 817 (9th Cir. 2020) ................................................................................46

*Kansas v. Becerra,*
 764 F. Supp. 3d 801 (N.D. Iowa 2025) ................................................................37

*Kowalski v. Tesmer,*
 543 U.S. 125 (2004) ...............................................................................................38

*Krasilych v. Holder,*
 583 F.3d 962 (7th Cir. 2009) ................................................................................34

*Lewis v. Casey,*
    518 U.S. 343 (1996) ...........................................................................................47

*Luther v. Borden,*
    48 U.S. (7 How.) 1 (1849) ............................................................... 17, 18

*Martin v. Mott,*
    25 U.S. (12 Wheat.) 19 (1827) ....................................................... 17, 18

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................43

*Massey v. Wheeler,*
    221 F.3d 1030 (7th Cir. 2000) ........................................................38

*Mays v. Dart,*
    974 F.3d 810 (7th Cir. 2020) ................................................... 42, 43

*Metropolitan Washington Chapter, Associated Builders & Contractors, Inc. v. District of Columbia,*
    62 F.4th 567 (D.C. Cir. 2023) ........................................................38

*MI-BOX New England, LLC v. MI-BOX Holding Co.,*
    No. 21-cv-5809, 2025 WL 2549248 (N.D. Ill. Apr. 18, 2025) ...............16

*Murthy v. Missouri,*
    603 U.S. 43 (2024) .............................................................. 37, 39, 44

*National Federation of Independent Business v. Sebelius (NFIB),*
    567 U.S. 519 (2012) ..........................................................................29

*New York v. United States,*
    505 U.S. 144 (1992) ..........................................................................28

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ......................................................47

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) .................................................*passim*

*Newsom v. Trump,*
    --- F. Supp. 3d ---, 2025 WL 1663345 (N.D. Cal. June 12, 2025) ...............30

*Newsom v. Trump,*
    --- F. Supp. 3d ---, 2025 WL 2501619 (N.D. Cal. Sep.t. 2, 2025) .................*passim*

*Nken v. Holder,*
    556 U.S. 418 (2009) ..........................................................................46

*Nuclear Regulatory Commission v. Texas,*
   605 U.S. 665 (2025) ........................................................................................................20

*Oesterich v. Selective Service System Local Board Number 11,*
   393 U.S. 233 (1968) ........................................................................................................20

*Oregon v. Trump,*
   No. 3:25-cv-1756, 2025 WL 2823653 (D. Or. Oct. 4, 2025) ....................................31

*Perpich v. Department of Defense,*
   496 U.S. 334 (1990) .........................................................................................6, 7, 28, 41

*Ratzlaf v. United States,*
   510 U.S. 135 (1994) ........................................................................................................36

*Robinson v. Overseas Military Sales Corporation,*
   21 F.3d 502 (2d Cir. 1994) ...........................................................................................31

*Smith v. United States,*
   293 F.3d 984 (7th Cir. 2002) .................................................................................. 8, 31

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ........................................................................................................37

*State of Oregon et al. v. Donald Trump et al.,*
   --- F. Supp. 3d ---, 2025 WL 2817646 (D. Or. Oct. 4, 2025) ...........................*passim*

*Sunshine Anthracite Coal Co. v. Adkins,*
   310 U.S. 381 (1940) ........................................................................................................32

*Tennessee v. Davis,*
   100 U.S. 257 (1880) ........................................................................................................39

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ........................................................................................................37

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ........................................................................................................32

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ........................................................................................................29

*United States v. Bacon,*
   851 F.2d 1312 (11th Cir. 1988) ....................................................................................34

*United States v. Comstock,*
    560 U.S. 126 (2010)............................................................................ 27, 28

*United States v. Hartley,*
    678 F.2d 961 (11th Cir.1982)....................................................................34

*United States v. Hatch,*
    722 F.3d 1193 (10th Cir. 2013) ................................................................27

*United States v. Khan,*
    35 F.3d 426 (9th Cir. 1994)......................................................................35

*United States v. Klimavicius–Viloria,*
    144 F.3d 1249 (9th Cir. 1998) ..................................................................35

*United States v. Morrison,*
    529 U.S. 598 (2000)..................................................................................39

*United States v. Pecore,*
    664 F.3d 1125 (7th Cir. 2011) ..................................................................34

*United States v. Texas,*
    599 U.S. 670 (2023)...........................................................................*passim*

*United States v. Washington,*
    596 U.S. 832 (2022)..................................................................................45

*United States v. Yunis,*
    924 F.2d 1086 (D.C. Cir. 1991) .................................................................8

*University of Texas v. Camenisch,*
    451 U.S. 390 (1981)..................................................................................45

*Warth v. Seldin,*
    422 U.S. 490 (1975)..................................................................................40

*Willingham v. Morgan,*
    395 U.S. 402 (1969)..................................................................................39

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008).........................................................................15, 16, 42

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 15 ..................................................................... 6, 16

U.S. Const. art. II, § 2, cl. 1 ........................................................................ 7, 41

**Statutes**

10 U.S.C. § 275 ................................................................................................ 8, 33

10 U.S.C. § 10101 .............................................................................................. 6, 41

10 U.S.C. § 12406 ............................................................................................ *passim*

18 U.S.C. § 1385 .............................................................................................. *passim*

Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775 .................................................25

Act of May 2, 1792, ch. 28, §§ 1–2, 1 Stat. 264 ................................................26

The Militia Act, 12 Stat. 281 (1861) ................................................................19

**Rules**

Fed. R. Civ. P. 65(c) ........................................................................................48

**Executive Orders**

Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 24, 1970). ...........................33

**Other Authorities**

Alaska National Guard, "Alaska Army National Guardsmen to deploy to Southwest border to support Customs and Border Protection (Oct. 3, 2024), https://perma.cc/BQ6W-WKHV. ..............................................................42

Antoinette Grajeda, "Arkansas National Guardsmen mobilized to southern border," *Arkansas Advocate* (Oct. 6, 2025), https://perma.cc/KZS5-DG7X ........................................................................42

*Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions,* 1 Supp. Op. O.L.C. 343, 343 (1971) .........................................................35

*I am the Guard: A History of the Army National Guard, 1636-2000,* https://perma.cc/4UKD-HC7X ......................................................................41

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* Version 8 (updated Nov. 6, 2018) (CRS Report) .. 7, 26

*Rebellion,* Black's Law Dictionary (1st ed. 1891) ..............................................25

*Rebellion,* Black's Law Dictionary (12th ed. 2024) ............................................25

*Rebellion*, The Cyclopedic Dictionary of Law (1901) ...................................................................25

*Rebellion*, Webster's International Dictionary of the English Language (1903) ......................................26

U.S. Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025),
   https://perma.cc/KD4T-TUXP ....................................................................................................12

U.S. Dep't of Homeland Security, *"ICE and CBP Law Enforcement Dodge Literal Bullets from Rioters"* (July 11, 2025),
   https://perma.cc/N4GJ-VUTL ....................................................................................................12

x

## INTRODUCTION AND SUMMARY OF ARGUMENT

The most fundamental duty of any American elected official, from the President of the United States to a local mayor, is to use all lawful means to protect the lives and safety of those who serve our country, state, and communities. Each law enforcement agency is populated by courageous men and women who accept some measure of personal risk in serving their country. But for officers within the Department of Homeland Security's Immigration and Customs Enforcement (ICE), that risk is extraordinarily severe at present. In recent months, individuals who disagree with Congress's and the Executive's policy judgments on immigration have resorted to vicious tactics to thwart and intimidate the public servants charged with executing immigration laws.

In Chicago, the ICE Enforcement and Removal Operations (ERO) field office has been the target of actual and threatened violence. Agitators have assaulted federal law enforcement officers with rocks, bricks, pepper spray and incendiary devices. They have damaged federal property, including by destroying external plumbing. Rioters have blocked means of ingress and egress and physically assaulted federal personnel. They have even rammed occupied law enforcement vehicles forcing them off the road. Federal personnel have had their personal vehicles damaged and tires slashed, and they have been unable to enter their place of work without escort. They have even been followed home and aggressively confronted. There have also been substantial threats to the officers personally: multiple officers have been the victims of doxing, threats on social media, and threats to their family members. Some individuals have experienced break-ins at their home. One leader of the notorious Latin King gang placed a bounty of $10,000 on the murder of Border Patrol Tactical Commander Gregory Bovino. The violence is quickly eclipsing the violence DHS experienced in Los Angeles. Over the last two weeks, DHS has seen more arrests of individuals with semi-automatic weapons who have assaulted, obstructed, or impeded federal agents in Chicago than in Los Angeles over the last four months. Even street gangs have organized to assault, obstruct, and impede immigration enforcement

operations. As a result of these ongoing and sustained attacks, federal officers have been diverted from their regularly assigned law enforcement operations to provide crowd control and protection of federal personnel and property.

In the face of this ongoing and sustained violence, and two days after a sniper murdered two people at another ICE facility in Texas, on September 26, 2025, DHS sought assistance from the Department of War (DoW) "in order to safeguard federal personnel, facilities, and operations in the State of Illinois," "including those directly supporting [ICE] and the Federal Protective Service (FPS)," which "have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement action." Decl. of Gen. Steven S. Nordhaus ¶¶ 8-9 (Nordhaus Decl.). Because of the increased urgency based upon changes to the situation on the ground in Illinois, DHS later sent a renewed request for assistance in early October, this time asking for even more DoW personnel.

In response, on October 4, 2025, President Trump issued a memorandum calling to federal service at least 300 members of the Illinois National Guard under 10 U.S.C. § 12406 to protect federal property and personnel who are executing federal law. The President made clear that the federalization is only "until the Governor of Illinois consents to a federally-funded mobilization, under Title 32" of the U.S. Code, pursuant to which the Guardsmen would be under the command and control of Governor. *Id.* Ex. D (Oct. 4 Presidential Memo). As the President explained, violent groups "have sought to impede the deportation of and removal of criminal aliens through violent demonstrations, intimidation and sabotage of Federal operations," that "these violent activities appear to be increasing," and that the situation in Illinois, "particularly in and around the City of Chicago, cannot continue." *Id.* He directed the Secretary of War to carry out the protection mission, and upon Governor JB Pritzker's refusal to mobilize the Illinois National Guard under Title 32, the Secretary of War directed the mobilization of 300 Illinois Guardsmen. In addition, 200 of 400 federalized Texas Guardsmen have been deployed to Illinois.

2

These deployments are tailored to the threat in Illinois, particularly in and around Chicago. Whereas 4,000 Guardsmen were federalized (and another 700 Marines were deployed) in Los Angeles to provide safety after wide-ranging riots—federalization which the U.S. Court of Appeals for the Ninth Circuit recently held was likely lawful, *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025) (per curiam)—currently only approximately 500 Guardsmen will be deployed to address the ongoing situation in Illinois. Plaintiffs nonetheless filed this lawsuit, seeking a temporary restraining order (TRO) and a preliminary injunction enjoining the federalization and deployment of the National Guard before any Guardsmen have begun the protection mission. But Plaintiffs have not made the requisite showing to warrant emergency injunctive relief.

