UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; CITY OF CHICAGO, an Illinois municipal corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army <br><br> Defendants. | Case No. 25-cv-12174 <br><br> Judge Perry |

**PLAINTIFFS' SUPPLEMENT IN FURTHER SUPPORT OF THEIR MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Introduction**

Since Plaintiffs' Monday morning filings and the Court's initial hearing that afternoon, the Trump administration has continued its purposeful defiance of the lawful bounds of its power to create a federal military occupation of Illinois.[1] Indeed, in the past few days, the President has repeated his disdain for any guardrails on those powers. A few hours after the Monday hearing in

---

[1] As invited by the Court's Oct. 6 minute entry, ECF 6, Plaintiffs' herein present supplemental evidence to support the Plaintiffs' Motion. The evidence follows an accompanying index.

this case, Trump issued *an after-the-fact memorandum* invoking 10 U.S.C. § 12406 *to federalize National Guard troops that Secretary Hegseth had already deployed into Illinois*. That same day, Trump's Deputy Chief of Staff Stephen Miller asserted the authoritarian view that the President has "plenary authority"—sweeping and unlimited power—to federalize National Guard troops and dispatch them to American cities like Chicago. The next day, Trump told press in the Oval Office that he might just invoke the Insurrection Act to "get around" judicial orders blocking his unlawful troop deployments, like the one last weekend in Oregon. Then just yesterday, Trump himself posted on social media that the Governor of Illinois and Mayor of Chicago should be jailed.

These were not empty threats. They were made even as defendants dispatched a third state's National Guard to Illinois in federalized status, this time from California, and without any new deployment order specific to Illinois. This lawless targeting by the President and his administration of people and places he does not favor will not stop without court intervention.

The Court can and should stop this authoritarian march. We remain a nation of laws, we have no king, and the President has no such "plenary authority" to federalize National Guard troops and deploy them into the streets of Illinois. The Court should enter a preliminary injunction against defendants' federalization and deployment of any state's National Guard, or deployment of U.S. military, into Illinois over the objection of its Governor.

**Supplemental Evidence**

1. Authentication of ICE's Chicago Field Office Acting Director Hott's "Kudos" Email to ISP, <u>and Illinois National Guard Communication of Facts Regarding Deployment Activity</u>

The supplemental declaration of Bria Scudder, Deputy Governor for public safety (Ex. 22, "Supp. Scudder"), puts in evidence facts about the public safety situation outside the United States Immigration and Customs Enforcement (ICE) facility in Broadview and the current deployment status of the National Guard in Illinois, including:

2

    a.    The October 7, 2025 email from Acting Chicago Field Office Director Russell Hott to the ISP Major in charge of the state and local police joint unified command outside the ICE facility in Broadview, Illinois, in which the ICE Director gives "kudos" to the state and local law police, and states that DHS agents had not needed to interact with any protesters at all over this past weekend, October 4 and 5, because the state and local police were handling everything. Supp. Scudder ¶¶ 4-6.

    b.    Protests outside the facility in recent days have uniformly been small and resulted in one or zero arrests. Supp. Scudder ¶¶ 13-19.

    c.    National Guard troops with a sub-standard amount of crowd control training (for which the standard is five days between deployment and beginning their mission) are planned to be active in Broadview by the time the Court reads this submission. Supp. Scudder ¶¶ 8-11.

2. **Chicago Police Superintendent Larry Snelling Sworn Statement Regarding CPD Response Policies and Recent Activities for Safety of Federal Agents**

The declaration of Larry Snelling, Superintendent of the Chicago Police Department (Ex. 23, "Snelling Decl."), puts into evidence facts regarding CPD's assistance to federal agents who need police for their own safety and CPD's assistance to federal agents following an incident where federal agents shot a civilian in Bright Park on October 4, 2025. The declaration shows:

    a.    Federal agents deployed tear gas multiple times on October 4, 2025, at the Brighton Park scene, injuring 27 CPD officers who had responded to assist federal agents. Snelling Decl. ¶¶ 17, 19, 21.

    b.    CPD responded with assistance to multiple events involving federal immigration agents that day, including:

        o    Preserving an incident scene where a woman had been shot by ICE agents until CPD could turn the scene over to federal authorities (Snelling Decl. ¶¶ 10-13);

        o    Documenting a vehicle collision involving federal agents (Snelling Decl. ¶ 14); and

        o    Working to maintain order and public safety at a scene where a crowd of people was upset with federal agents, following the shooting of the civilian (Snelling Decl. ¶¶ 15-21).

    c.    While CPD's policy is not to participate in civil immigration enforcement, it is CPD's policy and practice to respond and take appropriate police action when a public safety issue or violation of the Illinois Compiled Statutes or Municipal Code

3

of Chicago arises contemporaneously with a civil immigration enforcement operation. Snelling Decl. ¶¶ 6-9.

