# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | Case No. 25-cv-12174 |
| Plaintiffs, | Judge April M. Perry |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, | |
| Defendants. | |

## OPINION AND ORDER

Since this country was founded, Americans have disagreed about the appropriate division of power between the federal government and the fifty states that make up our Union. This tension is a natural result of the system of federalism adopted by our Founders. And yet, not even the Founding Father most ardently in favor of a strong federal government believed that one state's militia could be sent to another state for the purposes of political retribution, calling such a suggestion "inflammatory," and stating "it is impossible to believe that [a President] would

1

employ such preposterous means to accomplish their designs."[1] But Plaintiffs contend that such an event has come to pass, and argue that National Guard troops from both Illinois and Texas have been deployed to Illinois because the President of the United States wants to punish state elected officials whose policies are different from his own. Doc. 13 at 8.[2] Plaintiffs further argue that President Donald J. Trump has exceeded the authority granted to him by 10 U.S.C. § 12406, violated the Tenth Amendment, and that the deployment of federalized troops violates the Posse Comitatus Act. *Id.* at 9. Before this Court is a request for a temporary restraining order ("TRO") and preliminary injunction barring mobilization of the National Guard or deployment of the U.S.

---

[1] "A sample of this is to be observed in the exaggerated and improbable suggestions which have taken place respecting the power of calling for the services of the militia. That of New-Hampshire is to be marched to Georgia, of Georgia to New-Hampshire, of New-York to Kentuke and of Kentuke to Lake Champlain. Nay the debts due to the French and Dutch are to be paid in Militia-men instead of Louis d'ors and ducats. At one moment there is to be a large army to lay prostrate the liberties of the people; at another moment the militia of Virginia are to be dragged from their homes five or six hundred miles to tame the republican contumacy of Massachusetts; and that of Massachusetts is to be transported an equal distance to subdue the refractory haughtiness of the aristocratic Virginians. Do the persons, who rave at this rate, imagine, that their art or their eloquence can impose any conceits or absurdities upon the people of America for infallible truths?

If there should be an army to be made use of as the engine of despotism what need of the militia? If there should be no army, whither would the militia, irritated by being called upon to undertake a distant and hopeless expedition for the purpose of rivetting the chains of slavery upon a part of their countrymen direct their course, but to the seat of the tyrants, who had meditated so foolish as well as so wicked a project; to crush them in their imagined intrenchments of power and to make them an example of the just vengeance of an abused and incensed people? Is this the way in which usurpers stride to dominion over a numerous and enlightened nation? Do they begin by exciting the detestation of the very instruments of their intended usurpations? Do they usually commence their career by wanton and disgustful acts of power calculated to answer no end, but to draw upon themselves universal hatred and execration? Are suppositions of this sort the sober admonitions of discerning patriots to a discerning people? Or are they the inflammatory ravings of chagrined incendiaries or distempered enthusiasts? If we were even to suppose the national rulers actuated by the most ungovernable ambition, it is impossible to believe that they would employ such preposterous means to accomplish their designs."

The Federalist No. 29, at 186-187 (Alexander Hamilton) (Jacob Ernest Cooke ed., 1961).

[2] All "Doc." citations reference the ECF docket number and page number assigned by the docketing system.

military over the objection of the Governor of Illinois. Doc. 3. For the reasons that follow, Plaintiffs' motion for a TRO is GRANTED, in part.[3]

## FACTUAL BACKGROUND

The events relevant to this case begin in the unassuming Village of Broadview, a small suburb approximately twelve miles west of downtown Chicago. Doc. 13-5 at 2. In addition to approximately 8,000 residents, Broadview is also home to an Immigration and Customs Enforcement ("ICE") Processing Center, where ICE detainees are temporarily held before being transported elsewhere. *Id*. at 3. Across the street from the ICE Processing Center is a parking lot leased by ICE for vehicles and equipment storage. *Id*. For the past nineteen years, the ICE Processing Center has regularly been visited by small groups who hold prayer vigils outside. Doc. 13-6 at 3.

In early September 2025, ICE's Chicago Field Office Director informed the Broadview Police Department that approximately 250 to 300 Customs and Border Patrol ("CBP") agents would begin arriving in Illinois for an immigration enforcement campaign dubbed "Operation Midway Blitz." Doc. 13-5 at 2-5. This escalation in enforcement activity caused a corresponding increase in protests near the ICE Processing Center. *Id*. at 5. On some occasions, demonstrators have stood or sat down in the driveway leading to the ICE Processing Center. ICE has then physically removed those individuals, and ICE vehicles have come and gone as needed. *Id*. The typical number of protestors is fewer than fifty. *Id*. The crowd has never exceeded 200. *Id*.

---

[3] The Court declines at this time to enter a Preliminary Injunction, and also to extend the scope of the TRO to include the military, a complex issue that is discussed at length below.

On September 12, there were between eighty and one hundred protestors present outside of the ICE Processing Center singing, chanting, and holding small musical instruments. *Id*. Around 10:00 a.m., twenty to thirty federal agents parked across the street and walked toward the ICE Processing Center in camouflage tactical gear with masks covering their faces, which represented a "noticeable shift" from the way agents had previously approached the building. *Id*. at 6. In the opinion of the Broadview Police, this development caused the tone of the protestors to change. *Id*. The crowd grew louder and began to press closer to the building. *Id*. Broadview Police responded, positioning themselves between the ICE Processing Center and the protestors, and when the agents went inside, the crowd calmed down and Broadview Police relocated to the outer perimeter of the crowd. *Id*. Throughout the rest of the day, the crowd chanted, and some individuals stood in the driveway to the ICE Processing Center. *Id*. ICE intermittently grabbed those people to move them physically out of the driveway. *Id*. ICE agents eventually gave a dispersal order through a loudspeaker, threatening to deploy chemical agents if the protestors did not leave. *Id*. Approximately twenty to thirty minutes later, ICE deployed tear gas and pepper spray at the crowd. *Id*. Since September 13, Broadview Police and the Illinois State Police ("ISP") have set up surveillance cameras to continually record and monitor activity in the area. *Id*. at 7.

Protestors have continued to assemble outside of the ICE Processing Center. *Id*. ICE agents regularly deploy tear gas to disperse the crowd or stand on top of the building to shoot balls of pepper spray at protestors from above. *Id*. at 7-8. It is the opinion of the Broadview Police Department that the use of chemical agents against protestors "has often been arbitrary and indiscriminate," at times being used on crowds as small as ten people. *Id*. at 8.

4

On September 26, a group of between 100 to 150 protestors gathered outside of the ICE Processing Center, and ICE again deployed pepper spray and tear gas. Doc. 13-5 at 9. The Broadview Police Department requested assistance from Illinois's law enforcement mutual aid network, and ISP, Maywood Police Department, Westchester Police Department, and LaGrange Police Department sent a total of six cars. *Id*. at 9-10. One road was closed for approximately five hours. *Id.* at 10.

That same day, DHS sent a memorandum requesting "immediate and sustained assistance from the Department of War … in order to safeguard federal personnel, facilities, and operations in the State of Illinois." Doc. 13-2 at 15. The memorandum claimed that "Federal facilities, including those directly supporting Immigration and Customs Enforcement … and the Federal Protective Service … have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions. These groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations." *Id*. DHS requested deployment "of approximately 100 [Department of War] personnel, trained and equipped for mission security in complex urban environments. These personnel would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures." *Id*. at 16.

On September 27, CBP informed Broadview Police that they should prepare for an increase in the use of chemical agents and ICE activity in Broadview, and that it was "going to be a shitshow." Doc. 13-5 at 10. That day, Broadview Police monitored the "small crowd of quiet protestors" who were outside the ICE Processing Center and watched as federal officials formed a line and marched north up the street, pushing the crowd to another location. *Id*. Federal

5

officials dismantled a water and snack tent that protestors had been using and later that evening deployed tear gas, pepper spray, and pepper balls at protestors. *Id*. at 10-11.

On September 28, Illinois was asked to voluntarily send Illinois National Guard troops to protect federal personnel and property at the ICE Processing Center in Broadview. Doc. 13-2 at 4. Governor Pritzker declined that request, concluding that "there were no past or present current circumstances necessitating it." *Id*.

On October 2, Broadview Police, ISP, Cook County Sheriff's Office, Cook County Department of Emergency Management and Regional Security, and the Illinois Emergency Management Agency publicly announced a joint "Unified Command" to coordinate public safety measures in Broadview around the ICE Processing Center. Doc. 13-5 at 12.

On October 3, approximately 200 protestors gathered outside of the ICE Processing Center, some of whom were elected officials and members of the media. *Id*. at 13. In turn, there were approximately 100 state and local law enforcement officers on site who established designated protest areas. *Id*. Although some protestors attempted to come close to federal vehicles, state and local law enforcement officers were able to maintain control and arrested approximately five people for disobeying or resisting law enforcement, with two arrests for battery or aggravated battery. *Id*. at 15; Doc. 13-15 at 16. Federal law enforcement detained twelve people. Doc. 13-15 at 16.

On October 4, there were approximately thirty protestors at the ICE Processing Center. Doc. 63-2 at 10. According to DHS's representative at the ICE Processing Center, local law enforcement arrived within five to ten minutes, immediately pushed the protestors back to the

designated protest areas, and controlled the scene. *Id*. at 10-11. DHS did not have to intervene with any protestors. *Id*. at 11.

