# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; CITY OF CHICAGO, an Illinois municipal corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES ARMY; DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army <br><br> Defendants. | Case No. 25-cv-12174 <br><br> Judge April M. Perry <br><br> Magistrate Judge Jeffrey T. Gilbert |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION UNDER RULE 12(b)(1)**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY .................................................. 2

LEGAL STANDARD ............................................................................................................. 6

ARGUMENT ........................................................................................................................ 7

I.    Invalidating and enjoining Defendants' unrescinded orders would provide Plaintiffs ongoing protection against unlawful troop deployments. .................................................. 7

II.    The voluntary cessation exception to mootness applies. ................................................. 10

    A.    It is not absolutely clear the unlawful troop deployments are over for good when the President has promised to "come back." ......................................................... 10

    B.    Defendants' attempts to avoid the voluntary cessation exception fail. ..................11

        1.    Defendants' failed pursuit of a Supreme Court stay does not support dismissal on mootness grounds ...................................................................................... 12

        2.    Defendants receive no special solicitude as government officials .................. 14

CONCLUSION .................................................................................................................... 15

**INTRODUCTION**

After losses at every level of the federal judiciary, President Trump announced the removal of federalized National Guard troops from Chicago in a New Year's Eve post. Defendants claim his forced retreat moots this case. But mootness case law recognizes a mid-litigation about-face for what it is. When a defendant stops unlawful conduct only after being sued, a federal court need not pretend nothing happened and dismiss. The case proceeds to final resolution unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020).

Defendants have no way around the "voluntary cessation" exception to mootness. Far from being "absolutely clear" that the challenged troop deployments will not recur, the President said the opposite in his New Year's Eve post: "We will come back, perhaps in a much different and stronger form, when crime begins to soar—Only a question of time!" Consistent with this promise, Defendants' motion does not disavow a future non-consensual troop deployment. They claim only that different facts and legal authority will be invoked.

Even that meager assurance is questionable. Defendants have not rescinded the challenged 2025 orders and still defend their validity before this Court. And the orders themselves aggregate past events—citing June 2025 events in California to justify October 2025 deployments in Illinois. Voiding and enjoining these orders is necessary to stop their continued misuse.

Defendants claim courts afford greater deference to government officials who change course in good faith. But the change must be definitive, not caveated by future contingencies. *See Elim*, 962 F.3d at 345. Here, with the challenged orders still on the books, Defendants refuse even to acknowledge a change has occurred. This type of begrudging stand-down is exactly why the voluntary cessation exception exists—and why Defendants' mootness motion fails.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On the morning of Saturday, October 4, 2025, the Secretary of Defense, at the President's direction, ordered the mobilization of "at least" 300 troops from the Illinois National Guard for deployment in Illinois. ECF 13-3. He then issued another order that same weekend mobilizing "up to" 400 members of the Texas National Guard for deployment in Illinois. ECF 13-4. The orders cited 10 U.S.C. § 12406 and referenced "violent demonstrations" against federal immigration enforcement functions. ECF 13-3, 13-4. Both were issued over the Illinois Governor's objection. ECF 13-2 (Scudder Decl.) ¶¶ 18-22. As Plaintiffs later learned, the President had issued a memo invoking § 12406 to federalize National Guard troops in Illinois, based upon allegations of "threats of violence" and the determination that "the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." ECF 62-1 at 16–17.

The State of Illinois and the City of Chicago ("Plaintiffs") filed suit challenging these orders and deployments on October 6, 2025, and moved for a temporary restraining order and preliminary injunction the same day. ECF 1, 13. Defendants opposed, relying on the language of the President's order, arguing the actions were within the President's § 12406 authority because he was "unable with the regular forces to execute the laws of the United States" in Illinois. ECF 62 at 22-25 (citing 10 U.S.C. § 12406(3)). Defendants also argued a "rebellion" or "danger of rebellion" justified the invocation of § 12406, even though neither the President's October order federalizing troops in Illinois nor either of Secretary Hegseth's orders mobilizing troops for an Illinois deployment used the word "rebellion." *Id.* at 25-27 (citing 10 U.S.C. § 12406(2)). By October 7, 2025, members of the Texas National Guard had begun deploying in Illinois. ECF 62-3 (Knell Decl.) ¶ 6.