First, Plaintiffs have failed to make a strong showing of a likelihood of success on the merits. Under 10 U.S.C. § 12406, the President is authorized to call up members of the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or when "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)–(3). Both conditions apply here: The violent actions and threats by large numbers of protestors, directed at those enforcing of federal immigration laws and at federal property, constitute at least a danger of a rebellion against federal authority and significantly impede the ability of federal officials to enforce federal law.

Plaintiffs also assert a claim under the Posse Comitatus Act (PCA), which criminalizes willful use of certain military components to execute the laws without Congressional authorization. But there is no private right of action for civil injunctive relief from an asserted violation of the PCA, which is a criminal statute that the Executive Branch enforces, and which requires "willful" conduct. The oddity of applying this *mens rea* requirement to the federal government underscores that there is no civil cause of action to enforce the PCA against the federal government. Indeed, in the 147-year history of the PCA, no court had *ever* allowed injunctive relief in a civil action against the Government based on the

PCA, until a decision last month from the U.S. District Court for the Northern District of California. And even that decision—rendered only following a trial on the merits—did not enjoin the deployment and federalization itself and, in any event, was swiftly administratively stayed by the Ninth Circuit.

But even if Plaintiffs could enforce the PCA, the Guard is not authorized to execute the laws—only to protect federal personnel and property, which the Supreme Court, the Ninth Circuit, and consistent Executive Branch practice recognize does not create a PCA problem. Indeed, Plaintiffs brought this suit and seek extraordinary relief before the Guardsmen have even been *deployed*, and thus necessarily have no basis for their contention that the Guard will engage in law enforcement proscribed by the PCA. Moreover, even if the Guard were conducting law enforcement, there is no violation of the PCA because the PCA's prohibition on the use of the military to execute the laws is inapplicable when such law enforcement is expressly authorized by statute. And the statute the President invoked to federalize the Guard here—the invocation of which the Ninth Circuit has already held was likely lawful as to the much larger Los Angeles area deployment—expressly authorizes the Guard to "execute those laws" of the United States that the President deemed the regular forces "unable . . . to execute." 10 U.S.C. § 12406(3).

Plaintiffs further assert a Tenth Amendment claim, but that claim is simply derivative of their statutory challenges under Section 12406 and the PCA. As Plaintiffs concede, their Tenth Amendment claim rests on their assertion that the President lacks the authority to federalize and deploy the Illinois National Guard. Thus, if the federalization and deployment is authorized by Section 12406 (which it is) and there is no violation of the PCA (which is the case here), then the Tenth Amendment has no independent role to play in this case.

Finally, Plaintiffs challenge the deployment of Texas National Guard to Illinois. But Illinois lacks Article III standing to challenge the federalization of the Texas National Guard under Section 12406. Any interest in commanding and controlling the Texas National Guard belongs to the Texas

4

Governor, who is the commander-in-chief of the Texas Guardsmen when they are not in federal status. Plaintiffs' other alleged injuries—that deployment will intrude on Illinois's sovereignty and cause economic harm—are speculative, generalized grievances that cannot support Article III standing. And even if Plaintiffs are deemed to have suffered an injury-in-fact, judicial relief is still not available because Plaintiffs do not fall within Section 12406's zone of interest, which at most protects the interest of those States whose Guardsmen are federalizing under the statute. Ultimately, under our constitutional scheme, it is the President's prerogative to determine where federalized Guardsmen are assigned, and an injunction interfering with military assignment decisions would contravene separation-of-powers principles.

Plaintiffs have also failed to make a strong showing of irreparable harm warranting emergency injunctive relief. They insist that the deployment inflicts a sovereign injury on Illinois, but a dispute over whether the statutory conditions for federalizing the Guard exist does not harm Illinois's sovereignty, let alone irreparably harm it, because Illinois is not being prevented from carrying out its own laws or setting its own enforcement priorities by the challenged federal action. This is particularly so when the Guard has only a protection mission and will not engage in law enforcement, federal or state. Plaintiffs likewise will not suffer irreparable harm due to the impact of the protection mission on Illinois and the City of Chicago. All of their asserted irreparable injuries rely on speculation as to the potential impact of activating three percent of the Illinois National Guard for a protection mission, on possible future events that may not occur, on the actions of third parties not before this Court, or on *parens patriae* injuries that are not cognizable as against the federal government. The Ninth Circuit found similar assertions of irreparable harm insufficient to warrant injunctive relief in *Newsom*, and this Court should do the same.

By comparison, the injury an injunction would work on the public interest is far greater. Defendants undoubtedly have a substantial, tangible interest in protecting their property and

personnel from harm. Plaintiffs do not so much as acknowledge this interest, and their analysis of this prong conflates the public interest with the merits. That failure is telling. Plaintiffs ask the Court to second-guess the President's judgment of the current situation in Illinois and exercise supervisory authority over his deployment of federalized Guardsmen, with the potential of putting federal officers (and others) in harm's way. But responsibility, and accountability, for those decisions should rest with the political branches of the federal government, not this Court. This Court should thus deny Plaintiffs' motion.

## BACKGROUND

### I. Legal Background

#### A. The National Guard System

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990) (citation omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command. *See* 10 U.S.C. § 10101; *see also* Nordhaus Decl. ¶¶ 8-9.

"Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Perpich*, 496 U.S. at 345. Guard members may have one of three statuses at any time: (1) federal active duty under Title 10; (2) state control with federal authority under Title 32; or (3) state active duty. Title 10 gives the Federal Government authority to raise and employ military forces, including National Guard units, under federal control

and at federal expense. Title 32 authorizes use of the National Guard for federal purposes and at federal expense but under state control. Finally, the Governor of a state may order that state's National Guard into state active duty pursuant to state law at state expense.

Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406, the statutory authority under which the President acted here. Section 12406's historic lineage dates to the First Militia Act of 1792, which was used by George Washington to respond to the Whiskey Rebellion. *See* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* Version 8 (updated Nov. 6, 2018) (CRS Report). Today, in its entirety, Section 12406 provides:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

Once called into Title 10 federal service, "members of the National Guard … lose their status as members of the state militia," *Perpich*, 496 U.S. at 347, and become federal soldiers with the President as the Commander in Chief of those forces, U.S. Const. art. II, § 2, cl. 1; *see also* Nordhaus Decl. ¶ 8-9.

### B. The Posse Comitatus Act

The PCA states in full as follows:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385. The PCA generally forbids using the Armed Forces "to execute the laws," *id.*, such as by directly engaging in domestic law-enforcement duties normally assigned to civilian police. *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991). Further, 10 U.S.C. § 275 directs the Secretary of War to promulgate regulations to ensure that members of the armed forces do not directly participate in "a search, seizure, arrest, or other similar activity" unless otherwise authorized by law. 10 U.S.C. § 275.

## II.    Factual Background

Throughout the summer, ICE has seen a sharp and violent increase in protests and attempts to impede its duties of enforcing the Nation's immigration laws. *See* Decl. of Russel Hott, ¶¶ 48-60 (Hott Decl.). ICE's facility located a few miles outside of Chicago, known as the ICE Broadview Processing Center (BSSA), has experienced significant unrest targeting both the facility itself and those who work in it. *Id.* ¶¶ 30-47 ICE and CBP officers, as well as civilian employees, have had all means of ingress and egress at BSSA blocked and have been physically assaulted while attempting to leave and go to work. *Id.* ¶ 31. Individuals outside of BSSA have become so volatile that employees who parked in an open lot have had to be escorted by multiple officers to get into the building. *Id.* Vandalism of cars, even personal vehicles, has become common with slashed tires and flour poured into a gas tank. *Id.*; *see also* Decl. of Daniel Parra ¶ 13 (Parra Decl.). These escalating threats and violence have necessitated employees to park away from the BSSA facility, to be shuttled to and from the facility, but the shuttles are routinely attacked by rioters as well. Hott Decl. ¶ 31. Rioters have also conducted calculated attacks on vehicles attempting to enter or leave the facility where one individual would jump on the hood of a car, another would block it by standing immediately behind the car, and

the car would then be swarmed and tires slashed while the BSSA employees remain inside. *Id.* Declarant Hott was personally subjected to this exact scheme. *Id.* Cars have also been used as weapons as individuals have intentionally collided their cars to hit vehicles occupied by federal law enforcement officers. *Id.* ¶ 21; *see also,* Parra Decl. ¶ 19. The damage and violence has been so indiscriminate, that even employees of nearby businesses were mistaken for ICE employees, accosted, and at least one of their personal vehicles vandalized. Hott Decl. ¶ 32. The building itself has also been a target. Graffiti covers the BSSA building, concrete surfaces, signs, and even the flagpole. *Id.* ¶ 33. BSSA's external plumbing has been destroyed and downspouts broken off *Id.*

In response to increased threats, violence, and obstruction of operations, federal law enforcement officers have routinely been diverted from their regular law enforcement responsibilities to protect federal personnel and property, impacting their mission. *Id.* ¶ 34. Fireworks have been shot at officers; bottles, traffic cones, rocks and canisters of CS gas have been thrown; and an Improvised Explosive Device was placed outside the BSSA. *Id.* ¶¶ 20, 36-38; *see also* Parra Decl. ¶ 19. With physical assaults on law enforcement officers sharply on the rise, officers have been hit and punched by individuals present at the protests on several occasions. Hott Decl. ¶ 35. More than thirty officers have been injured during these assaults—injuries include a torn ACL, a beard ripped of an officer's face, multiple lacerations, cuts, bruises, multiple hospitalizations, and, as a result of being tackled by a rioter, a hyper extended knee. *Id.* ¶ 43. Multiple loaded guns have been discovered in the possession of individuals arrested at these riots. *Id.* ¶ 20; *see also* Parra Decl. ¶ 15 (two rioters arrested with loaded handguns), ¶ 19 (woman who attempted to run over officers with her car was in possession of a handgun), ¶ 20 (individual arrested for clocking officers with vehicle found with handgun and additional loaded magazine).

Just this past weekend, CBP agents in a vehicle were intentionally boxed in on a public road by approximately ten vehicles, while two of the ten vehicles rammed the CBP vehicle on the passenger

and driver's side. Parra Decl. ¶ 19, 22. When agents exited the vehicle, one of the assailants drove directly at an agent, placing him under imminent threat of death or great bodily harm and forcing the agent to discharge his service-issued firearm at the vehicle, striking the occupant, who ultimately fled to the hospital and has since been arrested. *Id.* At the scene of the ramming, however, approximately 200 rioters converged and over the next several hours threw objects, including glass bottles, at agents and physically assaulted the agents. *Id.*

Aside from Illinois law preventing state and local law enforcement from sharing critical information with immigration law enforcement officers, requests to local law enforcement for assistance have largely gone unanswered, with outright refusal occurring in some instances. *See id.* ¶¶ 7, 21; Hott Decl. ¶¶ 12-21, 27-29. State and local public officials have inflamed animosity towards federal agents, with the Chicago Mayor being quoted as saying, "we have a rogue, reckless group of heavily armed and masked individuals roaming throughout our city that are not accountable to the people of Chicago." Parra Decl. ¶ 23. The Governor similarly claimed that "armed Border Patrol agents were downtown, marching up and down Michigan Avenue, harassing and intimidating residents and tourists." *Id.* According to the Governor, "ICE's chief offender Gregory Bovino has been leading the disruption and causing mayhem while he gleefully poses for photo ops and TikTok videos." *Id.* In another statement, the Governor stated that agents were "acting like jackbooted thugs." *Id.*

The "unprecedented level of political rhetoric against immigration enforcement" has resulted in increased threats to federal law enforcement personnel, physical assault against officers performing their lawful duties, and damage to government property. *Id.* ¶ 24. However, it is evident that this animosity towards federal law enforcement and immigration officials has spread to local law enforcement who have refused repeated requests for assistance. Hott Decl. ¶¶ 12-29. For example, despite receiving a request for assistance from DHS as it was surrounded by 200 violent rioters, the Chief of Patrol in Chicago ordered "NO UNITS WILL RESPOND TO THIS." *Id.* ¶ 28.