3. <u>Relevant Statements by Trump and Administration Officials Since the Morning of October 6</u>

The Supplemental Declaration of Sherief Gaber (Ex. 24, "Supp. Gaber") compiles statements by Defendants, including officials who speak for defendant agencies, since Plaintiffs' filing of this action on the morning of October 6, 2025, including President Donald Trump, Deputy White House Chief of Staff Stephen Miller, Attorney General Pamela Bondi, and FBI Director Kash Patel. This includes authentication of the following:

    a.    The Presidential Memorandum invoking 10 U.S.C. § 12406 to federalize the Illinois National Guard, which was first published on the White House website at 4:53 p.m. CT on October 6, 2025 (also attached hereto as Exhibit 25).

    b.    Trump administration statements confirming that the intended use of National Guard troops in Chicago is for law enforcement tasks, including crowd control and crime prevention.

    c.    Trump's threat to invoke the Insurrection Act to "get around" judicial decisions preventing him from unlawfully federalizing National Guard troops into American cities.

    d.    Miller's assertion that the President has "plenary authority" under Section 12406.

**Application of Supplemental Evidence**

**I.    The President's *Post Hoc* October 6 Memo Is an Insufficient Basis for Federalizing the Illinois National Guard and Is Irrelevant to the Other Deployments**

Shortly after Monday's hearing, the White House issued a Presidential memorandum, titled "Department of War Security for the Protection of Federal Personnel and Property in Illinois" Ex 25, (Oct. 6 Memo); Ex. 24, Supp. Gaber ¶¶ 16-17 (showing Oct. 6 Memo was posted after the hearing). This transparent effort to clean up the record in support of the federalization of the Illinois National Guard does not legalize their actions. Astoundingly, it violates every claim at issue in

4

Plaintiffs' motion for preliminary relief: it operated to violate Section 12406, the Tenth Amendment, and the Posse Comitatus Act.

The October 6 Memo asserts, without factual basis, that federal facilities in Illinois "have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities" and "have *sought to impede* the deportation and removal of criminal aliens through violent demonstrations, intimidation, and sabotage of Federal operations." Ex. 25 (Oct 6 Memo) (emphasis added). It based "these activities *are similar to* other ongoing efforts in multiple States and cities around the country to disrupt the faithful enforcement of Federal law." *Id.* (emphasis added). Referencing a purported "credible *threat* of continuing violence" in various states, the memo somehow reached the wholly unsupported conclusion that: "I have further determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." *Id.*

The memo then invokes Section 12406, without reference to subsection, stating Trump was calling into federal service *at least* 300 members of the Illinois National Guard "until the Governor of Illinois consents to a federally funded mobilization, under Title 32 of the United States Code, of the Illinois National Guard under State control." *Id.* As for the mission being assigned, the memo stated the troops would be protecting ICE, and other federal personnel, and federal property at locations where "violent demonstrations prevent the execution of Federal law or *are likely to prevent the execution of Federal law based on current threat assessments and planned operations*." *Id.* (emphasis added). Notably, the memorandum says nothing about federalizing Texas or California (or any other state's) National Guards for deployment into Illinois.

As an initial matter, the October 6 Presidential memo invoking Section 12406 to federalize Illinois National Guard does not ratify prior actions taken to federalize troops, nor does it authorize

5

actions not set out in the memorandum. Before it issued, the violation of the statute and Illinois's sovereign injury already was complete, as defendant Hegseth already had issued: (1) the October 4 Title 32 request for Illinois troops; (2) the October 4 Illinois Federalization Order; and (3) the undated DoD Texas Mobilization Order, which Illinois learned of the evening of October 5th. Secretary Hegseth also already had deployed, via his memoranda, those federalized troops to Illinois. Following all of this, through informal channels, Illinois learned yesterday that federalized members of the California National Guard now have been deployed to our state. This is not pursuant to any known lawful process and is also without the consent of the Governor of Illinois.

The October 6 Memo also reflects *ultra vires* conduct, as it does not satisfy Section 12406. Certainly, it does not even facially seek to meet the first two bases—foreign invasion or rebellion—but its attempt to satisfy the third prong of Section 12406, that the "President is unable with the regular forces to execute the laws of the United States," also fails.