Despite this, on the same day, the President issued a memorandum stating that the "situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue. Federal facilities in Illinois, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities…I have determined that these incidents, as well as the credible threat of continued violence, impede the execution of the laws of the United States. I have further determined that the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." Doc. 62-1 at 16. This memorandum authorized the federalization of Illinois National Guard members under 10 U.S.C. § 12406. *Id*. at 17. It further authorized those personnel to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." *Id*.

Also on October 4, the Department of War asked the Adjutant General of the Illinois National Guard to agree to the mobilization of 300 Illinois National Guard troops pursuant to 32 U.S.C. § 502(f). Doc. 13-2 at 5, 21. The Illinois National Guard Adjutant General was informed that if he did not agree in the next two hours, "the Secretary of War will direct the mobilization of as many members of the ILNG as he may deem necessary under Title 10 United States Code." *Id*. at 21. Governor Pritzker reaffirmed his position that there was no public safety need necessitating such a deployment. Doc. 13-15 at 24. Later that day, the Secretary of War issued a memorandum calling forth "at least 300 National Guard personnel into Federal service…to

protect U.S. Immigration and Customs Enforcement, Federal Protective Service, and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." *Id.* at 29.

On October 5, a few dozen protestors were present at the ICE Processing Center. Doc. 63-2 at 11. State and local officers responded with approximately one dozen patrol cars, and DHS did not have to intervene with protestors. *Id.* Internal communications between DHS and ISP Sunday night referred to it as "great thus far this weekend." *Id.* DHS further stated "It's clear that ISP is the difference maker in this scenario, and we are grateful for their leadership. Hopefully, we can keep it up for the long-haul." *Id.*

That same day, the Secretary of War issued a memorandum ("Texas Memorandum") mobilizing up to 400 members of the Texas National Guard. Doc. 13-2 at 34. The Texas Memorandum referenced a June 7, 2025 Presidential Memorandum federalizing "at least 2,000 National Guard personnel" pursuant to Title 10 "to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where violent demonstrations against these functions are occurring or are likely to occur based on current threat assessments and planned operations." *Id.*; Doc. 13-11 at 2. It further stated that on "October 4, 2025, the President determined that violent incidents, as well as the credible threat of continued violence, are impeding the execution of the laws of the United States in Illinois, Oregon, and other locations throughout the United States." Doc. 13-2 at 34.

Apart from the above protest activity, ICE has reported to Broadview Police acts of vandalism like the slashing of tires on fifteen vehicles, the "keying" of ICE vehicles, and sugar being put in vehicles' fuel tanks. Doc. 13-5 at 8, 11. The ICE Processing Center has continuously remained open and operational throughout the protest activity. *Id*. at 11. Broadview Police are not aware of any occasion where an ICE vehicle was prevented from entering or exiting due to activity by protestors. *Id*. In the opinion of the Broadview Police Department and ISP, state and local law enforcement officers are able to maintain safety and control outside of the ICE Processing Center. *Id*.; Doc. 13-15 at 17. Similarly, the Superintendent of the Chicago Police Department has indicated that his officers have responded unrest involving ICE in order to maintain public safety. Doc. 63-3.

Defendants report significantly more violence in the Chicago area than the Broadview Police or ISP. Specifically, Defendants provided declarations from DHS Chicago Field Office Director Russell Hott and CBP Chief Patrol Agent Daniel Parra that detail various instances of violence across Cook County between June 2025 and the present. Doc. 62-2, Doc. 62-4. Some of what these declarants complain about is, while aggravating, insulting, or unpleasant, also Constitutionally protected. *See, e.g*., Doc. 62-2 at 6 (describing a rally to "get ICE ouf of Chicago!" accompanied by a photograph of destroyed property); *id*. at 19 (describing protestors' use of bullhorns). For example, a protestor who happens to lawfully possess a weapon while protesting is exercising both their First and Second Amendment rights. There is no evidence within the declarations that, to the extent there have been acts of violence, those acts of violence have been linked to a common organization, group, or conspiracy.[4] And with respect to

---

[4] This is not to say that some acts of violence, like boxing in immigration enforcement vehicles, have not been coordinated acts among the people involved. There is simply no evidence linking these discrete acts to each other.

9

Defendants' declarants' descriptions of the ICE Processing Center protests, the version of the facts set forth in these affidavits are impossible to align with the perspectives of state and local law enforcement presented by Plaintiffs.

The Court therefore must make a credibility assessment as to which version of the facts should be believed. While the Court does not doubt that there have been acts of vandalism, civil disobedience, and even assaults on federal agents, the Court cannot conclude that Defendants' declarations are reliable. Two of Defendants' declarations refer to arrests made on September 27, 2025 of individuals who were carrying weapons and assaulting federal agents. *See* Doc. 62-2 at 19; Doc. 62-4 at 5. But neither declaration discloses that federal grand juries have refused to return an indictment against at least three of those individuals, which equates to a finding of a lack of probable cause that any crime occurred. *See United States v. Ray Collins and Jocelyne Robledo*, 25-cr-608, Doc. 26 (N.D. Ill. Oct. 7, 2025); *United States v. Paul Ivery*, 25-cr-609 (N.D. Ill.). In addition to demonstrating a potential lack of candor by these affiants, it also calls into question their ability to accurately assess the facts. Similar declarations were provided by these same individuals in *Chicago Headline Club et. al. v. Noem*, 25-cv-12173, Doc. 35-1, Doc. 35-9 (N.D. Ill.), a case which challenged the Constitutionality of ICE's response to protestors at the Broadview ICE Processing Center. In issuing its TRO against DHS Secretary Kristi Noem, the court in that case found that the plaintiffs would likely be able to show that ICE's actions have violated protestors' First Amendment right to be free from retaliation while engaged in newsgathering, religious exercise, and protest, and Fourth Amendment rights to be free from excessive force. *Id*. at Doc. 43. Although this Court was not asked to make any such finding, it does note a troubling trend of Defendants' declarants equating protests with riots and a lack of appreciation for the wide spectrum that exists between citizens who are observing, questioning,

and criticizing their government, and those who are obstructing, assaulting, or doing violence.[5] This indicates to the Court both bias and lack of objectivity. The lens through which we view the world changes our perception of the events around us. Law enforcement officers who go into an event expecting "a shitshow" are much more likely to experience one than those who go into the event prepared to de-escalate it. Ultimately, this Court must conclude that Defendants' declarants' perceptions are not reliable.[6]

Finally, the Court notes its concern about a third declaration submitted by Defendants, in which the declarant asserted that the FPS "requested federalized National Guard personnel to support protection of the Federal District Court on Friday, October 10, 2025." Doc. 62-3. This purported fact was incendiary and seized upon by both parties at oral argument. It was also inaccurate, as the Court noted on the record. To their credit, Defendants have since submitted a corrected declaration, and the affiant has declared that they did not make the error willfully. Doc. 65-1. All of the parties have been moving quickly to compile factual records and legal arguments, and mistakes in such a context are inevitable. That said, Defendants only presented declarations from three affiants with first-hand knowledge of events in Illinois. And, as described above, all three contain unreliable information.

---

[5] At oral argument, Defendants' counsel repeatedly referred to the idea that protestors who wear gas masks are demonstrating a desire to do physical violence to law enforcement, even when pressed by the Court that masks are protective equipment, not offensive weapons. Presumably, counsel does not believe that the CBP officers who have engaged in street patrols in and around Chicago are also demonstrating a desire to do physical violence, though they are both wearing masks and carrying weapons. Additionally, the Court notes that despite the claim that protestors are wearing gas masks, most of the photos submitted by Defendants show protesters wearing Covid-19 masks. Doc. 62-2 at 13.

[6] The Court also notes that DHS's informal email representations to ISP about the state of affairs in Broadview align more with ISP's declarations presented by Plaintiffs than they do with DHS's declarations.

Plaintiffs contend that the deployment of the Illinois and Texas National Guard comes not from any good faith concern about the ability of federal law enforcement to do their jobs unimpeded, but rather from President Trump's animus for Illinois's elected officials. In support of this argument, Plaintiffs attach social media posts by President Trump attacking Illinois Governor JB Pritzker as "weak," "pathetic," "incompetent," and "crazy." Doc. 13-10 at 17, 19, 22-23. Plaintiffs have also presented evidence that President Trump strongly disagrees with various policy decisions by Illinois officials, including "sanctuary" policies in Illinois and the City of Chicago that limit the cooperation between local law enforcement and federal immigration authorities. *See, e.g.*, *id*. at 12 ("No more Sanctuary Cities! […] They are disgracing our Country […] Working on papers to withhold Federal Funding for any City or State that allows these Death Traps to exist!!!"); 32-33 ("This ICE operation will target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets. President Trump and Secretary Noem stand with the victims of illegal alien crime while Governor Pritzker stands with criminal illegal aliens.").

Though courts have consistently upheld legal challenges to sanctuary policies as consistent with the rights reserved to states by the Tenth Amendment,[7] President Trump, Department of Homeland Security Secretary Kristi Noem, and Attorney General Pamela Bondi have stated that they believe Illinois officials are violating federal law, and have suggested that their support for these policies should result in criminal prosecution. For example, on August 13, 2025, Attorney General Bondi sent letters to Governor Pritzker and Chicago Mayor Brandon

---

[7] *See, e.g., United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *27 (N.D. Ill. July 25, 2025) (collecting cases).

12

Johnson informing them that "[a]s the chief law enforcement officer of the United States, I am committed to identifying state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations, and taking legal action to challenge such laws, policies, or practices. Individuals operating under the color of law, using their official position to obstruct federal immigration enforcement efforts and facilitating or inducing illegal immigration may be subject to criminal charges….You are hereby notified that your jurisdiction has been identified as one that engages in sanctuary policies and practices that thwart federal immigration enforcement to the detriment of the interests of the United States. This ends now." Doc. 13-9 at 2-3.