2

This Court issued a temporary restraining order ("TRO") on October 9 and an opinion on October 10. ECF 67, 70. The Court found Plaintiffs had standing because they had "introduced evidence suggesting that Defendants intend to unlawfully deploy the National Guard to Illinois, where they are to engage in crime-fighting and other activities falling within the ambit of Illinois's sovereign police powers." ECF 70 at 25. The Court also found Plaintiffs were likely to succeed on their claims that the President exceeded his § 12406 authority and violated Illinois's sovereignty under the Tenth Amendment. *Id.* at 30-48. The TRO enjoined the "federalization and deployment of the National Guard of the United States within Illinois." ECF 67.

Defendants immediately appealed the TRO on October 10, seeking an emergency stay in the Seventh Circuit. ECF 75. The following day, October 11, the Seventh Circuit denied an administrative stay request regarding the "deployment" component of the TRO, while staying the "federalization" prohibition. ECF 80. On October 16, the Seventh Circuit issued an opinion allowing the "deployment" prohibition in the TRO to remain in effect, while continuing to stay the "federalization" component. *Illinois v. Trump*, 155 F.4th 929, 941 (7th Cir. 2025).

On October 17, Defendants filed an emergency application with the Supreme Court seeking a stay of the TRO. Application, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 17, 2025). There, Defendants continued to justify their actions under two of § 12406's conditions: where there is a "rebellion" against the governmental authority, or where the President is "unable with the regular forces to execute the laws[.]" *Id.* at 28-34 (citing § 12406(2) and (3)). With that emergency application still pending, on October 29, the Supreme Court ordered further briefing on whether "regular forces" in § 12406(3) refers to the professional military, and, if so, how that interpretation affects the operation of the statute. No. 25A443, Doc. 20 (U.S. Oct. 29, 2025).

3

While the Supreme Court considered Defendants' stay request from October to late December 2025, federalized National Guard troops remained in Illinois, though the TRO's prohibition on deployment limited their activities.[1] On December 22, 2025, Secretary Hegseth issued a memorandum, apparently documenting previous verbal orders from November 25, directing that "[g]iven ongoing domestic unrest," "[a]ll 300 Illinois National Guard personnel will remain in federal service, with an initial extension of their orders to April 15, 2026."[2]

The following day, December 23, 2025, the Supreme Court denied Defendants' stay application in a written opinion. *Trump v. Illinois*, 146 S. Ct. 432 (2025). The Court preliminarily "conclude[d] that the term 'regular forces' in § 12406(3) likely refers to the regular forces of the United States military," which "means that to call the Guard into active federal service under § 12406(3), the President must be 'unable' *with the regular military* 'to execute the laws of the United States.'" *Id.* at 434. And "[b]ecause the statute requires an assessment of the military's ability to execute the laws, it likely applies only where the military could legally execute the laws." *Id*. Those circumstances, the Court explained, are "exceptional," because under the Posse Comitatus Act, "the military is prohibited from 'execut[ing] the laws' 'except in cases and under circumstances expressly authorized by the Constitution or Act of Congress.'" *Id*. (quoting 18 U.S.C. § 1385) (alterations in original).