Given the unprecedented hostile position that has been taken by state and local law enforcement against federal immigration enforcement, resources have had to be reallocated to "ensure the security of [DHS] agents while on patrol as a result of threats and attacks," including providing "dedicated security and medical teams" and even armored vehicles to accompany them. Parra Decl. ¶ 25. The allocation of these resources "have placed a strain on the special operations community," impacting operations elsewhere. Less resource in these environments compromises the safety of federal law enforcement. *Id.*

Simply put, the levels of violence against federal law enforcement executing their lawful duties have reached an unprecedented high. *Id.* ¶ 11, 22. At the same time, the lack of assistance from local law enforcement, the local law's prohibition against cooperation with immigration agents, and state and local public officials' statements that inflamed animosity toward federal law enforcement officers have all contributed to the need for assistance from the National Guard. *Id.* ¶¶ 7, 11, 23; *see also* Hott Decl. ¶¶ 9-11 (discussing the City Mayor's October 6, 2025 executive order prohibiting federal agents from using city-owned spaces for immigration enforcement activities; Chicago Police Department's refusal to respond to ICE requests for assistance; local laws against cooperation with federal agents), ¶¶ 12-29 (providing examples of local law enforcement and officials refusing to assist federal law enforcement).

Violence, unfortunately, has not been limited to Chicago. Earlier this summer, riots in Los Angeles targeted ICE operations. In response, the President signed a memorandum on June 7 calling into federal service members and units of the National Guard under 10 U.S.C. § 12406 to "temporarily protect ICE and other United States personnel who are performing federal functions . . . and to protect Federal property, at locations where protests against those functions are occurring or are likely to occur[.]" Nordhaus Decl. ¶ 16; *see also id.*, Ex. D (June 7 Presidential Memo). The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in

11

response to ICE and other government officials' enforcement of federal law. *Id.* "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." *Id.*, Ex. D. Four thousand Guardsmen were federalized from the California National Guard and 700 active duty Marines were deployed to Los Angeles to protect federal property and personnel. *Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 2501619, at *3 (N.D. Cal. Sep.t. 2, 2025), *appeal filed*, No. 25-5553 (9th Cir. Sep. 3, 2025).

The mission has succeeded in providing critical protection to law enforcement officers under attack and facing threats—efforts that have led to a decrease in organized violence against federal law enforcement officers. For example, in Camarillo, about 50 miles from downtown Los Angeles, a few weeks after the initial riots, officers enforcing immigration laws encountered 500 rioters and came under gunfire. U.S. Dep't of Homeland Security, *"ICE and CBP Law Enforcement Dodge Literal Bullets from Rioters"* (July 11, 2025), https://perma.cc/N4GJ-VUTL. The crowd laid down a makeshift spike strip to counter DHS vehicles. *Newsom*, 2025 WL 2501619, at *8. Guardsmen were deployed and provided protection. *Id.* These countermeasures led to improved conditions, and officials have accordingly reduced the California force. All the Marines and almost 95 percent of the Guardsmen have since departed. *See id.* at *9; Defendants' Response Brief Regarding Jurisdiction, *Newsom v. Trump*, No. 25-cv-04870-CRB, at 5, ECF No. 190-1 (N.D. Cal. Sep. 5, 2025). As of mid-August, only 260 federalized Guardsmen continued their service in California. *Id.* at 4.

Though conditions in Los Angeles have improved since this summer, ICE personnel and property remain subject to actual and threatened violence nationwide. In September, a man shot at an ICE field office in Dallas, killing two detainees and injuring one other. U.S. Dep't of Homeland Security, *DHS Issues Statement on Targeted Attack on Dallas ICE Facility* (Sept. 24, 2025), https://perma.cc/KD4T-TUXP. The shooter's shell casings bore anti-ICE messages. *Id.* That same tragedy thankfully has not occurred elsewhere this year, but the risk at the ICE facility near Chicago

has been and remains especially acute. Two hundred members of the Oregon National Guard were also federalized to address violence against federal property and personnel in Portland, but the district court for the District of Oregon temporarily enjoined the deployment of not only the Oregon National Guard but also any other National Guard to Oregon. *State of Oregon, et al., v. Donald Trump, et al.*, 2025 WL 2817646 (D. Or. Oct. 4, 2025).

Based on the escalating violence targeting the ICE facility in Chicago, DHS has twice requested assistance from the DoW to secure the facility. *See* Nordhaus Decl. ¶ 14. The first request, dated September 26, 2025, cited sustained unrest at federal facilities in Illinois with the overarching foal of "reinforcing the safety of federal personnel, safeguarding public property and enabling uninterrupted execution of federal law enforcement missions." *Id.* Ex. B. Soon thereafter on October 3, 2025, in light of the ever-increasing extreme violence against federal personnel and property, with increased urgency, DHS submitted a second request, for the assistance of 300 National Guard personnel rather than 200 "to respond to the increasingly hostile and dangerous conditions." *Id.* Ex. C.

In response, on October 4, 2025, the President issued a memorandum calling to federal service at least 300 members of the Illinois National Guard. *See id.* ¶ 16, Ex C. This memorandum, entitled "Department of War Security for the Protection for Federal Personnel and Property in Illinois," discusses the "violent groups intent on obstruction Federal law enforcement activities" that have "sought to impede the deportation and removal of criminal aliens through violent demonstrations, intimidations, and sabotage of Federal operations." *Id.* It also noted that the violent activities are increasing and that they are "not occurring in isolation." *Id.* The President noted that there are similar to activities in multiple cities and states to "disrupt the faithful enforcement of Federal Law." Since June 7, 2025, amid violent protests, the President "determined that similar activities warranted the mobilization of the National Guard." *Id.* "In light of both past incidents in Chicago and the credible threat of future incidents," the President invoked 10 U.S.C. 12406 to federalize the Illinois National

Guard. *Id.* As the President explained, the Guard will protect "ICE, FPS, and other United States Government personnel who are executing Federal law in the State of Illinois, and Federal property" therein. *Id.* To that end, President Trump delegated authority to the Secretary of War to "coordinate with the Governor of the State of Illinois and the Chief of the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the Illinois National Guard under this authority." *Id.* Here, the appropriate members and units of the Guard were determined to be approximately 500 for the protection of Federal personnel and property.

After the President issued the October 4, memorandum, the Secretary of War sought mobilization of 300 Illinois National Guard personnel under Title 32, which would have kept the mobilized National Guard personnel under the command and control of the Governor of Illinois but with federal funding. *Id.* ¶ 17. To this end, General Steven S. Nordhaus, Chief of the National Guard Bureau and member of the Joint Chiefs of Staff, prepared a memorandum "directed to the Illinois Adjutant General requesting the Illinois National Guard be mobilized in Title 32 status within 2 hours to respond to the time-sensitive danger posed to federal personnel, property, and functions" at 11:22am Eastern Time ("ET"). *Id.* ¶¶ 18–19. The Illinois Governor denied the request. *Id* ¶ 20. The Secretary of War then issued a memorandum directing the mobilization of the Illinois National Guard in Title 10 status pursuant to President Trump's determination in the October 4, 2025 memorandum. *Id.* ¶ 21, Ex. F. On October 5, 2025, the Secretary of War further mobilized another 400 members of the Texas National Guard to perform federal protection missions where needed, including in the cities of Portland and Chicago. *Id.* ¶ 23, Ex. G . Currently, 200 of those 400 Texas National Guardsmen are deployed to Illinois. Knell Decl. ¶ 6. All 500 Guardsmen, once federalized, will be under the command and control of U.S. Northern Command, one of DoW's unified combatant commands. *Id.* ¶¶ 2, 3.

The next day, October 6, 2025, Plaintiffs filed this instant case, ECF No. 1 (Compl.), and moved for a TRO and preliminary injunction later that day, ECF Nos. 3, 13. The Court has scheduled

14

a hearing for October 9, 2025.

## THE COURT'S QUESTIONS

In preparation for the upcoming hearing, the Court has ordered Defendants to address: "(1) when National Guard troops will arrive in Illinois; (2) what municipalities within Illinois troops will be sent to; and (3) what the scope of the troops' activities will be once [there.]." Notification of Docket Entry, ECF No. 30.

As the attached declaration of Major General Knell explains, on October 7, 2025, fourteen members of the federalized California National Guardsmen arrived in Illinois to provide mobilization training to other federalized Guardsmen. These Guardsmen are not anticipated to perform missions beyond providing training and subject matter expertise. Knell Decl. ¶ 5. Also on October 7, 200 Texas National Guardsmen arrived in Illinois. *Id.* 6. Accordingly, as of October 8, 2025, there are approximately 200 federalized National Guardsmen in the State of Illinois. *Id.* ¶ 5. In addition, a total of 300 Illinois National Guardsmen have been mobilized and they are mustering to ensure readiness for Title 10 mobilization. *Id.* ¶ 5. Currently, all federalized National Guardsmen are based out of Joliet, Illinois, and the area of operation is primarily within Cook County, Illinois. *Id.* ¶¶ 5, 7. Federalized National Guard will perform "the federal protection mission as authorized by the President in his October 4, 2025, Memorandum and the Secretary of War Memoranda." *Id.* ¶ 8. The scope of the activities will be in "response to requests for assistance from Federal Government agents and agencies only when they are related to the protection of federal personnel performing official functions, as well as requests for protection duties such as protection of federal buildings" *Id.* "The federalized National Guard will not be engaging in law enforcement activities." *Id.*

## LEGAL STANDARD

Emergency injunctive relief, such as a TRO or a preliminary injunction, is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also*

*MI-BOX New England, LLC v. MI-BOX Holding Co.*, No. 21-cv-5809, 2025 WL 2549248, at *4 (N.D. Ill. Apr. 18, 2025) ("The standard for obtaining a TRO is the same as that required to issue a preliminary injunction."). Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (applying *Winter*). This requires a "strong showing" that they are likely to succeed on the merits; "a mere possibility of success is not enough" to entitle the plaintiff to a preliminary injunction. *Ill. Republican Party*, 973 F.3d at 762–63.[1]

## ARGUMENT

### I. Plaintiffs Are Unlikely to Succeed on the Merits.

#### A. The President Reasonably Determined that Section 12406's Conditions Are Satisfied and that Decision Is Conclusive.