The memo specifies no triggering event to support such a finding and instead speaks in hypothetical and future terms. These terms—with phrases like "sought to impede," "likely to prevent," and "appear to be increasing"—do not convey any current inability to execute federal law required for invocation of Section 12406(3). The memo does not specify it, because it does not exist. There simply has been no incident, or series of incidents, where the President has been unable to execute federal law, much less any broader circumstance warranting federalized troops.

The memo also independently violates the Tenth Amendment. It seeks to strong arm the Governor of Illinois into acquiescing to Title 32 for Illinois's National Guard, stating the federalization is only in effect "*until the Governor of Illinois consents* to a federally-funded mobilization, under Title 32 . . . ." Once again, Defendants have put an impermissible, coercive, unconstitutional "choice" to Illinois. *See* ECF 1, ¶ 234; ECF 13 at 41.

6

Finally, this memo also seeks to have federalized troops violate the Posse Comitatus Act. Even were that not already clear from the Defendants and their affiliates' own statements, *See* e.g. Supp. Gaber ¶¶ 4–7 (Trump); ¶¶ 12, 13 (Bondi); ¶ 14 (Patel), and the original September 26 DHS Memo seeking National Guard troops in Illinois for "mission security in complex urban environments" and to "integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures," the October 6 Memo also makes that clear. It includes no limitation on which federal laws the National Guard can execute or where they can do so. The final paragraph of the memorandum contains the sweeping statement that "the deployed National Guard personnel may perform those protective activities that the Secretary of War determines *are reasonably necessary to ensure the execution of Federal law* in Illinois, and to protect Federal property in Illinois." Ex. 25 (emphasis added). In their response brief, Defendants even argue that the federalized National Guard's permissible scope includes performance of law enforcement. ECF 62 (Def. Opp.).at 33. Plainly, this is the plan, and that mission scope violates the Posse Comitatus Act.

On October 8, in an exhibit to their filing in this lawsuit, Defendants made public for the first time a memorandum dated October 4, which has identical language to the October 6 publicly available memorandum. This memorandum is deficient for the same reasons identified above. Furthermore, Defendants offer no explanation why there are two versions of the same memorandum with different dates: there is one dated October 4, but only ever made public or known to Plaintiffs on October 8, as a filing in this suit, and the one that we provide in our attachments, dated October 6, which was published on the White House website that same day. Neither memorandum was publicly available nor provided to Illinois at the time Secretary Hegseth issued his order deploying federalized troops to Illinois. The October 4 memo was shielded from

7

public scrutiny when Defendants acted,[2] although they must act on "reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

**II.     The New Deployment of California National Guard to Illinois Is Illegal**

The day after this Court suggested to the Defendants, "If I were the government, I might strongly consider taking a pause on this until Thursday" (Tr. at 11:24-25, ECF 42), Defendants hit the accelerator. They again violated the law by deploying fourteen federalized California National Guard troops to Illinois on October 7, without any Presidential order under Section 12406, not that any facts exist in Illinois to justify such an invocation, even if the order did exist.

The California troops are being relocated from Oregon, where the district court blocked their deployment four days ago. Second TRO at 1, *Oregon v. Trump*, No. 25-cv-01756 (D. Or. Oct. 5, 2025), Dkt. No. 68. Plaintiffs do not know whether the remainder of the approximately 200 federalized California National Guard troops remaining in Oregon will soon follow. *See* Decl. of Paul S. Eck at 3, *Oregon v. Trump*, No. 25-cv-01756, Dkt. No. 60.

Plaintiffs are unaware of any order by the President or any of the Defendants directing this assignment, providing any legal or factual rationale for this deployment, or detailing its scope or purpose. Like the deployment of federalized Texas troops, Illinois received no request to consent to the California deployment and no advance notice that it was happening. The lack of any transparent notice or process at all violates fundamental principles of notice, accountability, and transparency, and it smacks of an effort to evade accountability by state governments, federal courts, and the people. This secrecy creates confusion and chaos for Illinois, Chicago, and our state

---

[2] This newfound October 4 President memo also does not seem to have been shown to General Nordhaus, whose declaration only notes he "became aware" that the president had issued a memorandum, not that he received or reviewed any such document. Nordhaus Decl., ECF No. 62-1 at ¶16

and local law enforcement officials, and the lack of any public notice or process is reason alone to enjoin the deployment of federalized California National Guard troops to Illinois.