Plaintiffs have also presented evidence demonstrating President Trump's longstanding belief that crime in Chicago is out of control, and that federal agents should be used to stop that crime. *See, e.g.,* Doc. 13-10 at 4 ("we need troops on the streets of Chicago, not in Syria"); *id.* at 8 ("If Chicago doesn't fix the horrible 'carnage' going on […] I will send in the Feds!"); *id.* at 10 (If Democrat leaders in Chicago "don't straighten it out, I'll straighten it out"); 11 ("The next president needs to send the National Guard to the most dangerous neighborhoods in Chicago until safety can be successfully restored, which can happen very, very quickly.") 17 ("[T]he National Guard has done such an incredible job [in Washington, D.C.] working with the police….Chicago's a mess. You have an incompetent mayor, grossly incompetent and we'll straighten that one out probably next. That'll be our next one after this and it won't even be tough."). On August 25, 2025, President Trump stated: [W]e will solve Chicago within one week, maybe less. But within one week we will have no crime in Chicago." *Id.* at 18. On September 2, 2025, President Trump posted on social media: "Chicago is the worst and most dangerous city in the World, by far. Pritzker needs help badly, he just doesn't know it yet. I will

solve the crime problem fast, just like I did in DC. Chicago will be safe again, and soon." *Id*. at 28. On September 3, 2025, President Trump sent a fundraising email which stated: "I turned our Great Capital into a SAFE ZONE. There's virtually no crime. NOW I WANT TO LIBERATE CHICAGO! The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime. I wish they'd just give me a call. I'd gain respect for them. Now hear me: WE'RE GOING TO DO IT ANYWAY." *Id*. at 29-30 (emphasis in original). When asked at oral argument whether the National Guard was, in fact, being deployed to Illinois to "stop crime," Defendants' counsel did not disagree that this was the objective of the deployment. Nor did counsel limit the scope of that mission in any meaningful sense.

## HISTORICAL BACKGROUND

As discussed, this case concerns questions of federalism and the Constitutional and statutory limits placed on the President's ability to deploy National Guard troops for purposes of domestic law enforcement. Especially at issue is the scope of 10 U.S.C. § 12406, the statutory predicate for the current National Guard deployment in Illinois. Because there is not an abundance of case law interpreting Section 12406, the Court begins with some historical background.

### A. The Constitution

During the Constitutional Convention of 1787, one topic of hot debate among the Founders was how to properly scope the federal government's military powers. Indeed, among the grievances directed against King George III by signatories to the Declaration of Independence was his keeping "in Times of Peace, Standing Armies, without the Consent of our Legislatures." Decl. of Independence para. 13 (U.S. 1776). Thus, while the Founders recognized

that well-trained soldiers were necessary "for providing for the common defense" of our young nation, they were concerned "that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate states." *Perpich v. Dept. of Defense*, 496 U.S. 334, 340 (1990); *see also Reid v. Covert*, 354 U.S. 1, 23–24 (1957) ("The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds."). Further informing some Founders' suspicion of standing armies was the fact that local militias of individual states had played a vital role in securing the recent victory in the Revolutionary War. *See* Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 182–83 (1940).

Another concern among some Founders was the extent of the federal government's powers to deploy federal military forces—including federalized militia—for purposes of general law enforcement. For instance, in response to a proposal to add language to the Constitution which would empower the federal government to "call forth the force of the Union" against states that passed laws contravening those of the union, James Madison moved successfully for its removal, opining that such use of force against a state "would look more like a declaration of war, than an infliction of punishment." Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789–1879* 8 (citing Max Farrand, *The Records of the Federal Convention*, vol. 1 at 54). During the ratification debates, Patrick Henry expressed fears that the language of the Militia Clause allowing Congress to have the militia called forth to execute the laws of the Union would open the door to federal troops engaging in domestic law enforcement. 3 J. Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 387 (1836) [hereinafter "Elliot Debates"]. Antifederalist Henry Clay expressed similar concerns and asked the Federalists "for instances where opposition to the laws did not

15

come within the idea of an insurrection." *Id*. at 410. To this, Madison replied that "there might be riots, to oppose the execution of the laws, *which the civil power might not be sufficient to quell*." *Id.* (emphasis added). Patrick Henry pressed the issue, charging that granting power of "calling the militia to enforce every execution indiscriminately" would be "unprecedented," and a "genius of despotism." *Id*. at 412. To this, Madison noted the "great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance; which is a construction not warranted by the [Militia] clause." *Id.* at 415.

Confronted with such concerns, even federalist proponent Alexander Hamilton rejected the notion that the militia could enforce domestic law, opining that given "the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of colour, it will follow, that the conclusion which has been drawn from it, in its application to the authority of the federal government over the militia is as uncandid as it is illogical." The Federalist No. 29, at 188 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961). To Hamilton, then, it was nothing more than an "exaggerated and improbable suggestion[]" that the federal government would command one state's militia to march offensively into the territories of another, given how assuredly such conduct would invite "detestation" and "universal hatred" by the people of the would-be usurper. *Id*. at 186–87.

On September 17, 1787, the U.S. Constitution was ratified. Many of the concerns debated by the Founders reflect in its contours. Regarding the militia, the Founders chose to vest Congress—not the President—with constitutional power "to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions," U.S. Const. art. I, § 8, cl. 15 (the "Calling Forth Clause"), as well as to provide for the "organizing, arming, and

16

disciplining the militia, and for governing such part of them as may be employed in the service of the United States." U.S. Const. art. I, § 8, cl. 16. The President, then, would be the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. 2, § 2, cl. 1.

That the Framers understood the Calling Forth Clause narrowly can be seen in Congress's earliest efforts to put the clause into legislative practice. In 1792, Congress enacted an Act to "provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions." Act of May 2, 1792, 1 Stat. 264 (1792). In 1795, Congress repealed the 1792 Act and passed an amended version. Act of February 28, 1795, 1 Stat. 424 (1795). In both versions, Congress authorized the President to call upon the militia in response to invasion or insurrection without much limitation. But for the President to call forth the militia in cases where "the laws of the United States shall be opposed, or the execution thereof obstructed," stricter controls were imposed. *Id.* Specifically, Congress authorized the calling forth of militia only when the forces of obstruction were "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals" by the Act. *Id.* These early efforts demonstrate contemporaneous understanding that military deployment for purpose of executing the laws was to be an act of last resort, only after other systems had failed.

Beyond the Calling Forth Clause, other Constitutional provisions respond to Founders' concerns about specters of military overreach. For instance, the Founders chose not to consolidate control over the nation's standing army and naval forces into a single branch of federal government. Power to command was vested in the President, U.S. Const. art. II, § 2, cl. 1, but power to actually "declare War," "raise and support armies," and "provide and maintain a

17

Navy" entrusted to Congress. U.S. Const. art. I, § 8, cls. 11–13; *see also* The Federalist No. 24, at 153 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961) (noting "the whole power of raising armies was lodged in the *legislature*, not in the *executive*") (emphasis in original). Moreover, two of the Constitution's first ten Amendments articulate safeguards against the military: the Second Amendment—with its assurance that well-regulated militias would be prepared and armed to fight for the security of the states—and the Third Amendment, with its prohibition on quartering of soldiers in times of peace.

Finally, the Constitution and its early amendments also reflect another long-standing American principle: that the states possess a "residuary and inviolable dual sovereignty." The Federalist No. 39, at 256 (James Madison) (Jacob Ernest Cooke, ed., 1961); *see also Printz v. United States*, 521 U.S. 898, 918 (1997) ("It is incontestible that the Constitution established a system of 'dual sovereignty'"); *Carter v. Carter Coal Co.*, 298 U.S. 238, 294 (1936) (the Framers "meant to carve from the general mass of legislative powers, then possessed by the states, only such portions as it was thought wise to confer upon the federal government"). This conception is reflected throughout the Constitution's text, but particularly in the Tenth Amendment, which states that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. These reserved and residuary powers include, among other things, "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S 598, 618 (2000); *see also Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) (the "power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"); *Carter*, 298 U.S. at 295 ("It is no longer open to question that the general government, unlike the

states … possesses no inherent power in respect to the internal affairs of the states.") (citation omitted).

**B. Posse Comitatus Act**

American rejection of military encroachment into domestic law enforcement was explicitly rejected in 1878, with the passage of the Posse Comitatus Act. As amended, it provides that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385.

The historical context that gave rise to the Posse Comitatus Act merits discussion. After the Civil War, federal troops were deployed to states of the former Confederacy for purposes of keeping public order and enforcing federal law. *See* Sean J. Kealy, *Reexamining the Posse Comitatus Act: Toward a Right to Civil Law Enforcement*, 21 Yale L. & Pol. Rev. 383, 393 (2003). While deployed, these troops carried out such law enforcement duties as enforcing taxes, arresting members of the Ku Klux Klan, and guarding polling places to ensure newly enfranchised former slaves could cast their votes in accord with federal law protections. *Id*. n. 59. In response to this exercise of federal power, Congressmen from Southern states pushed for, and succeeded, in passing the Posse Comitatus Act as a means to "limit the direct active use of federal troops by law enforcement officers to enforce the laws of this nation." *United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986) (internal quotes and citations omitted).

As detailed further below, the Court's decision today does not turn on the merits of Plaintiffs' claim that Defendants violated the Posse Comitatus Act. That said, the Act represents

another moment that America recognized the importance of checking military intrusion into civilian law enforcement.