---

[1] USNORTHCOM, Federal Protection Mission, available at: https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/ (cited at ECF 130 at 4, 9, 11 (internal pagination) and cited at Ex. 2 hereto (Tresnowski Decl.) ¶¶ 3–5); *see also* WBEZ Chicago, *Trump's deployment of National Guard members to Chicago cost taxpayers $21 million, congressional report says* (Jan. 29, 2026), available at: https://www.wbez.org/immigration/2026/01/29/trump-deployment-national-guard-chicago-cost-taxpayers-21-million-congressional-report (citing Congressional Budget Office, Estimating the Costs of Troop Deployments to U.S. Cities (Jan. 28, 2026), available at: https://www.cbo.gov/system/files/2026-01/61943-Troop-Deployments.pdf). U.S. Northern Command's website and the CBO report are subject to judicial notice. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (collecting cases).

[2] Dec. 22, 2025 Sec'y of Def. Mem. for the Sec. of the Army, et al., re: "Force Structure Decisions for the Presidentially Directed Mission to Protect Federal Law Enforcement Personnel and Functions in Illinois and Oregon," attached hereto as Exhibit 1-A to the Scudder Decl. ("Dec. 22 Hegseth Memo.").

Accordingly, "before the President can federalize the Guard under § 12406(3), he likely must have statutory or constitutional authority to execute the laws with the regular military and must be 'unable' with those forces to perform that function." *Id*. And at this stage, the Supreme Court concluded, "the [federal] Government has failed to identify a source of authority that would allow the military to execute the laws in Illinois." *Id*.

Following the Supreme Court's ruling, on December 31, 2025, the President posted the following conditional retreat on Truth Social:

> We are removing the National Guard from Chicago, Los Angeles, and Portland, despite the fact that CRIME has been greatly reduced by having these great Patriots in those cities, and ONLY by that fact. Portland, Los Angeles, and Chicago were GONE if it weren't for the Federal Government stepping in. We will come back, perhaps in a much different and stronger form, when crime begins to soar again - Only a question of time! It is hard to believe that these Democrat Mayors and Governors, all of whom are greatly incompetent, would want us to leave, especially considering the great progress that has been made??? President DJT[3]

By January 21, 2026, the U.S. Northern Command reported that "[a]ll Title 10 troops in Portland, Los Angeles, and Chicago have completed demobilizing activities."[4]

Defendants moved to dismiss this case as moot on February 6, 2026, citing the announced demobilization of the previously federalized National Guard troops in Illinois. ECF 129, 130. Defendants cite no written order—and Plaintiffs are aware of none—from Secretary Hegseth rescinding the October 2025 orders initiating these mobilizations in the first instance. Nor have Defendants cited any document rescinding the two Presidential memoranda—dated June 7, 2025 and October 4, 2025—documenting the President's invocation of 10 U.S.C. § 12406. ECF 13-10 at 37-40 (Gaber Decl. Ex. 9-A); ECF 62-1 at 16-17 (Nordhaus Decl. Ex. C).

---

[3] ECF 130 at 3 (quoting @realDonaldTrump, Truth Social (Dec. 31, 2025, 3:55 p.m.), also cited at Exhibit 2 hereto (Tresnowski Decl.) at ¶ 7–9 and hereafter referred to as "Dec. 31 Truth Social Post."
[4] USNORTHCOM, Federal Protection Mission, cited at Exhibit 2 (Tresnowski Decl.) ¶¶ 3–5.

5

Nonetheless, Defendants argue that because of the Supreme Court's ruling, "there is no reasonable expectation that Defendants will again federalize or deploy National Guard troops under the challenged orders." ECF 130 at 1. Defendants continue to defend the validity of the challenged orders, however. At the February 19, 2026 status conference, Defendants informed the Court they would still oppose summary judgment on Plaintiffs' § 12406 *ultra vires* claim (Count I) regarding the challenged orders. ECF 133, 2/19/26 Tr. at 06:02-07:09. They apparently took the Supreme Court's silence on "the rebellion rationale"—a rationale Defendants had argued to the Supreme Court, to no avail—as license to keep insisting the orders are lawful. *Id*.