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. In Section 12406, Congress explicitly authorized the President to "call into Federal service" members of the National Guard "[w]henever," *inter alia*, "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)–(3). The President reasonably determined that both of those conditions were satisfied when he federalized members of the Illinois

---

[1] Plaintiffs claim that the "Seventh Circuit employs a 'sliding scale' approach," but even under such an approach, a strong showing on one factor cannot make up for a weak showing on another factor. Pls' Br. at 23 (quoting *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). *GEFT Outdoors* was clear that a court "must deny [an] injunction" if a plaintiff fails to meet the "threshold requirements" of establishing a likelihood of success on the merits and irreparable harm, 922 F.3d at 364—both of which still need a strong showing, *see Ill. Rep. Party*, 973 F.3d at 762–63. The "sliding scale" comes in only after all those requirements are met as the Court balances the equities and considers the public interest. *Id.*

National Guard and Texas National Guard in response to mob violence in the Chicago area. Plaintiffs have no likelihood of success in second-guessing that determination.

### 1. The President's Decision to Invoke Section 12406 Is Conclusive and Not Subject to Judicial Review.

Initially, the President's determination is "conclusive upon all other persons," and is thus not reviewable. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827). Plaintiffs state, "Even in the face of . . . foreign conflict, federal courts have not shied from judicial review of and checks upon presidential overreach in the domestic use of military authority." Mem. in Supp. of Pls' Mot. for a TRO & Prelim. Inj. at 35, ECF No. 13 ("Pls' Br."). Not so. Congress vested the decision whether to call up the National Guard in the President, not the courts, as the Supreme Court observed nearly 200 years ago in *Martin*. There, a member of the New York militia challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812. *See Martin*, 25 U.S. (12 Wheat.) at 20–23. President Madison had activated the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (quotation marks omitted). The Supreme Court refused to entertain the militia member's contention that the President had misjudged the danger of such an invasion, explaining that "the authority to decide whether the exigency has arisen . . . belongs exclusively to the President," whose decision "is conclusive upon all other persons." *Id.* at 30. The Court emphasized that the 1795 law "confided" the power to call up the militia "to the Executive of the Union," as Commander in Chief, and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31; *cf. Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849).

Those same principles apply here. At bottom, Plaintiffs seek to use this suit to second-guess the President's judgment that the violence, threats, and intimidation against officials enforcing federal immigration laws as well as federal property roiling Chicago warranted activating approximately 500 Guardsmen (200 of which are from Texas)—both because the violence rose to the level of rebellion or a danger of rebellion against the federal government's authority to enforce the immigration laws and because the violence left the President sufficiently unable to ensure faithful execution of federal law. But like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" those statutory prerequisites are satisfied "exclusively to the President," whose decision must be treated as "conclusive." *Martin*, 25 U.S. (12 Wheat.) at 30.

*Martin* cannot be distinguished on the grounds that that case involved an invasion by a foreign government, as Plaintiffs attempt to do. *See* Pls' Br. at 37; *Newsom*, 141 F.4th at 1050 (recognizing that "§ 12406 is not limited to the domestic use of military force" and emphasizing that "[w]e see no reason that Congress would have intended for the President to receive significant deference when he invokes the first precondition in § 12406, but not when he invokes the other two."). Nor, as the Ninth Circuit also explained, does the President's decision bind only military subordinates. To the contrary, the Court in *Martin* emphasized that the President's decision was "conclusive upon all other persons." 25 U.S. (12 Wheat.) at 28. And in *Luther*, the Court explained that even courts could not second-guess President Tyler's decision to call out the militia. 48 U.S. (7 How.) at 44–45. Similarly, the Ninth Circuit recognized that *Martin*'s continuing viability is not for lower courts to decide, as Plaintiffs encourage this Court to do by suggesting that subsequent decisions undermine *Martin*'s premises. *See* Pls' Br. at 37–38; *Newsom*, 141 F.4th at 1050–51. And the Supreme Court has repeatedly reiterated that when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial review. *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *cf. Baker v. Carr*,

369 U.S. 186, 213 (1962) (quoting *Martin,* 25 (Wheat.) at 30, for the proposition that an emergency demands "[a] prompt and unhesitating obedience").

### 2. At A Minimum, This Court Should Apply a Highly Deferential Standard of Review.

To be sure, the Ninth Circuit held in *Newsom* that these precedents preserve some degree of judicial review of the President's decision to call forth the Guard. Defendants disagree with that holding, which is of course not binding on this Court. But, in any event, the Ninth Circuit made clear that this longstanding precedent interpreting statutory delegations of the calling-forth power requires, at a minimum, that courts "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048; *see also id.* at 1047 (observing that review of the President's decision in this context is "especially deferential"). The judicial role is, at most, limited to determining whether the President "had a colorable basis for invoking" Section 12406. *Id.* at 1052.

Plaintiffs' contention that "this Court should reject as unpersuasive the Ninth Circuit's [purportedly] overly deferential standard of review under Section 12406," Pls' Br. at 40, is based on a misunderstanding of statutory construction. Plaintiffs claim that

> before 1903, when Congress enacted what is now Section 12406, the Militia Act had authorized the President to federalize the militia "whenever . . . it shall become **impracticable, in the judgment of the President** . . . to enforce . . . the laws of the United States." 12 Stat. 281, 281 (1861) (emphasis added). But in 1903, Congress made two important changes: it (1) substituted "unable" for "impracticable" and (2) omitted any reference to the President's judgment. The Ninth Circuit essentially chose to read this deferential language back into Section 12406. But that outcome is entirely at odds with one of the most "compelling" "principles of statutory construction": "Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987).

*Id.* at 40. That argument is incorrect. The Ninth Circuit explicitly considered variations in statutory language since the 1795 Act and determined that,

> if Congress had disagreed with the *Martin* Court's interpretation of the 1795 Act, it could have amended the statute to provide for greater judicial review of the existence

> of a predicate condition. Congress did not do so at the time, and since then, Congress
> has modified the statutory delegations of the calling forth power in various ways, but
> the test of § 12406 is, in several material respects, the same as the [1795 Act] text
> quoted in *Martin*.

*Newsom*, 141 F.4th at 1048-49. In any event, Plaintiffs' reliance on *INS v. Cardoz-Fonseca* is misplaced.

That case related to a comparison between an earlier-debated version of a bill that never became law

versus the version that Congress eventually enacted. *See Cardoza-Fonseca*, 480 U.S. at 441–42. That is a

different situation from this one, where a Congressional enactment followed an earlier Congressional

enactment. Moreover, Plaintiffs' quip that "the Ninth Circuit erred in overlooking subsequent

Supreme Court precedent engaging in far less obsequious judicial review," Pls' Br. at 40, ignores those

portions of the Ninth Circuit's opinion that did just that before concluding that any review of the

President's determination should be highly deferential, *Newsom*, 141 F.4th at 1050–51.

That highly deferential standard articulated by the Ninth Circuit in *Newsom* and noted by the

district court in *Oregon* is reinforced by the nature of non-statutory ultra vires review more generally,

which is one of the most demanding standards known to the law. It is "a Hail Mary pass," *Nuclear

Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted), requiring a showing that the

defendant is engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393

U.S. 233, 238 (1968), or "has plainly and openly crossed a congressionally drawn line in the sand," *Fed.

Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022); *see Am. Soc'y of Cataract & Refractive

Surgery v. Thompson*, 279 F.3d 447, 456 (7th Cir. 2002) (holding that ultra vires review only requires a

"cursory look at the merits" and rejecting claim because "the Secretary's regulation [is] a reasonable

interpretation of an unclear statutory mandate."). Plaintiffs do not come close to satisfying that

extraordinarily demanding standard here.

### 3. Plaintiffs' Procedural Challenge Is Unlikely to Succeed Because the President Has Met the Procedural Requirement of Section 12406.

Plaintiffs claim that "[t]he President has failed to properly invoke his limited authority in 10

U.S.C. § 12406" because "there is no order from the President himself" and "Plaintiffs are aware of no document—issued by the President or anyone else—that provides any specific basis for the deployment of the National Guard to Illinois." Pls' Br. at 25–26. Based on that misunderstanding, without citing any precedent in support, and in contravention to every court order ever issued on the subject, Plaintiffs go as far as to argue that "[t]he Court owes the President and his administration no deference" because "the [Secretary of War's] deployment orders contain no rationale." Pls' Br. at 38.

Plaintiffs' procedural argument fails because as an initial matter, the only procedural requirement Section 12406 imposes is that the federalization order "be issued through the governors of the States," 10 U.S.C. § 12406—a process about which Plaintiffs have no complaints. While Section 12406 does not require the President to memorialize his decision to invoke Section 12406 in writing, the President has done so, issuing a memorandum on October 4, 2025, federalizing at least 300 Illinois National Guard members until the Governor of Illinois consents to a federally funded mobilization under Title 32 of Illinois National Guard under State control. Nordhaus Decl. Ex. C. The President directed the Secretary of War to coordinate with the Illinois Governor, which the Secretary of War duly did that same day. In his memorandum to the Adjutant General of the Illinois National Guard, the Secretary specifically noted the President's decision and directive. *Id.*, Ex. F. Because the Secretary of War has properly conveyed the federalization order to the Adjutant General for transmission to the Illinois Governor, as is customarily done, there is no procedural violation. Any suggestion that the President must directly communicate his rationale to the State's Governor has no basis in the statute.

Nor is any procedural requirement relevant to the validity of the President's invocation of Section 12406. That is, even if there had been a procedural violation, it would not warrant any injunctive relief. As the Ninth Circuit found in the analogous California National Guard case where the plaintiffs challenged the defendants' compliance with the "through the through the governors of the States" language, "even if Defendants failed to comply with the procedural requirement, such

failure would not justify the injunctive relief imposed by the district court" because "the statute's procedural requirement does not affect the President's authority to federalize the National Guard." *See Newsom*, 141 F. 4th at 1053-54.

### 4. The President Properly Invoked Section 12406.

#### i. The President properly determined that the condition of Section 12406(3) exists.

The President's decision to federalize Guardsmen is unreviewable, but if the Court concludes otherwise, the conditions precedent to a Section 12406 federalization exist in Illinois. The President explained in the October 4 memorandum that "[f]ederal facilities in Illinois, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities." Nordhaus Decl, Ex. C. These groups have used means such as "violent demonstrations, intimidation, and sabotage of federal operations," and "[t]hese violence activities appear to be increasing." *Id.* The President also noted that that "[t]hese activities are not occurring in isolation," but rather they "are similar to other ongoing efforts in multiple States and cities around the country to disrupt the faithful enforcement of Federal law." *Id.* Based on this, the President determined that "these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States" and "that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." *Id.*

On that same day, relying on that Presidential authority, Secretary Hegseth issued a Memorandum for the Adjutant General of the Illinois National Guard through the Governor of Illinois calling into Federal service up to 300 members of the Illinois National Guard. *See* Nordhaus Decl., Ex F. On October 5, Secretary Hegseth also issued a separate Memorandum for the Adjutant General of the Texas National Guard through the Governor of Texas calling into service up to 400 members of the Texas National Guard based on the same "October 4, 2025 . . . President[ial]

22

determin[ation] that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois . . . ." *See id.*, Ex G. Of those 400 Texas National Guardsmen, two hundred are deployed to Illinois. Knell Decl. ¶ 6.