California's National Guard was federalized pursuant to the June 7 Memorandum (Pls.' *Ex Parte* Mot. for TRO at 4-5, *Newsom v. Trump*, 25-cv-04870 (N.D. Cal. June 10, 2025), Dkt. No. 8), but that order does not create the *carte blanche* authority that Defendants pretend it does. Even if the California National Guard were properly federalized in Los Angeles in June, the President's attempt to use them anywhere, for any purpose, and for any amount of time would read Section 12406 out of existence and grant the President nearly unlimited power to use the military as his personal police force indefinitely.[3] That broad view of the President's power would run directly counter to the Founders' reservation of powers over the militia to Congress (see U.S. Const. art. I, § 8, cls. 15-16), and Congress's narrow delegation of that authority to the President in cases of extreme emergencies. But that is exactly the power Defendants argue the President has. ECF 62 (Def. Opp.) at 27. The fact that the California National Guard troops deployed in Illinois as of the filing of this Supplement are currently assigned to provide training duties does not mitigate the unlawfulness of this deployment. The President may only "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws." 10 U.S.C. § 12406 (emphases added). The statute requires the mission to match the basis for federalization. But the President's determination to federalize the California National Guard was made nearly four months ago, based on entirely

---

[3] The President's Deputy Chief of Staff Stephen Miller has made little secret of this strategy, stating that the President has "many options and "if I told you [what options] right now, [the states] would just start pre-drafting their next motion for a TRO." Ex. 24, Supp. Gaber ¶¶ 8, 10. Defendants' counsel, before Judge Immergut, has also put forward the notion that once federalized, National Guard troops can be retained and deployed in effectively unlimited fashion. *See* Hearing re Temporary Restraining Order, October 5, 2022, *State of Oregon et al. v. Trump et al.*, 3:25-cv-01756-IM (D. Or.); Tr. 5:22-6:4; 6:19-7:9

different facts at a different location. Pls.' *Ex Parte* Mot. for TRO at 4-5, *Newsom v. Trump*, 25-cv-04870, Dkt. No. 8. To the extent that Defendants no longer believe that those troops are necessary in California, they have no statutory basis to continue their federalization and deployment. Whatever the purpose for federalizing the California National Guard in June, the state of Illinois had nothing to do with it, and Defendants have no lawful basis to deploy them here. *See* Op. and Order Granting Mot. for TRO at 21-22, *Oregon v. Trump*, 25-cv-1756, Dkt. No. 56 ("violence in a different state . . . do[es] not provide a colorable basis to invoke Section 12406(3)").

Defendants' plan to deploy federalized troops to Illinois under 10 U.S.C. Section 12406—regardless of where the troops are from—fails to meet the requirements of Section 12406, the Tenth Amendment, and the PCA.

**III.     The New Evidence Reflects There Is No Lawful Basis to Invoke Section 12406 Here**

Defendants' evidentiary submissions fail to provide concrete evidence of any inability to enforce federal law, such that military reinforcements would be required in the Chicago area. The Hott declaration, the primary source of defendants' claims of harm and inability to carry out the law, makes no claim that DHS is unable to execute the laws of the United States, at best alleging diversion of additional resources without differentiating how much of that diversion is the consequence of DHS' own unprecedented surge. The evidence Plaintiffs have submitted, both in the Plaintiffs' opening papers and submitted with this Supplement, makes clear that the federal defendants are well able to enforce federal law in Illinois.

First, the assertion that Illinois's state and local police harbor "animosity" towards federal agents such that they have "refused repeated requests for assistance" is patently false. (Not that it would be sufficient to provide inability to enforce federal law in any event.) Just two days ago, on October 7, Russell Hott, Acting Director of the ICE Chicago Field Office, who oversees all the

10

ICE operations in the Chicagoland area, passed along to the Illinois State Police "kudos" from the DHS official overseeing the Broadview facility, praising ISP for "the effectiveness of this Unified Command, from our perspective." Ex. 22 (Supp. Scudder), ¶ 6 and Ex. A thereto.

In so doing, DHS's official directly overseeing the Broadview facility wrote that, because of Illinois's joint unified command outside the ICE facility in Broadview, DHS did not even have to interact with protesters that weekend. *Id.* ¶ 5 and Ex. A. Specifically, the report stated, "Saturday, we had about 30 or so protesters up at the fence in the late afternoon. *Within about 5-10 minutes of us calling the ISP, state and local law enforcement were onsite* and immediately pushed back the protesters to the designated area without DHS's need to intervene." *Id.* In light of Director Hott's private praise of the Illinois State Police's effectiveness in managing the Broadview facility, it is surprising to see his materially contradictory sworn testimony in this suit that federal facilities face a "serious risk of harm and aggressive actors" if this court enjoins the use of the National Guard in Illinois. *See* ECF 62-6, ¶ 63.