### C. The Origins of 10 U.S.C. § 12406

The final piece of our historical puzzle is 10 U.S.C. § 12406, which Defendants represent supplies the authority for the deployment of federalized National Guard troops into Illinois. In its current incarnation, it provides:

> Whenever
>
>> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>>
>> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>>
>> (3) the President is unable with regular forces to execute the laws of the United States;
>>
>> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel invasion, suppress rebellion, or execute those laws.

10 U.S.C. § 12406.

Key provisions of Section 12406's language originate with the Dick Act of January 21, 1903, 32 Stat. 775–80 (1903), and Militia Act of 1908, 35 Stat. 399–403 (1908). In the leadup to their enactment, leading federal executives expressed their views on the inadequacy of the nation's militia. *E.g.*, President Roosevelt, address to Congress (December 3, 1901) (commenting that the existing laws governing the organization of the militia were "obsolete and worthless"); *Id.* Secretary of War Elihu Root (sharing similar view on the lack of a disciplined militia system to support the nation's "small Regular Army"). Responding to these concerns, Congress passed the Dick Act. Among its innovations, the Dick Act authorized substantial

20

funding for professional equipment (Section 3) and training by federal regular forces (Section 20). Dick Act, 32 Stat. 775. Beyond these modernizations, the Dick Act also represents the first statutory usage of the name "National Guards" to refer to the state militias. *Id*. at 333–34 (1988). Congress revisited the subject matter of the newly modernized National Guard with the Militia Act enacted May 27, 1908 ("1908 Act"). By that time, the Dick Act's modernization efforts were largely understood a success. As then-Acting Secretary of War Robert Shaw put in his report to Congress on the 1908 bill, "As a result of the initial expenditure [under the Dick Act] the organized militia is now fairly well clothed, armed, and equipped for active military service." *See* H.R. Rep. No. 60-1067, at 6 (1908).

Among other amendments, the 1908 Act made two changes of note. First, it proposed to authorize the President to call forth the National Guard to serve "either within *or without* the territory of the United States" for the first time. 35 Stat. 400; cf. also *See* H.R. Rep. No. 1094, 57th Cong. (1902) at 22-23 (describing, at a time prior to this change, how "services required of the militia can be rendered only upon the soil of the United States or of its Territories"). This new language was accompanied by a change to the calling forth articles, which as of the 1908 Act read,

> That whenever the United States is invaded, or in danger of invasion from any foreign nation, or of rebellion against the authority of the Government of the United States, or the President is unable **with the regular forces at his command** to execute the laws of the Union in any part thereof, it shall be lawful for the President to call forth such number of the militia … as he may deem necessary to repel such invasion, suppress such rebellion, or to enable him to execute such laws.

21

35 Stat. 400 (emphasis added). In his comments on the bill, Secretary Shaw characterized these two changes—the new Presidential authority to call the militia abroad and changes to Section 4—as complementary provisions. Specifically, Shaw noted:

> This wholesome and patriotic provision [for the National Guard to operate outside the United States] originates in the organized militia and constitutes an offer of their services in case of national emergency during the entire period of the emergency as measured by the call of the President, and is coupled with the reasonable and proper requirement that—
>
> "When the *military needs* of the Federal Government arising from the necessity to execute the laws of the Union, suppress insurrection, or repel invasion can not be met by the regular forces, the organized militia shall be called into the service."

H.R. Rep. No. 60-1067, at 6 (1908) (emphasis added). Thus, Shaw understood the 1908 Act as a step towards making the National Guard "an essential and integral part of the first line of national defense." *Id*. at 6–7. Through the twentieth century, Congress continued to bring the National Guard more into the fold of the nation's general military apparatus. *See generally* Jeffrey A. Jacobs, Reform of the National Guard: A Proposal to Strengthen the National Defense, 78 Geo. L.J. 625, 629—31 (1990).

## LEGAL STANDARD

A request for injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). The standard for issuing a TRO is the same as is required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 Fed. Appx. 546, 548 (7th Cir. 2014). To obtain a TRO, the movant must demonstrate: (1) a likelihood of success on the merits; (2) that there is no adequate remedy at law; and (3) that the movant will suffer irreparable harm if the relief is not granted. *Smith v. Exec. Dir. of Indiana War Mem'ls*

*Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). If the movant makes this showing, the court then "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Finally, in balancing the harms, the court must consider the public interest in granting or denying the requested relief. *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001).

## ANALYSIS

Plaintiffs allege that Defendants' actions have violated (1) the statutory authority granted to the President in 10 U.S.C. § 12406; (2) Illinois's sovereign rights as protected in the Tenth Amendment; and (3) the Posse Comitatus Act. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest weigh in their favor. Defendants respond that President Trump has determined that the statutory criteria under Section 12406 have been met, and that the Court must give that determination deference. Defendants further argue that if the Court finds that deployment of the National Guard was proper under Section 12406, Plaintiffs cannot succeed on the merits of any of their claims.

The Court notes that its determinations for the purposes of this TRO are necessarily preliminary ones, based on the materials presented thus far, and constrained by the amount of time that the Court has had to review this weighty and urgent matter. The Court has had less than five days to consider 200 years of history, a factual record of approximately 500 pages, extensive briefing that raises complex issues of law for which there is limited precedent, and the six amicus curiae briefs that have been filed. With those caveats in mind, the Court determines that a TRO is warranted.

## I.  Justiciability

Defendants first challenge Plaintiffs' standing to seek a TRO based on their claim that Defendants' deployment of federalized National Guard into Illinois violates 10 U.S.C. § 12406. Federal courts have jurisdiction only over "cases" and "controversies," U.S. Const. art. III § 2, cl. 1, and so "any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Article III standing requires that Plaintiffs have a concrete and particularized injury in fact, actual or imminent, that is fairly traceable to the defendant's conduct and likely to be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A party moving for entry of a TRO must establish their standing to do so. *E.g., Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (collecting cases)). Because the "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion," the party whose standing is challenged must establish that standing "by affidavit or other evidence … rather than general allegations of injury." *Speech First*, 968 F.3d at 638 (first quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990); then quoting *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801 (7th Cir. 2016)).

A state has a recognized "interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982). Accordingly, states have been found to possess standing "when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022); *see also Texas v. United States*,

24

809 F.3d 134, 153 (5th Cir. 2015) (noting "states may have standing based on … federal assertions of authority to regulate matters they believe they control). Here, Plaintiffs have introduced evidence suggesting that Defendants intend to unlawfully deploy the National Guard to Illinois, where they are to engage in crime-fighting and other activities falling within the ambit of Illinois's sovereign police powers. No more is needed from the record to establish Plaintiffs' standing to pursue a TRO.

The Court is not persuaded by Defendants' argument that Plaintiffs cannot challenge deployment of the Texas National Guard because the Illinois Governor has no legally protected interest in controlling the militia of another state. This misses the point: Plaintiffs' claimed injury is not loss of an ability to control or command, but the loss of its own sovereign rights.[8] Nor is the Court compelled by Defendants' assertion that intrusion into Plaintiffs' sovereign police powers is too generalized to support standing. It is true that grievances may be too generalized to support Article III injury if what the plaintiff seeks is "relief that no more directly and tangibly benefits him than it does the public at large." *Defs. Of Wildlife*, 504 U.S. at 573-74. That is not the case here, though, as Illinois's evidence describes injuries directed to its specific sovereign interests, not the interests of states generally.[9] For these reasons, the Court concludes that Plaintiffs have standing.

---

[8] The Court discusses these sovereign rights in the context of irreparable harm below.

[9] Defendants also argue that Plaintiffs lack standing because states to which National Guard are deployed fall outside Section 12406's "zone of interests."  As a threshold matter, the Court questions how relevant the "zone of interests" test is to this case, given its primary usage in cases involving claims brought under the Administrative Procedure Act. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394–99 (1987) (concluding that "[t]he 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."). But even if the test applies, the Court has no trouble concluding that Illinois would fall within its zone of interests, given the history of the Militia Clause (from which Section 12406 draws its language) and the Founders' concerns regarding unchecked federal deployment of militias into the states.

Next, the Court considers Defendants' argument that it is outside the power of the Judiciary to review this case. "In general, the Judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821)). The Supreme Court has carved out a "narrow exception to that rule, known as the 'political question' doctrine." *Id.* When a controversy turns on a political question, courts lack the authority to decide the dispute. *Id.* The political question doctrine does not apply simply because the litigation challenges the authority of one of the coordinate political branches, nor "merely 'because the issues have political implications.'" *Id.* at 196 (quoting *INS v. Chadha,* 462 U.S. 919, 943 (1983)). Rather, the political question doctrine applies "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* at 195 (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993)). The political question doctrine is a doctrine "of 'political *questions*,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Defendants raise two points in support of their argument that the President's decision to invoke Section 12406 is not reviewable. First, Defendants cite in passing the rule that when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial review. Doc. 62 at 28 (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)). The Court takes no issue with this general premise but finds it does not apply here. Section 12406 "permits the President to federalize the National Guard '[w]henever' one of the three enumerated conditions are met, not whenever <u>he determines</u> that one of them is met." *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1248 (N.D. Cal. 2025) (quoting 10 U.S.C. § 12406) (emphasis in original). Thus, the decision whether to federalize the National Guard,

26

though undoubtedly a decision delegated to the President, is not one committed to his discretion alone. The political question doctrine does not apply on this ground.