## LEGAL STANDARD

Defendants seek dismissal under Rule 12(b)(1), claiming mootness has left this Court without subject matter jurisdiction. Defendants' motion rests on facts external to the complaint—the January 2026 demobilization of National Guard troops—so it is a "factual challenge" to the Court's jurisdiction, rather than a "facial challenge." *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). As such, the Court may "look beyond the jurisdictional allegations of a complaint and view evidence to determine whether subject matter jurisdiction exists in fact." *Ciarpaglini v. Norwood*, 817 F.3d 541, 543 (7th Cir. 2016).

A defendant must meet a "demanding standard" to prove a case is moot. *Word Seed Church v. Vill. of Hazel Crest*, 111 F.4th 814, 820 (7th Cir. 2024). A case only becomes moot when it is "impossible for a court to grant any effectual relief whatever" to the plaintiffs, *id.*, and plaintiffs have "no remaining stake" in the case. *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994). When defendants claim their own voluntary cessation of challenged conduct moots the case, they bear the "formidable burden" of persuading the court such conduct will not "start up again." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). "Courts

6

are understandably skeptical when a defendant seeks dismissal of an injunctive claim as moot on the ground that it has changed its practice while reserving the right to go back to its old ways after the lawsuit is dismissed." *Ciarpaglini*, 817 F.3d at 544. Dismissal is only appropriate where it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *W. Virginia v. EPA*, 597 U.S. 697, 720 (2022).

## ARGUMENT

Defendants do not meet the demanding standard for a mootness dismissal. Instead of renouncing the non-consensual deployment of federal troops in Illinois, the President promises to "come back" as soon as crime trends up again. Defendants' attempts to mitigate the damage from the President's pronouncement only yield more contradictions.

Defendants say the Supreme Court's ruling "materially altered Defendants' understanding" of § 12406 so much that a "future federalization . . . could not proceed on the same facts as presented in this case." ECF 130 at 12–13. And yet, Defendants point to the Supreme Court's silence on their audacious "rebellion" argument as grounds to argue the existing federalization orders are lawful. Defendants cite courts' willingness to credit government officials' "acts of self-correction," but simultaneously refuse to admit their conduct requires correction. ECF 130 at 10. Even now, Defendants could rescind their orders and offer declarations to this Court renouncing their threats to "come back" uninvited. Because they haven't and won't, the case continues.

**I. Invalidating and enjoining Defendants' unrescinded orders would provide Plaintiffs with ongoing protection against unlawful troop deployments.**

Defendants claim the recent demobilization of National Guard troops in Illinois has given Plaintiffs "all the relief [they] might have won" from this Court. ECF 130 at 6 (quoting *FBI v. Fikre*, 601 U.S. 234, 241 (2024)). That is wrong in at least two respects. First, Plaintiffs seek invalidation and vacatur of the federalization and deployment orders that started this case—they

7

have not been rescinded and were in fact extended as recently as December 22, 2025. *See* Compl., Prayer for Relief ¶¶ A-B (declaratory relief), D (vacatur); Ex. 1-A, Dec. 22 Hegseth Memo. Second, this Court's TRO is what halted Defendants' unlawful deployment in the first instance, but the TRO is not a permanent injunction and would expire upon dismissal. ECF 96, 98. To prevent another such deployment—based on the same or "similar" unlawful orders—Plaintiffs seek a permanent injunction against the unlawful federalization and deployment of the National Guard in Illinois. Compl., Prayer for Relief ¶¶ B-C (seeking permanent injunctive relief).

Plaintiffs seek to invalidate, vacate, and enjoin the orders precipitating the unlawful troop deployments at issue, not to resolve a "hypothetical question," but because the orders' continued existence is an imminent threat to Plaintiffs' sovereignty. ECF 130 at 6 (quoting *Fikre*, 601 U.S. at 241). *See, e.g.*, *ACLU v. Alvarez*, 679 F.3d 583, 593 (7th Cir. 2012) (injunctive claim against statute could proceed based on "credible threat of prosecution" where prosecutor had "not foresworn the possibility" of enforcing challenged statute against plaintiffs). As recently as December 22, 2025—the day before the Supreme Court ruled—Defendants were claiming that "ongoing domestic unrest" justified extending the federalization of Illinois's National Guard troops. Ex. 1-A, Dec. 22 Hegseth Memo. Defendants point to their subsequent demobilization activities in January 2026, but they identify no memoranda from the President or Secretary Hegseth rescinding their prior memoranda initiating the mobilization. Even without federalized troops present in Illinois, the existence of the challenged orders is not harmless. Defendants use prior orders to justify new ones.