Those Presidential judgments were sufficient to invoke Section 12406(3), and they were fully supported by the facts on the ground. As the Ninth Circuit held as to the California federalization and deployment that followed a similar Presidential order with similar findings and articulated basis, the President "had a colorable basis for invoking [Section] 12406(3)." *Newsom*, 141 F.4th at 1052.

Both ICE and CBP officials have further provided detailed accounts of the violence and threats facing federal property and personnel, as well as the strain on their resources required to maintain and respond to them. *See* Hott Decl. ¶¶ 12-47; Parra Decl. ¶¶ 8-27. As Director Hott explains, in recent days, agitators in the Chicago area have assaulted federal law enforcement officers with rocks, bottles, pepper spray, and traffic cones. Hott Decl. ¶¶ 20, 37; Parra Decl. ¶¶ 11-16. They have shot fireworks at officers stationed outside, defaced federal buildings, destroyed external plumbing systems, vandalized government (and personal) vehicles, and blocked federal law enforcement from getting in and out of those buildings to execute the immigration laws of this country. Hott Decl. ¶¶ 13, 31-36; Parra Decl. ¶¶ 12-16. And individual officers carrying out their constitutional duties have frequently been doxed, including threats on social media to them and their family members. Hott Decl. ¶¶ 16, 24, 44; Parra Decl. ¶ 24. Their homes and cars have been broken into. Hott Decl. ¶ 24. And a leader of the notorious Latin Kings gang put a bounty of $10,000 on the murder of Border Patrol Chief Gregory Bovino. Hott Decl. ¶¶ 24, 44; Parra Decl. ¶ 17. All of these tactics are aimed at intimidating officers from doing their jobs of executing the laws of the United States.

Plaintiffs' submissions show the same. Plaintiffs' own declarant described protests with hundreds of people, Pls' Br. at 35, occurring "almost around the clock," Pls' Br., Ex. 4, Decl. of Chief Thomas Mills ¶ 18, ECF No. 13-5, that evince a high degree of concerted planning and organization.

Plaintiffs acknowledge that protesters have impeded ICE operations by unlawfully blocking their vehicles from entering and exiting an ICE building, Pls' Br. at 16, and that protesters have attempted to break through lines of law enforcement officers, *id.* at 20. What is more, Plaintiffs recognize that "elected officials" and "their staffs" have been present at these protests, *id.*, plainly demonstrating that local officials are not only unable but also unwilling to control the riots. Federal immigration authorities' ability to engage in vigorous enforcement of existing laws is plainly impeded if they must do so in a climate of violent anarchy.

The Ninth Circuit further explained in *Newsom* that Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is inappropriate so long as any continued execution of the laws is feasible." 141 F.4th at 1051. To suggest otherwise, the panel reasoned, would mean that "so long as any quantum of federal law enforcement could be accomplished in the face of mob violence," "the President would be unable to call up the Guard to respond." *Id.* (citation omitted). In other words, that federal law enforcement officers are sometimes or even frequently able to carry out missions in the Chicago area, as Plaintiffs argue, *see* Pls' Br. at 31–32, does not negate the President's finding that he is unable to execute the laws of the United States. And Plaintiffs' repeated and artfully chosen references to the "*largely* peaceful" nature of the protests, *see id.* at 20, 32, 35 (emphasis added), do little to conceal that the truth that these protests have *frequently* been violence and *frequently* impeded federal law enforcement.

To be sure, the Ninth Circuit held that there must be more than some "minimal interference." *Newsom*, 141 F.4th at 1051. But the Ninth Circuit in *Newsom* did not suggest a standard, as Plaintiffs would have this Court adopt, where "the phrase 'unable . . . to execute the laws' *necessarily* describes a scenario comparable in magnitude to an invasion or rebellion." *See* Pls' Br. at 33 (emphasis added). Indeed, Plaintiffs cite no caselaw for their novel reading of Section 12406(3) and ignore that the one

24

circuit court to consider the issue—the Ninth Circuit—relied upon the violence itself and deferred to the President's judgment that "those activities significantly impeded the ability of federal officers to execute the laws." *Newsom*, 141 F.4th at 1052. *Newsom* thus stands for the proposition that Section 12406(3) authorizes the President to call up the National Guard when he is unable to ensure to his satisfaction the faithful execution of federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers. The President plainly had a colorable basis for that determination here.

### ii.    The condition of 10 U.S.C. § 12406(2) likewise exists.

The President's action under Section 12406 was independently warranted under the provision authorizing him to call the Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

The term "rebellion" encompasses the violent resistance to lawful enforcement of federal immigration law occurring in Chicago. Black's Law Dictionary defines rebellion to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *See Rebellion*, Black's Law Dictionary (12th ed. 2024). The same understanding prevailed in 1903, when Congress first enacted what is now Section 12406. *See* Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (authorizing the President to call forth the state militias into active federal service in the case of, among other things, "rebellion against the authority of the Government of the United States"). Dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority. *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."); *Rebellion*, An American Dictionary of the English Language (1900) ("Open resistance to lawful authority."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("[T]he forcible opposition and

resistance to the laws and process lawfully installed"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open resistance to, or defiance of, lawful authority.").

Plaintiffs do not specifically offer their own definition of rebellion but rather rely on the findings of the district court in *Oregon* that a rebellion must be "violent," "armed," "organized," "open and avoided," and aimed at "the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue." Pls' Br. at 32 (quoting *Oregon v. Trump*, ---F. Supp. 3d---, 2025 WL 2817646, at *13 (D. Or. Oct. 4, 2025)).[2] The *Oregon* Court's statements are incorrect and untethered to any statutory basis. For that reason and others, the Government has filed a notice of appeal as to that decision. Congress plainly used "rebellion" in its broader sense here. Otherwise, Section 12406 would fail to encompass numerous instances, both before and after its initial enactment in 1903, in which the President has called the militia into federal service to address defiance of federal authority in situations that fell short of organized efforts to overthrow the government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey. *See* CRS Report 8. President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion." *See id.* at 7–8; *see also* Act of May 2, 1792, ch. 28, §§ 1–2, 1 Stat. 264, 264. But when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited to a particular federal law. The Whiskey Rebellion, moreover, is only one example of a range of civil

---

[2] Plaintiffs misrepresent that "[e]ven the Ninth Circuit panel declined to consider the President's 'rebellion' declaration. This Court can and should become the third to summarily reject any assertion that a 'rebellion' exists . . . ." Pls' Br. at 34 (citation omitted). Actually, the Ninth Circuit stated, "[W]e do not reach the other condition invoked by the President, § 12406(2), concerning 'rebellion'" because it found that the criteria for invoking Section 12406(3) had been met. *Newsom*, 141 F.4th at 1051. That is a far cry from saying the Ninth Circuit "summarily reject[ed]" that a rebellion existed.. Pls' Br. at 34. This Court could, of course, similarly find that Section 12406(3) was satisfied and decline to consider Section 12406(2) if it so chose.

disorders that members of the militia and other federal military forces have long been called upon to address. Throughout the early years of the republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report at 9–12. In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes and miners' strikes. *See id.* at 13–14, 35–37. And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See id.* at 37–38.

The events around Chicago certainly exhibit many of the same features as these historical precedents. As both the *Oregon* Court and Plaintiffs here ignore, an actual rebellion need not have materialized for the President to federalize the National Guard pursuant to Section 12406(3). Only a "danger of a rebellion" is necessary, 10 U.S.C. §12406(2), and under even the most charitable reading of the facts in this case to Plaintiffs, the President certainly had a colorable basis for finding that condition was present. In response to lawful immigration enforcement efforts, agitators have specifically targeted federal property and officials with violence, intimidation, and threats. Congress sensibly did not require the President to await an actual rebellion before federalizing Guard members where a significant threat of rebellion exists. Creating life-threatening dangers for federal officers enforcing federal law and targeting federal employees for their work performing federal functions surely amounts to a dangerous risk of rebellion. The President was not required to wait for tragedy to occur (as happened in Texas just weeks ago) before protecting federal officials and property.

### B. Defendants' Actions Are Consistent with the Tenth Amendment.

The President's invocation of Section 12406 is also plainly consistent with the Tenth Amendment. So long as the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment

expressly disclaims any reservation of that power to the States . . . ." (quoting *New York v. United States*, 505 U.S. 144, 156 (1992))). That principle forecloses Plaintiffs' Tenth Amendment claim. Plaintiffs do not contend that Section 12406—some variant of which has existed since virtually the Founding—is unconstitutional. So if the federalization and deployment is authorized by Section 12406—which it is—the Tenth Amendment has no independent role to play here. That is particularly so because as the Ninth Circuit has recognized, the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054.

Contrary to Plaintiffs' suggestion, this is not an "unlawful[] usurp[ation] [of] Illinois's control over its National Guard forces." Pls' Br. at 41. Instead, that argument is derivative of Plaintiffs' Section 12406 claim because if the President lawfully deployed Illinois's National Guard under that statute— which he did—then the Tenth Amendment provides no recourse. *Cf. Comstock*, 560 U.S. at 144. Indeed, there was no dispute on this point in the California National Guard case. *Newsom*, 141 F. 4th at 1041–42 ("Our conclusion that it is likely that the Presidents order federalizing members of the California National Guard was authorized under § 12406(3) also resolves the Tenth Amendment claim because the parties agree that the Tenth Amendment claim turns on the statutory claim."). The Oregon district court's opinion relied upon by Plaintiffs is not to the contrary. There, the court held that the federalization of Oregon's National Guard violated the Tenth Amendment because it preliminarily determined that the President had "exceed[ed] constitutional authority that Congress granted him, such as in Section 12406." *See Oregon*, 2025 WL 2817646, at *13.

Plaintiffs' reliance on anti-commandeering principles, *see* Pls' Br. at 42, is misplaced because no commandeering has taken place. As discussed above, the National Guard is composed of both the State and Federal National Guards. *Perpich*, 496 U.S. at 345. The federal government is thus not unlawfully commandeering *state* officials when it federalizes the Guard consistent with Section 12406.

Plaintiffs also suggest that the federalization and deployment of Guardsmen to Illinois violates the Tenth Amendment because this step was purportedly taken with the subjective intention to "dragoon Illinois into federal immigration enforcement." Pls' Br. at 42. In support they cite a litany of other litigations that have no bearing on the issues before this Court, in an apparent suggestion that Defendants are bad actors. *See id.* at 42–43. They further assert that the federalization and deployment is part of a "campaign against Illinois's so-called 'sanctuary' law." *Id.* at 42.