Second, the Defendants' baseless contention that the Chicago Police Department are refusing repeated requests for assistance also is disputed by the Declaration of CPD Superintendent Larry Snelling. Snelling makes clear that CPD has a policy and practice of responding to federal agents in need of police protection for their safety. Ex. 23 (Snelling Decl.), ¶¶ 6-9. He specifically describes the events in Brighton Park on October 4, reflecting the fact that CPD responded to assist DHS agents in multiple ways. *Id*. ¶¶ 10-22. Contrary to public reporting, at no time during that incident did CPD leadership instruct officers to refuse to help federal agents whom leadership believed to be in danger. *Id*. ¶ 22. Unfortunately, because of the DHS agents' poor training for their current Chicagoland operation, *see* ECF 13-14 (Kerlikowske Decl.), ¶ 28-41, they injured 27 CPD

11

officers through the reckless deployment of chemical munitions in the form of multiple canisters of tear gas. Ex. 23 (Snelling Decl.), ¶ 21.

Finally, the idea that the Broadview facility is in a state of "significant unrest" simply ignores the facts on the ground. Illinois Emergency Management Agency reports that there were *at most* 20 protestors outside the facility at any given time since Sunday, October 5, through yesterday, October 8. Ex. 22 (Supp. Scudder), ¶ 13-19. IEMA's reports are corroborated in sum and substance by ICE Director Hott's email forward conveying the sentiment there was essentially no issue onsite—an email sent just two ago. Twenty people simply do not pose a "danger of rebellion" or nor do they "impede" a federal agency that includes 80,000 law enforcement officers from doing their job. *See* ECF 13-14 (Kerlikowske Decl.), ¶ 53-55.

## IV.     Plaintiffs should not be required to post a bond

Plaintiffs request that the Court exercise its discretion to waive posting a bond under Federal Rule of Civil Procedure 65(c).

The Seventh Circuit has long held that requiring security rests within the discretion of the district court and that the failure to require security under Rule 65(c) is not reversible error. *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). Notwithstanding the literal language of Rule 65(c), "[u]nder appropriate circumstances bond may be excused" in the issuance of a preliminary injunction. *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977). This Court also has held that it is appropriate to forgo posting of a bond in cases involving constitutional rights. *Smith v. Bd. of Election Comm'rs*, 591 F. Supp. 70, 71-72 (N.D. Ill. 1984).

Any impact on Defendants from enjoining the unlawful deployment of National Guard members to Illinois is *de minimis*. The federal government "cannot suffer harm from an injunction

12

that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

## Conclusion

In just the last six days, Defendants have federalized National Guard troops from three states—Illinois, Texas, and California—and deployed them to Illinois to perform unspecified duties in unidentified locations for an undefined period of time. To redress these irreparable and immediate injuries, and the additional ones that would flow from Defendants' unknown next deployment, the court should grant Plaintiffs' motion and enter a temporary restraining order and preliminary injunction against implementation of the October 4 Federalization Order, the Texas Mobilization Order, and any similar order effectuating the mobilization of the National Guard of the United States, any state National Guard, or deployment of the U.S. military over the objection of the Governor of Illinois. Defendants' continued unlawful actions, made at a breakneck pace, including deployment of the federalized California National Guard, make that relief all the more urgent. The State of Illinois and City of Chicago ask the Court to enter that relief today.

Date: October 9, 2025                                       Respectfully submitted,

| | |
|---|---|
| **MARY B RICHARDSON-LOWRY** | **KWAME RAOUL** |
| *Corporation Counsel of the City of Chicago* | *Attorney General of Illinois* |
| | |
| By: /s/ Stephen J. Kane | By: /s/ Sarah J. North |
| STEPHEN J. KANE | CARA HENDRICKSON |
| CHELSEY B. METCALF | Executive Deputy Attorney General |
| City of Chicago Department of Law | CHRISTOPHER WELLS |
| 121 North LaSalle Street, Room 600 | Division Chief, Public Interest Division |
| Chicago, Illinois 60602 | SARAH J. NORTH |
| 312-744-6934 | Deputy Division Chief, Public Interest Division |
| stephen.kane@cityofchicago.org | SARAH HUNGER |
| chelsey.metcalf@cityofchicago.org | Deputy Solicitor General |
| *Counsel for the City of Chicago* | KATHARINE ROLLER |
| | Complex Litigation Counsel |
| | KATHERINE PANNELLA |

13

        Senior Assistant Attorney General
SHERIEF GABER
MICHAEL TRESNOWSKI
Assistant Attorneys General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Christopher.Wells@ilag.gov
Sarah.North@ilag.gov
Sarah.Hunger@ilag.gov
Katharine.Roller@ilag.gov
Katherine.Pannella@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*