Second, Defendants rely on *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827) for the specific proposition, untethered to modern political question doctrine jurisprudence, that the issue of whether the President properly mobilized the National Guard is not subject to judicial review. *Martin* involved President Madison's use of the New York militia during the War of 1812. Plaintiff, Jacob Mott, refused to report for duty. Mott was court-martialed and fined, and the State seized his property to satisfy the debt. Mott then brought an action for replevin in state court, arguing that the seizure was illegal because President Madison's order federalizing the New York militia was invalid. Among other objections, Mott argued that the avowry (the pleading justifying the taking of Mott's property) was fatally defective because it failed to allege that the exigency (the invasion) in fact existed. *Id.* at 23–28. By the time these issues reached the Supreme Court, the war had taken thousands of American lives and had been over for nearly twelve years. Harry L. Cole, *The War of 1812* at 94 (1965).

At issue in *Martin* was the meaning of the 1795 Act,[10] a precursor to 10 U.S.C. § 12406, which provided: "[W]henever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President ... to call forth such number of the militia ... as he may judge necessary to repel such invasion." *Martin*, 25 U.S. at 29. The Supreme Court held that whether the President's authority to call forth the militia had been properly invoked, that is, whether the exigency of an actual or imminent invasion had in fact arisen, was an issue to be decided solely by the President, and not subject to be contested

---

[10] Act of February 28, 1795, 2. Stat. 424 (1795). The Court discussed this statute earlier, noting the Act's separation of provisions for the President to call forth the militia in response to invasion or insurrection versus for purposes of executing domestic law.

"by every militia-man who shall refuse to obey the orders of the President." *Id.* at 29–30. The language of the opinion is strikingly forceful. *E.g.*, *id.* at 30 ("We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons."). However, the *Martin* Court reached its decision with facts and in a context vastly different from those present here. This Court reads *Martin*'s forcefulness of speech as a reaction to those particular facts, and not as conclusive on the broader issue of whether a Court can ever decide whether a President has properly invoked Section 12406.[11]

In large part, *Martin* was a reaction to the challenger seeking review. The Supreme Court there found it preposterous that whether an exigency existed could be "considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be *contested by every militia-man* who shall refuse to obey the orders of the President[.]" *Id.* at 29–30 (emphasis added). To that end, the Court found that the President's conclusion must be unquestionable because militiamen's "prompt and unhesitating obedience to orders is indispensable." *Id.*; *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 206 n.1 (2012) (Sotomayor, J., and Breyer, J., concurring in part and

---

[11] It is not necessary, nor appropriate, for the Court to pass on the continued viability of *Martin*. *Newsom v. Trump*, 141 F.4th 1032, 1050–51 (9th Cir. 2025). *Martin* remains binding upon this Court until the Supreme Court says that it is not. However, case law does not govern where it does not apply. Moreover, as seemingly sweeping as the language of *Martin* is, so too is *Laird v. Tatum* in the opposite direction:

> when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

408 U.S. 1, 15–16 (1972).

concurring in the judgment) (describing the need for prompt and unhesitating obedience to Presidential orders as the reasoning for the *Martin* decision). Moreover, *Martin* also relied on the "nature of the power itself"—the power to call forth the militia in response to an *invasion*. The Supreme Court has often recognized that the President's authority over foreign affairs and matters of war to be among the least appropriate for judicial review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (acknowledging that policies regarding foreign relations and the War Powers are largely immune from judicial review). Here, the modern version of the foreign invasion prong of section 12406 is not at issue; the only relevant circumstances are purely domestic.[12]

Finally, in the 200 years of judicial-review jurisprudence since *Martin*, the Supreme Court has provided ample guidance for when the political question doctrine should or should not apply. In that time, the Supreme Court has instructed that courts must make a "discriminating inquiry into the precise facts and posture of the particular case" before deciding that the political question doctrine applies. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Having done so here and

---

[12] *Luther v. Borden* is also distinguishable as resting on a rationale not relevant here. There, the President was asked to call forth the militia by one of two bodies of government competing for authority in Rhode Island, and by consenting to the request, the President necessarily recognized one as the lawful government. 48 U.S. 1, 44 (1849) ("For certainly no court of the United States, … would have been justified in recognizing [a different party than the President] as the lawful government; or in treating as wrongdoers or insurgents the officers of the government which the President had recognized, and was prepared to support by an armed force. In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice."). This interpretation of *Luther* is well-settled. *See Baker v. Carr*, 369 U.S. 186, 222 (1962) ("[S]everal factors were thought by the Court in *Luther* to make the question there 'political': the commitment to the other branches of the decision as to which is the lawful state government; the unambiguous action by the President, in recognizing the charter government as the lawful authority; the need for finality in the executive's decision; and the lack of criteria by which a court could determine which form of government was republican."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 590 (2004) (Thomas, J., dissenting) (explaining *Luther* as holding that "courts could not review the President's decision to recognize one of the competing legislatures or executives"); *see also Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 418 (1839) ("When the executive branch of the government, ... assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department."). The recognition of a foreign sovereign is not relevant to today's decision.

having found the facts and posture of this case to be vastly different from those in *Martin*, the Court is comfortable concluding that *Martin*'s holding does not bar judicial review.

## II. Likelihood of Success on the Merits

### A. 10 U.S.C. § 12406

Now that the Court has concluded that it can reach the merits of the case, it does so by beginning with 10 U.S.C. §12406. [13]

Section 12406 states:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws.

10 U.S.C. § 12406.

When interpreting a statute that leaves key terms undefined, the court must "interpret the words consistent with their 'ordinary meaning ... at the time Congress enacted the statute.'" *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*,

---

[13] Plaintiffs pursue their claim that Defendants violated 10 U.S.C. § 12406 on an *ultra vires* basis. To bring an *ultra vires* claim, plaintiffs must demonstrate that a defendant "violated a clear statutory mandate and exceeded the scope of [their] delegated authority." *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 456 (7th Cir. 2002). Section 12406 is nothing if not a delegation of authority, and so Court's analysis of whether Plaintiffs are likely to succeed on the merits will hinge on the degree to which Defendants' action are in violation of Section 12406's command.

444 U.S. 37, 42 (1979)). Several sources may be useful for determining a term's ordinary meaning at a particular time, including contemporaneous judicial decisions and dictionary definitions, *see id*. at 277–78, and how the term was used in other statutes enacted around the time, *see Perrin*, 444 U.S. at 43. Statutory interpretation is, however, a holistic endeavor "which determines meaning by looking … to text in context, along with purpose and history." *Gundy v. United States*, 588 U.S. 128, 140–41 (2019). Similarly, when defining the scope of delegated authority, a court must look "to the text in context and in light of the statutory purpose." *Id.*

Before turning to the meaning of Section 12406's subsections, a note on deference: Defendants are not entitled to "deference" on the issue of what constitutes a rebellion for the purposes of the Act, nor what it means to be "unable with the regular forces to execute the laws." Those are matters of statutory interpretation, a function committed to the courts. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("Whatever respect an Executive Branch interpretation was due, a judge 'certainly would not be bound to adopt the construction given by the head of a department.' Otherwise, judicial judgment would not be independent at all.") (internal citation omitted); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 131–32 (2015) (Thomas, J., concurring) ("[T]he Constitution does not empower Congress to issue a judicially binding interpretation of the Constitution or its laws. Lacking the power itself, it cannot delegate that power to an agency."). The Court will not, therefore, simply accept Defendants' assertion that the deployment satisfies the strictures of Section 12406. *See* Antonin Scalia and Bryan A. Garner, *Reading Law* 53 (2012) ("Every application of a text to particular circumstances entails interpretation.").

Defendants are, however, entitled to a certain amount of deference on the question of whether the facts constitute the predicates laid out in Section 12406. Section 12406 prongs (2)

and (3) broadly engage with matters of national security, and in that context the Executive is necessarily better suited than the judiciary to evaluate the precise nature of the threat. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–35 (2010). Therefore, Defendants are "not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* Still, Defendants must support their position by pointing the Court to some of the facts upon which it bases its conclusions and by offering explanations which paint a substantially reasonable picture justifying the Executive's position. *E.g.*, *id.* (requiring government to explain how support for terrorist organization's non-violent functions constituted material support to a terrorist organization, and concluding that explanation reasonable, rather than simply crediting government's belief that plaintiffs' conduct came within the statute's prohibition); *Hirabayashi v. United States*, 320 U.S. 81, 94–95 (1943) (giving Executive and Congress "wide scope for the exercise of judgment and discretion" but nonetheless basing its decision on "whether in the light of all the facts and circumstances there was any substantial basis for the conclusion ... that the curfew as applied [to Japanese Americans in the wake of Pearl Harbor] was a protective measure necessary to meet the threat of sabotage and espionage"). With that standard of review in mind, the Court proceeds to determine the applicability of Section 12406(2) or 12406(3) to the facts of this case as the Court has found them.

**1. Section 12406(2)**

Second 12406(2) permits the federalization of the National Guard when there is "rebellion or danger of a rebellion against the authority of the Government of the United States." "Rebellion" is not defined by Title 10, and so the Court turns to sources indicating the term's ordinary meaning at the time Congress enacted the statute. In so doing, the Court substantially agrees with the interpretation provided by the Northern District of California and the District of

Oregon. *See Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–55 (N.D. Cal. 2025); *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646, at *12–13 (D. Or. Oct. 4, 2025).