The contested orders in this case prove the point. The President's October 4, 2025 memorandum invoking § 12406 to federalize the Illinois National Guard referenced his June 7, 2025 memorandum regarding protests in California, asserting that events in Illinois were "not occurring in isolation" and were "similar to other ongoing efforts in multiple States and cities

8

around the country to disrupt the faithful enforcement of federal law." ECF 62-1 at 16-17 (Nordhaus Decl. Ex. C). Secretary Hegseth's contemporaneous undated order dispatching the Texas National Guard to Illinois likewise cited the President's June 7, 2025 memorandum. ECF 13-4. And until their mootness motion, Defendants argued that events across the nation, spanning months, can justify invocation of § 12406 in a particular city. *See Oregon v. Trump*, 802 F. Supp. 3d 1277, 1291-1292 (D. Or. 2025) ("*Oregon I*") (summarizing and rejecting Defendants' reliance on "violence elsewhere in the country" across several months to justify troop deployments in Portland); *Oregon v. Trump*, --- F. Supp. 3d ----, 2025 WL 3126773, at *36 (D. Or. Nov. 7, 2025) ("*Oregon II*") (same). Neither Plaintiffs nor this Court must accept Defendants' self-serving claim that "the 2025 events" can be relegated to history. ECF 130 at 14. The 2025 orders haven't been.

Even if the orders had been rescinded, the fact that Defendants have demobilized and removed troops from Illinois is not equivalent to injunctive relief. A claim for injunctive relief against a previously imposed executive action is not moot when the executive has reserved authority to reinstitute the challenged action. *See Elim*, 962 F.3d at 344 (rejecting mootness in challenge to expired executive order because the Governor "reserve[d] the option" to reinstate the challenged terms); *Cassell v. Snyders*, 990 F.3d 539, 546 (7th Cir. 2021) (same). That is the exact posture of this case. Absent an injunction, Defendants can "resume the challenged conduct as soon as" this case is dismissed. *Elim*, 962 F.3d at 345. Because this Court can provide meaningful declaratory and injunctive relief to Plaintiffs, this case is not moot.[5]

---

[5] Defendants say there is "no question" Plaintiffs would lack standing if they "were to bring their case now" with no federalized troops present in Illinois, because a future deployment is "conjectural" or "hypothetical." ECF 130 at 6. Unlike *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-06 (1983), which Defendants cite, Defendants here have stated their intent to continue targeting Plaintiffs. Those threats— especially combined with Defendants' demonstrated willingness to deploy troops in Illinois—would provide Plaintiffs ample standing to seek injunctive relief at this point. *See ACLU*, 679 F.3d at 593 (plaintiffs had standing against prosecutor who had "not foresworn the possibility" of enforcing challenged statute against them).

### II. The voluntary cessation exception to mootness applies.

Even if the recent troop withdrawal left Plaintiffs without the need for any further relief (it doesn't), this case presents a textbook example of the voluntary cessation exception to mootness. Defendants can obtain dismissal only if it is "absolutely clear" their challenged conduct "could not reasonably be expected to recur." *W. Virginia v. EPA*, 597 U.S. 697, 720 (2022). The President's promise to "come back" is irreconcilable with this standard. Defendants' motion should fail.

#### A. It is not absolutely clear that unlawful troop deployments are over for good when the President already has promised to "come back."