There are two obvious problems with Plaintiffs' argument. First, Plaintiffs ignore the "facially legitimate and bona fide" reason for the President's action as the commander-in-chief, which is the protection of federal officials and property. *Cf. Trump v. Hawaii*, 585 U.S. 667, 703 (2018) (in an area where the Executive has broad discretion, once the Executive has provided a "facially legitimate and bona fide" for his action, the Court "will neither look behind the exercise of that discretion, nor test it by balancing its justification"). Although Plaintiffs disagree as to the degree in which federal personnel and property are under threat, they cannot seriously argue that the protection mission is "inexplicable by anything but animus." *Id.* at 706. And deploying National Guardsmen in a purely protective capacity so that immigration law enforcement officers can carry out their statutory mission would be a very odd "punishment" on Plaintiffs—the President is merely ensuring that laws are faithfully executed, as it is his constitutional duty to do so. To the extent Plaintiffs have a policy disagreement with the President—which the rhetoric of their brief clearly indicates—this is not the forum for resolving political disputes.

Second, the Tenth Amendment does not have a scienter component. It concerns the division of authority between States and the federal government. Plaintiffs cite no authority for the proposition that a standalone Tenth Amendment claim can be used to challenge otherwise valid federal policies on the ground that the federal decisionmaker purportedly acted with improper motives. Plaintiffs cite *National Federation of Independent Business v. Sebelius* (*NFIB*), 567 U.S. 519 (2012), for the proposition that

29

"[e]ven using recognized instruments of federal power . . . can violate the Tenth Amendment when the effect is like 'a gun to the head.'" Pls' Br. at 42 (quoting *NFIB*, 567 U.S. at 581). But *NFIB* is no help to Plaintiffs. There, the Supreme Court considered an Affordable Care Act provision that was *intended* to "coerc[e] the States" into expanding Medicaid coverage by threatening to withhold federal money. 567 U.S. at 575. And "[t]he threatened loss of over 10 percent of a State's overall budget" was "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582. The challenged protection mission here, in contrast, cannot reasonably be viewed as coercion. This is nothing more than a political disagreement—Plaintiffs simply disagree with the manner in which the Executive enforces federal immigration laws (over which Plaintiffs can claim no authority anyway) and with the steps the Executive deems necessary to ensure no impediment to the execution of such laws (which, again, has nothing to do with the enforcement of state law). Indeed, not even Plaintiffs contend that the temporary federalization of the National Guard for solely protective purposes leaves them with "no real option but to" change their policy on immigration enforcement. There is no doubt that Plaintiffs *do not intend* to change that policy. In sum, Plaintiffs' Tenth Amendment claim has no likelihood of success.

### C. Plaintiffs' PCA Claim Fails.

Plaintiffs next assert that the PCA bars the federalization and deployment of National Guard members and entitles them to injunctive relief. This claim is unlikely to succeed for five reasons.

*First*, no court has enjoined the federalization and deployment of National Guard based on the PCA, and this Court should not be the first. Plaintiffs brought this suit before deployment when the National Guard has yet to conduct any activities. Both the Northern District of California in *Newsom v. Trump* and the District of Oregon in *Oregon v. Trump* did not issues TROs based on those plaintiffs' arguments that deployment alone would violate the PCA. *See Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 1663345, at *16–17 (N.D. Cal. June 12, 2025) (choosing not to reach plaintiffs' PCA

claim until the record was "more complete" about what activities were being conducted); *see generally Oregon v. Trump*, No. 3:25-cv-1756, 2025 WL 2823653 (D. Or. Oct. 4, 2025) (not ruling on Plaintiffs' PCA claim); *Oregon*, 2025 WL 2817646, at *13 (same). And even after discovery and a trial on the merits, the *Newsom* district court did not enjoin the deployment of National Guard troops to California. Instead, the court enjoined the troops from engaging in certain *activities* that it believed qualified as execution of the laws forbidden by the PCA, *Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 2501619, at *29 (N.D. Cal. Sept. 2, 2025). Even then, the *Newsom* district court did not enjoin the protection of federal property. *Id.* at *24 n.23 ("[T]he record does not indicate that the military's presence at federal buildings in Los Angeles involved any impermissible law enforcement activity."). Nor did the court find the only instance of "detention" by a solider—a Marine detained an individual attempting to enter a federal building and "turn[ed] him over to law enforcement at the first possible occasion"—violated the PCA. *See id.*

*Second*, Plaintiffs lack a cause of action to enforce the PCA. That Act imposes criminal penalties for "willfully us[ing] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. This Circuit has held that "the Posse Comitatus Act . . . is a criminal statute that provides no private cause of action." *Smith*, 293 F.3d at 988 (citing *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994)); *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). Plaintiffs' claim is therefore foreclosed by binding Circuit precedent. Indeed, when Congress intends to provide for judicial review of Presidential and federal agency action, it very rarely (if ever) makes the outcome of that review depend on questions of governmental scienter—which is typically a predicate of criminal violation as is the case here.

31

Nor do Plaintiffs have any equitable cause of action to enforce compliance with the PCA. "[T]he statutory grant" empowering federal courts to issue equitable remedies "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citation omitted). Where courts have enjoined federal or state governments in equity, it has typically been for civil violations on behalf of plaintiffs subject to a relevant regulatory scheme. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). By contrast, there is no historical basis for a court to enjoin the federal government to comply with a criminal statute that protects the public at large.

Indeed, the Executive Branch has exclusive authority over prosecuting federal crimes, including its exercise of prosecutorial discretion. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 (2023). That authority cannot be transferred to private citizens, *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), and courts cannot adjudicate a private citizen's (or a State's) grievance over the Executive Branch's prosecutorial decisions, *see Texas*, 599 U.S. at 680–81. These principles operate as a "limitation[]" on "[t]he power of federal courts of equity to enjoin unlawful executive action." *Armstrong*, 575 U.S. at 327. Allowing a plaintiff to pursue a civil PCA claim—under an ultra vires theory or otherwise—would conflict with these settled principles.

In the 147-year history of the PCA, the government is aware of only a single case granting injunctive relief in a civil action involving the PCA: the *Newsom* district court decision last month. That decision—which has since been administratively stayed by the Ninth Circuit, *see* Order, *Newsom v. Trump*, No. 25-5553, ECF No. 7.1 (9th Cir. Sep. 4, 2025)—is wrong and will not withstand appellate review. But even that district court understood that the PCA does not itself provide for a cause of action, instead granting an injunction based on a non-statutory *ultra vires* theory. *Newsom*, 2025 WL 2501619, at *27 n.26. That too was incorrect: *ultra vires* review is not available to grant a type of

injunction (such as an injunction against the federal government based on a criminal statute the federal government enforces) that is not available in equity at all. And the court's conclusion that California met the extremely high bar for relief on an *ultra vires* theory was plainly erroneous.

*Third*, Plaintiffs' PCA claim also fails at the threshold because, even if the federalized troops were to engage in law enforcement, that is expressly permitted by the PCA. The PCA's prohibition on the use of armed forces "as a posse comitatus or otherwise to execute the laws" does not apply "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Section 12406(3)—the statute that the Ninth Circuit held likely authorized the President's federalization of the National Guard in California —expressly authorizes the President to federalize the National Guard "to execute the laws of the United States" when he is unable to do so with "regular forces." 10 U.S.C. § 12406(3). A more straightforward authorization of law execution is difficult to imagine. The PCA prohibits use of the military to "execute the laws" unless authorized by, *inter alia*, an Act of Congress, 18 U.S.C. § 1385, and Section 12406(3) allows the National Guard to be federalized for precisely that purpose. Thus, the federalized National Guard may be used to execute federal law where regular forces are unable to do so, without violating the PCA. This is consistent with historical practice, as President Nixon invoked Section 12406(3) to federalize the National Guard during the Postal Strike of 1970. *See* Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 24, 1970). It is undisputed that the troops there were used to deliver mail—*i.e.*, execute the federal mail laws—and no one suggested they violated the PCA in doing so. Section 12406(3) provides express authorization for the conduct complained of here, and that is sufficient to bring it within the PCA's express exception.

The statute and internal procedures cited by Plaintiffs do not change this result. *See* Pls' Br. at 45-46. 10 U.S.C. § 275 merely requires the Secretary of War to "prescribe [ ] regulations" to prevent "direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise

authorized by law." And in any event, Plaintiffs have presented no evidence demonstrating that any National Guard member will directly participate "in a search, seizure, arrest, or other similar activity." 10 U.S.C. § 275. Further, the internal policies and procedures cited by Plaintiffs cannot be the basis for a PCA violation because they "do not have the force of law." *See United States v. Pecore*, 664 F.3d 1125, 1132 (7th Cir. 2011); *see also Krasilych v. Holder,* 583 F.3d 962, 966 (7th Cir. 2009) (noting that the "Attorney General's guidelines are internal rules that have no legal force").

*Fourth*, notwithstanding the Guard's clear authority to execute the law in Chicago, the Guard has not been authorized to execute the laws for PCA purposes. Again, as specified in the President's October 4 memorandum federalizing the National Guard and the Secretary's memorandum of that same date, the mission is to protect federal property and federal personnel who are executing federal laws. Such indirect involvement does not constitute law enforcement. As the Seventh Circuit recognized, "[a] majority of courts that have addressed the issue . . . have noted that where military involvement is limited and where there is an independent military purpose of [the challenged conduct] to support the military involvement, the coordination of military police efforts with those of civilian law enforcement officials does not violate [the PCA]." *Hayes v. Hawes*, 921 F.2d 100, 103 (7th Cir. 1990) (citing cases). Instead, "the magnitude of military involvement" in law enforcement functions must be "pervasive" and "did not subject the citizenry to the regulatory exercise of military power." *Id.* at 103-04 (first citing *United States v. Hartley*, 678 F.2d 961, 978 (11th Cir.1982), and then *United States v. Bacon*, 851 F.2d 1312 (11th Cir. 1988)). Here, as specified by the President and the Secretary of War, the Guard will not engage in active and direct execution of the law in any meaningful sense; instead, the Guard's functions are limited to protecting ICE agents and other governmental personnel, as well as federal property. Indeed, as noted above, even the *Newsom* district court found that "individual examples of [the deployed troop's] conduct, like the detention of a veteran at the Wilshire Federal Building, are too isolated to violate the Posse Comitatus Act." *Newsom*, 2025 WL 2501619, at

34

*24 n.23 (discussing example that the soldiers "minimized their interaction with the [detained individual], turning him over to law enforcement authorities at the first possible occasion").

Moreover, the protective function does not constitute law execution for PCA purposes for another independent reason. The President has an "inherent" protective and emergency power derived from the Take Care Clause. *See Cunningham v. Neagle*, 135 U.S. 1, 90 (1890). Indeed, the Court in *Neagle* viewed it as *obvious* that protection of federal officials enforcing the laws was within the President's authority:

> [W]ho can doubt the authority of the president ... to make an order for the protection of the mail, and of the persons and lives of its carriers, by ... providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a posse comitatus properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

*Id.* at 65; *see In re Debs*, 158 U.S. 564, 582 (1895) ("If [an] emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws."). Similarly, as then-Assistant Attorney General Rehnquist explained more than half a century ago, the President has inherent Article II authority "to use troops for the protection of federal property and federal functions." *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343, 343 (1971); *see id.* at 344 (discussing decisions in *Neagle*, 135 U.S. 1 *and In re Debs*, 158 U.S. 564; *see also United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998) (no PCA violation where "the Navy supplied equipment, logistical support and backup security"); *United States v. Khan*, 35 F.3d 426, 432 (9th Cir. 1994) ("logistical support and backup security").