In the late 1800s and early 1900s, "rebellion" was understood to mean a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence. *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1251–53 (N.D. Cal. 2025) (collecting authorities). And should the dictionary definitions leave any doubt, the text of subsection (2) itself requires that the rebellion be "against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

This sets a very high threshold for deployment of the National Guard: As an example, during the late 1800s, after the close of the Civil War, the Supreme Court and several statutes referred to the Civil War as constituting a "rebellion." *United States v. Anderson*, 76 U.S. 56, 71 (1869) ("As Congress, in its legislation for the army, has determined that the rebellion closed on the 20th day of August, 1866."); *id.* at 70 ("On the 20th day of August, 1866, the President of the United States, after reciting certain proclamations and acts of Congress concerning the rebellion, ... did proclaim ... that the whole insurrection was at an end, and that peace, order, and tranquility existed throughout the whole of the United States of America. This is the first official declaration that we have, on the part of the Executive, that the rebellion was wholly suppressed[.]"); Act of March 2, 1867, 14 Stat. 432 (approving in all respects President's proclamations as to those "charged with participation in the late rebellion against the United States").

Are we, then, in danger of something akin to another Civil War? The President would be entitled to great deference on the question of whether that state of affairs exists. But it does not appear as though President Trump has made that conclusion. The June 7, 2025 memorandum issued by President Trump states that "[t]o the extent that protests or acts of violence directly

33

inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." Doc. 62-1 at 19. This is a legal conclusion, not a factual one. And in all of the memoranda actually deploying the National Guard to Illinois, the Court does not see any factual determination by President Trump regarding a rebellion brewing here. Rather, those memoranda refer specifically to difficulty executing the laws, indicating that Section 12406(3), not 12406(2) provided the basis for the deployment of the National Guard.

This is sensible, because the Court cannot find reasonable support for a conclusion that there exists in Illinois a danger of rebellion satisfying the demands of Section 12406(2). The unrest Defendants complain of has consisted entirely of opposition (indeed, sometimes violent) to a particular federal agency and the laws it is charged with enforcing. That is not opposition to the authority of the federal government as a whole. Defendants have offered no explanation supporting the notion that widespread opposition to immigration enforcement constitutes the makings of a broader opposition to the authority of the federal government.[14]

### 2. Section 12406(3)

Turning to Section 12406(3), the parties dispute both its meaning and whether its conditions have been met. With no Seventh Circuit or Supreme Court decision on Section 12406(3)'s meaning, the Court embarks—as it must—on its own, text-based interpretation of the statute. The phrase "unable with the regular forces to execute the laws of the United States" contains several key terms.

---

[14] Even if the Court were to have credited Defendants' version of the facts, Defendants still would not have any support for the conclusion that the organized, repeated, violent, and increasingly hostile attacks on ICE agents, their personal property, and ICE property suggests anything more than an opposition to immigration law enforcement and immigration policy, as opposed to the authority of the Government as a whole.

First, "unable." In the late 1800s and early 1900s, "unable" was understood to mean "not having sufficient power or ability," being incapable. Universal Dictionary of the English Language Vol. 4 at 4900 (1900) ("Not able; not having sufficient power or ability; not equal to any task; incapable."); Noah Webster, A Dictionary of the English Language at 454 (1868) ("Not able; not having sufficient strength, knowledge, skill, or the like."); William Dwight Whitney, The Century Dictionary Vol. VIII at 6578 (1895) ("1. Not able. 2. Lacking in ability; incapable."). These definitions evoke a binary approach: ability or not, capability or not. This reading is consistent with the legislative history: In the words of Secretary Shaw, Section 12406(3) was to be used when "the military needs of the Federal Government arising from the necessity to execute the laws of the Union, … *can not* be met by the regular forces." H.R. Rep. No. 60-1067, at 6 (1908) (emphasis added).

Next, the meaning of "with the regular forces." Several historical sources indicate that the phrase "regular forces" was understood at the time of enactment to mean the soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen who did not make it their livelihoods to serve their country but instead took up arms only when called forth in times of national emergency.

First, numerous statutes from the early 1800s through when Section 12406(3) was enacted use the word "regular" or "regular forces" to distinguish the standing army from the militia. For example, in 1806, Congress passed a statute entitled "An Act for establishing Rules and Articles for the government of the Armies of the Unites States" which primarily set forth the duties and obligations of soldiers and officers in the army. 2 Stat. 359 (1806). Most articles are to this effect, but the statute also includes an article stating,

> "All officers, serving by commission from the authority of any
> particular state, shall, on all detachments, courts martial, or other

> duty, wherein they may be employed in conjunction with the *regular forces* of the United States, take rank, next after all officers of the like grade in said regular forces, notwithstanding the commissions *of such militia* or state officers may be elder than the commissions of the *officers of the regular forces* of the United States."

Act of April 10, 1806, 2 Stat. 359 (emphases added). The distinction again appears in 1903.

Then, Congress passed an act entitled "An Act to promote the efficiency of the militia and for other purposes." 32 Stat. 775. That statute states, "That the militia, when called into the actual service of the United States, shall be subject to the same Rules and Articles of War as the *regular* troops of the United States." Act of January 21, 1903, 32 Stat. 775. And in 1908, in the same act effecting the change which led to the modern Section 12406, section 2 states:

> [W]hether known and designated as National Guard, militia, or otherwise, [the militia] shall constitute the organized militia. On and after January twenty-first, nineteen hundred and ten, the organization, armament, and discipline of the organized militia in the Several States … shall be the same as that which is now or may hereafter be prescribed for the *Regular* Army of the United States

Act of May 27, 1908, 35 Stat. 399 § 2.

In addition to these statutory instances of the terms "regular" and "forces" being used to distinguish the military (in particular the Army) from the militia, there are several examples of courts discussing the important differences between the "regular forces" and the militia. In *McClaughry v. Deming*, Justice Peckham explained:

> [A]t all times there has been a tendency on the part of the regular, whether officer or private, to regard with a good deal of reserve, to say the least, the men composing the militia as a branch not quite up to the standard of the Regular Army, either in knowledge of martial matters or in effectiveness of discipline, and it can be readily seen that there might naturally be apt to exist a feeling among the militia that they would not be as likely to receive what

> they would think to be as fair treatment from regulars, as from
> members of their own force.

*McClaughry v. Deming*, 186 U.S. 49, 56 (1902). The opinion repeats this distinction throughout,

several times. *E.g.*, *id.* at 56 ("there was a substantial difference between the regular forces and

the militia"); *id.* ("While it may be that there was then no particular distrust or jealousy of the

Regular Army, the provision in question recognized, as we have said, the difference there was

between the two bodies, the regulars and the militia or volunteers."). In the lower court decision

before the Eighth Circuit, it was similarly observed when speaking about the militia as compared

to the regular Army that,

> The decisions of the courts had recognized the two forces as
> different,— the one as temporary, called forth by the exigency of
> the time, to serve during war or its imminence, and then to be
> dissolved into its original elements; the other as permanent and
> perpetual, to be maintained in peace and in war.

*Deming v. McClaughry*, 113 F. 639, 643 (8th Cir.), *aff'd,* 186 U.S. 49 (1902) (emphasis added).

Even today in the statutory context surrounding Section 12406, Title 10 makes repeated

use of the words "regular" and "forces" in close proximity to each other to refer to the military

(the Army, Navy, etc.) to the exclusion of the National Guard. *See, e.g.*, 10 U.S.C. § 10103

("Whenever Congress determines that more units and organizations are needed for the national

security than are in the regular components of the ground and air forces, the Army National

Guard of the United States and the Air National Guard of the United States, or such parts of them

as are needed, … shall be ordered to active duty and retained as long as so needed.").

Altogether then, the phrase "unable with the regular forces to execute the laws of the

United States" means that in order for the President to call forth the militia to execute the laws,

the President must be incapable with the regular forces—that is, lacking the power and force

with the military alone—to execute the laws. This understanding of "regular forces" is not only consistent with the ordinary meaning of "regular forces" at the time Section 12406's operative language was initially enacted, but it makes sense given the evolution of the Army over time.

At the Founding, the militia was understood to be the main fighting force of the nation. *Youngstown*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). But by the early 1900s calling-forth act amendments, Congress had provided through several means for the military to become significantly stronger and more robust. In that context, Congress specified that the regular forces must be relied upon until the point of failure before the militia (by then named the National Guard) could be federalized. The specification was a recognition that by that time the regular forces (that is, the Army, Navy, etc.) were better equipped to handle matters of national emergency. *See McClaughry*, 186 U.S. at 57 ("History shows that no militia, when first called into active service, has ever been equal to a like number of regular troops.").

Here, Defendants have made no attempt to rely on the regular forces before resorting to federalization of the National Guard, nor do Defendants argue (nor is there any evidence to suggest) that the President is incapable with the regular forces of executing the laws. Therefore, the statutory predicate contained within Section 12406(3) has not been met on that basis alone.

The Court is not, of course, suggesting that the President can or should use the military to solve every domestic concern. The question remains when "the regular forces" may be called upon to execute the laws. And that answer must not lie in the Militia Clause alone. When Congress made reference in the 1908 Act to the regular forces being used to execute the laws, Congress implicitly drew on the War Powers, which govern declaring war and commanding of the armed forces. *Ex parte Quirin*, 317 U.S. 1, 26, *modified sub nom. U.S. ex rel. Quirin v. Cox*, 63 S. Ct. 22 (1942) ("The Constitution thus invests the President as Commander in Chief with

the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war."). Thus, the answer to what it means for the regular forces to fail to execute the laws depends on both the meaning of the Militia Clause (from which the statute borrows the phrase "execute the Laws")[15] and the scope of the War Powers. The materials interpreting and explaining those sources suggest two important limitations.