Defendants cannot avoid application of the "voluntary cessation" exception to mootness in this case based on the President's statements and Defendants' continued insistence that the challenged orders are lawful.

Even as the President announced the demobilization of National Guard troops in Illinois, he simultaneously promised to "come back." Specifically, on December 31, 2025, President Trump posted on social media that "we are removing the National Guard from Chicago, Los Angeles, and Portland," only to add: "We will come back, perhaps in a much different and stronger form, when crime begins to soar again—Only a question of time!"[6]

This pronouncement was not a one-off. Days later, at a January 4, 2026 press conference, the President again promised to come back to address crime in Chicago, explaining:

> We brought down crime by 25%. [Governor Pritzker] didn't do anything. He's not doing anything. But they want us to leave. He had a day where they had 17 murders not too long ago . . . 17 murders and 77 people shot. But 17 died. And then he talks about, 'Oh, we can handle it.' He can't handle it. But we pull back, and we'll go in at the appropriate time.[7]

Later, on January 20, 2026, the President elaborated on the benefits he sees from military force in

---

[6] Exhibit 2, ¶ 7–9 (Dec. 31 Truth Social Post).
[7] *Id.*, ¶ 11.

10

American cities, explaining:

> To me, a town looks better when you have military people. These are big, strong guys, and bad guys look at them and they say 'we're not going to mess around.' * * * We brought Chicago down 25%, even though we just had a minimal crew there.[8]

Clearly, the President still intends to use the military unlawfully, to "engage in crime-fighting and other activities falling within the ambit of Illinois's sovereign police powers." ECF 70 at 25.

Defendants claim the President's statements "merely confirm[] the possibility of a '*different*' form of deployment in the future based on future events." ECF 130 at 13 (quoting Dec. 31 Truth Social Post). A single word from the President's post—"different"—does not erase his many other words, including in the same post, proclaiming his ongoing desire to send troops into Illinois. Besides, the President said "*perhaps*" the next time would be "different"—leaving open the possibility of a future troop deployment based on the same legal authority.

Defendants downplay that possibility by affirming the controlling effect of the Supreme Court's ruling. But the President has promised a return to Chicago "when crime begins to soar," notwithstanding the Court's conclusion that the circumstances in which the military can "legally execute the laws" in American communities are "exceptional." *Illinois*, 146 S. Ct. at 434. The President's disregard for Illinois's sovereignty and retained police power caused this case in the first place. *See* ECF 70 at 13–14, 25, 44–48. Despite repeated losses, the President is "absolutely clear" on only one thing: he intends to pursue future unlawful National Guard federalization and troop deployments in Illinois.

### B. Defendants' attempts to avoid the voluntary cessation exception fail.

Defendants attempt to avoid the voluntary cessation exception in two principal ways, both of which fail. First, Defendants portray their race to the Supreme Court and subsequent defeat

---

[8] *Id.*, ¶ 12.

11

there as a point in their favor for mootness purposes. ECF 130 at 11. Nothing in mootness jurisprudence rewards Defendants for sticking with their unlawful conduct until every tier of the federal judiciary rebukes them. In any event, Defendants seek to justify that conduct even now by sticking with their outlandish "rebellion rationale" in this Court. Second, Defendants claim entitlement to "greater stock in their acts of self-correction" because they are public officials. ECF 130 at 10. But that benefit flows only to public officials who have definitively and genuinely renounced their prior course of conduct. That hasn't happened here. The voluntary cessation exception to mootness applies.

### 1. Defendants' failed pursuit of a Supreme Court stay does not support dismissal on mootness grounds.

Defendants argue that the voluntary cessation exception is inapplicable because they have not sought to "manipulate the court's jurisdiction" and "strategically avoid judicial review" of their "challenged activity." ECF 130 at 11 (quoting *Samma v. Dep't of Defense*, 136 F.4th 1108, 1114 (D.C. Cir. 2025)). They point to their vigorous pursuit of appellate review of this Court's TRO as evidence that they are not attempting to avoid judicial scrutiny. Defendants are inventing an exception to the voluntary cessation exception that has no basis in law.