Against all of this, Plaintiffs speculate that "there is simply no way federalized National Guard troops can perform their assigned mission without violating the Posse Comitatus Act" without explaining why. Pls' Br. at 46. But Guard members may protect federal law enforcement agents to allow those agents to execute federal immigration laws. By analogy, when the Secret Service protects

35

the President, they are not executing the President's authorities; and when the U.S. Marshals protect the judiciary, they are not exercising the judicial power of the United States.

*Fifth*, Plaintiffs fail to demonstrate willfulness—a requisite for the criminal statute. The PCA provides that, absent express authorization, anyone who "*willfully* uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385 (emphasis added). Notably, lack of willfulness is not merely an affirmative defense; rather, as the plain language of the statute makes clear, absent willfulness there is no violation of the PCA in the first place. In the context of a criminal statute, the word "willful" generally requires proof "that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (citation omitted). Although the specific "construction is often dependent on the context in which it appears," willfulness at least requires proof "that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

Here, the Complaint does not plausibly plead willfulness as it does not mention willfulness at all. Nor does Plaintiffs' TRO brief. Plaintiffs have thus not even attempted to show that they are likely to succeed in demonstrating willfulness. Nor could they because Defendants' actions are consistent with Supreme Court precedent going back to the nineteenth century holding that the President has inherent authority to use the military to protect federal employees and property. Similarly, OLC precedent going back more than half a century says the same, as do multiple cases holding that providing security for law enforcement operations does not violate the PCA. Plaintiff's PCA claim has no likelihood of success.[3]

---

[3] Plaintiffs do not address the likelihood of success on the merits of their Equal Sovereignty (Count 4), Administrative Procedures Act (Counts 5–6), Separation of Powers (Count 7), Militia Clauses (Count 8), or Take Care Clause (Count 9) claims. Defendants therefore do not respond to

II.  **Plaintiffs Have No Right to Judicial Relief Regarding Their Challenge the Federalization and Deployment of Texas National Guard Members to Illinois**

Plaintiffs challenge the deployment of some 200 Texas National Guard members to Illinois. But the challenge fails at the outset because Plaintiffs cannot demonstrate Article III standing and because Plaintiffs claims are not within the zone of interest of Section 12406.

A.  **Plaintiffs Cannot Demonstrate Article III Standing for Their Challenge Concerning the Texas National Guard.**

Plaintiffs invoking the Court's jurisdiction must have Article III standing for "each claim that they press against each defendant," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted), and "for each form of relief that they seek," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And to show standing, a plaintiff must demonstrate, among other things, that it has suffered an injury in fact—that is, it has suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted); *see also Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025) (a plaintiffs must have "a personal stake in [a] dispute" and not be a "mere bystander[]") (citation omitted). Here, Plaintiffs fail to demonstrate that they have suffered an injury in fact as to the federalization and deployment of Texas National Guard to Illinois.

*First*, Plaintiffs have not suffered an invasion of a legally protected interest. They argue that the federalization and deployment of Texas National Guard to Illinois is unlawful because "[t]he Section 12406 [prerequisites] do not exist" and because no order about the Texas National Guard was sent "through" Governor Pritzker. Pls' Br. at 51. But Plaintiffs have no legal right to assert a Section 12406 violation regarding the Texas National Guard because any interest in commanding and controlling the Texas National Guard belongs to the Texas Governor, not Governor Pritzker or the

---

those claims here, and Plaintiffs are not entitled to preliminary relief on them. *E.g.*, *Kansas v. Becerra*, 764 F. Supp. 3d 801, 815 (N.D. Iowa 2025).

City of Chicago. Moreover, Section 12406's requirement—that the federalization order be sent "through" the State's Governor (or in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia)—plainly refers to the State Governor who is otherwise the commander-in-chief of the Guardsmen to be federalized, not the Governor of the location where the federalized troops will be deployed. *See* 10 U.S.C. § 12406. And "ordinarily, a party 'must assert [its] own legal rights' and 'cannot rest [its] claim to relief on the legal rights . . . of third parties.'" *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023) (citation omitted); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) ("[W]e have not looked favorably upon third-party standing."). While courts have sometimes allowed a litigant to assert the rights of a third party—"when the third-party plaintiff can show a close relationship between the first and third party and some obstacle to the first party's ability to protect his own interest," *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000)—the Texas Governor is more than capable of advancing his own interest.

*Second*, Plaintiffs have not suffered a concrete and particularized injury stemming from the deployment of Texas National Guard to Illinois. They argue that the deployment "intrudes on" the State's "sovereign police power." Pls' Br. 24. But that is only a "generalized grievance, no matter how sincere," and is thus "insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). Moreover, the purported intrusion on the State's police power cannot be squared with the federalized Texas National Guard's protection mission, which is only to protect federal property and federal personnel executing federal law. The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054.

At the same time, Plaintiffs have pointed to nothing suggesting that a State can sue whenever the federal government operates within a State's jurisdiction. Nor could it. Even if the Texas National Guard's protection mission is deemed as a law enforcement mission (which it is not), the federal

38

government has a "very basic interest in the enforcement of federal law through federal officials;" indeed, it "can act only through its officers and agents" who "must act within the States." *See Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)). Deploying federalized Guardsmen to protect federal personnel and property thus does not intrude on Illinois's police power or sovereignty any more than when DHS uses its personnel—such as the Federal Protective Service—to perform the same function. Plaintiffs' only citation is to *United States v. Morrison*, which held that Congress lacked authority under the Commerce Clause and the Fourteenth Amendment to enact a civil remedy for victims of gender-motivated violence. *See* 529 U.S. 598, 602 (2000). The case says nothing about the purported sovereign injury asserted here.

Plaintiffs also claim that some "economic harm" will be "inflict[ed]" if the National Guard is deployed. Pls' Br. at 25. These economic harms are not clearly defined, but Plaintiffs seemingly argue that their restaurant and tourism sectors could be harmed, which could then decrease the amount of tax revenues Plaintiffs receive from "sales, car rental[s], hotel[s], and cannabis." Pls' Br. at 48. Those speculative assertions do not come close to demonstrating an injury in fact, as a plaintiff must "establish a *substantial* risk of future injury," not a "speculative" one. *Murthy*, 603 U.S. at 69 (2024) (emphasis added). By Plaintiffs' admission, the ICE facility that will be protected by Texas National Guard members is "twelve miles from downtown Chicago," Pls' Br. at 2, so it is entirely unclear how National Guard protection will disrupt any entertainment or sales that would occur absent deployment. *See* Pls'. Br., Decl. of Jack Lavin (Lavin Decl.), Ex. 17 ¶ 10, ECF No. 13-18 (local chamber of commerce declaring that "armed military troops in the downtown area, in retail corridors, or in residential neighborhoods will depress consumer activity"); *id.* ¶¶ 9–10 (restaurant association speculating that people will not visit restaurants in downtown Chicago and other areas if deployment occurs, comparing the deployment to COVID-19 pandemic—which included stay-at-home orders by several governmental entities, including Plaintiffs).

Not only are Plaintiffs' bald assertions of harm speculative, as will be discussed in greater detail, Plaintiffs also cannot assert this type of *parens patriae* claim against the federal government as a matter of law. *See Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)). And as for Plaintiffs' assertion that they would lose tax revenues as a result, they do not explain how they would calculate lowered tax revenues and whether other factors—relating to seasonal shifts or other reasons—could be the cause. More importantly, this type of injury is not cognizable because federal policy choices frequently generate the sort of "indirect effects on state revenues." *Texas*, 599 U.S. at 680 n.3. In sum, this Court has no jurisdiction to review Plaintiffs' claim about the Texas National Guard.

### B. Plaintiffs' Challenge Is Not Within the Zone of Interest of Section 12406, and Thus They Cannot Sue for Any Alleged Injury.

Even if Plaintiffs satisfied Article III standing for their Texas National Guard claim, the claim is still outside Section 12406's zone of interest. The zone of interest test "serve[s] to limit the role of the courts in resolving public disputes" by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Even when the Article III standing requirements have been met, a plaintiff must still "establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory guarantee whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991). Plaintiffs cannot do so.

Here, Section 12406 is primarily concerned with Congress's grant of power under the Militia Clause to the President to federalize the National Guard in certain circumstances. To be sure, it also appears to account for the interests of the States whose National Guard would be federalized—specifically, it provides a procedural mechanism for the federalization order to be issued through the State Governor. *But see Newsom*, 141 F.4th at 1053 (finding that the requirement to issue orders

"through the governor[]" "does not grant the governor any 'consulting' role"; "[i]t simply delineates the procedural mechanisms through which the President's orders are issued"). But under any interpretation of Section 12406, the statute plainly does not protect the interest of the States to which the federalized troops could be deployed.

This makes sense because the *deployment* decision is firmly committed to the President's discretion. As explained above, the National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101. Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*, 496 U.S. at 347, and become federal soldiers, who serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1. It is in that status—*i.e.*, as federal soldiers—that the Texas National Guard members are being deployed to Illinois. On that issue, the statute imposes no geographic limitation. If anything, the statute merely confers broad discretion on the President, authorizing him to call up the Guardsmen in "such numbers as he considers necessary." 10 U.S.C. § 12406.

Indeed, it is not unusual for the National Guard of one state to deploy to another to meet an immediate need. Nordhaus Decl. ¶ 24. That the Executive may deploy Guardsmen from one State to another has deep historical roots. In 1794, President Washington's War Department issued orders to the Governors of Virginia, Maryland, Pennsylvania, and New Jersey to prepare a combined force of 12,950 militiamen to quash the rebellion occurring in western Pennsylvania (what has come to be known as the "Whiskey Rebellion"). *See I am the Guard: A History of the Army National Guard, 1636-2000*, at 72, *available* at https://perma.cc/4UKD-HC7X. President Lincoln similarly invoked the National Guard to call up 75,000 troops from across the United States—including Pennsylvania and Massachusetts—to protect Washington, D.C. before the Civil War. *Id.* at 96. And President Woodrow

41

Wilson requested National Guard members—including some from New York and Pennsylvania—to protect the United States–Mexico border with approximately 112,000 Guardsmen eventually patrolling the border within six weeks. *Id.* at 143. More recently, during both the current administration and Biden Administration, Guard from non-border states have been federalized to Title 10 status and sent to the Southwestern border to give support. *See* Antoinette Grajeda, "Arkansas National Guardsmen mobilized to southern border," *Arkansas Advocate* (Oct. 6, 2025), https://perma.cc/KZS5-DG7X; Alaska National Guard, "Alaska Army National Guardsmen to deploy to Southwest border to support Customs and Border Protection," (Oct. 3, 2024), https://perma.cc/BQ6W-WKHV

In sum, because Plaintiffs fall outside Section 12406's zone of interest, they have no right to judicial relief concerning their Texas National Guard claim.