First, the ratification debates suggest that the phrase "execute the Laws" within the Militia Clause itself (from which Section 12406 borrows its language) was only to apply in cases where the civil power had first failed. During the ratification debates, in response to the concerns of the antifederalists, James Madison repeatedly assured them that the "execute the Laws" portion of the Militia Clause was only to be utilized in the case of opposition to "the execution of the laws, *which the civil power might not be sufficient to quell*." Elliot Debates, *supra*, at 410 (emphasis added). Madison dismissed the idea that the Clause was granting the power to call forth the militia "to enforce every execution [of law] indiscriminately." *Id*. at 412. And Alexander Hamilton called the idea that the militia of one state would be brought to another to "tame" that state's "contumacy" an "absurdit[y]." The Federalist No. 29, at 186. Altogether then, the assurances of our Founders makes clear that the power to call forth the militia to execute the laws was not to be employed merely in cases of the need for law enforcement, nor even when a state might stubbornly oppose the authority of the federal government. Only when "the civil power might not be sufficient" was the provision allowing the calling forth of the militia to execute the laws to apply. This understanding of when the militia might execute the laws is consistent with the Framers' broader concerns:

---

[15] Scalia & Garner, *Reading Law* 73 ("[I]f a word is obviously transplanted from another legal source, ... it brings the old soil with it." (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). The Court applies this principle to the phrase "execute the laws" which has remained unchanged from the Militia Clause itself, save for capitalization.

> The nation began its life in 1776, with a protest against military usurpation. It was one of the grievances set forth in the Declaration of Independence, that the king of Great Britain had 'affected to render the military independent of and superior to the *civil power.*' The attempts of General Gage, in Boston, and of Lord Dunmore, in Virginia, to enforce martial rule, excited the greatest indignation. Our fathers never forgot their principles; and though the war by which they maintained their independence was a revolutionary one, though their lives depended on their success in arms, they always asserted and enforced the subordination of the military to the civil arm.

*Ex parte Milligan*, 71 U.S. 2, 37 (1866) (emphasis added); *see also Luther v. Borden*, 48 U.S. 1, 61 (1849) (contrasting "civil power" with "martial law"); Act of February 28, 1795, 1 Stat. 424 (1795) (evidencing Congress's early understanding that the militia only be called forth when the forces of obstruction were "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals" by the Act).

Here, there has been no showing that the civil power has failed. The agitators who have violated the law by attacking federal authorities have been arrested. The courts are open, and the marshals are ready to see that any sentences of imprisonment are carried out. Resort to the military to execute the laws is not called for.

Second, the separation of powers and division of War Powers specifically suggests that in the absence of a total failure of the civil power, the President must have an independent source of authority (independent from the Militia Clause or the Section 12406 delegation) expressly authorizing him to deploy the military domestically:

> Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights. On the other hand, Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress.

*Youngstown Sheet & Tube Co.*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). By the express language of the Posse Comitatus Act, the answer to when the armed forces may be utilized to execute the laws must at least be: exceedingly rarely. The Posse Comitatus Act was passed not long before the Section 12406 language referring to the regular forces came into being. 18 U.S.C. § 1385. The Posse Comitatus Act uses similar language to the precursor to Section 12406, forbidding the willful use of "any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise *to execute the laws*." *Id.* "We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988). Thus, "laws dealing with the same subject—being *in pari materia* (translated as "'in like manner') should if possible be interpreted harmoniously." Antonin Scalia and Bryan A. Garner, *Reading Law* 252 (2012). The Posse Comitatus Act makes it a criminal offence to use the Army, Navy, Marine Corps, and Air Force to "execute the laws" unless expressly authorized by Congress. 18 U.S.C. § 1385. And as Justice Jackson in his well-known *Youngstown* concurrence has recognized, while this prohibition likely does not apply to hold the President criminally liable, the Act nonetheless operates to "forbid[]" the President "to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 644–45 (Jackson, J., concurring in the judgment). There is no indication that Section 12406 was intended to repeal the Posse Comitatus Act and effect a sweeping implied authorization for the President to use the armed forces for the purposes of executing the laws. *See* Scalia and Garner, *Reading Law* 255 ("[R]epeals by implication are disfavored"). Therefore, military law enforcement must only be authorized as the Posse Comitatus Act suggests, where it is *expressly* authorized.

To that end, Congress has enacted a number of specific statutes that allow the armed forces to participate directly in law enforcement in certain circumstances. This last category includes the Insurrection Act and twenty-five other statutes. *E.g.,* 16 U.S.C. § 23 (empowering troops to prevent trespassers or intruders from entering the Yellowstone National Park), 16 U.S.C. § 78 (same, but with Sequoia National Park, the Yosemite National Park, and the General Grant National Park); 22 U.S.C. §§ 401–408 (empowering the President to "employ such part of the land or naval forces of the United States as he may deem necessary to carry out" provisions forbidding the illegal exportation of war materials); 25 U.S.C. § 180 (empowering president to employ military forces to remove persons settling on reservation land). Section 12406 is no such statute.

i.       *Alternative Interpretations*

Defendants offer their own interpretation of Section 12406(3), based on their reading of *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), which is that it authorizes the President to call the National Guard whenever he is "unable to ensure to his satisfaction the faithful execution of the federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers." Doc. 62 at 35. This interpretation is shockingly broad: Defense counsel confirmed during oral argument that it would allow the federalization of the National Guard if there was *any* repeated or ongoing violation of federal law in a community. Given that Defendants have also contended that every state official who implements a sanctuary city policy is violating federal law, Defendants' position also seems to be that the National Guard may be deployed solely on the basis of state officials exercising their Constitutionally protected right to implement these policies.

42

Defendants' definition was properly rejected by the Ninth Circuit. On the issue of Section 12406(3)'s meaning, the Ninth Circuit in *Newsom* declined to adopt the lower court's definition of the section that "so long as some amount of execution of the laws remain[ed] possible, the statute cannot be invoked." *Newsom*, 141 F.4th at 1051. But it also rejected the position asserted by Defendants that "minimal interference with the execution of laws [would] justify invoking § 12406(3)," as such a reading "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id*. (emphasis in original). Rather, the Ninth Circuit held that since evidence suggested execution of federal law had been "significantly impeded," invocation of 12406(3) was proper. *Id*. at 1052. That is a far cry from Defendants' proposed definition.

In any event, while decisions of the Ninth Circuit are "not binding" on this Court, *Hays v. United States*, 397 F.3d 564, 567 (7th Cir. 2005), and the Court frankly does not agree that "significantly impeded" is the same thing as "unable," the Court would still find that Plaintiffs are likely to succeed on the merits even were the Ninth Circuit standard applied. As discussed, there is evidence of protests, some of which have included acts of violence. There is also evidence of property destruction, and discrete groups who have attempted to impede DHS agents. At the same time, there is significant evidence that DHS has not been unable to carry out its mission. All federal facilities have remained open. To the extent there have been disruptions, they have been of limited duration and swiftly controlled by authorities. Pairing all this with evidence that federal immigration officials have seen huge increases in arrests and deportations, *see* Doc. 13 at 34–35; *id.* at 34 n.124, the Court concludes that even under the Ninth Circuit standard, the factual conditions necessary for President Trump to have properly invoked Section 12406(3) simply do not exist.

43

For the foregoing reasons, the Court finds Plaintiffs are likely to succeed on the merits of their *ultra vires* claim that Defendants' deployment of the National Guard to Illinois violated 10 U.S.C. § 12406.

### B. The Tenth Amendment and Posse Comitatus Act

Plaintiffs also allege that the National Guard deployment Defendants plan to carry out will involve a host of activity well outside the bounds of the President's authority, and that these acts would violate the Posse Comitatus Act and Tenth Amendment.

Plaintiffs offer substantial evidence in support of their concerns that the scope and purpose of the National Guard's deployment in Illinois could intrude into the general police powers generally reserved to the states. That evidence primarily consists of President Trump's social media posts concerning crime in Chicago. In one post, just about one month before President Trump authorized the deployment of the National Guard in Illinois, the President promised: "I will solve the crime problem" in Chicago, "just like I did in DC," where the President previously deployed the National Guard. Doc. 13-10 ¶ 59; *id.* ¶ 44 (similar, in August 2025). President Trump further stated: "Chicago will be safe again, and soon." *Id*. The following day, in a fundraising email, President Trump stated: "I turned our Great Capital into a SAFE ZONE. There's virtually no crime. NOW I WANT TO LIBERATE CHICAGO! The Radical Left Governors and Mayors of crime ridden cities don't want to stop the radical crime. I wish they'd just give me a call. I'd gain respect for them. Now hear me: WE'RE GOING TO DO IT ANYWAY." *Id*. ¶ 60.

The President of the United States's promises on official matters are to be treated with great respect, particularly those made during his Presidency and respecting specific matters of Executive action. Additionally, nothing within the official communications deploying the

44

National Guard is inconsistent with President Trump's plan to utilize the National Guard to combat crime in Chicago. President Trump's October 4, 2025 memorandum authorizes the National Guard to "perform those protective activities that the Secretary of War determines are reasonably necessary to ensure the execution of Federal law in Illinois, and to protect Federal property in Illinois." Doc. 62-1 at 16.[16] At oral argument, the Court pressed counsel for Defendants to clarify the scope of the National Guard's mission. Asked if the National Guard would limit its operations to just Cook County, where the incidents of concern occurred, counsel noted that operations throughout Illinois were possible. Asked if the National Guard, once deployed, would be authorized to respond to assistance requests by employees of any federal agency—not just DHS—counsel did not know. And asked what sort of activities the Guard would be authorized to perform for purposes of carrying out their mission, counsel professed no knowledge as to whether or not the National Guard would engage in crowd and traffic control, street patrols, searches, or pursuits: the sort of regular police activities traditionally carried out by state and local law enforcement.