Defendants point to no case holding that unsuccessful pursuit of an interlocutory appeal lessens their burden on mootness. At most, Defendants have shown that they are not prepared (at this point) to defy the Supreme Court. But compliance with a court order does not render a case moot. *See, e.g.*, *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992). Defendants identify no reasons "unrelated to the litigation" that would avoid application of the voluntary cessation exception. *Cf. Citizens for Resp. & Ethics in Washington v. Wheeler*, 352 F. Supp. 3d 1, 13 (D.D.C. 2019). Instead, they expressly concede that their failed interlocutory appeal, not self-correction, prompted their change in course: "It was only upon the Supreme

12

Court's decision that 'regular forces' likely means 'regular military'—a finding with which Defendants disagreed—that Defendants demobilized the National Guard and ended the deployment for the Federal Protection Mission in not only Illinois but also California and Oregon." ECF 130 at 11. To be sure, Defendants' interlocutory appeal led to binding precedent from the Supreme Court regarding the meaning of § 12406(3), and that precedent makes it virtually certain Defendants will lose this case. But the fact that Defendants are likely to lose does not deprive Plaintiffs of the ability to pursue their claims.

The fact that Defendants aggressively contested this Court's TRO all the way to the Supreme Court is not a reason to relax the "skeptical" approach applied in voluntary cessation cases. *Ciarpaglini*, 817 F.3d at 544. Far from it: Defendants' mootness motion is a transparent attempt to avoid judicial scrutiny in the form of a final judgment and permanent injunction. They acknowledge the Supreme Court's decision "concerns only interim relief and is not necessarily conclusive as to the merits," but elsewhere profess it has "materially altered Defendants' understanding of Section 12406(3)." ECF 130 at 12–13. A "future federalization" would "require a different statutory analysis under the Supreme Court's interpretation of § 12406(3) and could not proceed on the same facts as presented in this case." ECF 130 at 13.

Promising a citation change in a "future federalization" order comes as cold comfort to Plaintiffs—especially when Defendants haven't even given up their defense of their existing federalization orders. Days after offering the aforementioned assurances in their mootness motion, Defendants sought to downplay the effect of the Supreme Court's ruling, noting in open court that "[t]here's nothing in there related to the rebellion rationale, and we think that we would have to have a full record before the Court can make findings as to that." ECF 133, 2/19/26 Tr. at 06:06-13. But the absence of Supreme Court commentary on the "rebellion rationale" isn't for lack of

13

trying by Defendants. *See* Application, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 17, 2025), at 31-34. If the argument had a scintilla of merit, the Court would have at least addressed it. Instead, it brushed aside that chaff to get to the Section 12406(3) issues. But Defendants' insistence on continuing to press the "rebellion rationale" is a strike against their mootness motion.

Simply put, Defendants cannot have it both ways. They cannot cite their failed interlocutory appeal as an assurance against renewed implementation of the challenged orders, while still asserting the validity of those orders. The standard requires an "absolutely clear" showing from Defendants that their challenged conduct will not recur. *W. Virginia*, 597 U.S. at 720. Defendants' self-contradiction provides no such clarity.

### 2. Defendants receive no special solicitude as government officials.

Defendants claim their status as government officials lessens their burden under the voluntary cessation exception. ECF 130 at 10. But the precedent they cite requires "acts of self-correction" by public officials to be "genuine." *Id.* (quoting *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003)). More recent Seventh Circuit precedent also rejected mootness arguments from executive officials citing mid-litigation policy changes. *See Elim*, 962 F.3d at 344 (rejecting mootness in challenge to expired executive order). Neither the facts nor the law lessen Defendants' burden in this case.