## III. Plaintiffs Have Not Shown Irreparable Harm.

Even if Plaintiffs established that they are likely to succeed on the merits—which they have not—emergency injunctive relief is still unwarranted. "[P]laintiffs seeking preliminary relief" must "demonstrate that irreparable injury is *likely* in the absence of an injunction," a point the Supreme Court has "frequently reiterated." *Winter*, 555 U.S. at 22. This requires showing more than a mere "possibility" of such harm; rather, a "strong showing" must be made on this element. *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (explaining that Supreme Court had rejected standard of a "possible" irreparable injury as "too lenient" (quoting *Winter*, 555 U.S. at 22)).

Plaintiffs assert that the extraordinary relief of a TRO and preliminary injunction is necessary to prevent irreparable harm that will arise from the assignment of a few hundred Guardsmen to a protection mission in a State of nearly 13 million people. On this record, there are no irreparable consequences that will befall Plaintiffs as a result of this action such that an injunction is needed now. To be sure, Plaintiffs identify a few varieties of potential irreparable harm in their brief, but none

meets the high threshold imposed by Supreme Court and Seventh Circuit law.

To begin, Illinois asserts, with little legal support, that any deployment of Guardsmen into Illinois is an injury to its state sovereignty and a basis for finding of irreparable harm. Pls' Br. 47. The law does not bear out this view. Putting aside the Tenth Amendment context, a State has two readily recognized sovereign interests: (1) the enforcement of its laws and (2) recognition from its sister sovereigns (most frequently involving the maintenance and recognition of borders). *Alfred L. Snapp*, 458 U.S. at 601. Thus, a State claiming irreparable harm to its sovereign interest must show, for example, that their duly enacted laws are in some way being impeded. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.") (citation omitted); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citation omitted).

Such an injury to sovereignty has not occurred here. Plaintiffs are not being prevented from carrying out state laws and policies, or from setting their own priorities for law enforcement. Rather, the dispute in this case is over whether Defendants have properly invoked a federal law that authorizes the deployment of Guardsmen under certain circumstances—specifically whether the statutory prerequisites are met. That is "a merits argument," not an assertion about norms of sovereignty or irreparable harm. *Newsom*, 141 F.4th at 1055 (rejecting argument that disturbance of "the constitutional balance of power between federal and state government[s]" justified equitable relief from a Title 10 deployment). Without more, a violation of a federal statute is not an irreparable sovereign injury for the State of Illinois.

Plaintiffs next assert an injury to their interest in law enforcement and public safety because the protection mission might "impair . . . Illinois' ability to call upon the Guard to protect itself and its citizens to respond to a natural disaster or other emergency" and result in "increased unrest . . .

43

requiring increased expenditure and diversion of resources by state and local law enforcement agencies to maintain order." Pls' Br. at 47–48. But although such dilemmas are a "possibility," Plaintiffs have not made a "strong showing" they are "likely," as emergency injunctive relief requires. *Mays*, 974 F.3d at 822. The Ninth Circuit addressed, and rejected, similar assignations of irreparable harm in *Newsom* as "too speculative." *Newsom*, 141 F.4th at 1055-56 ("We do not know whether future protests will grow due to the deployment of the National Guard. And we do not know what emergencies may occur in California while the National Guard is deployed." (citation omitted)).

Finally, as noted before, Plaintiffs assert they will suffer downstream economic effects as a result of the deployment, with declarants averring that the presence of Guardsmen will deflate various tax revenue streams Plaintiffs enjoy. Pls' Br. at 48. This argument fails for numerous reasons. First, it is, effectively, a *parens patriae* claim on behalf of the economic interests of their citizens, which a State cannot assert against the federal government. *Alfred L. Snapp*, 458 U.S. at 607. Second, the cited declarations, *see* Lavin Decl.; Pls' Br., Decl. of Sam Toia, Ex. 18, ECF No. 13-19, rely entirely on assumptions as to how unknown individuals will adjust their behavior in response to the protection mission. They also speculate on the supposed impact the Guardsmen have had on tourism and nightlife in cities, such as Washington, D.C., where deployments have occurred, although they make no attempt to quantify these declines, demonstrate they are statistically meaningful, or eliminate other possible sources for the decline. These assertions would not be an adequate basis for Article III standing, much less irreparable harm. *Murthy*, 603 U.S. at 72 ("[Plaintiffs] cannot rely on 'the predictable effect of Government action on the decisions of third parties'; rather, [they] can only 'speculate about the decisions of third parties.'" (cleaned up) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019))). Third, federal policy choices frequently generate the sort of "indirect effects on state revenues" Plaintiffs complain of here, and if such claims make Article III standing "more attenuated," as the Supreme Court has found, *Texas*, 599 U.S. at 680 n.3, then they are certainly not

enough to establish irreparable harm.

Plaintiffs' arguments on irreparable harm are even weaker as applied to the use of Texas' Guardsmen. As already explained above, Plaintiffs have no legally cognizable right to challenge the federalization of the Texas National Guard and no concrete or particularized injury as to the deployment. And if they had standing, they do not fall within Section 12406's zone of interest to entitle them to judicial relief. It necessarily follows that they cannot claim irreparable injury as to the deployment of the Texas National Guard to Illinois. Plaintiffs fail to articulate why sending federal soldiers to protect federal property and federal law enforcement officers performing federal functions invades the sovereignty of the state. If anything, the reverse is true: states and localities have no constitutional authority to "interfere[e] with or control[] the operations of the Federal Government" by dictating which Guardsmen it selects to carry out particular federal responsibilities. *United States v. Washington*, 596 U.S. 832, 833 (2022).

The absence of irreparable harm on this record is underscored by the limited size and scope of the protection mission. Currently only about 500 members of the National Guard are being deployed to Illinois—fewer than thirteen percent of the 4,000 Guardsmen federalized in California (not to mention the additional approximately 700 Marines also deployed there). And even as to that much larger federalization and deployment, the Ninth Circuit held that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants." *Newsom*, 141 F.4th at 1054.

Preliminary relief is an extraordinary tool that is only appropriate if needed "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The impact of the limited protection mission at issue in this case fails to rise to that level. As such, the Court should deny Plaintiffs' motion on this basis alone.

## IV. The Remaining Factors Counsel Against Injunctive Relief.

The alleged irreparable harm in this case is easily outweighed by the potential harm to

Defendants and to the public should the Court issue the requested injunction, considerations that merge because the federal government is the defendant in this case. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs barely address this aspect of the test for injunctive relief, asserting that because the protection mission is contrary to law, there is no harm to Defendants if the mission is enjoined. Pls' Br. at 49. Their argument conflates the balancing of the equities with the likelihood of success on the merits. Those are distinct factors that must be evaluated separately and balanced against the potential injury to the federal government (and the public) if the protection mission at issue here is enjoined. Simply referring back to the merits is insufficient.

Again, as noted above, the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054 (citing *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020)). And as explained in the attached declarations from federal officials, enjoining the deployment and federalization of the National Guard at issue here would threaten that interest by putting at risk the safety of federal employees and property in Illinois. At the moment, federal officers must choose whether, and to what degree, to dedicate resources to securing both their property and personnel from actual and threatened violent attacks, which necessarily diverts resources from their law enforcement mission. The protection mission unquestionably would alleviate this dilemma and assist federal law enforcement in carrying out their duties effectively. This Court accordingly should find that the federal government's interest in preventing these threats outweigh the harms that Plaintiffs put forward here. That is what the Ninth Circuit held in *Newsom* as to a far larger deployment of Guardsmen in California, concluding that "[t]he federal government's interest in preventing [violent] incidents . . . is significant." *See Newsom*, 141 F.4th at 1055 As was the case in *Newsom*, Plaintiffs' alleged harms are either not legally cognizable or highly speculative, and are certainly not weightier than the federal government's concrete concern with protecting federal officers and property from harm. As such, the balance of the equities tips

46

sharply in the direction of Defendants, and any emergency injunctive relief should be denied.

## V. Any Injunctive Relief Should Be Narrowly Tailored And Permit Lawful Agency Activity.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). Plaintiffs did not file a proposed order for the Court to consider. To the extent the Court intends to grant Plaintiffs' request for a TRO or PI, such relief should be narrowly tailored to apply only to Plaintiffs, and to enjoin only specific activities the Court finds are unlawful. For example, as discussed above, even if the Court finds PCA violations, that would plainly not be a basis to enjoin the deployment and federalization itself, as Plaintiffs request. In addition, no relief should run against Defendants DHS and Secretary Noem. None of Plaintiffs' arguments provide a basis from which to enjoin those parties. The Court also lacks jurisdiction to enjoin the President. "[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *see also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

## VI. This Court Should Proceed to Address Plaintiffs' Preliminary Injunction Motion and Not Entertain the TRO Motion.

Plaintiffs have requested "a temporary restraining order and [a] preliminary injunction," Pls Br. 52, but a TRO would be superfluous if the Court were to issue a preliminary injunction. TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). Here, where Plaintiffs have filed a 52-page brief along with multiple declarations and dozens of exhibits, Defendants are responding with their own lengthy brief and multiple supporting declarations, the

Court is holding a hearing, and the Court's basis for issuing any injunctive order would be strongly challenged, such an order would effectively be a preliminary injunction and would thus be appealable. *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018). It would be inefficient to repeat all of this in short order, given that any TRO lasts only 14 days. Thus, the Court should either grant a preliminary injunction (even though Defendants submit that an injunction is unwarranted) or deny Plaintiffs' motion in its entirety.

## VII. Any Injunctive Relief Should Be Stayed Pending Appeal and Must Include a Bond.

Finally, to the extent the Court issues injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum, administratively stayed for 7 days to allow Defendants to seek an emergency, expedited stay from the Court of Appeals or Supreme Court if an appeal is authorized. Notably, in *Newsom*, Judge Breyer administratively stayed both of the injunctions he issued—he administratively stayed the more recent injunction issued on September 2 for a period of 10 days. 2025 WL 2501619, at *29. The Ninth Circuit, for its part, administratively stayed and then stayed the first injunction, and then almost immediately administratively stayed the second injunction as well. At least a modest stay is warranted to allow for orderly briefing in the court of appeals assuming the losing party is authorized to do so.

Any injunctive relief should be accompanied by a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

## CONCLUSION

The Court should deny Plaintiffs' motion.

Dated: October 8, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director
Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/  *Michael J. Gerardi*
MICHAEL J. GERARDI
(DC Bar No. 1017949)
Senior Trial Counsel
CHRISTOPHER D. EDELMAN
(DC Bar No. 1033486)
Senior Counsel
BENJAMIN S. KURLAND
(DC Bar No. 1617521)
KATHLEEN C. JACOBS
(TX Bar No. 24091154)
J. STEPHEN TAGERT
(VA Bar No. 99641)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 616-0680
Email: michael.j.gerardi@usdoj.gov

*Counsel for Defendants*