Defense counsel suggests that it is inappropriate to use any of President Trump's social media posts or speeches when considering this case, citing *Trump v. Hawaii*, 585 U.S. 667 (2018). In that case, the petitioner sought to establish that the President's proclamation restricting

---

[16] Defendants do not assert that any inherent power is a stand-alone source of the President's authority to deploy the National Guard, but at times appear to conflate the power to federalize the militia with the power to protect federal personnel and property. Whatever the President's authority to protect federal property and personnel, he may not do so *with the National Guard* unless one of the statutory predicates under section 12406 is met. That statutory delegation is the only source of the President's authority to federalize the militia; without it, the power would remain entirely with Congress, and it would be a usurpation of Congressional power to federalize the National Guard for reasons not covered by that delegation. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

the entry of aliens from several majority-Muslim nations but neutral to religion on its face, was

unlawful under the Establishment Clause. *Id.* at 702–06. Specifically, the petitioner sought to

establish that the proclamation "was motivated not by concerns pertaining to national security

but by animus toward Islam." *Id.* at 681. The statutory merits turned on whether the President,

under his grant of statutory authority, had found that the entry of the covered aliens "would be

detrimental to the interests of the United States," which the Court found the President had. *Id.* at

683. As for petitioner's Establishment Clause claim, that depended on whether the Proclamation

was unconstitutionally motivated by religious animus. *Id.* at 705–07. To prove their claim,

plaintiffs sought to rely on sever statements made by the "President and his advisers casting

doubt on the official objective of the Proclamation." *Id.* at 699. Prior to taking office, President

Trump's statements explicitly endorsed a "total and complete shutdown of Muslims entering the

United States." *Id.* at 700. But after taking office, the President's statements were less specific.

*Id.* at 700–01. In an appeal challenging the grant of a nationwide preliminary injunction on the

Proclamation, the Court held that it could consider the President's extrinsic statements but that it

would uphold the challenged proclamation "so long as it can reasonably be understood to result

from a justification independent of unconstitutional grounds." *Id.* at 705. The choice of this

standard was motivated in large part by the extraordinary deference owed to the office of the

President in matters of relations with foreign powers and precedent suggesting that decisions in

the arena of alien admission should be upheld so long as there existed a facially legitimate reason

for the decision. *Id.* at 703–04.

Today's case differs from *Trump v. Hawaii* in several important respects. For one, the

issue here is not what motivated President Trump when he deployed the National Guard, but

rather what the authorization memoranda allows and how it will be carried out. Moreover, this

case does not concern foreign relations, an arena where the President's decisions are largely immune from judicial review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Rather, this case concerns relations with the State of Illinois, a matter of federalism routinely arbitrated by the courts. Finally, President Trump's statements were made during his Presidency, close in time to his official action, and will likely be looked to by the members of his administration who are tasked with implementing his order. For these reasons, the Court believes *Trump v. Hawaii* does not preclude a finding that the National Guard have been deployed to "solve crime" in Chicago.

That said, there has been little argument on this issue specifically and there is even less evidence that has been presented about what, exactly, the National Guard are being trained to do or where they would be doing it. Perhaps most importantly, a decision is not required for the purposes of this TRO. In the interest of judicial restraint, the Court declines to make a finding at this time what, exactly, the scope of the National Guard's mission entails.

Turning to the law: As discussed, the Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Tenth Am. These reserved and residuary powers include, among other things, "the police power, which the Founders denied the National Government and reposed in the States." *United States v. Morrison*, 529 U.S 598, 617-18 (2000); *see also Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) (the "power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"). One of Plaintiffs' theories of Tenth Amendment harm is that by federalizing the Illinois National Guard, Defendants usurped Illinois's right to control its own National Guard forces. As there are constitutionally recognized grounds for the National

Guard to be called forth by the President, *see* U.S. Const., art. I § 8, cl. 15, the Court understands this theory to rise and fall with Plaintiffs' 10 U.S.C. § 12406 claim, insofar as the Court does not understand Plaintiffs' theory to be that even a proper invocation of 10 U.S.C. § 12406 would violate the Tenth Amendment. Given the Court's conclusion that Plaintiffs are likely to succeed on their *ultra vires* claim, it finds Plaintiffs would also be likely to succeed on this theory of a Tenth Amendment violation.[17]

Plaintiffs also contend that they are entitled to a TRO enjoining Defendants from deploying the federalized National Guard based on the Posse Comitatus Act. Defendants raise a number of arguments for why Plaintiffs are unlikely to succeed on the merits of this claim, including that (1) the Act provides no basis to enjoin deployment of the National Guard, only the Guards' activities; (2) Plaintiffs lack a cause of action to enforce the Act in either equity or through a private right of action; (3) the Act expressly permits federalized troops to engage in law enforcement; and (4) the Guard has not been authorized to execute the laws in violation of the Act. Given that the Court has already determined likelihood of success on the merits on other grounds, it declines to reach the merits of the Posse Comitatus Act claim at this time.

### III.  No Adequate Remedy at Law and Irreparable Harm

In addition to showing a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). Here, the Court concludes that Plaintiffs have demonstrated at least two types of irreparable harm.

---

[17] Plaintiffs press two additional theories of Tenth Amendment harm: that Defendants' deployment of the National Guard was a means to coerce and punish Illinois for enacting certain laws and that the deployment would intrude on Illinois's general police power. As they are not strictly necessary for this Court's decision on Plaintiff's motion for a TRO, the Court declines to reach these alternative theories at this time.

First, as is discussed above, the Court concludes that Defendants' actions likely violate the Tenth Amendment, and "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). The presence of National Guard members from Texas makes the constitutional injury especially significant. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty" among the States. *Shelby Cty. v. Holder*, 570 U.S. 529, 544 (2013) (emphasis in original). Alexander Hamilton defended state militias on the understanding that they would be made up of "our sons, our brothers, our neighbours, . . . men who are daily mingling with the rest of their countrymen," and who would be appointed by the elected leaders of that state. *See* The Federalist No. 29, at 185 (Alexander Hamilton) (Jacob Ernest Cooke, ed., 1961). Here, to have a National Guard from Texas be deployed to Illinois against the wishes of Illinois's elected leaders arguably empowers Texas at the expense of Illinois, injuring Illinois's right to be "equal in power, dignity, and authority" to every other state. *Coyle v. Smith*, 221 U.S. 559, 567 (1911).[18]

Second, the Court finds that deployment of National Guard members is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order. There has been overwhelming evidence presented that the provocative nature of ICE's enforcement activity has caused a significant increase in protest activity, requiring the Broadview Police, ISP, and other state and local law enforcement agencies to respond. *See, e.g.*, Doc. 13-5; Doc. 13-15; Doc. 13-14. Given that National Guard members "are trained to effectively destroy enemies in combat

---

[18] For this same reason, the Court does not find persuasive Defendants' argument that Plaintiffs do not have standing to challenge the deployment of the Texas National Guard in Illinois. The Court easily concludes that a state may suffer injury by having another state's troops deployed within its jurisdiction. Given that they wear separate uniforms and have different training, the fact that all of the National Guard members have been "federalized" does not persuade the Court that they are all the same.

49

scenarios" rather than to de-escalate conflicts, Doc. 13-7 ¶ 29, the Court believes that allowing them to deploy at the Broadview Processing Center or anywhere else in Illinois will only add fuel to the fire that Defendants themselves started.[19] And Plaintiffs, quite literally, are responsible for putting out those fires, as well as treating any injuries that may result. *See* Doc. 13-5 at 4 (noting that the Broadview Fire Department is responsible for providing paramedics and hospital transportation for the ICE Processing Center). This diversion of limited state and local resources is an irreparable harm for which Plaintiffs have no adequate remedy at law.

## IV. Balance of Harms and Public Interest

Finally, the balance of the equities and public interest weigh in favor of granting Plaintiffs' request for a TRO. ICE's enforcement activity has resulted in significantly higher numbers of deportations and arrests in 2025 as compared with 2024. Doc. 13 at 34, n.124. State and local police have indicated that they are ready, willing, and able to keep the peace as ICE continues its operations in Chicago. Doc. 13-5; Doc. 13-15. Defendants remain free to deploy as many federal law enforcement officers as they believe appropriate to advance their mission. Therefore, the harm of denying Defendants access to 500 National Guard members is *de minimis*. In contrast, the significance of the public's interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods cannot be overstated. Chicago's history of strained police-community relations, which has stemmed in part from lack of police training and inappropriate uses of force, is well-documented. *See, e.g.*, *Illinois v. City of Chicago*, Case No. 17-CV-6260, 2019 WL 398703, at *1 (N.D. Ill. Jan. 31, 2019) (Chicago Police Department Consent Decree).

---

[19] In both Los Angeles and Portland, the National Guard's presence has caused an increase in civil unrest. *Oregon v. Trump*, Case No. 3:25-CV-1756-IM, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025).

To add to this milieu militarized actors unfamiliar with local history and context whose goal is "vigorous enforcement" of the law, Doc. 62 at 34, is not in the community's interest.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' request for a TRO. Pursuant to Federal Rule of Civil Procedure 65(d)(1) and *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922 (7th Cir. 2019), the Court has entered the terms of the TRO in a separate document. Doc. 67.

Date: October 10, 2025

**United States District Judge**