On the law, Defendants cite a Seventh Circuit case affirming a mootness dismissal in a First Amendment challenge to a city ordinance that had been repealed during the litigation. *Fed'n of Advert. Indus. Representatives*, 326 F.3d at 929. But Defendants' actions fall far short of "the complete repeal of a challenged law" through legislative action. *Id.* The challenged orders have not been rescinded, even though, unlike a legislative repeal, they could be with the stroke of a pen.

Defendants' insistence on the possibility of future troop deployments is more like the status of the executive action at issue in *Elim*, 962 F.3d 341. There, the Seventh Circuit applied the

14

voluntary cessation exception to continue exercising jurisdiction over a First Amendment challenge to a pandemic-related executive order by Governor Pritzker. Although the original executive order had been replaced with a more permissive order, the Governor expressly "reserve[d] the option" to "restore the approach" of the original executive order if circumstances changed. *Id*. at 344. Because it was not "absolutely clear" the terms of the original executive order would "never be restored," the case proceeded. *Id.* at 345. When confronted with a similar challenge to the same superseded executive order nine months later, the Seventh Circuit again refused to dismiss on mootness. *Cassell*, 990 F.3d at 546. *Elim* and *Cassell* provide more relevant guideposts for this case challenging executive actions taken amid evolving circumstances.

As with the law, the facts also cut against Defendants. Courts place "greater stock" only in "*genuine*" acts of "self-correction" by public officials. *Fed'n of Advert. Indus. Representatives*, 326 F.3d at 929 (emphasis added). Here, no evidence reflects any genuine change of heart by President Trump or Secretary Hegseth regarding the use of the military in Chicago. On the contrary, the President promises to "come back." *Cf. Elim*, 962 F.3d at 345 (executive's reservation of authority to reinstate similar orders precluded mootness). Given that, this Court should not hesitate to join the host of other federal courts applying the voluntary cessation exception to mootness in cases challenging this administration's unlawful actions. *See, e.g., Vasquez Perdomo v. Noem,* No. 2:25cv-5605, 2026 WL 475985, at *15 (C.D. Cal. Feb. 19, 2026); *Chatwani v. Noem*, No. 25-cv-4024, 2026 WL 458418, at *4 (N.D. Ill. Feb. 18, 2026); *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, No. 25-cv-1237, 2025 WL 3687548, at *10 (S.D.N.Y. Dec. 19, 2025); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 88 (D.R.I. 2025).

## CONCLUSION

The Court should deny Defendants' motion to dismiss this case as moot.

15

Date: March 10, 2026 | Respectfully submitted,

**MARY B RICHARDSON-LOWRY** | **KWAME RAOUL**
*Corporation Counsel of the City of Chicago* | *Attorney General of Illinois*

By: /s/ Stephen J. Kane | By: /s/ Michael M. Tresnowski

STEPHEN J. KANE
JOHN HENDRICKS
CHELSEY B. METCALF
LAURA GEARY
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
Stephen.Kane@cityofchicago.org
John.Hendricks@cityofchicago.org
Chelsey.Metcalf@cityofchicago.org
Laura.Geary@cityofchicago.org

*Counsel for the City of Chicago*

CARA HENDRICKSON
Executive Deputy Attorney General
CHRISTOPHER G. WELLS
Division Chief, Public Interest Division
SARAH J. NORTH
Deputy Division Chief, Public Interest Division
GRETCHEN HELFRICH
Deputy Bureau Chief, Special Litigation Bureau
KATHARINE ROLLER
Complex Litigation Counsel
KATHERINE PANNELLA
Senior Assistant Attorney General
SHERIEF GABER
MICHAEL TRESNOWSKI
Assistant Attorneys General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov
Christopher.Wells@ilag.gov
Sarah.North@ilag.gov
Gretchen.Helfrich@ilag.gov
Katharine.Roller@ilag.gov
Katherine.Pannella@ilag.gov
Sherief.Gaber@ilag.gov
Michael.Tresnowski@ilag.gov

*Counsel for the State of Illinois*